UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA            CASE NUMBER: 00-6309-CR-Seitz

      Plaintiff,

vs.

JOHN MAMONE

      Defendant.

_____/

NIGHT BOX
FILED

MAR 0 1 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## DEFENDANT JOHN MAMONE'S MOTION FOR ORDER ELIMINATING HOUSE ARREST COMPONENT OF BOND

THE DEFENDANT, JOHN MAMONE, through counsel, moves this Court to enter an Order

Altering Bond, by deleting the house arrest component. In support of this request, it is respectfully

alleged as follows:

1.      On October 31, 2000, Magistrate Judge Stephen T. Brown set bond for John Mamone

in the amount of $1,000,000.00, with numerous special conditions, including twenty-four (24) hour

house arrest. In rendering his order after a pretrial detention hearing, the judge said house arrest was

necessary for the protection of the community. No appeal was taken by either party and Mr.

Mamone was released.[1] (In order to assist the Court and the parties, a copy of the transcript of the

hearing is attached hereto as **Exhibit A**.) Attached hereto as **Exhibit B** is an "Errata Sheet" that

---

[1]At the time of the Detention hearing, John Mamone had been held since his arrest under subhuman conditions at FDC. He had extremely limited contact with the outside world. Even when he was taken from his cell to meet with his attorney, separated by a glass partition, his handcuffs were not removed until he was securely locked in 3' by 4' room and then, only by John Mamone putting his hands, handcuffed behind him, through a hole in the door for the guard to unlock and remove the cuffs. Total desperation understates his emotional condition. With that backdrop, the defense at the time of the Detention hearing offered 24 hour house arrest. Now, however, we are in a substantially better position to defend and even attack the Government's proffer and argument.

delineates, by page and line from that transcript, aspects of the Government's proffer that the defense now can prove are incorrect, inaccurate, misleading or incredible.

2.    Since his release, John Mamone has been under the strict supervision of Pretrial Services. The only change in the bond occurred when the Court ratified the agreement between the Government and the defense to amend house arrest so that Mr. Mamone could meet with his attorney at his attorney's office. Since then, Mr. Mamone has worked regularly at the offices of Thornton & Rothman, P.A. helping to prepare this large and complex case. In all regards, he has complied with the conditions of his release and the orders of his Pretrial Officer, David Nuby, Jr.

3.    This request to delete the condition of house arrest is being made for four (4) reasons:

A.    John Mamone has fully complied with all conditions of release for almost four (4) months and has demonstrated that even if house arrest were initially appropriate, which the defense in no way concedes, he no longer warrants such a restrictive condition of release,

B.    The Government's discovery response to date has demonstrated that the allegations made by the Government at the detention hearing, in terms of the danger prong of the pretrial detention test, are unsupported by any evidence other than mere allegations by informants.

### *1. Government's Proffer as to alleged Al Polito Incident (Transcript, P. 15-17)*

In particular, by far the most damning allegation by the Government was about a confidential informant who, the Government proffered, was beaten by John Mamone when the informant, John Mamone and others went for a ride in a car. The Government claimed at the time of the detention hearing that Mr. Mamone threatened the informant, hit him at least two times and tried to "bite his ear off." At the time of the hearing, the defense argued that there was no proof of the allegation. Now that a full review of pertinent conversations (Government's term) relating to this informant has

Thornton *&* Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

been conducted by the defense, it is known that the reason no such evidence was produced at the hearing was that no such evidence exists. Why is the lack of evidence critical? Because the alleged incident occurred during the time the informant/alleged victim was recording conversations of John Mamone and others on a body bug he wore.[2] Mr. Polito recorded at least thirty (30) meetings he had with John Mamone, according to the transcripts and cassette recordings provided to the defense. Why was this supposed meeting not recorded?

And, if the meeting were not recorded, why was it not surveilled? The Government's assertion from the detention hearing, at page 16, line 5, that Al Polito (in the transcript the name is mis-spelled "Bellitto") "did not have the opportunity to call his FBI control agent" is not only without any proof, it is ludicrous. In its proffer, the Government claimed, at page 15 and 16, that Mr. Polito received a call from Mr. Buccinna (a co-defendant in this case) arranging the meeting with John Mamone that supposedly resulted in the physical assault by Mr. Mamone upon Mr. Polito and that Mr. Polito then drove to the meeting. By the time of this purported meeting, in March of 2000, the Government was nearing the conclusion of this investigation that began years before and the agents and prosecutors were well-aware of nearly all of the information that was included in the indictment as well as the proffer for the detention hearing.

If Mr. Mamone was dangerous in court in November of 2000, he was surely dangerous from March of 1999 until March of 2000, the bookend dates of the initiation of the "Polito" tapes until this critical alleged meeting. The Government's excuse that Al Polito did not have the opportunity to call his FBI control agent just cannot withstand the simple scrutiny of common sense. The Court

---

[2]The tapes and transcripts from the Al Polito consensual recordings that were provided by the Government to the defense show that the informant wore a body bug from at least March 25, 1999, until at least April 6, 2000.

Page -3-

cannot and must not put any credence in this significant part of the Government's proffer.

### 2. Government's Proffer as to alleged Huey Steinhart Incident

Another important fact gleaned from the thousands of pages of transcripts and other papers obtained in discovery is the admission by the Government that Huey Steinhart, one of the supposed victims of Mr. Mamone's violence, the person the Government claims in its proffer, at page 17-18, was "roughed up" by Mr. Mamone, Mr. Buccinna (a co-defendant) and a Joe Russo (not a defendant), is no longer a "cooperating witness." (See affidavit in support of Title III application, attached hereto, with relevant portion highlighted, as **Exhibit C**.) It seems at least unfair that the Government would seek pretrial detention and get 24 hour house arrest for John Mamone based, in part, on hearsay from an admitted criminal[3] who apparently claimed he was a victim and then, even before John Mamone is charged and arrested, refuses to testify. It is particularly unfair when the "victim" faces no consequences for either his admitted criminal activity or any potentially false accusation. Not incidentally, whatever happened to the Government's power to compel testimony?

### 3. Government's Proffer as to alleged Jeffrey Braverman Incident

A third alleged act of violence on John Mamone's part supposedly had him hitting a Mr. Braverman on the arm with a baseball bat. (Proffer, at page 18) According to information uncovered by the defense, this is the same Mr. Braverman who was the subject of a television story on infamous "con men" and who has been the focus of criminal fraud investigations. Consequently, this part of the proffer boils down to an uncorroborated allegation, from an unreliable source, who, according to the proffer, had a strong bias against John Mamone based on a financial debt.

---

[3]Attached hereto as **Exhibit D** is a copy of a transcript of a conversation, from the "Polito" tapes, between Mr. Polito and Huey Steinhardt in which Mr. Steinhardt admits prior criminal conduct.

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

**4. *Government's Proffer as to alleged "Veiled Threats on Telephones to the Bookies"***

At page 19 of the detention hearing transcript, the Government makes reference to John Mamone and "veiled threats." Now that the defense has reviewed thousands of pages of transcripts containing hundreds of conversations involving John Mamone, it can safely be said that Mr. Mamone has, to say the least, a colorful vocabulary and unusual manner of expressing himself. Without boring the Court with the litany of sentences, phrases and words used by Mr. Mamone that may seem, if taken out of context, to contain "veiled threats," suffice it to say that the discovery from the Government shows that on hundreds of occasions, John Mamone was loud, vulgar and aggressive. Right or wrong, that is his way. With his friends, with his employees and with his customers, John Mamone expresses, and expressed, himself in a way that may seem to have been rude, even outrageous on more that one occasion, but it was not a "threat" and should not be exaggerated to the extent of supporting the Government's detention request.

C.     Since his release, John Mamone has attempted to earn a living to help support his family, including his wife, four children at home and two older children from John's first wife. As is documented in pleadings filed with the Court, the business from which both John and his wife, Grace, earned a living (Gateway Transportation) was dissolved on December 1, 2000, after it became impossible to overcome the business difficulties partially caused by the bad press of the arrests in this case as well as the attempt by the Government to initiate forfeiture proceedings on the business, including the freezing of bank accounts.

Although Grace is now working, her income is insufficient to pay the essential bills of the family. Unless John Mamone can work, the family cannot financially survive. John Mamone, who will turn 50 this year, has been in the trucking business for all of his adult life. There is no doubt

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

that if he can work, John can earn sufficient funds to cover the remainder of the family's bills. In order to work, John needs to be released from house arrest so that he can solicit business from customers who need transportation and, then, place the business with the trucking company or broker that will pay the highest commission. All of this sales work must be accomplished through personal contact with both ends of the transaction. It cannot be done over the telephone.

      D.     Because of the voluminous discovery in this case, including over 3,000 taped conversations arising out of several Title III wiretaps as well as consensual monitorings, the Trial Court, at the request of the defense, set this case for trial in February of 2002.[4] By the time this case goes to trial, John Mamone would have been under house arrest for over fifteen (15) months. Given the facts presented herein, it is not fair, nor is it necessary that John Mamone be kept from earning a living and participating in the lives of his family members for that length of time.

      Until the day of his arrest, John Mamone was actively involved in the care of his children. He has been especially involved in the coaching of his sons in baseball, basketball and football.[5] At the time of his arrest, John was a coach of a youth league football team that had a successful season

---

[4]We pray the Court does not see the defense request as similar to that of the child who, convicted of murdering his parents, seeks mercy by arguing he is an orphan. The defense asked for February of 2002 as the trial date not to improve Mr. Mamone's position as to this motion, but for the reasons presented to the Court, that is, to permit sufficient time to prepare for trial.

[5]Significantly, John has also been involved in the leadership of the basketball and football leagues, rising to the level of Vice President of the Coral Springs Flag Football league. In his various capacities with the leagues, he has been responsible for the daily operation of dozens of teams, scheduling, oversight of coaches, referees and cheerleaders. His leadership continues to be sought out by the leagues and even now he is helping, albeit in a much more limited fashion necessitated by the house arrest condition.

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 · Telephone (305) 358-9000 · Telefax (305) 374-5747

until his arrest and, then, lost most of its remaining games.[6] John was asked to, and tried to, help coach the team in the playoffs by telephone from his home. Attached hereto as **Exhibit E** is a collection of letters from parents of players who John coached attesting to the significant role he played in the lives of their children.

4.      John Mamone is the only person charged in this case who is under house arrest.[7] Although the superceding indictment lists John as the lead defendant, perhaps the Court recalls that in the original indictment, John was # 2. Without any effort on his part, he became # 1 when Steven Raffa, the person who was alleged to be the head of the organized crime family and supposedly John Mamone's boss, committed suicide. At the time of his death, Mr. Raffa was under house arrest, however, unlike John Mamone, Mr. Raffa was permitted to work out of the house four (4) hours per day. In Mr. Raffa's case, the Government withdrew their request for pretrial detention and agreed to the provision permitting Mr. Raffa to work, as well as a bond one-quarter the amount of Mr. Mamone's. Simply stated, the disparity in treatment was and is unfair.[8]

_____

[6]In fact, until the day before his arrest, which the defense well-knew was in the works, John Mamone continued to request that his arrest be delayed until after the youth football season concluded by Thanksgiving.

[7]Some of the defendants in this case had other cases pending at the time of their arrest in this case. Several defendants have prior records. Others have less than significant ties to the community. According to the government, and based on a review of the evidence provided in discovery, a few defendants have allegedly been involved in crimes of violence.

[8]In its proffer, at page 19 of the transcript, the Government argued that because Mr. Mamone, unlike his alleged boss, Steven Raffa, was involved in "direct and indirect acts of violence," the Court should detain the subordinate and release the boss. This argument proved to be less than consistent in light of its proffer, at page 14, lines 6-13, and page 18, lines 5-8, wherein the Government alleged that co-defendants of Mr. Mamone were likewise involved in acts of actual violence, but, ultimately, the Government agreed not to seek, or to withdraw their demand for, detention for these individuals.

Page -7-

5.     John Mamone's Pretrial Release supervisor, David Nuby, Jr., has been contacted regarding his position on this motion. Mr. Nuby said John Mamone has complied with all of the bond conditions, the conditions of house arrest and his (Mr. Nuby's) orders. He has no objection to the entry of an Order that removes the house arrest condition of the bond. This Court is strongly encouraged to rely upon the experience and expertise of Mr. Nuby.

6.     There was an overwhelming outpouring of family, friends and community who literally and figuratively stood up for John Mamone. That support remains steadfast, in spite of the serious charges, the threat of decades of prison in the event of a conviction and significant press coverage of this case. The people who have come forward are pillars of the community and loved ones. They know and understand what is on the line. For that reason, many put their financial lives on the line for John Mamone. Even more offered to serve as sureties, if needed.

The size and type of bond posted in this case is not only direct evidence of support for John Mamone, but represents a huge incentive for John Mamone to comply with each and every condition of the bond. One of those conditions is to obey the law. John Mamone will comply with the conditions of his bond.

7.     The government has been provided a copy of this motion. Assistant United States Attorney Brian McCormick objects to the Court granting the relief requested in this motion.

WHEREFORE, the Defendant, John Mamone, respectfully requests that this Court enter an Order deleting the requirement of house arrest.

Respectfully Submitted,

DAVID ROTHMAN
Florida Bar #240273

Page -8-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendant John

Mamone's Motion For Order Eliminating House Arrest Component of Bond was forwarded via

facsimile to Assistant U.S. Attorney Brian McCormick, 299 East Broward Blvd., Ft. Lauderdale, Fl

33301 on this the _____ day of March, 2001.

DAVID ROTHMAN

Thornton & Rothman, P.A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 · Telephone (305) 358-9000 · Telefax (305) 374-5747

# EXHIBIT A

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION


**UNITED STATES OF AMERICA,**

Case No. 00-6309-Cr-SEITZ

Plaintiff,

vs.                                    **MIAMI, *FLORIDA***
                                       OCTOBER 31, 2000

**JOHN MAMONE, et al.,**

Defendants.

---

### TRANSCRIPT OF PRETRIAL DETENTION HEARING
### BEFORE THE HONORABLE STEPHEN T. BROWN,
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

**BRIAN McCORMICK, A.U.S.A.**
500 East Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33301 954/356-7392


FOR THE DEFENDANT:


**THORNTON & ROTHMAN**
200 South Biscayne Blvd.
Miami, Florida
**BY: DAVID B. ROTHMAN, ESQ.**


REPORTED BY:            **JERALD M. MEYERS, RPR-CM**
                        Official Federal Court Reporter
                        301 North Miami Avenue, 9th Floor
                        Miami, FL  33128-7797 - 305/374-8108


**STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION**

2

```
 1   (Call to order of the Court)
 2              THE COURT:  The United States versus John Mamone,
 3   case number 00-6309-Judge Seitz.
 4              THE COURT:  Mr. McCormick, are you ready to
 5   proceed?
 6              MR. McCORMICK:  Yes, Your Honor.
 7              THE COURT:  Go ahead.
 8              MR. McCORMICK:  Your Honor, the basis, as we have
 9   indicated before for the detention of Mr. Mamone, is flight
10   and danger to the community.
11              The government's proffer in this case is going to
12   demonstrate that the crimes charged against Mr. Mamone are
13   crimes of violence under the Bail Reform Act, that meaning
14   extortion, over and above the fact the defendant is charged
15   with the crimes of violence, by the operation of his loan
16   shark business.
17              The government will also show specific acts
18   committed by the defendant to demonstrate the propensity,
19   his propensity to commit crimes of violence in the
20   collection of debts from gamblers and loan sharks.
21              Your Honor, the government's indictment in this
22   case charges a whole plethora of crimes under the RICO
23   Statute, 1962(d), the conspiracy to participate in a
24   racketeering enterprise.
25              The crimes include loan sharking, an illegal
```

1   gambling business, money laundering and running and

2   collecting extortions, extensions of credit.

3           Your Honor, the guidelines in this case are

4   tremendously high.  Computing the money laundering

5   guidelines under the sentencing guidelines, conservatively

6   speaking, it is in the mid to high 30's, and Mr. Mamone,

7   because of things that I am going to bring up in this

8   pretrial detention hearing, is well into the criminal

9   history and in the sentencing guidelines where he will

10  serve from 25 to 30 years in prison if he is convicted, and

11  sentenced according to the government's position in these

12  matters.

13          Mr. Mamone has a criminal record that is very

14  important in this particular case, for beginning in August

15  of 1993, he has arrested for destruction of a vessel and

16  mail fraud.

17          What is important to note on that is Mr. Mamone

18  pled guilty in March of 1995, and he was sentenced to four

19  years probation and restitution of $94,000.00.  That's a

20  federal offense.

21          He was under supervision for part of that in Ft.

22  Lauderdale.  The probation lasted from 1995 until about

23  April of 1997.  Why I am raising that now, Your Honor, is

24  Mr. Mamone is charged in the indictment, the RICO

25  indictment in the substantive counts with committing

1  criminal acts during that very probation, and also during

2  the period that he was under bond.

3         So I cite the Court to Section or Title 18,

4  3142(g)(2)(b) which is a very, very important consideration

5  in terms of what factors the Court looks to in terms of

6  deciding whether detention is appropriate.

7         Again, Your Honor, in 1994, Mr. Mamone was

8  arrested for extortion bribery, I believe in New Jersey.

9  He was placed on bond.  Mr. Mamone, in March of 1994, pled

10 guilty to the bribery charges and was sentenced to four

11 years probation.

12        That probation ran from March of 1995 until about

13 June of 2000.  Once again, Your Honor, the facts of this

14 indictment spans from in or about 1995 until October of

15 2000, but importantly, again, the state probation spans the

16 period of time that he was committing the criminal acts

17 charged in this very indictment.

18        There is virtually no time period under which

19 Mr. Mamone is charged in the indictment that he wasn't

20 under some form of supervision, either bond as a result of

21 his prior criminal activity, or probation or supervised

22 release.  It just didn't occur in this case.

23        Again, Your Honor, that's an extremely important

24 consideration in terms of the Court determining whether

25 detention is the appropriate.

1          Mr. Mamone is charged in 70 counts, and all those

2     70 counts, some of those 70 counts, I should say, cover the

3     entire period.  Other counts cover specific charges.

4          The case against Mr. Mamone consists of evidence

5     gathered from consensual recordings from wire taps covering

6     approximately four months.

7          In determining -- one of the wire taps covered a

8     cellular phone that Mr. Mamone carried, I believe over a 60

9     day period of time.  Also, substantial records were

10    recovered proving up various parts of this RICO enterprise;

11         There were, from search warrants that were

12    executed in South Florida, as well as other states of the

13    union, numerous records were obtained and analyzed during

14    the pendency of this investigation from various financial

15    institutions that I will be summarizing for the Court.

16         There is a multiple of physical surveillance of

17    Mr. Raffa, Mr. Mamone and all the other co-conspirators in

18    this case, and there is, of course, cooperating witness

19    information and confidential source information.

20         In short, Your Honor, what this case is about is,

21    it is about the Trafficante crime family that operated in

22    South Florida at least during the time period set forth in

23    the indictment.

24         The indictment alleges, and we will prove in

25    court or in trial that Steve Raffa is a leader or a faction

1  of that family that operates in South Florida.

2          We will show that Steve Raffa supervised and

3  directed a criminal crew that engaged in these various

4  criminal acts set forth in the indictment, such as money

5  laundering, loan sharking, extortion, bank fraud, mail

6  fraud, wire fraud, gambling and receipt of stolen property,

7  among other crimes set forth.

8          Also, Your Honor, in terms of a summary, we will

9  show that John Mamone was Mr. Raffa's second in command who

10 managed the day-to-day operation of this organization that

11 operated in South Florida.

12         In terms of the gambling side of the case, Your

13 Honor, the proof will show at trial that the structure of

14 the enterprise, in part, relied heavily upon an illegal

15 gambling business and collection of debt from gamblers who

16 incurred losses in that business.

17         The proof will show that Mr. Mamone used, on a

18 frequent basis, used threats of violence in collection, in

19 collecting these particular losses from not only bettors

20 who bet with the illegal gambling business, but from

21 bookies and sub-bookies and agents who worked underneath

22 John Mamone and incurred major losses or major debt to John

23 Mamone who was supervising the entire operation.

24         These particular gambling activities were picked

25 up frequently in the Title III or wiretap interceptions

1    that I've already indicated to the Court.

2           Also, the government will rely and has been

3    relying greatly on a cooperating witness by the name of Al

4    Bellitto who worked with several organized crime groups

5    during the pendency of this investigation and met

6    frequently with John Mamone, and John Mamone engaged him in

7    frequent criminal conduct that will be outlined later in

8    this proffer.

9           The state warrants were also very useful in terms

10   of establishing the individual bookmakers who worked under

11   John Mamone during the time charged in this indictment.

12          Also, we are going to be showing in this proffer

13   the use of the check cashing stores in South Florida as a

14   means or focal point for laundering activities from the

15   organized crime activity which was supervised by John

16   Mamone.

17          In short -- I will get into it in a little

18   later -- the check cashing stores were used to launder

19   debts from bettors and bookies on behalf of John Mamone.

20          The check cashing stores were also used to

21   launder monies that were obtained from victims throughout

22   the United States, as a result of a very successful Ponzi

23   scheme that was perpetrated on investors who were located

24   throughout the United States, through the City of

25   Greenville, South Carolina.

8

```
1              You are going to find, Your Honor, based upon

2   this proffer, that anywhere from 20 to 30 million dollars

3   was laundered through the check cashing stores through the

4   direct knowledge and control of members of this enterprise,

5   and some direct participation by John Mamone who had

6   knowledge and aided and assisted the check cashing stores

7   in going about this type of money laundering activity.

8              Your Honor, I go back now to 1996 where there was

9   a cooperating witness by the name of Louis Maione,

10  M-a-i-o-n-e.  Mr. Maione was a cooperating witness in an

11  investigation involving the Gambino crime family.

12             Mr. Maione was linked very closely to the acting

13  head of that crime family, an individual by the name of

14  Nicholas Carazzo.

15             Mr. Carazzo assumed control of that family as a

16  result of John Gotti being convicted and being sentenced to

17  life, as I am sure the Court is aware.

18             During the pendency of Mr. Maione's cooperation

19  against the members of the Corrazo-Gambino crime family,

20  one of his assignments, while he was working under the

21  auspices of the FBI was to provide housing for Nick Corrazo

22  who came to South Florida to supervise his criminal crew

23  that was working in Deerfield Beach, Florida.

24             One of the places that Mr. Maione obtained for

25  Mr. Corrazo's stay was a hotel by the name of Ocean Manor,
```

1  which is located on A1A in Ft. Lauderdale.

2          Mr. Maione frequented that particular

3  establishment and the bar located in the establishment on

4  numerous occasions when the Gambino crew stayed there

5  visiting from New York.

6          During one of those particular meetings in 1996,

7  Mr. Maione met an individual by the name of Lou Kastanza.

8  Mr. Kastanza informed Mr. Maione that he had a gambling

9  debt that he had incurred with an individual bookie, and

10 the bookie had beaten him up, and he was in fear, and he

11 asked if Mr. Maione could possibly intercede on behalf of

12 Mr. Kastanza with the bookie and the organized crime group

13 that the bookie was involved in because Mr. Kastanza knew

14 that Mr. Maione had contacts with the Gambino crime family.

15         Well, Mr. Maione agreed to do that, and

16 Mr. Maione met an individual by the name of Joe Bellitto

17 who was the head of that particular bookmaking operation,

18 at least insofar as he knew at that time.

19         Mr. Maione, on behalf of the Gambino crime

20 family, told Mr. Bellitto that Mr. Kastanza was under the

21 protection of the Gambino crime family.  Therefore, he

22 should reduce the payments that Mr. Kastanza had to make,

23 and it would be done in that manner.

24         Well, Mr. Kastanza made some payments through

25 Mr. Maione to Mr. Bellitto, but the payments stopped.  At

```
 1    that time, Mr. Maione and Mr. Raffa called for a meeting or

 2    what they call, in organized crime parlance, a sit down

 3    that occurred on June 13th of 1996 to discuss the

 4    nonpayment by the bookie who owed the Trafficante gambling

 5    enterprise money at the insistence of the Gambino

 6    enterprise, and this is a traditional meeting that took

 7    place that Mr. Maione attended; Mr. Steve Raffa attended,

 8    Mr. John Mamone attended, and an individual named Augie

 9    Correro attended.  Mr. Correro was a made member of the

10    Gambino crime family.  During that particular meeting,

11    which was recorded --

12            THE COURT:  Just a second.  Hold on for a minute.

13    Something is troubling me.  You started this proffer by

14    telling this Court why Mr. Mamone is the second in command

15    of this organization and Mr. Raffa is the leader.

16            MR. McCORMICK:  Yes, Your Honor.

17            THE COURT:  This is an indicted case, vastly

18    different from a complaint.  I am assuming -- and you

19    correct me if I am wrong now -- that all of the allegations

20    that you have suggested so far, they are applicable to this

21    defendant and are, likewise, applicable to Mr. Raffa; the

22    same Mr. Raffa that you have agreed to a corporate surety

23    bond on.

24            MR. McCORMICK:  And for house arrest.

25            THE COURT:  Yes.  Now, my question is what makes
```

1  this defendant, and I think somewhere along the way you

2  need to focus on why something similar to that should not

3  be applicable to this defendant, and there certainly may be

4  an answer.  I want you to be able to get there.

5          **MR. McCORMICK:**  All right, Your Honor.  Perhaps

6  one of the things I wanted to bring to the Court's

7  attention I already have, and the fact is that Mr. Mamone

8  was under supervision during the entire time that this case

9  was, rather the facts of this case led to the indictment,

10  from 1995 until October of 2000, and I have already

11  outlined to the Court that Mr. Mamone was, indeed, under

12  some form of supervision, sometimes double supervision by

13  probation, and that's a big difference in regard to Mr.

14  Raffa.

15          Another matter which is going to distinguish him

16  from Mr. Raffa are that Mr. Mamone actually participated in

17  acts of violence in furtherance of the RICO enterprise, and

18  I am going to get into that, and this is preliminary to

19  that, and his leadership role is proved up by virtue you of

20  his attending the June 13, 1996 meeting.

21          I just have a couple of excerpts to read as to

22  that, and my intention then was to provide to the Court

23  specific threats made by Mr. Mamone to specific acts of

24  violence made by Mr. Mamone that support our contention

25  that he should be detained.

1            THE COURT:  Okay.  I think you will need to focus

2   on that because the general rule is that when you lay out

3   the background, obviously it might lead this Court to a

4   similar conclusion.  So, as I said, you certainly did cover

5   that, and you need to distinguish this defendant from

6   Mr. Raffa.

7            MR. McCORMICK:  I will do that, Your Honor.  With

8   the Court's indulgence, though, I would just read a couple

9   of excerpts.  I have the transcripts.  I don't know if the

10  Court is interested in the transcripts or not.

11           THE COURT:  For the moment the answer is, no, but

12  go ahead and read them and then I will let you know if I

13  need them.  Go ahead.

14           MR. McCORMICK:  Your Honor, I am referring to the

15  June 13, 1996 transcript of the meeting between John

16  Mamone, Steve Raffa and Augie Correro, as well as the

17  cooperating witness, Mr. Maione.

18           On page 10 I refer, when Mr. Mamone is

19  discussing -- Mr. Mamone does most of the talking during

20  this particular sit down between the two organized crime

21  families.

22           Mr. Mamone is talking about the debt owed by Lou

23  Kastanza.  He says, "9,000, and let's find out where this

24  guy that owes the money.  We will help him F--- collect,

25  like anybody else, but, you know what, you brought the guy

```
 1   in.  You are responsible for the money.  He agreed, and he

 2   agreed to pay 100 a week."

 3           What he is referring to is his insistence upon

 4   Mr. Kastanza making the payment to the bookie working under

 5   him, which is Joe Bellitto.

 6           In another discussion, talking about the physical

 7   violence that was used against Mr. Kastanza, Mr. Mamone

 8   says --

 9           MR. ROTHMAN:  What page is this, Mr. McCormick?

10   I am sorry.

11           MR. McCORMICK:  Page 12.  I am sorry.

12           MR. ROTHMAN:  Thank you.

13           MR. McCORMICK:  "He misses two appointments with

14   Lou.  He don't show up to Joe's office."  Meaning Joe

15   Bellitto.

16           "We cannot find this guy.  So we finally turn the

17   track on different play-out.  We got to play house."

18   That's unintelligible -- "especially out of disrespect.  We

19   talked to Augie," meaning Augie Correro.

20           "He's beat us.  We are trying to help you find

21   the guy for the money.  He don't even have the courtesy to

22   come down here and talk to us.  He is like avoiding us.

23   That's why he got slapped.  Not for the money.  Nothing

24   else.  Just a wake up call."  That's John Mamone.

25           Again, John Mamone states, "Yeah, Joe, why --
```

1    you" -- I am going to page 13, Mr. Rothman.

2              "Yeah, Joe, why?  Why you coming?

3              Oh, it doesn't matter.  He wins.  We're getting

4    something.  You understand, Joe," he says, meaning

5    Bellitto.

6              I "Want the guy to come up with our money.  So

7    the next time the guy came himself.  Well, like he said, it

8    went on for maybe four weeks, but up, before the house,

9    when he finally got through and he got smacked by Joe,

10   listen, he does the smack.  He got plenty of time.  It

11   wasn't a shake up.  It wasn't that we threatened the guy.

12   Listen, when he comes," and he goes on and speaks about

13   that.

14             And then John Mamone on page 18 states, and it is

15   a rather lengthy meeting, but he states to the group, "So

16   we're going to, shaking him down or taking an" --

17   unintelligible -- "from him.  It is our business.  We don't

18   let anyone know we have been to this guy.  What you -- are

19   you going to tell us who to shake down now?  Like, we can't

20   shake down.  Like, somebody -- listen, I don't go into your

21   backyard and tell you what to do.  Why you coming to mine

22   and telling me what to do?  I am collecting from this guy

23   eight weeks.  Whether we are entitled to payments or not, I

24   am collecting right from this guy.  It is my business what

25   I want to do with him."

1          What he is telling the Gambino crime family is it

2    is their territory and he controls who is going to be

3    collected from and who is going to be shaken down.  If he

4    wants to do that, he will do that.

5          Your Honor, in terms of Al Bellitto, Al Bellitto

6    was a cooperating witness with the government, as I stated,

7    that worked for, against other organized crime groups under

8    the auspices of the FBI.

9          Al Bellitto engaged in several, at John Mamone's

10   request, engaged in several criminal acts directly having

11   to do with the illegal gambling business, as well as

12   dealing in counterfeit checks, as well as dealing in checks

13   that were obtained from the South Carolina Ponzi scheme

14   that I alluded to earlier.

15         Mr. Bellitto was also indebted to Mr. Mamone to

16   the extent of $40,000.00 in January of 1999.  That

17   particular debt was incurred as a result of some people who

18   bet through Mr. Bellitto, and that was before Mr. Bellitto

19   was cooperating with the government.

20         Mr. Bellitto was slow in paying the vigorish

21   payments, which is extortion with interest, and he was slow

22   in paying the principal.

23         Mr. Mamone made several telephone calls to him in

24   a threatening manner, that he wanted to collect for those

25   particular monies.  However, more particularly, on March

1   21, 2000, Mr. Bellitto received a call from an individual

2   by the name of Buccinna who is also on the indictment.

3          Mr. Buccinna directed Mr. Bellitto to meet with

4   Mr. Mamone at a coffee shop in Coral Springs.  Mr. Bellitto

5   did not have the opportunity to call his FBI control agent.

6          However, Mr. Bellitto did drive over and meet

7   with Mr. Mamone at that particular time.

8          When he arrived at the coffee shop, Mr. Buccinna

9   was alone, but shortly Mr. Mamone arrived in a car that was

10  driven by David Bell, another codefendant in this case.

11         Both Mr. Buccinna and Mr. Bellitto got into the

12  car; Mr. Mamone's car, although it was driven by Mr. Bell.

13         Mr. Bellitto was seated in the back seat of that

14  particular car, with Mr. Mamone.  During that particular

15  drive, which ended up behind a Borders book store in Coral

16  Springs, Mr. Mamone began to question Mr. Bellitto about

17  nonpayment of this extortionate loan that Mr. Bellitto had

18  taken out in January of 1999.

19         I think that was before Mr. Bellitto had begun

20  cooperating with the FBI, and any payments were made after

21  that through the FBI who furnished money to Mr. Bellitto

22  who gave it to Mr. Mamone.

23         During this conversation, he threatened

24  Mr. Bellitto with physical abuse, and finally hit him two

25  times while he was in the back seat; at least two times,

1   and at that particular time, Mr. Mamone also tried to bite

2   his ear off.  Mr. Mamone stayed with Mr. Bellitto for a few

3   minutes.  Then they drove him back to his car.

4           Your Honor, that is simply an act of violence as

5   direct as you can get in  a loan sharking collection.

6           Now, Your Honor, we also have Mr. Mamone engaging

7   in loan sharking activity with an individual by the name of

8   Mr. Steinhardt.  Mr. Steinhardt borrowed approximately

9   $40,000.00 from Mr. Mamone at one point a week.

10          Mr. Steinhardt also referred another individual

11  by the name of Mr. Defazio to Mr. Mamone for a loan shark

12  loan or loan shark advancement.

13          Apparently there was a controversy of whether

14  Mr. Defazio was going to pay Mr. Mamone.  So Mr. Mamone

15  decided that Mr. Steinhardt should pay the entire amount of

16  the loan shark loan that was made to the individual

17  referred to him by Mr. Steinhardt.

18          Now, Mr. Steinhardt was also introduced to an

19  individual by the name of Joe Russo who was involved in

20  this loan shark operation with Mr. Mamone.

21          Mr. Mamone and Mr. Russo were not being paid by

22  Mr. Steinhardt, and what ended up happening was

23  Mr. Steinhardt was called into the check cashing store,

24  which was located at 5701 Margate Boulevard.  It was called

25  Check Cashing Unlimited, which was at least owned on paper

1   by Mrs. Mamone.

2            When Mr. Steinhardt arrived at that particular

3   business, Mr. Russo hit Mr. Steinhardt in the back of the

4   head and pinned him against the wall.

5            Now, Mr. Mamone, Mr. Russo and Mr. Buccinna then

6   roughed Mr. Steinhardt up in the back of the store, asking

7   for payment and asking how could he not be making these

8   payments?  How could me do things like this to them?

9            Again, on May 17th of 1997, at a meeting at

10  Mr. Mamone's residence -- strike that, Your Honor.

11           Mr. Braverman, another individual who was

12  referred to the loan shark operation by Mr. Steinhardt, I

13  believe was introduced to Mr. Mamone.

14           Mr. Braverman also became indebted to these

15  individuals in approximately May of 1997.  Mr. Braverman

16  was also called into Margate where he met with John Mamone

17  and other people.

18           Mr. Mamone directed Mr. Braverman to the check

19  cashing store; the vault area of the check cashing store.

20           There, John Mamone struck Mr. Braverman in the

21  left arm approximately three times with a baseball bat, in

22  an attempt to get his point across that payment should be

23  made to Mr. Mamone and members of the organization.

24           As I said, Your Honor, during the Title III of

25  this particular case, Mr. Mamone was intercepted on

1    numerous occasions making veiled threats on telephones to

2    the bookies who incurred debt because of bounced checks, or

3    what have you, going through the check cashing stores.

4           These are direct acts of violence and indirect

5    acts of violence that weren't present for Mr. Raffa.

6           Mr. Raffa's involvement, this is as an overseer,

7    and he will probably be punished upon conviction as

8    severely as Mr. Mamone, but at this particular time, we are

9    talking about direct threats and direct violence.  There

10   are two different considerations, in the government's view.

11          I don't know if the Court wishes me to talk about

12   the money laundering activity that occurred at the stores

13   or not.  If the Court accepts the allegations in the

14   indictment --

15          **THE COURT:**  I already said I have to.

16          **MR. McCORMICK:**  Okay.  Just to point out, just a

17   very few quick facts on that, Your Honor.  During the

18   summer of 1999 through maybe December, January of 2000,

19   there was a Ponzi scheme that was being operated out of

20   Greenville, South Carolina.

21          The Ponzi scheme had to do with victims located

22   throughout the United States being convinced to -- I might

23   add elderly victims who had their life savings typed up in

24   these types of investments.

25          They were convinced by people in South Carolina,

1  Virgil Womack and his organization, to invest their IRA's

2  their pensions, what have you, into a trust called Chemical

3  Trust and other types of trusts, with the promise that the

4  trust would pay anywhere from 10 to 20 percent.

5          The agents were given commissions from that.

6  There was a guarantee given to the investors that the

7  individuals who invested, a bonding company would guarantee

8  that no losses would be incurred whatsoever as a result of

9  these investments.

10         Now, this was an out and out Ponzi scheme because

11  the money, the people who demanded their money back, or

12  demanded interest from their investment, were paid from

13  monies coming in from other investors.

14         The bulk of the monies, the bulk of these monies

15  were sent down via Fred and David Morgenstern, who are also

16  in the indictment, to be deposited in check cashing stores,

17  and there is three major check cashing stores that were

18  used, all of which Mr. Mamone had great influence over;

19  Check Cashing Unlimited, Check Cashing Unlimited II.

20         Check Cashing Unlimited became Gold Coast Check

21  Cashing, as well as the callous market.

22         Now, what is so important about Mr. Mamone in

23  this matter is he assisted this extremely large and

24  significant money laundering operation.

25         The monies were deposited through these check

1    cashing stores and through various other accounts and

2    transported over to the Bahamas and then to Europe, and

3    those monies were never used for the intended purpose, and

4    everybody involved in this case made substantial illegal

5    profits, including Mr. Mamone.

6           An example of that would be in September of 1999,

7    Mr. Mamone brought checks totaling about a million dollars

8    to a callous market through Al Bellitto, the cooperating

9    witness with the government.

10          These funds were deposited.  They were given to

11   Kaiser Akel, a person who owned this market who was the

12   money launderer, and Mr. Akel looked at these funds and

13   looked at the individual checks from the investors.

14          Now, what Mr. Akel ended up doing was he called

15   from the legend of the check some of the investors to see

16   if these checks were good or bad, and the problem was when

17   he called the one or two investors that he did, he found

18   out that people were very, very old, and he decided that,

19   he became very fearful and didn't become involved in this

20   scheme, and he handed the checks back to Mr. Mamone.

21          Mr. Mamone put at least $350,000.00 of those

22   funds through Gold Coast Check Cashing, a check cashing

23   store that he once directly controlled, but the money was

24   lost, obviously, and it went to other parts of the country.

25          Your Honor, Mr. Mamone also cashed numerous of

1    these Chemical Trust checks through Irving Weiss and Bruce

2    Chiusano.  Mr. Chiusano is on the indictment.

3         The check cashing store that Mr. Weiss and

4    Chiusano was involved in was Check Cashing Unlimited II.

5    These checks were brought by not only Mr. Mamone, but Fred

6    Morgenstern, a coconspirator, Peggy Preston, Mark Weiss and

7    Jason Crosson.

8         These checks were brought to the check cashing

9    stores and negotiated on behalf of the enterprise.  What is

10   important, though, is a group of these checks, at least

11   $769,000.00 of these checks were deposited by John Mamone,

12   and John Mamone asked for the money to be paid directly to

13   him.

14        Rather than do that, the Check Cashing Unlimited

15   furnished the checks to, in the form of cashier's checks to

16   the Gold Coast -- excuse me -- to Check Cashing Unlimited.

17        Mr. Mamone put the bulk of these funds in an

18   account that he opened up for the express purpose of

19   laundering these funds at a Merrill Lynch account.

20        These funds were laundered through that account.

21   And, as a matter of fact, a portion of these funds were

22   even used to deposit within Gateway Services, which is an

23   enterprise that Mr. Mamone ostensibly was running, and he

24   considered, I think in his motions papers he considers to

25   be legitimate.  May I have a minute, Your Honor?

```
 1                THE COURT:  You may.  Let me ask you one

 2  question.

 3                MR. McCORMICK:  Okay.

 4                THE COURT:  On what basis do you contend the

 5  defendant is a risk of flight?

 6                MR. McCORMICK:  Your Honor, the risk of flight

 7  isn't the strongest basis.  I concede that, and I conceded

 8  that to Mr. Rothman.

 9                The basis, if there is any risk of flight, is the

10  dilemma that Mr. Mamone is facing upon conviction.  He

11  could possibly be sentenced to 30 years in jail, and that's

12  the sole basis that I have to make the argument the length

13  or severity of the sentence.

14                THE COURT:  Okay.

15                MR. McCORMICK:  Thank you, Your Honor.  The only

16  other matter that I would bring to the Court's attention is

17  during our investigation we do have evidence that

18  Mr. Mamone has access to monies overseas, and those monies,

19  of course, were of concern.

20                We are concerned about that because of the

21  possibility of flight.  I know he has a lot of friends and

22  neighbors here, and they are claiming that Mr. Mamone is

23  not a risk of flight, and that isn't our main argument, but

24  it certainly should be considered, in conjunction where the

25  danger to the community argument.
```

```
 1              THE COURT:  Thank you.  Mr. Rothman, address only
 2   the danger to the community.
 3              MR. ROTHMAN:  Judge, to begin with, number 1, if
 4   prior record of Mr. Mamone is for insurance fraud and
 5   commercial bribery for allegedly giving somebody money to
 6   get a contract.  Not a business official, but a
 7   nonbusiness -- I mean, not a public official; a business
 8   official.
 9              Mr. Mamone received house arrest, followed by
10   probation in the federal case and probation in the state
11   case.
12              The federal case was a case in which I
13   represented him on, and I recommended that he not plead
14   guilty and should go to trial. He took a plea.  He got the
15   probation.  He completed the probation.
16              I would disagree with the government as to what
17   occurred.  While he was out on probation in that case, he
18   was under house arrest.  In fact, the court shortened his
19   sentence.  The government never raised any issue then which
20   they claim now they knew about.
21              In the state case, he was in the middle of a
22   trial which he would have won, and they offered him a short
23   period of probation on a plea, and he took it.  That's the
24   prior history.  No violence in those prior cases at all.
25   No pleas of violence at all.
```

                              - 10/31/00

1      On the issues here, Judge, as I stated in my

2  papers, there are conditions that will make Mr. Mamone not

3  a danger to anybody, assuming the truth of any of those

4  allegations, and I would like to question a few of those,

5  Judge, but, obviously, in the format we have in a detention

6  hearing, it becomes quite difficult.

7      For example, Mr. McCormick read to you from a

8  transcript.  I was provided last night a series of

9  transcripts.  The one biggest allegation I think they have

10  in the violence aspect is this supposed assault upon

11  Mr. Bellitto; threatened him; hit him and went to bite his

12  ear.

13      Where is the tape?  Mr. Bellitto, in other tapes

14  I have been provided, is on the body bug.  They have a

15  series of conversations in which a lot of things were said.

16  Much of what was said was not done.  Almost all of what was

17  said was not done.  A lot of puffing going on, but it was a

18  body bug that Mr. Bellitto was wearing.

19      Where is the tape?  Where is the evidence, which

20  I don't know at this stage, what is the evidence on that?

21      Some of the people that the government talked

22  about here being involved in violence have been given a

23  bond by the government; agreed to a bond in this case.

24      Some of the people who are out on bond in other

25  cases have been given a bond in this particular case.  The

 1  government has picked and chosen and Your Honor hit

 2  probably the major issue head on at the outset of this

 3  hearing.

 4          If John Mamone is guilty, what does that make

 5  Steve Raffa?  If John Mamone is bad, what does that make

 6  Steve Raffa?  They agreed to a quarter of a million dollar

 7  corporate surety; not a half a million.

 8          We are offering a million dollar bond, Judge, and

 9  we have the people I mentioned, but in addition to those

10  people, I would like to introduce them, they did take the

11  time to come here, but I want to address that at the end.

12          In addition to the people I mentioned in the

13  meeting we had last night, when I went to the home of the

14  Switzers who were kind enough to host a gathering of all of

15  the neighbors and friends, in addition to the people

16  mentioned, Ralph and Michelle Bartanian also agreed to

17  co-sign on a bond of a million dollars.

18          They have assets in excess of $500,000.00.  Jim

19  and Connie Guise have agreed to sign on.  They have assets

20  over a million dollars.  There is strong support.  We can

21  structure a bond so there is absolutely no concern for any

22  future violence.

23          And what I submit to the Court what is occurring

24  here today, by the government negotiating on everyone's

25  bond, and not John, Mamone is legal blackmail.

*- 10/31/00*

 1           What this is all about, Judge, is not pretrial

 2    detention.  What this is all about is cooperation.  The

 3    government point blank told me if John would cooperate,

 4    things would be different with the bond.

 5           I find that to be wrong, morally, and I find it

 6    to be offensive.  It is clearly legal.  It happens every

 7    day in court.  They have been seeking his cooperation.

 8           He is now locked up in the hole, basically,

 9    because he has been described by the indictment as

10    dangerous because they have moved for pretrial detention.

11           They have excluded his family entirely.  He has

12    not talked to his children.  This is what is being done,

13    Judge, to apply pressure.

14           What I am telling the Court is there are

15    conditions of bond.  House arrest.  I will go so far,

16    Judge, and I have never done this in 23 years of practice,

17    I will agree to 24 hours a day house arrest, and when he

18    needs to meet with me, I will go to his home, which is

19    substantially far from my practice.

20           Judge, it means that much to us to prepare this

21    case.  It means that much to us to let him be with his

22    family for what could be a very long period of time.

23           What they call acts of violence came in the

24    course of this case, and although clearly anything like

25    this is substantial, they are not such that they cannot be

1  controlled and dealt with, assuming the truth, with a

2  substantial personal surety bond, secured by five people,

3  with special conditions, and 24 hour house arrest.

4        I can address other issues, Judge.  The Louis

5  Maione incident, we are talking about 1996.  I don't know

6  what some of that stuff means, frankly.  I don't think

7  that's relevant to the issues before this Court.

8        There is a lot of chatting going on in a lot of

9  these conversations; a lot of puffing by a lot of these

10 people.

11       **THE COURT:**  Mr. McCormick, we are talking about a

12 lot of tapes.  Mr. McCormick, why won't a bond -- forget

13 the bond suggested by Mr. Rothman.  I am not inclined to

14 release the defendant on a personal surety bond, but why

15 won't a bond, coupled with house arrest 24 hours a day,

16 address the issue of concern expressed by the government?

17       **MR. McCORMICK:**  Your Honor, I think all we have

18 to do is look to Mr. Mamone's performance in the past.

19       Mr. Mamone has shown he doesn't obey any type of

20 supervision.  Any condition, he doesn't obey it.

21       Mr. Rothman minimized all of that.  Your Honor,

22 that's the substance of this matter, is that while he was

23 under these very, not to violate federal, for example,

24 federal, state local laws, he did that.

25       He did that with impunity for 5 years.  My answer

1   to that, Your Honor, is I don't know that it would, and I

2   don't think he has earned the right to even test before the

3   Court at this particular stage.

4           MR. ROTHMAN:  Just in brief response, Judge, in

5   1995 when Judge Gonzalez placed Mr. Mamone on house arrest,

6   for that year he was under house arrest.  He did everything

7   he was supposed to do.                                    .

8           None of the allegations, as far as I am aware,

9   are in that one year under house arrest.  It is different.

10  We all know house arrest is different.

11          He can be controlled.  His access to and from is

12  absolutely controlled.  Any violation will be determined

13  immediately.  We can even control who can come to the

14  house.

15          I will agree to special conditions, if the

16  government agrees to provide a list of people who they

17  don't want coming to the house.  Unless there is something

18  extraordinary about it, I will agree to that.  They cannot

19  come to the house.

20          I will agree he can't talk to people by calling

21  out of the house.  And if they want to monitor that, I will

22  agree to that.  We will agree to anything, Judge, that's

23  somewhat reasonable, given their concerns.  We tried to

24  address it.

25          MR. McCORMICK:  Your Honor, the argument that

1   Mr. Rothman makes can be made in any case where detention

2   is requested.

3          There is nothing that has been shown by

4   Mr. Rothman, other than bringing in friends and neighbors

5   to bear witness for Mr. Mamone.  The facts don't change.

6          **THE COURT:**  All right.  I am forced to agree with

7   the government's position with regard to Mr. Mamone, while

8   admittedly there are some distinctions as compared to even

9   Mr. Raffa who has a prior record.

10         In a gross sense, it is inconsistent to treat the

11  defendants differently in this case.  Now, Mr. Rothman

12  accidently anticipated one of the questions that I was

13  going to ask.

14         I have asked this question in the past.  I don't

15  think the Court has any legal authority to do it, candidly,

16  but I think the parties can agree to it.  Query:  If I were

17  to agree to set a bond in this case, and we haven't gotten

18  to a bond yet as far as what has occurred so far, the

19  defendant agreed voluntarily to have his phone tapped.

20  We've offered it I have attitude to.

21         **MR. ROTHMAN:**  We've offered it.  Without even

22  talking to Mr. Mamone, I have offered it.  Let me confirm

23  it, please.

24         **THE COURT:**  All right.

25         **MR. ROTHMAN:**  The answer is absolutely, yes.

```
 1            MR. McCORMICK:  Can I speak to that issue, Your

 2   Honor?

 3            THE COURT:  Sure.

 4            MR. McCORMICK:  If nothing else, I have learned

 5   through past 3 or 4 as far as having a phone tap doesn't

 6   mean anything.  Everybody and their brother has a cell

 7   phone that they could have at their -- there is no way to

 8   control this, Your Honor.

 9            Mr. Mamone could have five phones brought in by

10   five different firms, and we would never know the

11   difference.

12            THE COURT:  Here is what I am going to do:  I

13   have heard the evidence in this case.

14            First of all, I am denying the government's

15   motion based on risk of flight, given the amount of time

16   the defendant is facing, and as I read Section 3142(G),

17   that is a condition, that is a factor to be considered, but

18   it is not dispositive of the facts.

19            If it were, the government would simply say that

20   anybody facing, I don't know -- (inaudible) they haven't

21   said that.

22            So, while that is a factor, I have to look at all

23   the other factors.  Weighing in the government's favor,

24   there is an allegation of some overseas money, but simply

25   outweighing that, however, is the fact that all of this
```

```
 1   defendants ties are to the United States.

 2            There is no showing that this defendant has a

 3   single familial tie, a single business tie that is outside

 4   of this country other than arguably somebody overseas.

 5            So I have no problem finding this defendant is

 6   not a risk of flight, and that I will so enter.

 7            On the issue of danger to the community, I agree

 8   in part with the government that there is some evidence

 9   that this defendant constitutes a danger.

10            However, I also agree with Mr. Rothman with what

11   has been said that will solve this problem.  Remember,

12   danger to the community must be considered by clear and

13   convincing evidence, and I do not find, by clear and

14   convincing evidence, that the defendant constitutes such a

15   danger to the community; that is he cannot be a danger,

16   such a danger to the community that nothing short of

17   pretrial detention will suffice.  So I am denying the

18   government's request for pretrial detention.

19            Now, having said all of that, the defendant is

20   facing serious charges with serious consequences.  It is an

21   indicted case with presumptions attached.

22            What I am going to do in this case is this, and

23   we will probably have another hearing.  I am going to set a

24   $500,000.00 corporate surety bond and a $500,000.00

25   personal surety bond, both of which will have Nebbia
```

```
 1   conditions attached to them.

 2           The additional conditions of bond will be the

 3   defendant is required to maintain full 24 hour house

 4   arrest.

 5           The stipulation that you have made, Mr. Rothman,

 6   the only reason for leaving the home will be for medical

 7   emergencies that has done to be documented and proven.

 8           Additional conditions of bond:  With the

 9   defendant's acquiescence, a full wiretap.  With that

10   stipulation, you do what you need to do.

11           MR. ROTHMAN:  Excuse me.  Judge, are you ordering

12   that it be a wiretap, or are you authorizing it with our

13   agreement that the government shall or has the ability to

14   wiretap?

15           In other words, I don't want to be involved in

16   violation of a court order if the government decides not to

17   do it.

18           THE COURT:  No, no.  I have heard the defense

19   stipulate to have it done.  I am telling Mr. McCormick that

20   that stipulation has been made.  And if the government

21   wants to go ahead and do it with that stipulation, that

22   won't be an issue.

23           If the government doesn't want to, then it won't

24   be a condition.

25           MR. McCORMICK:  Your Honor, as a further
```

 1    condition as to Mr. Mamone, will the Court also consider

 2    directing that it would be a violation of Mr. Mamone's bond

 3    for him to possess or use a cell phone?

 4          THE COURT:  You are anticipating.  I am not

 5    through yet.  Okay.  You still haven't answered my

 6    question.  Does the government want to set up a wire tap?

 7          MR. McCORMICK:  I can't answer that now.  I have

 8    to speak to the agents.

 9          THE COURT:  You will be allowed to do so because

10    of the situation of the defendant, if you choose to.

11          MR. McCORMICK:  It is extremely expensive.

12          THE COURT:  Now, additional conditions of bond.

13    The defendant is not to be in any possession of any other

14    telephones, either a wire, cell phone, two-way radios,

15    including but not limited to long string with cans on them.

16          MR. ROTHMAN:  Judge, when you discuss possession,

17    obviously, I think of my old law school training,

18    constructive versus actual.  They have a small child.  His

19    wife is outside the home.  Is she allowed to possess a cell

20    phone?

21          THE COURT:  I will solve the problem this way,

22    and I will hear from you on it.

23    (At this point the tape ran out.  Concluding remarks to

24    follow in a later transcript.)

25

1                    **C E R T I F I C A T E**

2          I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4

5    _____        _____
        DATE                      JERALD M. MEYERS, RPR-CM

6                                 Official Federal Court Reporter
                                  United States District Court
7                                 301 N. Miami Avenue, 9th Floor
                                  Miami, FL  33128-7797 - 305/374-8108

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA           CASE NUMBER: 00-6309-CR-Seitz

     Plaintiff,

vs.

JOHN MAMONE

     Defendant.

_____/

### *ERRATA* SHEET FOR TRANSCRIPT OF PRETRIAL DETENTION HEARING

| Page | Line | Topic (Government's Proffer and Correction or Explanation) |
|------|------|-----------------------------------------------------------|
| 3 | 13-20 | Mr. Mamone was arrested for "destruction of a vessel." Although that is true, the proffer fails to explain that this was an insurance fraud case in which Mr. Mamone is not alleged to have committed any act of violence. He received, and was early terminated from, probation. |
| 4 | 7-11 | The Government stated that in 1994 Mr. Mamone pled guilty to bribery charges (in a New Jersey state case) and was placed on four years probation. In fact, the charge was "commercial bribery" and did not involve any public official. The correct date of the plea was September 11, 1998, and the four years of probation was early terminated less than 2 years later, on June 2, 2000. |
| 5-6 | 20-1 | The Government claims that this case is about the Trafficante crime family. However, there is not a single credible piece of evidence that supports this claim. |
| 6 | 17-18 | The claim is that Mr. Mamone "on a frequent basis, used threats of violence in ... collecting .... from bettors... bookies and sub-bookies and agents who worked underneath John Mamone." Our review, to date of hundreds of transcripts reveals this assertion is not accurate. As can be attested to by the agents who monitored thousands of John Mamone conversations, and as can be confirmed by friends and relatives, Mr. Mamone yells when he speaks. He uses strong language for emphasis. Not every colorful word or phrase is a threat. |

Page 1 of 2

Thornton *&* Rothman, P.A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

| Page | Line | Topic (Government's Proffer and Correction or Explanation) |
|------|------|------------------------------------------------------------|
| 12 13 | 22- 24 | The Proffer goes into great detail, quoting from a conversation from 1996, in which Mr. Mamone is involved, to prove up violence on the part of Mr. Mamone. Preliminarily, it is important to note that the recently deceased Steven Raffa, John's "boss" and the man for whom the Government agreed to a bond, was also present. At this conversation, Mr. Mamone described a past act, committed by someone other than John Mamone, in which someone was "slapped." At most, this elaborate and specific part of the proffer shows knowledge on the part of Mr. Mamone, nothing more. Just as important, however, is the fact that the person who the Government claims did the slapping is a co-defendant in this case, and he is not being detained, nor is he under house arrest. |
| 15 | 23-25 | Once again, the Government proffers that "Mr. Mamone made several telephone calls to [Al Polito] in a threatening manner..." Once again, the "Polito" transcripts and tapes do not support this claim. To the contrary, the proof supports the fact Mr. Polito was lying to several people, scamming not only Mr. Mamone, but others. The cheating and the lies made Mr. Mamone angry and he became loud and vulgar, neither of which are a basis for detention or house arrest. |
| 16-17 | | The alleged Al Polito assault is referenced here. As the matter is sufficiently dealt with in the attached motion, it is not necessary to further dispute it here. |
| 17-18 | | This is the alleged Steinhardt incident, discussed in the motion. |
| 18 | | This is the Braverman allegation, likewise discussed in the motion. |
| 18- 19 | 24- 3 | What at page 6, lines 17-18, in the proffer were "threats of violence" have morphed into, a mere twelve pages later, "veiled threats." And the proof as found in the tapes do not support the allegation that the people to whom the Government referred to here as "bookies" were even bookmakers. |

Page 2 of 2

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358 - 9000 • Telefax (305) 374 - 5747

# EXHIBIT C

DLWF:df

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

NO._____

IN THE MATTER OF THE APPLICATION   )
OF THE UNITED STATES OF AMERICA    )    UNDER SEAL
FOR AN ORDER AUTHORIZING THE       )
INTERCEPTION OF WIRE COMMUNICATIONS)

AFFIDAVIT IN SUPPORT OF APPLICATION

I, Patrick G. Brodsky, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI).  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.   I have been employed as a Special Agent of the FBI for over four years.  For the past four years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN).  As a result of my participation in these investigations, conversations with other FBI agents familiar with the criminal activities of the LCN, reviews of reports concerning LCN, reviews of reports concerning LCN activities, members and associates, and reliable informant information, I know that the

criminal activities of the LCN include, but are not limited to, gambling, trafficking in narcotics, loansharking, money laundering, extortion, labor racketeering, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3. This Affidavit is being submitted in support of an application which seeks an Order authorizing the interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others yet unknown, occurring over the following telephone numbers for a period of thirty (30) days:

A. Cellular telephone number (954) 614-1821, electronic serial number (ESN) EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE; and,

B. Cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN.

C. Authorization is also sought to intercept communications from any telephone numbers subsequently assigned to or used by the instruments bearing the same ESN as the target cellular telephones and notwithstanding any changes in the ESN of the target cellular telephones so long as its assigned telephone

2

number remains the same.

      D.   Authorization is also sought so that, in the event that the target cellular telephone is transferred outside the territorial jurisdiction of the Court, interceptions may take place in any other jurisdiction within the United States.

    4.   The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

      A.   Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, that is, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(I) below, and through the collection of unlawful debt, in violation of Title 18, United States Code, Sections 1962(c) and (d);

      B.   Making extortionate extensions of credit, financing extortionate extensions of credit, collecting extensions of credit by extortionate means and conspiracy to do so, in violation of Title 18, United States Code, Sections 892, 893 and 894;

      C.   Wire fraud and mail fraud in violation of Title 18, United States Code, Sections 1341 and 1343;

      D.   Interference with commerce by threats or violence,

in violation of Title 18, United States Code, Section 1951;

      E.    Interstate Gambling Business, in violation of Title 18, United States Code, Section 1955;

      F.    Money laundering, in violation of Title 18, United States Code, Section 1956 and 1957;

      G.    Transportation of stolen goods, securities, moneys, in violation of Title 18, United States Code, Section 2314;

      H.    Bank Fraud, in violation of Title 18, United States Code, Section 1344;

      I.    Interstate and Foreign Travel in Aid of Racketeering, in violation of Title 18, United States Code, Section 1952; and,

      J.    Conspiracy, in violation of Title 18, United States Code, Section 371.

     5.    I have personally participated in this investigation of the offenses referred to in paragraph 4 of this affidavit.  From that personal participation in this investigation, and through oral and written reports made to me by agents and analysts of the FBI and other state and local law enforcement agencies, I am familiar with the facts and circumstances of the investigations.

     6.    Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation.  I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7.    The facts and circumstances of this affidavit as set forth below demonstrate that:

A.    There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated herein above in paragraphs 4(A) through 4(I).

B.    There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have used, are using, and will continue to use cellular telephone number (954) 614-1821, ESN EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE, and, cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN, for the purpose of facilitating the offenses enumerated in paragraph 4.

C.    The interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES,  MICHAEL BUCCINNA, VIRGIL WOMACK,

5

CHARLOTTE WOMACK, and others yet unknown, will yield relevant information and admissible evidence of those offenses, including communications concerning:

    (i)   the precise nature and scope of the illegal activities;

    (ii)   the identities and roles of the coconspirators and other participants in these illegal activities;

    (iii)   the locations and means used in furtherance of these illegal activities;

    (iv)   the location of records maintained by or in relation to these illegal activities;

    (v)   the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and,

    (vi)   the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth above in paragraph 4.

  D.  In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

  8.  Normal investigative procedures have been tried and have

not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

9. AT&T Wireless records reveal that cellular telephone number (954) 614-1821, ESN EB6391C2, is subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida.

10. Sprint telephone records reveal that cellular telephone number (954) 557-3651, ESN 25314057896, is subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address).

## BACKGROUND OF THE INTERCEPTEES

11. **STEVE BRUNO RAFFA**, a/k/a "Uncle Steve", was born on October 2, 1941, in the city of Ciancianna, in the province of Agrigento, Sicily, Italy. **RAFFA** currently resides at 15641 SW 16th Street in Pembroke Pines, Florida. According to the Italian law enforcement authorities, **RAFFA's** brother, Pietro Raffa (now thought to be deceased), was documented as being a member of the Sicilian Cosa Nostra (Sicilian Mafia) based in the Agrigento Province of Sicily. **RAFFA** is now the Boss of the Trafficante LCN family in South Florida. The Trafficante LCN family exercises considerable power and influence in South Florida. No arrest record for **RAFFA**

7

could be located.

12.   **JOHN MAMONE** was born on June 12, 1951, in New Jersey.
**MAMONE** currently resides at 1960 Augusta Terrace in Coral Springs,
Florida. **MAMONE** is a made member in the Trafficante LCN family and
is considered to be one of **RAFFA's** closest confidantes. **MAMONE** has
the following criminal record: He was arrested on December 16,
1991, in New Jersey for Intimidation and the case was dismissed.
**MAMONE** was arrested on August 16, 1993, for mail fraud; he was
subsequently convicted and was sentenced on March 31, 1995, to 48
months probation and restitution in the amount of $94,444. On
October 3, 1994, **MAMONE** was arrested by the New Jersey State Police
and charged with one count of terrorist threats, one count of theft
by extortion, one count of commercial bribery, one count of
tampering with a witness/informant, one count of racketeering and
one count of racketeering conspiracy; **MAMONE** was sentenced on
September 9, 1998, to four years probation and a fine of $7,500.
Until approximately August of 1999, **MAMONE** operated Check Cashing
Unlimited, a check cashing store, located at 5701 Margate
Boulevard, Margate, Florida (hereinafter referred to as Check
Cashing Unlimited). In August of 1999, Check Cashing Unlimited was
purchased by **FRED MORGENSTERN** and is now called Gold Coast Check
Cashing.

13.   **FRED MORGENSTERN** was born on October 28, 1948, and
resides at 23170 Floral Wood Lane in Boca Raton, Florida.

8

MORGENSTERN incorporated Gold Coast Check Cashing, Inc., in April of 1998.  In approximately August of 1999, MORGENSTERN took over the operation of Cash 96, 3591 North Andrews Avenue, Oakland Park, Florida, and Check Cashing Unlimited and is presently operating both under the name of Gold Coast Check Cashing. MORGENSTERN has a criminal record which includes the following:  MORGENSTERN was arrested on June 5, 1976, for theft and was convicted and sentenced to five years probation.  MORGENSTERN was arrested on December 22, 1976, in Cincinnati, Ohio, for passing bad checks and the case was dismissed.  On January 30, 1989, MORGENSTERN began serving a three year sentence for transportation of stolen securities.  On October 18, 1994, MORGENSTERN was arrested for grand larceny and the charges were later dropped.  As described below, MORGENSTERN is also associated with VIRGIL WOMACK in a scheme to defraud investors, which the Trafficante LCN family is also involved with at least to the extent of laundering the investors' funds.

14.  PEGGY PRESTON was born on August 17, 1964, and resides at 4717 N. W. 82nd Avenue, Fort Lauderdale, Florida.  Based on electronic surveillance information, PRESTON is an associate of both MORGENSTERN and CROSSEN and assists MORGENSTERN with financial transactions.  PRESTON is employed at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida, and has no criminal record.

9

15. **MARK WEISS** was born on August 25, 1962, and resides at 21190 Mainsail Circle Apartment 11, Aventura, Florida. **WEISS** is involved in the management of Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida. He was arrested for assault and battery on January 7, 1999; this case was later dismissed. **WEISS** is a collector of extortionate loans for Bellitto made through Gold Coast Check Cashing.

16. **ISRAEL TORRES**, also known as "Buddy", was born on July 10, 1950, in Manhattan, New York, and has a registered address of 5100 Las Verde Circle, #318, Delray Beach, Florida. Anthony Graziano is a Capo in the Bonanno LCN Family and is **TORRES'** principal contact for the criminal crew operating in South Florida. On October 6, 1994, **TORRES** was arrested by Broward County Sheriff's Office, Florida, for two counts of Grand Larceny and Tampering With/Destroying Evidence. On December 2, 1994, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Fraud, Illegal Use of Credit Cards and Forgery of Credit Card. On December 23, 1994, **TORRES** plead nolo contendre to the October 6, 1994 charges and plead guilty to the December 2, 1994 charges; **TORRES** was sentenced to four years probation, suspension of his driver's license, and restitution of $8,460. On March 31, 1998, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Grand Theft; those charges were subsequently dismissed.

17. **MICHAEL BUCCINNA** was born on April 30, 1959, and resides

10

at 6363 N.W. 39th Street, Coral Springs, Florida. **BUCCINNA** works

at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate,

Florida. **BUCCINNA** has no criminal record, but as described below,

**BUCCINNA** helps to collect extortionate loans for **MAMONE**.

18. **VIRGIL WOMACK**, also known as Lewey L. Catoe, III, George

H. Williamson, and Clifton Wilkinson, was born on July 24, 1941, in

Georgia. **WOMACK** currently resides at 11052 Watson Drive, Suite C

in Seneca, South Carolina. **WOMACK** has a criminal record which

includes the following: **WOMACK** was arrested on March 10, 1986, for

battery and the case was dismissed; **WOMACK** was arrested on April

17, 1990, for battery, criminal damage to property second degree,

aggravated assault and terrorist threats and acts. **WOMACK** received

a suspended sentence upon payment of a fine of $120.00 and

restitution.

19. **CHARLOTTE WOMACK**, the spouse of **VIRGIL WOMACK**, was born

on November 23, 1948. **CHARLOTTE WOMACK** currently resides at 11052

Watson Drive, Suite C, Seneca, South Carolina. **CHARLOTTE WOMACK**

has no criminal history.

### PREVIOUS APPLICATIONS

20. I caused a search to be made of the electronic

Surveillance Indices of the Federal Bureau of Investigation and the

Drug Enforcement Administration during the week of December 27,

1999, in order to determine whether previous applications have been

made to intercept wire, oral or electronic communications of **STEVE BRUNO RAFFA**, **JOHN MAMONE**, **FRED MORGENSTERN**, **PEGGY PRESTON**, **MARK WEISS**, **ISRAEL "BUDDY" TORRES**, **MICHAEL BUCCINNA**, **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, or of any of the communication facilities named in this Affidavit. These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

21. On January 16, 1991, the Honorable Robert J. Ward, United States District Judge, Southern District of New York, signed a Court Order which authorized the interception of oral communications of **JOHN MAMONE** and others for a period of thirty (30) days. Extension Orders authorizing the continued interception of oral communications of **JOHN MAMONE** and others each for periods of thirty days were issued on February 16, 1991, March 13, 1991, April 17, 1991, and May 16, 1991.

22. On September 12, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered an Order authorizing the interception of wire communications of **JOHN FRANCIS MAMONE** and others occurring over telephone number (908) 469-1657 and (908) 469-8424, for a period of thirty (30) days. On October 16 and November 15, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered Orders authorizing extensions of time for the above described interception of wire communications

12

for additional thirty (30) day periods.

23. On November 19, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **JOHN MAMONE** and others occurring over telephone number (954) 295-6672, 1700 N. State Road 7, Hollywood, Florida, for a thirty (30) day period.

24. On September 23, 1999, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN,** and others occurring over telephone number (954) 564-5599, for a period of thirty (30) days.

25. On November 12, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days.

26. On December 28, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917)

414-7111, for a period of thirty (30) days, which is ongoing at this time.

<u>FACTS AND CIRCUMSTANCES</u>
<u>ESTABLISHING PROBABLE CAUSE</u>

27. Based on my investigative training and experience, coupled with information provided by various sources, including other agents of the FBI, I have learned the following information about the La Cosa Nostra (LCN), a nationwide secret criminal association crime group in the United States.

A. The LCN is the most powerful and sophisticated organized crime group in the United States.

B. The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C. The hierarchy of each LCN family is very rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo," "Captain," or "Skipper." Caporegime are supervisors over "crews," <u>i.e.</u>, groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

D. There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino,

**Pages 15-18 missing in copy supplied in discovery.**

37. On August 16, 1999, CS-2 advised that **RAFFA** has previously admitted to CS-2 that he (**RAFFA**) is a member of the Trafficante LCN family. CS-2 advised that **RAFFA** and Vincent Loscalzo divide the territory of the Trafficante LCN family, with **RAFFA** being located in South Florida and Loscalzo being located in Tampa. **RAFFA** operates a crew of members and associates of the Trafficante LCN family in South Florida. CS-2 advised that **JOHN MAMONE** is a member of **RAFFA's** crew and engages in illegal gambling.

38. Confidential Source Number Three (CS-3) has been associated with **MAMONE** for approximately four years. Although CS-3 is no longer a source for the FBI, the information provided by CS-3 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, pen register information, and has been determined to be reliable.

39. In the fall or winter of 1995, CS-3 approached **JOHN MAMONE** and his associate, Joseph Russo, and took out an extortionate loan for approximately $40,000. CS-3 described the loan as a wholesale type loan that would usually run about a point to a point and a half per week. This loan was later forgiven when **MAMONE** became CS-3's silent partner in CS-3's business.

A. Based on my training, experience, and information form other agents, it is my understanding that this refers to one to one and one-half percent interest per week on the total loan or

19

over fifty-two percent interest per year.

40. CS-3 stated that in May 1997, **MAMONE** and Joseph Russo physically assaulted CS-3 in connection with a debt owed by a third party to **MAMONE** and Russo. **MAMONE** and Russo blamed CS-3 for the failure of the third party to pay approximately $150,000 that **MAMONE** and Russo thought they were owed as a result of a business dispute. CS-3 further stated that **MAMONE** and Russo also assaulted the third party with a baseball bat.

A. Agents from the FBI interviewed the third party who confirmed that he/she had been assaulted by **MAMONE** and Russo.

41. Confidential Source Number Four (CS-4) has provided information to the FBI for approximately eight months. CS-4 has been meeting with members and associates of various LCN families in South Florida since in or about 1995. CS-4 has provided information on loansharking, gambling, extortion and stolen property activities engaged in by members and associates of LCN families operating in South Florida and elsewhere.

42. Where possible CS-4 has consensually recorded meetings with various organized crime members and associates including, among other individuals, **MAMONE**. CS-4 consensually recorded conversations whenever the circumstances permitted, depending upon safety concerns and practical considerations. The information provided by CS-4 has been proven to be truthful and reliable. This information has been corroborated by information from other cooperating witnesses, confidential sources and the consensually

20

recorded conversations made by CS-4 with targets of the investigation. Information provided by CS-4 has previously been included in two applications for electronic surveillance, both of which were granted.

43. CS-4 has been involved in illegal gambling activities with associates of the Colombo and Bonanno LCN families since approximately 1992. Prior to his cooperation, CS-4 had been regarded by the Colombo and Bonanno LCN families as an expert in operating bookmaking businesses in South Florida.

44. On November 3, 1999, CS-4 informed me that CS-4 has known Frank Ruggiero, a close associate of MAMONE for several years and during that time Frank Ruggiero told CS-4 that RAFFA and MAMONE are members of the Trafficante LCN family and that MAMONE reports to RAFFA.

45. On December 10, 1999, CS-4 informed me that CS-4 has known MAMONE since approximately 1996. During the last three years, CS-4 has collected checks for MAMONE from gamblers who have owed money to MAMONE for their gambling losses. CS-4 has also referred several individuals to MAMONE for loans, which were subsequently extended to them at extortionate interest rates. Through his conversations with MAMONE and these individuals, CS-4 is aware that MAMONE charges three points for loan amounts under $10,000 and two and one-half points for loan amounts over $10,000.

A. Based upon my experience and information from other

21

law enforcement officers, I am aware that points refers to the weekly interest being charged on the total amount of the loan, normally referred to as vigorish. Three points converts to 156% per annum, and, two and one-half points would convert to 130% per annum.

46. CS-4 informed me on December 10, 1999, that CS-4 is aware through conversations with **MAMONE** and personal observations that **MAMONE** is involved in a variety of criminal activities, including the laundering of checks, loansharking, gambling and collection of gambling debts, and, possession of stolen property, including stolen credit cards. As to the gambling business, CS-4 stated that **MAMONE** helps finance at least two separate bookmaking offices. CS-4 is aware that one of the offices, which is managed by Jackie Baruch, has been in operation for at least the last year of which CS-4 is aware and that there are at least five individuals involved in the operation of that bookmaking office.

47. CS-4 further informed me on December 10, 1999, that CS-4 is aware through conversations with **MAMONE** and **TORRES** that they have been partners in the extortionate loan business for many years. In addition, **TORRES** has received money from **MAMONE** at a low rate of interest and extended the money at extortionate rates to other individuals.

48. CS-4 also stated that **MAMONE** regularly makes extortionate extensions of credit in South Florida to several individuals associated with illegal gambling businesses, in particular

22

bookmaking operations.  Many of these loans were originally debts owed by individuals which were then converted into extortionate loans.  Specifically, CS-4 is aware that Alan Epstein currently has an extortionate loan of approximately $20,000.00 incurred through an unpaid gambling debt, and that Ralph Lento currently has an extortionate loan through **MAMONE** for approximately $20,000.00 on which Lento has made payments.

49.  In approximately January of 1999, prior to the time CS-4 began cooperating with the government, CS-4 received an extortionate extension of credit from **MAMONE** in the amount of $20,000.00 at an interest rate of 2% per week, for a total interest rate of approximately 104% per year.  CS-4 has been repaying the loan on a weekly basis and continues to do so.  CS-4 normally makes the payments to **MAMONE** at Gold Coast Check Cashing, Margate. **MAMONE** has advised CS-4 that with respect to CS-4's extortionate loan, that it is not just him (**MAMONE**) that is being paid, but **MAMONE'**s people as well.

A.  CS-4 informed me that CS-4 understands this statement by **MAMONE** to mean that **RAFFA** and the Trafficante LCN family are also receiving monies from the extortionate loan.

B.  Although CS-4 has known **MAMONE** for a lengthy period of time, when CS-4 has been late on the payments to **MAMONE**, **MAMONE** has been unpleasant.  For example, on October 7, 1999, at approximately 11:51 a.m., **MAMONE** left a message on an answering

23

machine for CS-4 concerning the outstanding extortionate loan MAMONE had extended to CS-4. CS-4 had not been making payments on the loan. MAMONE stated that CS-4 was a "fat motherfucker" and further remarked "wait till I see you" (CS-4). This message was related in an angry tone of voice, and clearly carried an implied threat of violence.

50. CS-4 has made payments on his extortionate loan from MAMONE at Gold Coast Check Cashing, Margate, Florida. CS-4 informed me that prior to each of the dates described below, CS-4 would call MAMONE at his cellular telephone number (954) 614-1821 to arrange the meetings to make payments on the extortionate loan. In addition, CS-4 had received a number of telephone calls from MAMONE concerning repayment on the loan which MAMONE placed from his cellular telephone, (954) 614-1821, which CS-4 determined from the caller identification function on CS-4's telephone. The telephone records for the telephone of CS-4 has not been obtained. CS-4 has made payments to MAMONE on the extortionate loan on the following dates: 6/24/99 - $400; 6/30/99 - $400; 7/15/99 - $400; 8/4/99 - $400; 8/12/99 - $400; 8/19/99 - $1,000; and, 10/7/99 - $300. In addition, on 06/14/99, CS-4 made a payment of $200 to BUCCINNA, which was to be credited towards CS-4's loan from MAMONE.

A. On December 10, 1999, CS-4 informed me that BUCCINNA works at Gold Coast Check Cashing, Margate, and acts as a collector of extortionate loans at the behest of MAMONE.

24

B.    A law enforcement officer has been present with CS-4 at the time that many of the calls have been received from or made to **MAMONE**'s cellular.  In particular, over the last thirty days, a law enforcement officer observed CS-4 place calls to **MAMONE**'s cellular telephone number, (954) 614-1821, and/or receive calls from **MAMONE**'s cellular no less than twenty separate times, the last occasion being on January 5, 2000.   The majority of these conversations over the last thirty days involved the extortionate loan and payments on it as well as arranging meetings with **MAMONE** concerning the loan.  Some of the conversations have also concerned checks which CS-4 has cashed at **MAMONE**'s behest.

C.    In addition to the payments described above, on November 29, 1999, CS-4 met with **MAMONE** at Check Cashing Unlimited and provided **MAMONE** with seven items which CS-4 represented to **MAMONE** to have been stolen from Maryland.  Specifically, CS-4 provided four Rolex watches, one Baume & Mercier watch, a ladies tennis bracelet, and a ladies emerald and diamond ring.  **MAMONE** was to sell these items through **MAMONE**'s unidentified fence and the amount received by **MAMONE** was to be deducted from CS-4's payments on the outstanding extortionate loan.  The following day, November 30, 1999, CS-4 reached **MAMONE** at his cellular telephone, (954) 614-1821, and during this recorded conversation, which was made while law enforcement was present, **MAMONE** informed CS-4 that he (**MAMONE**)

25

would credit $4,500 towards the principal on CS-4's loan as the value of the "stolen" jewelry that CS-4 had provided **MAMONE** the previous day.

51.    On March 25, 1999, CS-4 met with **MAMONE** and consensually recorded their conversation.  CS-4 and **MAMONE** discussed monies owed by bettors in an illegal gambling business, a bookmaking operation, as a result of losing wagers.  CS-4 and **MAMONE** further discussed the repayment of extortionate loans to **MAMONE** by various individuals.

52.    On December 10, 1999, CS-4 stated that CS-4 is aware that Scarola currently has an extortionate loan of approximately $10,000.00 through **MAMONE**.  CS-4 is specifically aware that Scarola has received at least four extortionate loans from **MAMONE** in the past in the amounts of approximately ten to fifteen thousand dollars.

A.    During electronic surveillance conducted pursuant to the court's Order dated November 22, 1999, described above, Scarola was intercepted in conversations in late November, 1999, with **TORRES** discussing a bookmaking operation in which Scarola is participating.

B.    Although Scarola is a named interceptee and has been identified through the November 22, 1999 electronic surveillance and its extension as a bookmaker, your affiant has no evidence to indicate that Scarola's relationship to **MAMONE** is anything but a

victim of an extortionate loan.  Therefore it is not anticipated that the conversations with **MAMONE** will involve any federal crimes being committed by Scarola notwithstanding the fact that Scarola is a named interceptee in the other ongoing electronic surveillance.

53.  On December 10, 1999, CS-4 reported that he has been present with **MAMONE** when **MAMONE** has called or received calls from Scarola on his (**MAMONE's**) cellular telephone.  CS-4 is aware that many of these conversations refer to Scarola's outstanding loan.

A.  Pen register information shows two incoming telephone calls to **MAMONE's** cellular telephone number (954) 614-1821 from Scarola's telephone number (954) 802-4510.

54.  CS-4 informed me on December 10, 1999, that in or about July 1999, CS-4 overheard **TORRES** engaging in conversations utilizing his own cellular telephone.  After such conversations, **TORRES** informed CS-4 that he (**TORRES**) had just spoken with **MAMONE**.  **TORRES** advised CS-4 that he (**TORRES**) had discussed with **MAMONE** monies loaned to individuals as extortionate extensions of credit.

A.  CS-4 advised that CS-4 could not overhear the substance of **TORRES** telephone conversations, but was informed by **TORRES** thereafter.

55.  On May 5, 1999, CS-4 met with **MAMONE** and consensually recorded their conversation.  At the direction of the FBI, CS-4 and **MAMONE** discussed the laundering of money through **MAMONE's** check cashing store in Margate, Check Cashing Unlimited, in the form of

27

checks provided by losing bettors to CS-4. **MAMONE** informed CS-4 that CS-4 should charge two points to launder the gambling proceeds.

A.   I know, based upon my training and experience and conversations with CS-4 that "two points" refers to two percent of the total amount of money laundered.

56.   On or about July 29, 1999, **MAMONE** gave CS-4 a check in the amount of $150,141.12 and requested that CS-4 cash it at Akel's Market, a check cashing store located at 502 NW 6th Street in Pompano Beach, Florida. **MAMONE** told CS-4 that CS-4 should wipe his (**MAMONE's**) fingerprints off of the check. CS-4 attempted to cash this check but was informed that the bank had identified it as counterfeit. CS-4 advised **MAMONE** of the problem and CS-4 retrieved the check from Kaiser and returned it to **MAMONE**.

A.   Investigation by the FBI confirmed that the check was counterfeit and the transaction was not completed.

57.   According to public records, Cash 96 was owned and operated by **RAFFA** from approximately 1998. According to CS-4, **MAMONE** owned and operated Check Cashing Unlimited from approximately 1995. CS-4 stated that both Cash 96 and Check Cashing Unlimited were sold to **MORGENSTERN** in approximately August of 1999.

A.   Florida corporate records show that **MORGENSTERN** was listed as the customer who filed the articles of incorporation for

28

Gold Coast Checking on April 28, 1998. Gold Coast Checking is now
the owner of the check cashing business being operated at 5701
Margate Boulevard, Margate, Florida. This is the location of the
business formerly run by **MAMONE** and called Check Cashing Unlimited,
from which CS-4 received the extortionate loan as discussed above.

    58. CS-4 reported that in approximately September of 1999,
**MAMONE** told CS-4 that **MAMONE** had twenty-one checks which **MAMONE**
wanted CS-4 to have cashed at Akel's Market, 502 N.W. 6th Street,
Pompano Beach, Florida. **MAMONE** told CS-4 that the checks had all
come from **MORGENSTERN**, that **MORGENSTERN** has people to invest and
that they receive 4-5% return a year. **MAMONE** stated that he
(**MAMONE**) wanted to receive back approximately $100,000 in cash, and
the rest in money orders and/or cashier checks. **MAMONE** initially
provided CS-4 with copies of the twenty-one checks, which CS-4 in
turn provided to Akel Kaiser. On or about September 22, 1999,
**MAMONE** and CS-4 took the twenty-one checks drawn on various
accounts, payable to the order of Chemical Trust, Alliance Trust
and various individuals, totaling approximately $1,046,000.00, to
Akel's Market. **MAMONE** said the checks should be good and asked
Kaiser to only charge him (**MAMONE**) one and one-half points rather
than two points. **MAMONE** said that he (**MAMONE**) would have more
checks to come. Kaiser was concerned because of the circumstances
of the out-of-state checks. Kaiser ended up taking all twenty-one
checks from **MAMONE**. Within a day, Kaiser called CS-4 and told CS-4

that Kaiser could not cash the twenty-one checks because it was too large an amount. **MAMONE** got the checks back from Kaiser and **MAMONE** later told CS-4 that he (**MAMONE**) had gotten rid of the checks.

     A.   Based upon the investigation, it appears that Kaiser is aware that the checks had come from **MORGENSTERN**, but is not aware of the investment fraud scheme. The investigation was unable to determine how or where **MAMONE** finally cashed these twenty-one checks after Kaiser refused to handle them.

     B.   The FBI in Greenville, South Carolina, has been conducting an ongoing investigation regarding mail fraud activities engaged in by various targets, including **MORGENSTERN**, and, **VIRGIL** and **CHARLOTTE WOMACK**. The investigation has disclosed that the above-referenced checks were the proceeds of mail fraud activity and were sent to South Florida in order to promote the illegal activity. A more detailed explanation of the scheme and artifice to defraud is set forth below.

     59.  In September of 1998, the Securities and Exchange Commission (SEC) filed a complaint for injunctive and other relief in federal court, Southern District of Florida, Case Number 98-7044-Civ-Dimitrouleas, against **MORGENSTERN**, Amquest International, Ltd., and others. That complaint alleges the following information. During 1996, Amquest did a private placement offering in order to supposedly raise money to create a mortgage company. Registration form N1-A was filed with the SEC, as well as form D

regarding the private placement memorandums issued by Amquest. The private placement memorandums were issued to approximately 100 investors. Approximately 5,000 shares of common stock were sold and approximately $3.4 million was raised. The proceeds of the private placement were laundered by MORGENSTERN through Kinsman Merchant & Associates, Inc. Checks were made payable to Kinsman, which were signed by MORGENSTERN and deposited in Kinsman's bank accounts. Kinsman then issued checks made payable to approximately fifteen different companies; these companies opened brokerage accounts in which the monies were deposited. Some of the money was as well deposited into MORGENSTERN's personal bank account and the personal account of the secretary of Amquest. MORGENSTERN was also involved in a second offering, Sleep Source, in which they raised money in an attempt to acquire Sleep-O-Rama. MORGENSTERN raised approximately $800,000 from fifteen different investors. The proceeds from this offering were again laundered through Kinsman and again through the fifteen company accounts. The complaint charges that MORGENSTERN and others engaged in a scheme to defraud investors in connection with Amquest International, LTD., described by the defendants as a financial services business. That civil case is still pending.

60.    In November of 1996, VIRGIL WOMACK, Principal for Western Continental Holdings, Inc., Tifton, Georgia, began to offer and sell unregistered securities in the form of Commercial

31

Promissory Notes. By January of 1997, **VIRGIL WOMACK** and his wife, **CHARLOTTE WOMACK**, formed a corporation known as Global Financial, Inc. (GFI), which continued to sell the notes nationwide to hundreds of investors. GFI falsely claimed that its corporate promissory note was an approved exempt security under the Securities Act of 1933. GFI further falsely claimed that the Notes were doubly insured and backed by a financial guarantee policy issued by Keyes International Insurance Company (KIIC), Ltd of St. Kitts, West Indies.

A.    According to the Georgia Secretary of States Office, these notes are not deemed exempt securities in accordance with state statutes, and neither are the transactions deemed exempt. **VIRGIL WOMACK** was not registered by the State of Georgia or any other state to sell securities.

B.    The National Association of Insurance Commissioners advised that KIIC was an offshore insurance company located on the island of St. Kitts, West Indies, and was not licensed to conduct business in the United States.

61.    From November of 1996 until mid-1999, **VIRGIL** and **CHARLOTTE WOMACK**, through their organization, defrauded investors of approximately $8 million. In fact, during one year the organization defrauded over one hundred investors of $6.4 million. According to public records, the State of Georgia placed GFI under receivership in 1999 and shortly thereafter, **VIRGIL WOMACK** left the State of Georgia.

62. Information from FBI, Macon, Georgia, on July 30, 1999, indicated that **VIRGIL WOMACK** had relocated to South Carolina from Georgia and was perpetuating a new investment fraud scheme, soliciting investors for an offering named Alliance Trust.

63. Confidential Source Number Five (CS-5) has been providing information to the FBI since October 29, 1999, and is being paid for this information. CS-5 is an employee of **VIRGIL WOMACK** and is in a unique position to provide information. The information provided by CS-5 has been corroborated through independent investigation, including other sources of information, physical surveillances, and pen register information, and, has been determined to be reliable.

64. On October 29, 1999, CS-5 advised a special agent of the Federal Bureau of Investigation (FBI) that **VIRGIL WOMACK**, his wife, **CHARLOTTE WOMACK**, her sister-in-law, Crystal Wilkinson, and others, are operating a securities investment business known as Chemical Trust and/or Alliance Trust, based in two condominiums in Seneca, South Carolina, one of which is WOMACKs' residence. CS-5 advised the FBI that **VIRGIL WOMACK** had recruited a cadre of salespeople (agents) throughout the United States who were actually marketing and selling these  investment instruments, known as Chemical Trust and Alliance Trust, to investors nationwide.  Investors are promised a guaranteed contract which returns varying amounts of interest on their investment.  Salespersons, however, are advised by **VIRGIL WOMACK** that they are guaranteed up to 25% commission on

their client's investment.

65. CS-5 advised this operation is receiving from $250,000 to $600,000 in investor checks on a daily basis. CS-5 stated that approximately 25% of the investor funds are processed through the First National Bank of Onaga, Onaga, Kansas, and Fidelity Bank of Atlanta, Georgia, through the use of Self-Directed Individual Retirement Accounts (IRAs). CS-5 indicated these IRA funds are wire transferred directly from these banks to a Chemical Trust account at Admiralty Bank, Palm Beach Gardens, Florida.

66. CS-5 advised that VIRGIL WOMACK has signatory authority on the Chemical Trust account at Admiralty Bank and he (VIRGIL WOMACK) recently wire transferred funds from that account to London, England.

A. A review of subpoenaed bank records by agents of the FBI for Admiralty Bank, Palm Beach Gardens, Florida, reflect that on October 20, 1999, $3,000,000.00 was wire transferred from Chemical Trust account #300137931, Seneca, South Carolina, to Falcon Trust Company, Ltd., account #63772677, at Barclays Bank, PLC, London, England. Bank records reflect authority to make this transaction were received by fax from VIRGIL WOMACK.

B. A review of subpoenaed bank records for Admiralty Bank reflect that on November 1, 1999, $1,250,000.00 was wire transferred from Chemical Trust account #300137931, to Falcon Trust Company, Ltd., account #63772677, Barclays Bank, PLC, London, England. VIRGIL WOMACK's signature and date, "11-1-99," appear on

34

the facsimile sheet authorizing the transaction.

67. On October 29, 1999, CS-5 advised that **VIRGIL WOMACK** has another account at the Admiralty Bank, Palm Beach Gardens, Florida, in the name of Prestige Accounting Services, Inc., which is used to pay agents (salesmen) and clients (investors) their commissions and interest earnings when demanded by the investor. CS-5 indicated that **VIRGIL WOMACK** uses the signature stamp of George H. Williamson, Sr. on this account. CS-5 told the FBI that these checks are also prepared from the Seneca, South Carolina location.

A. A review of subpoenaed bank records for Admiralty Bank, Palm Beach Gardens, Florida, for Prestige Accounting Services, Inc., Seneca, South Carolina 29678, account #300137842, reflects signatory authority as **VIRGIL WOMACK** and also shows checks signed by George H. Williamson, Sr., with a West Palm Beach address.

B. I understand that WOMACK's organization further the investor/victims by convincing them to forego annual interest payments on their investments with the promise of an additional 5% interest return.

68. On October 29, 1999, CS-5 told the FBI that **VIRGIL WOMACK** does not use his true name, but rather uses the name of Clifton Wilkinson, which is his brother-in law's name, when dealing with salespersons who market his trust instruments. CS-5 indicated **VIRGIL WOMACK** signs all documents as Wilkinson and utilizes a signature stamp in Wilkinson's name. CS-5 stated that **VIRGIL**

WOMACK also has a signature stamp with the names Lewey L. Catoe, III, and George H. Williamson, which he uses on documents and checks. CS-5 stated that VIRGIL WOMACK told CS-5 that he is to be referred to as Clifton Wilkinson when responding to telephonic inquiries by salespeople. VIRGIL WOMACK refers salespersons who would like to meet personally, to United Marketing Trust, which source believes is an office located at 4126 Pleasantdale Road, Suite B-207, Atlanta, Georgia 30340. CS-5 advised that all salespersons refer to VIRGIL WOMACK as Cliff (Wilkinson), and uses his cellular telephone, (770) 331-4079, extensively to conduct business operations.

    A.    I am aware that area code 770 is an Atlanta, Georgia telephone exchange.

    69.    On October 29, 1999, CS-5 advised that when VIRGIL WOMACK receives a new contract for an investor, the source prepares a payment surety bond, then facsimiles these bonds to U.S. Guarantee Corporation, in Scottsdale, Arizona. U.S. Guarantee Corporation sends back to VIRGIL WOMACK, via overnight mail, a new payment surety bond with an "official" logo of a blue eagle, signed by Alvin Tang, its Chief Operating Officer, and Kenneth Turner, its Vice-President. CS-5 advised that VIRGIL WOMACK stamps the name Lewey L. Cato, III on the bottom of the bond and it is sent to the investor. U.S. Guarantee Corporation represents that they are backed by $2.6 billion in assets.

    A.    Your affiant has determined through a review of

36

investigative records that Alvin Albert Tang was convicted by the State of Arizona in 1988 for defrauding investors of $1 million in a stock scheme.

     B.   Your affiant has been advised by the SEC that the claim that U.S. Guarantee Corporation is backed by $2.6 billion in assets is false.

    70.  On October 29, 1999, CS-5 told the FBI that the actual business address for the above-described Trusts, which is reflected on all business correspondence and the destination points for incoming mail from salespersons and investors, is Applewood Center Place, 290G Applewood Center, Suite 301, Seneca, South Carolina 29678-0930, which is a Mail Boxes, Etc. location. Unendorsed investor checks are packaged daily and mailed via Federal Express to **FRED MORGENSTERN** in South Florida.

     A.   CS-5 stated that until November 29, 1999, at the direction of **VIRGIL WOMACK**, CS-5 mailed the investor checks to **MORGENSTERN** at The Merrit Advisors Group, Inc., 4901 N.W. 17th Way, Suite 407, Fort Lauderdale, Florida. Since November 29, 1999, the checks are now being mailed on a daily basis to **MORGENSTERN** at Gold Coast Checking, Margate, Florida.

     B.   Based upon the investigation being conducted in South Carolina as well as in South Florida, your affiant has been unable to find any other reason for contact between **WOMACK** and **MORGENSTERN** other than the ongoing investment fraud described in this affidavit.

71.    On November 1, 1999, CS-5 advised that **MORGENSTERN** is the individual who assists **VIRGIL WOMACK** in cashing investor checks through several banks, including one in the Bahamas, and possibly two check cashing operations in Florida, one known as Gold Coast Check Cashing, Inc.  On November 12, 1999, CS-5 advised that **PEGGY PRESTON** works with **MORGENSTERN** in the Fort Lauderdale, Florida office of The Merrit Advisors Group. According to CS-5, **PRESTON** is involved in moving money from the Admiralty Bank in Palm Beach Gardens, Florida.

A.    **MORGENSTERN** is associated with both Kinsman Merchant & Associates as well as The Merrit Advisors Group.   Both these companies have the same office space located at 4901 N. W. 17th Way, Suite 407, Fort Lauderdale, Florida.

72.    CS-5 has indicated that the daily receipts which are then forwarded to **MORGENSTERN** average from $250,000 to $600,000 in investments, however, on several days the total has been in excess of $1 million.  For example, CS-5 stated that on October 28, 1999, at **VIRGIL WOMACK's** direction, CS-5 forwarded by DHL Express, unendorsed investor checks made payable to Chemical Trust totaling $626,574.66 to **MORGENSTERN**. On October 29, 1999, CS-5 forwarded an additional $256,206.00 in unendorsed investor checks to **MORGENSTERN**.  On November 1, 1999, CS-5 mailed, at **VIRGIL WOMACK's** direction, unendorsed investors checks made payable to Chemical Trust totaling $193,718.43 to **MORGENSTERN**.  On December 17, 1999,

38

CS-5 mailed to MORGENSTERN in Florida, at VIRGIL WOMACK's direction, unendorsed investors checks totaling $1,350,557.00; on December 21, 1999, the total of unendorsed investors checks mailed to MORGENSTERN in Florida was $1,234,535.06.

73. Based upon the information being provided on a daily basis by CS-5, from October 28, 1999, through December 30, 1999, a total of over 15 million dollars in investors checks have been received at WOMACK's office and in turn forwarded to MORGENSTERN in Florida. These monies represent the proceeds from the fraudulent investment scheme, commonly referred to as a Ponzi scheme, which is being operated by WOMACK and his associates out of South Carolina. As indicated by CS-5, the majority of the investors' checks are being forwarded on a daily basis to MORGENSTERN in South Florida. MORGENSTERN is the individual who handles the cashing of these checks, at least some of which are handled by MAMONE.

74. On November 12, 1999, CS-5 stated that PRESTON facsimilied a document regarding Chemical Trust, which had a return address of 5701 Margate Boulevard, Margate, Florida 33063. CS-5 advised that PRESTON acknowledged receipt of two packages, one containing $676,747.72, the other $98,891.00. CS-5 stated PRESTON can be reached at (954) 969-8606.

A. Telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, Margate, Florida.

75. On November 1, 1999, CS-5 advised that VIRGIL WOMACK said

39

to the source that once he (**VIRGIL WOMACK**) moved to the Bahamas and, "got the money out of the United States, it could not be touched by the United States Government," and added that "people that had money in the United States could put their money in his investment opportunity."

76. Your affiant has determined through investigation that the Secretaries of State or Superior Courts of eight (8) states have issued these Cease and Desist orders directing that **VIRGIL WOMACK** or Clifton Wilkinson, d.b.a. Chemical Trust, Allliance Trust, and Global Financial Incorporated, or his salesmen, immediately cease selling unregistered securities. These states are South Dakota, Kansas, Michigan, Georgia, Kentucky, Pennsylvania, Arkansas, and Oklahoma.

77. On November 23, 1999, CS-5 advised that **VIRGIL WOMACK** told CS-5 the reason that the Chemical Trust funds are now being placed into many different bank accounts is to not draw unwanted attention from the banks by having large sums of money in one account. **VIRGIL WOMACK** told the source that this is the reason the First National Bank of Onaga, Kansas, closed the Chemical Trust account.

A. A review of subpoenaed bank records has disclosed that **VIRGIL WOMACK** has recently opened and then closed several new accounts, i.e., Continental Trust, Seneca, South Carolina - opened August 20, 1999; closed November 30, 1999; Three Rivers Trust, Seneca, South Carolina - opened June 9, 1999, closed November 30,

1999; and, New Millennium Management, Longwood, Florida - opened July 9, 1999, closed October 14, 1999. VIRGIL WOMACK had signatory authority on all these accounts.

78. CS-5 provided copies of two different letters which were prepared on March 19, 1999, to be sent to various insurance companies with the stamped names of George H. Williamson and Lewey L. Cato, III, respectively, which were prepared by **CHARLOTTE WOMACK**. The letters represented these two individuals as trustees of Chemical Trust.

79. CS-5 has advised the FBI that VIRGIL WOMACK travels to Florida routinely to consult with MORGENSTERN concerning the business. **VIRGIL WOMACK** also travels to the Bahamas routinely and recently returned from a trip on November 16, 1999. CS-5 indicated **VIRGIL WOMACK** plans to relocate his business to the Bahamas in the near future.

A. Records of the United States Customs Service, Department of Treasury reflect that VIRGIL WOMACK entered the United States from Nassau, the Bahamas, on August 3, 1999, November 12, 1999, and November 16, 1999.

B. Records of the United States Customs Service, Department of Treasury reflect that FRED MORGENSTERN entered the United States from Nassau, the Bahamas, on October 15, 23, and 26 1998, November 3, 1998, December 2, 1998, January 3, 4, and 12, 1999, February 2, 1999, April 4, 1999, May 3, 1999, October 13, 22,

and 27, 1999, November 5 and 17, 1999, December 1, 8, 14, and 17, 1999.

C.    Recent pen register information from MORGENSTERN's cellular telephone, (954) 557-3651, shows that on two occasions, the day after MORGENSTERN returned from the Bahamas, he (MORGENSTERN), utilized the target cellular telephone, (954) 537-3651 and placed calls to MAMONE's cellular telephone, (954) 614-1821. Specifically on December 8, 1999, Customs' records indicate that MORGENSTERN returned from the Bahamas; on December 9, 1999, MORGENSTERN's cellular was then used to place a call to MAMONE. On December 17, 1999, MORGENSTERN again returned from the Bahamas; on December 18, 1999, MORGENSTERN's cellular was again used to call MAMONE's cellular.

D.    Based upon the investigation to date, the financial records reviewed, and the source information set forth above, your affiant believe that the travels by VIRGIL WOMACK and MORGENSTERN to and from the Bahamas and the follow-up telephone calls from MORGENSTERN's cellular to MAMONE's cellular as described above are in furtherance of the fraud being committed against numerous investors throughout the United States and the unlawful deposit of those funds in the Bahamas for the purpose of concealing the illegal profits from law enforcement detection and seizure.

PEN REGISTER ANALYSIS

42

79.  As described, above, in the preceding section, **MAMONE** uses his cellular telephone, target telephone number (954) 614-1821, to discuss the extortionate loans and other criminal activity undertaken by the **RAFFA** organization.  The pen register analysis set forth below demonstrates that **MAMONE**'s cellular telephone, target telephone number (954) 614-1821, is in regular contact with telephone number associated with other members of the criminal conspiracy set forth herein.   Based on the intercepted conversations, and the pattern of contact revealed by the pen register, your Affiant concludes that these contacts are in furtherance of the criminal activities of the conspiracy.

80.  On November 2, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 614-1821 for a period of sixty (60) days.

81.  Pen register records for cellular telephone number (954) 614-1821 reflect that 55 calls were placed to telephone number (954) 969-8606 between November 8, 1999 and December 27, 1999, with the last call being placed on December 22, 1999.  Pen register records for telephone number (954) 969-8606 reflect that 10 calls were place to telephone number (954) 614-1821 between November 17, 1999, and December 27, 1999, the last call being place on December

43

11, 1999. Telephone company records reflect that telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

82.  Pen register records for cellular telephone number (954) 614-1821 reflect that 26 calls were placed to telephone number (954) 969-9691 between November 10, 1999 and December 27, 1999, with the last call being placed on December 22, 1999. Pen register records for telephone number (954) 969-9691 reflect that 17 calls were place to telephone number (954) 614-1821 between November 15, 1999, and December 27, 1999, the last call being place on December 11, 1999.  Telephone company records reflect that telephone number (954) 969-9691 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

83.  Pen register records for cellular telephone number (954) 614-1821 reflect that 21 calls were placed to telephone number (954) 969-8638 between November 6, 1999 and December 27, 1999, with the last call being placed on December 23, 1999. Pen register records for telephone number (954) 969-8638 reflect that 5 calls were place to telephone number (954) 614-1821 between November 20, 1999, and December 27, 1999, the last call being place on December 11, 1999.  Telephone company records reflect that telephone number (954) 969-8638 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

84.  Pen register records for cellular telephone number (954)

614-1821 reflect that 39 calls were placed to telephone number (954) 829-4142 between November 15, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 829-4142 is subscribed to Ralph Lento, 1550 N. W. 80th Avenue, Margate, Florida.

    A.   As described above in the affidavit, Lento presently has an outstanding extortionate loan which Lento received from **MAMONE**.

85. Pen register records for cellular telephone number (954) 614-1821 reflect that 43 calls were placed to telephone number (954) 802-4510 between November 10, 1999 and December 27, 1999, with the last call being placed on December 24, 1999. Telephone company records reflect that telephone number (954) 802-4510 is subscribed to Freddy Scarola 1550 N. W. 80th Avenue, Margate, Florida.

    A.   Scarola presently has an outstanding extortionate loan which Scarola had received from **MAMONE**, as described above in the affidavit.

86. Pen register records for cellular telephone number (954) 614-1821 reflect that 34 calls were placed to telephone number (954) 270-0061 between November 10, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 270-0061 is subscribed to **MICHAEL BUCCINNA**, 6363 N. W. 39th Street, Coral

45

Springs, Florida.

87. Pen register records for cellular telephone number (954) 614-1821 reflect that 9 calls were placed to telephone number (954) 557-3651 between November 9, 1999 and December 27, 1999, with the last call being placed on December 21, 1999. Telephone company records reflect that telephone number (954) 557-3651 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

88. Pen register records for cellular telephone number (954) 614-1821 reflect that 3 calls were placed to telephone number (954) 557-3648 between November 17, 1999 and December 27, 1999, with the last call being placed on December 6, 1999. Telephone company records reflect that telephone number (954) 557-3648 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

89. Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954) 557-6252 on November 8, 1999. Telephone company records reflect that telephone number (954) 557-6252 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

90. Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954)

46

681-3545 on November 24, 1999.  Telephone company records reflect that telephone number (954) 557-6252 is subscribed to T.M.C., Commercial Center Inc, 4137 N. W. 135th Court, Opa-locka, Florida, **RAFFA's** business.

91.  On December 22, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 557-3651 and (954) 927-7113 for a period of sixty (60) days.

A.  Since the inception of this pen register, there was limited use of target cellular telephone (954) 557-3651 reflected on the pens.  Your affiant believes that this may have been due to the end of the year holidays.

B.  However there have been some recent calls of significance reflected on the pen register since the holidays have ended. Specifically, from January 3 to 4, 2000, there have been a total of 6 calls placed from MORGENSTERN's cellular telephone, (954) 557-3651 to the Bahamas.  Thus far your affiant has only been able to identify one of the numbers called, that is, (242) 326-3981, which is the American International Bank in the Bahamas; three of the calls on January 4, 2000 were placed to this telephone number.

C.  Pen register records for cellular telephone number (954) 557-3651 reflect 1 call was placed to telephone number (954)

557-3648, Kinsman Merchant & Associates, on January 4, 2000.

92. Pen registers have also been utilized in the South Carolina investigation. As it relates to this investigation, the following information has been received.

A. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-9021, the Chemical Trust office, reflects that from the period November 22, 1999 through December 27, 1999, 23 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on December 21, 1999. These calls were place on the following dates: November 22, 1999 (2 calls); November 23, 1999 (3 calls); November 29, 1999 (2 calls); December 2, 1999 ( 1 call); December 3, 1999 (4 calls); December 6, 1999 (3 calls); December 14, 1999 (1 call); December 15, 1999 (1 call); December 16, 1999 (1 call); December 20, 1999 (3 calls); and, December 21, 1999 (2 calls).

B. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-5471, another number for the Chemical Trust office, reflects that from the period November 22, 1999 through January 2, 2000, 12 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on January 2, 2000. These calls took place on the following dates: November 21, 1999 (2 calls); November 28, 1999 (1 call); December 2, 1999 (1 call); December 2, 1999(1 call); December 9, 1999 (1 call); December 15, 1999 (1 call); December 20, 1999 (2 calls); December 22, 1999 (1 call); December 31, 1999 (1 call);

48

January 1, 2000; and, January 2, 2000.

  C. A review of court ordered records concerning telephone number (770) 331-4079, a cellular telephone subscribed to by **VIRGIL WOMACK**, revealed that from October 5, 1999, through December 16, 1999, 5 calls were made to (954) 557-3651, **MORGENSTERN's** cellular, with the last call being placed on October 22, 1999.

  D. A review of court ordered records concerning telephone number (864) 882-5471, **WOMACK's** residence, revealed that from November 22, 1999, through December 21, 1999, 8 calls were made to (954) 557-3651, with the last call being placed on December 21, 1999.

**NORMAL INVESTIGATIVE TECHNIQUES**

  93. Your affiant submits this application seeking authorization for the interception of wire communications because alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or, (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

  94. Your affiant is aware that **JOHN MAMONE** is a member of a criminal organization in South Florida headed by **STEVEN BRUNO RAFFA**. Your affiant is also aware from prior investigations that members of LCN Crime families, such as **RAFFA**, typically use others

49

to insulate themselves from the commission of certain criminal acts. The relationship between members and associates of the **RAFFA** organization, and, **FRED MORGENSTERN** and **PEGGY PRESTON** is consistent with this type of insulation. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

95. The FBI in 1994 attempted to introduce two undercover agents into the **RAFFA** criminal organization. These efforts proved to be unsuccessful, and **RAFFA** later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

96. The use of confidential sources has been very valuable in developing information pertaining to the named interceptees and their criminal activities. However CS-1, CS-2, and CS-3 are unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families. Although CS-4 and CS-5 are willing to testify, they do not know all or sufficient detail concerning their co-conspirators' criminal conduct, which is needed to ensure a successful prosecution. This is, in part, because the targets of this investigation have been unwilling to discuss with them all of the details of their criminal activity. For example, none of them are in the inner circle of the Trafficante LCN family and thus are not privy to the many

50

activities and businesses in which they are not personally involved.

A.    CS-4 has met MORGENSTERN and although CS-4 was asked to assist MAMONE in cashing twenty-one checks in September, 1999 which MAMONE had identified as having come from MORGENSTERN, CS-4 was unable to gain any more information concerning those particular checks. In addition, CS-4 has not been asked to assist MAMONE in the cashing of any other checks which MAMONE is apparently receiving from MORGENSTERN. Nor has the investigation in South Florida or South Carolina been able to determine where or how MORGENSTERN is cashing the enormous amount of investors' checks that he (MORGENSTERN) is receiving on a daily basis from VIRGIL WOMACK.

B.    Although CS-5 is working in VIRGIL WOMACK's office in South Carolina, CS-5 is not privy to a vast amount of information concerning the investment fraud. CS-5 is not aware of the substance of the conversations between VIRGIL WOMACK and the various salespeople throughout the country. Further, because of VIRGIL WOMACK's recent concern over law enforcement scrutiny, VIRGIL WOMACK relocated his business records to a storage facility on December 21, 1999. CS-5 also has no information concerning the manner in which MORGENSTERN handles the laundering of the investors' checks once they reach South Florida. Therefore,

although the information from CS-5 provides some direct evidence against **VIRGIL WOMACK** and his immediate associates in South Carolina, CS-5's information is insufficient to identity the entire scope of this conspiracy and all the participants.

97.    Maione and CS-3 are no longer available to work in an undercover capacity for the FBI and are not known to have any current association with the listed interceptees. As noted above, CS-4 still has direct and regular contact with **MAMONE**.  At the FBI's direction, CS-4 has engaged in limited criminal transactions with **MAMONE**.  These transactions have included the purchase of jewelry purportedly stolen from interstate commerce and negotiations concerning the laundering of proceeds from illegal gambling.  However CS-4 is still not in a position to determine the full nature and extent of the criminal activity of all the named interceptees. None of the confidential sources possess complete access to all the listed interceptees.  In addition, although there is one other source not specifically mentioned in this affidavit, who has had contact with some of the named interceptees, the source does not have access to all of the named interceptees nor is the source in a position to determine the full extent of the ongoing criminal activity.  Specifically, in February and March of 1999, another source of the FBI cashed checks for **PRESTON** and another associate, and, during that time period met **MORGENSTERN**, who **PRESTON** indicated she worked for.  However the investigation has not shown those checks to be related to the South Carolina fraud

52

being spearheaded by **VIRGIL WOMACK** nor has the investigation as yet been able to even determine the source of those checks or if it relates to any criminal activity. Since that time, this particular source has not been approached by **MORGENSTERN, PRESTON,** or their associates to handle the cashing of any further checks. Therefore this source is not in a position at this time to be able to gather any information which would further the goals of this investigation. Moreover, the source is not in contact with the other named interceptees or their associates and, consequently, is not in a position to reveal the full scope and nature of the criminal activity. In summary, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify. Indeed, as noted in this affidavit, the members of **RAFFA** organization use violence to further their criminal acts.

98. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. For example, surveillance has established that on September 29, 1999, **RAFFA, MAMONE** and Bellitto all met at Gold Coast Check Cashing, Oakland Park, Florida. However, this technique has failed to

reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to observe their activities. In addition, it is not possible to conduct physical surveillance within either Gold Coast Check Cashing Store now owned by MORGENSTERN because the facilities are small and the presence of anyone but customers would arouse suspicion. The location of MORGENSTERN's other companies, The Merrit Advisors Group, Inc., and Kinsman Merchant & Associates, is upstairs in a secured building; law enforcement has been unable to gain access to the building itself.

A.    Physical surveillance on September 29, 1999, identified STEVE RAFFA, Giuseppe Bellitto and JOHN MAMONE at Gold Coast Check Cashing, 3591 North Andrews Avenue in Oakland Park, Florida. Specifically, from approximately 12:00 p.m. to 12:11 p.m. all three persons were inside Gold Coast Check Cashing. At approximately 12:12 p.m., Bellitto and MAMONE stepped outside of the store and briefly talked with each other. MAMONE then drove away in his vehicle while Bellitto reentered the store. Thereafter, at approximately 12:17 p.m., Bellitto stepped outside

54

the store, talked on cellular telephone, and then re-entered the store. At approximately 12:19 p.m., **RAFFA** and Bellitto left the store together and drove away in a vehicle.

B. On November 29, 1999, physical surveillance was conducted at Gold Coast Check Cashing, Margate, which was able to confirm the meeting between CS-4 and **MAMONE** described above during which CS-4 provided **MAMONE** with the "stolen" jewelry. However because this meeting took place within the store, the agents could not observe the actual exchange nor was physical surveillance able to determine where **MAMONE** took the jewelry subsequent to the meeting in order to fence or sell the "stolen" property.

C. On January 5, 2000, physical surveillance was conducted at **MORGENSTERN**'s business location at 4901 N.W. 17th Way, Fort Lauderdale. However no observation of **MORGENSTERN** could be made and law enforcement was unable to gain access to the buailding without arousing suspicion.

99. Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **STEVE BRUNO RAFFA**, **JOHN MAMONE**, **FRED MORGENSTERN**, **PEGGY PRESTON**, **MARK WEISS**, **ISRAEL "BUDDY" TORRES**, **MICHAEL BUCCINNA**, **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing

55

investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise. Your affiant has caused a covert video surveillance camera to be installed in the vicinity of the exterior of Gold Coast Check Cashing store in Oakland Park, Florida (formerly RAFFA's Cash 96).

Initially the images from this camera were generally not sufficiently clear to identify the persons entering and leaving the location. However, this condition has improved somewhat with the addition of new equipment. Yet even with the improved clarity, the camera can merely identify the individuals at the location, but cannot provide sufficient evidence because the substance of any conversations between those individuals remains unknown. Moreover, because of the physical location of Gold Coast Check Cashing, extensive physical surveillance is difficult. Physical surveillance has proved useful in confirming the presence of persons at meetings, e.g., the meeting of RAFFA, Bellitto and MAMONE on September 29, 1999. However, as noted above, in and of itself this technique does not disclose the substance of the criminal conversations.

100. The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However,

56

many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

101. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic

57

surveillance, in this case, is still necessary to accomplish successful prosecution because the recorded testimony of a cooperating witness will not reveal the full nature and extent of the criminal organization.

102. From prior investigations and reports of other Agents, your affiant knows that LCN Crime families and the Sicilian Mafia are extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

103. Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

104. Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace

techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

105. Although many bank records have been subpoenaed and reviewed in relationship to the investment fraud portion of this investigation, those records alone are insufficient to meet the goals of this investigation. The bank records have disclosed where some, but certainly not all, of the investors' funds are being funneled by WOMACK and his associates. WOMACK and his group are constantly opening and closing bank accounts, thereby making it difficult to continue to locate the accounts and acquire the bank records. Further, WOMACK and his associates have moved large amounts of the cash overseas to the Bahamas and England; those bank records are not readily available to U.S. law enforcement.

106. Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that the use of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in a coded format, which is difficult to

decipher absent the interception of relevant communications. On January 7, 2000, South Carolina arrested **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, and two associates and are in the process of executing search warrants at the **WOMACKs'** residence and the offices of Chemical/Alliance Trust in South Carolina, U.S. Guarantee Corporation in Arizona, as well as Merrit Advisors Group, Inc, and Gold Coast Check Cashing/Prestige Accounting Services, Margate. These latter two locations are where the investors' checks have been forwarded to **MORGENSTERN** and his associates. Even with the arrests of **VIRGIL** and **CHARLOTTE WOMACK**, these individuals would still have access to telephones and therefore remain named interceptees. Further, even if some records and evidence is found at these locations, it is not expected that they will fully disclose the manner and means by which **MORGENSTERN** and his associates have been laundering the vast amounts of investors' checks that they have been receiving on a daily basis at least since October of 1999. It is presently unknown where **MORGENSTERN** and his associates have been cashing these checks. Further, since **MAMONE** has divested himself of the check cashing store, it is not reasonable to expect that any evidence will be found which would reveal the agreement that **MORGENSTERN** and **MAMONE** have concerning the cashing of at least some of these investors' checks nor the specifics of where **MAMONE** has, in fact, cashed those checks. Nor can these search warrants be expected to uncover any evidence

concerning **RAFFA's** participation in this fraudulent investment scheme or his receipt, on behalf of the Trafficante LCN family, of his portion of the earnings of **MAMONE** for all of his (**MAMONE's**) criminal activities.

107.  As set forth above, **FRED MORGENSTERN** was also the subject of a separate criminal investigation concerning suspected money laundering and fraud activities.  Although initially, it appeared that this investigation was unrelated to the criminal activities of **RAFFA**, it now seems that the fraudulent activity and money laundering activity undertaken by **MORGENSTERN** is related to the **RAFFA** organization.  As noted above, CS-4 stated that **MORGENSTERN** is a significant earner and **MAMONE** receives a portion of those earnings.    In any event, the court authorized interceptions sought herein are necessary in order to disclose the full nature and extent of the on going criminal relationship between the **RAFFA** organization and **MORGENSTERN**.

A.   Although **VIRGIL** and **CHARLOTTE WOMACK** and their associates in South Carolina, Georgia and Arizona may be arrested during the course of this electronic surveillance, it is not anticipated that **MORGENSTERN**, **MAMONE**, **RAFFA** or their associates in South Florida will be arrested.  Therefore the criminal activity between **MORGENSTERN** and **MAMONE** is expected to continue in relationship to the investment fraud.  Based upon the pen register information described above, it is clear that **WOMACK** and

61

his offices are not the only locations or individuals that MORGENSTERN is in telephonic contact with concerning the investment fraud. In addition, it is reasonable to expect that the arrests will cause MORGENSTERN and MAMONE to be even more circumspect in their dealings and therefore electronic surveillance will be the only means of obtaining the evidence of their criminal activities. Further, because MAMONE, RAFFA, and their associates are involved in a number of unrelated criminal activities, the arrest of VIRGIL and CHARLOTTE WOMACK and their associates should have no effect on the continuation of those activities.

108. Finally, it should be observed that MAMONE and TORRES are also the subject of an ongoing investigation concerning his criminal activities with members and associates of the Bonanno LCN family. Indeed, the United States has recently obtained a court authorized electronic surveillance order in connection with that investigation (November 12, 1999, which was continued by Court Order on December 28, 1999). However the ongoing electronic surveillance of the cellular telephones being utilized by TORRES and Anthony Graziano do not appear to have developed any evidence concerning the criminal activity described in this affidavit. The pertinent interceptions of TORRES and MAMONE in that electronic surveillance thus far has disclosed that TORRES is currently involved in a bookmaking office, loansharking, and possibly telemarketing fraud. The interceptions thus far of MAMONE in that

electronic surveillance have been minimal.

109. Based on the foregoing, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

### MINIMIZATION

110. All interceptions will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interceptions will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

111. It is anticipated that interceptions will occur involving Italian and possibly other foreign languages. In the event such

63

conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception.

### PERIOD OF INTERCEPTION

112. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, participate in the illegal conduct referenced herein, the identifies of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, or for a period not to exceed thirty (30)

64

days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins to conduct an interception under the Order, or, ten (10) days after Order is entered, whichever is earlier.

_____
Patrick G. Brodsky, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of January, 2000.

_____
WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the document on file
Clarence Maddox, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date _____

65

# EXHIBIT D

FILE NUMBER:            245A-MM-88632

DATE OF TAPE:           OCTOBER 22, 1999

TIME OF TAPE:           2:28 P.M.

TAPE NUMBER:            83H8

TYPE OF TAPE:           BODY RECORDER

CASE AGENT:             SA NEIL MATHISON                    .

TRANSCRIBED/TYPED BY:   DANA BRAGER

REVIEWED BY:            SA TAMI KAYWORTH


PARTICIPANTS:           CW - COOPERATING WITNESS
                        HS - HARRIS STEINHART
                        UF - UNKNOWN FEMALE
                        UM - UNKNOWN MALE


ABBREVIATIONS:          (UI) - UNINTELLIGIBLE
                        (SC) - SIMULTANEOUS CONVERSATION
                        (PH) - PHONETIC

245A-MM-88632

CW:                          This is Hard Eight, Hard Eight uh it's 2:28
                             on Friday, October, I think it's October
                             23rd, it is a Friday, that I know um enroute
                             to meeting with Hughey Steinhart. This is
                             Hard Eight meeting at Lester's Diner in
                             Coconut Creek, Hard Eight.

                             (LONG PAUSE)

CW:                          Yeh, can you hear? Okay. Alright, I'll let
                             you, you cut in front of me.

                             (TURN SIGNAL, TRAFFIC NOISES)

                             (PHONE RINGING)

CW:                          Yeah. Yeah, okay you know what, um maybe we
                             could meet som...maybe we could meet like
                             over over here right on the right here um
                             afterwards so then I could ya know go to the
                             other place. Okay. Bye.

                             (CARD DOOR OPENING AND CLOSING)

                             (BACKGROUND CONVERSATIONS)

CW:                          Hi, there's gonna be two of us. Non smoking.
                             Okay, I'll be right out. I have to go the
                             men's room, thank you.

                             (DOOR SHUT, URINATING, TOILET FLUSHING, DOOR
                             SHUT)

UF:                          Hello, hello, how are you?

CW:                          Good how you doing?

UF:                          Good, can I get you a beverage?

CW:                          Water with lemon, please.

UF:                          You waiting for somebody?

CW:                          Yeah, he should be here any minute.

UF:                          Okay.

                             (BACKGROUND CONVERSATIONS)

2

245A-MM-88632

| | |
|---|---|
| CW: | Hello Hughey, are you nearby? From what? Where are you? No. The one on Coconut Creek Parkway, oh, okay, alright, bye. |
| HS: | I had a major fight with my mother. |
| CW: | Oh God. |
| HS: | She called me a crook. |
| CW: | She called you a crook? |
| HS: | She rehashes everyday, everyday, every wrong thing that I ever did in my life, how I blew all the money, which I admitted to her and then I said it was a sickness Ma, and then she starts on my wife, you wife is a golddigger, you give you wife all the money. |
| UF: | Hello? |
| CW: | Hey. |
| UF: | You want something to drink? |
| HS: | I would like a cup of coffee and a a, do you have a corn muffin? |
| UF: | Yeah. |
| HS: | Toasted with some butter and jelly. |
| UF: | Sure. |
| CW: | I'll have a a fruit salad. |
| UF: | Okay. |
| CW: | Thanks. |
| HS: | Rehashes every my wife, every single thing that my, your wife has all you money, you're a sucker, I says what ya like to call up and aggravate every day, yes she says, I said good. |
| CW: | Yeah, you have to do that yeah, it's not being disrespectful. |

3

245A-MM-88632

HS:            I don't wanna talk to you anymore, good I said, don't talk to me. I'm goonna get a lawyer, get a lawyer.

CW:            Unbelievable, isn't it?

HS:            there's nothing to get, I pissed it all away. It's gone. When are you gonna pay me back? Ma, I'm not gonna pay you back, I'm never paying you back, what'd you do, work for that money, I'm never paying you back. I saved it, you saved it for me, and I blew it, whose fault is that, it's mine.

CW:            Yeah.

HS:            So who's suffering today for it. Right? Would I have been in good shape if I didn't blow the half a million dollars?

CW:            Of course.

HS:            So who's suffering, you don't go out of the house.

CW:            Yeah.

HS:            Then when I tell her she don't belong there by herself, don't tell me I'm, she don't like it, I says what are you, the stock dividends come directly and to into the account, I don't see em. She shits that I told her that I got the checks, I didn't get the check, I says the check goes into the account. I says, how do you, don't you remember me telling you this. She says you never told me that, I says well you don't even know what day it is, you told me the other day it was Tuesday when it was Sunday, how could you remember, how could you tell me you remember that.

CW:            Eh, you gotta let her...

HS:            I can't. You'll never get the best of an argument with me, ever...

CW:            Yeah.

HS:            I will never give into you, will never agree

4

245A-MM-88632

      with, I don't give a shit what you say, forever, it'll never happen and I won't. That's why nobody talks to her.

CW:      Couple of things, um I have uh, you know I'm sorting out some IRS problems I got from the U.S. Attorney, not regarding my case, but there was an old student loan that they said I was in default of which I was on a scholarship but I think at one point my parents might have gotten a student loan for my housing and stuff.

HS:      That's a long time ago.

CW:      I just got it, ya know, so make a long story short, my accountant tells me I've got to show legal income legal business my attorney had told me that a long time ago, gotta do that. What I enjoy doing, I mean, I could get a job, I could go get a job at Covenant House if I wanted, I love the touting, I like the handicapping, I love the touting. I want to do it right.

HS:      Lot of money in it.

CW:      It would be a lot of money, I could do it, I could run it right as a business I could show income, ya know there's a lot ways you could work this.

HS:      Yeah, yeah (UI) do business, I know.

CW:      Ya know, but there's ya know like a few things I know how har..,it it I know how harad it is to get customers and to hold customers. But I'll be honest with you, the information that you get is tremondous...

HS:      Whay ya mean?

CW:      You could at least have a cr, you get inside information, basketball.

HS:      Oh, I don't know, that guys retired but yeah, okay.

CW:      Who's retired?

5

245A-MM-88632

HS:          He, he don't coach any, he don't coach anymore but his friend that stuff I used to get from him.

CW:          Yeah, who doesn't coach anymore? The guy for Marino?

HS:          He's gone, that's why that game was so good that year, that game that day cause he was fired.

CW:          Oh I know, he moved to Philadelphia (UI) the Texas game.

HS:          Yeah.

CW:          I understand and I...

HS:          I get some info from my friend in Arkansas, ya know, I still get it.

CW:          Yeah, but wht I'm saying is that with the guy, ya know okay getting that kind of information and we don't have to present it as strongly as that but get that information could make us, give us some strength.

HS:          Oh, yeah.

CW:          I mean, ya know, that game I, I kick myself for not doing what I was supposed to do.

HS:          Yeah, that's the one comes along very little and ya know you don't...

CW:          Well that guys retired, he's not gonna coach anywhere else? You're kidding. but he'll still have information.

HS:          But Tommy don't even talk to em because the guy took his account away from Tommy, they had a fight but ah...

CW:          Who's Tommy from Arkansas?

HS:          Yeah, I don't need them to (UI) Tommy'll get, he'lll get the information, he'll still get, he'll still get some information.

6

245A-MM-88632

CW:         What about, what about the the coach for
            Purdue, didn't you know him?

HS:         Tommy know him. Yeah he gets information, he
            still knows guys ya know, I know Pat Bork
            (PH) but I could call em myself.

CW:         Who's Pat Bork?

HS:         He was the coach.

CW:         Of ah...

HS:         Reno.

CW:         Oh, oh, Reno because we could if we're gonna
            build up a business and we could get some
            half way decent ya know, information and the
            way you look at games, I gotta make is
            successful because I've got to start to show
            a legitimate income or I'm gonna be in, who
            knows what ya know they're looking for every
            angle, all of a sudden, ya know for them to
            come, the FBI to come and then all of sudden
            I get from the U.S. Attorney, I get from the
            IRS, ya know what I'm saying?

HS:         Yeah, but...

CW:         You know how they work...

HS:         You don't live over your head.

CW:         No, but I have to show, how do I show how do
            I pay my bills. How could I show I pay my
            bills?

HS:         You're a professional gambler, you pay you
            taxes, they (UI) I asked them how does he
            show his income, this is how he shows it. He
            pays tax on all his gambling, what he used to
            do was he used to deposit the money he made
            as a bookmaker and pay his taxes on it,
            miscellaneous income. He never ever took a
            deduction, if he showed $832,000 income,
            miscellaneous income, he paid his thirty
            percent, twenty percent tax $168,000, he paid
            the full twenty percent tax to the government
            and never took a deduction, therefore, the

7

245A-MM-88632

government don't give a shit, they got all their taxes. Now if he showed $832,000 and his taxes were the hundred and sixty eight and he took $278,000 in deductions, they would have a fine tooth comb out, they would wanna know every single solitary thing that he did. That's what he told me, that his guy told him, he's one of the best guys with that miscellaneous income. You can show it, you pay your taxes, they'll never question you. It's when you start taking $200, $400, $800 deduction, they wanna know what's this for.

CW:         Well ya know football's real tough, basketball's gonna be starting soon. Do you think we could get, you think we could do alright with basketball?

HS:         Yeah.

CW:         Otherwise I gotta try some other business, but I-I enjoy doing this. but I thought this coach was still ya know, if he's a gambler he would still get some live games or the coach for Purdue, what's the coach's name?

HS:         Keating.

CW:         Who?

HS:         Jim Keating.

CW:         Oh.

HS:         The coach of Purdue?

CW:         Yeah, we get some live games.

HS:         I don't know about that, but its a good business (CW's name) but you gotta have leads, I think the best the thing is the way Muller wants to go, (UI) e-mail it, we'll all take a piece of it and I think it'll be astronomical. Is your computer fixed. We do weekly service, you don't talk to anybody, everythings on line, you get paid on line, you get paid by credit card. I think that's I think that's where its at.

8

245A-MM-88632

CW:                    You gotta be good.

HS:                    You gotta be able to get out to the people,
                       that's the whole idea. When I was doing the
                       phone service when I started was I had a lot
                       of customers. If I was gonna do it today, I
                       wouldn't have a lot of customers, I would
                       want thirty customers. The guys I had I
                       cultivated over a period of years and I used
                       to work on a percentage and I kept them win
                       or lose. When I lost I was in the minus and
                       when I won they paid me. I had a great
                       clientele, guys stuck it out, these guys
                       today they blow everyone out.

CW:                    But, but we, ya needed a little inside
                       information you need the edge. No?
                       Information you had with basketball's
                       tremendous last year.

HS:                    Oh yeah, yeah well basketball's...

CW:                    Well Huey, footballs' half over.

HS:                    It's much information is much more valuable
                       in basketball.

CW:                    Of course it is. You, you have the inside
                       about the guys being hurt (UI) I'm talking
                       about that do you still have access to that
                       kind of information plus (UI), do you think.

HS:                    Occasionally.

CW:                    Okay. Cause we're gonna just shott from the
                       hip.

HS:                    Listen, this guy was a good gambler, this
                       coach.

CW:                    Who?

HS:                    Reno.

CW:                    Oh the coach in Reno, yeah. So he's gotta
                       still be gamblin after he retired.

HS:                    Yeah, but Tommy don't talk to him. I could
                       talk to him, I got his number. He would talk

9

245A-MM-88632

|       |                                                      |
|-------|------------------------------------------------------|
|       | to me.                                               |
| CW:   | And what (UI).                                       |
| HS:   | He knows all the coaches out in that conference.     |
| CW:   | Now we're gonna start handicapping service or if he gives us information to get some money, I mean, is that,, is that... |
| HS:   | Yeah, yeah we could do that with him. You wanna get involved now that you're not coaching. You'll have a service, coaches come in, ya know we'll cut you in for a piece of the action. Get us some info. |
| CW:   | What about the coach from ValPariso? (UI)            |
| HS:   | Coach of Val Pariso?                                  |
| CW:   | Yeah. Oh he used to just know about that game?        |
| UF:   | Guys, I'm taking off, Jackie's gonna look after you if there's anything you need. Okay. You don't have to pay you check now, don't rush. |
| CW:   | Yeah, we'll give it to you now.                       |
| UF:   | Sure?                                                 |
| CW:   | Yeah.                                                 |
| UF:   | Okay.                                                 |
| CW:   | Here you go.                                          |
| UF:   | Be right back.                                        |
| HS:   | Yeah, we could do that. He may wanna get involved with doing something like that. |
| CW:   | All we're looking for just get a percentage.          |
| HS:   | Or get em down on the game.                            |
| CW:   | Yeah.                                                 |

10

245A-MM-88632

| | |
|---|---|
| HS: | Get some info on these college games, we'll get you down a nickel or a dime. |
| CW: | All you need is one Northern Texas game a year. Oh my God, I can't believe it. |
| HS: | That was a once in a lifetime that game. I never had a game from him any of em, at anytime. (UI). I had opinions but that was the real information man, ya know. Cause he always had to watch his ass because he was coaching. |
| UF: | There you go. Seven, eight, nine that makes ten. |
| CW: | Keep two of that. |
| UF: | Thank you very much. |
| CW: | Okay. |
| UF: | Have a great day. |
| CW: | Cause I got a... |
| UF: | Want any coffee or anything? |
| CW: | No thanks. Lot ya know, gotta show a legal income. I have the store ya know with Frank and I have a legal income from the store. |
| HS: | But there's no store, right? |
| CW: | There's a store but we need to come up with the money. Especially with these other things happening about a month, you gotta show something. |
| HS: | Well, I, ya know, I'll do a service with ya, I mean, I'm gonna I-I ah thing we can make money, I mean even if you make a dime a week, you show a dime a week, what's wrong with that. |
| CW: | anything, I just gotta show legal. I just gotta show... |
| HS: | But as far as how you live, you could show |

11

245A-MM-88632

|  | miscellaneous income. |
|---|---|
| CW: | Oh yeah, yeah. I know that. but I gotta establish something legal with taxes. |
| HS: | I was at my accountants last week (UI) sometimes I have guys they owe money. I have a good customer in Naples, he deposits in my account, eleven hundred, thirteen hundred and I put it down as income. |
| CW: | Yeah. |
| HS: | I pay my taxes on it. I put as beeper income. I could say the guy owed me four thousand, I gave him winnings, you understand? |
| CW: | Yeah. |
| HS: | I pay my taxes. |
|  | (PHONE RINGING) |
| CW: | Yeah. Yeah, I know. Hello. Yeah. Good, how you doing. Okay. Um I'm just with Hughey. No I'm just saying I'm meeting with Hughey, then I gotta go meet with somebody else, what's up? Okay. Yeah, okay. Okay, yeah, okay, alright, bye. Um yeah I just I get all shook up when this guy puts me on the alert like ya know. |
| HS: | Ya gotta, ya gotta get this going. Well, ya haven't really had a set tax, taxable income for as long as I know ya. The worst business... |
| CW: | Since I left Covenant House. |
| HS: | Yeah, how did you live all these years. |
| CW: | SOS, I know that's why I've got IRS problems too. |
| HS: | Why? |
| CW: | Cause I didn't file taxes and I used to file all the time. |

245A-MM-88632

| | |
|---|---|
| HS: | Ah. |
| CW: | So I-I finally have starated to file but now I gotta be consistent and do things right. |
| HS: | Right, right. |
| CW: | I gotta go catch little Frankie. |
| HS: | Little Frank? |
| CW: | Frankie. |
| HS: | Oh, where's he? |
| CW: | I'm going to meet him on off 95. |
| HS: | I'll do something with you, ya know ya wanna gear it up ah in the next couple of weeks ah this computer thing should be done, I'd like to incorporate computer picks on it. |
| CW: | Yeah. |
| HS: | As well as ya know our opinion. |
| CW: | Yeah. |
| HS: | And the weekly selections and then have a nightly thing for basketball computer totals, everything. |
| CW: | A lot of those, lot of those guys they have like you pick then they, then they have computer picks, they pay less but then these are strictly computer picks instead of opinions, yeah... |
| HS: | Yeah, absolutely, we should do all of that. I got that program, by the way, its funny, it came to me you bet. |
| CW: | Yeah, Youbet.com. |
| HS: | I have the, the disk for you there, I'm loading the thing. |
| CW: | Good. Yeah. |

13

245A-MM-88632

HS:  You can watch every race track live. Set up an account, if wanna bet, ya bet, if you don't you don't.

CW:  Freddie told me you had eight beepers that he could sell for three fifty but you only want two fifty.

HS:  Yeah, I told em. He has eight?

CW:  No, he said you have eight.

HS:  I said I have beepers, I didn't give him a number, I said I have a bunch of beepers. He's gotta give me two hundred, he's gonna leave it over there, at DCI. Monday, called me today.

CW:  Oh, I was with em when he called.

HS:  Oh, I should leave it over there (UI).

CW:  Alright, so then if I know that your feelings that we can honestly make a living and show income, start something.

HS:  Yeah, we can start, I mean ya know, see I have access cause I know all these guys, the names but I don't wanna get on the phone and cold call people.

CW:  Well, if we can get this guy, the coach from Reno or the ex-coach whatever, that would, get a little, you know, get a little inside information, a little edge it could help us in a couple of ways.

HS:  Basketball, ya know, set up a corporation and the uh, I think Moe is right, computer...

CW:  That is the best, cleanest out of the way.

HS:  You don't have to talk to anybody and then ya know I was gonna have my web page if they ever do it for, ya know, high rollers, send em video, they could see the Wall Street Journal. See what I'm doing is ya know even though you know I do other things a lot under the table things, I'm still accountable. The

14

245A-MM-88632

FBI was in my office, cause I started this whole industry they didn't know what the hell was going on. so for me to be doing it today, it's the same kind of thing and this is what I do, I mean and know I'm in the beeper business, I'm selling beepers to people and so they're gamblers, so when I go see the guy, it's a little bit different, ya know? So I'd like to uh...

CW:     Alright, cause I gotta, gotta uh, I didn't panic her ya know buy my they said it's kind of pressing ya know I gotta get something done by the end of the year. It's October.

HS:     So, open up a corporation and do the sports. Sports handicapping, ya know put it in and uh I don't know how you handle what you earned in the past, you ah...

CW:     alright, I gotta go meet Frankie...

HS:     What's happening with what's his name, he ain't back yet is he?

CW:     No, he's not back yet. He'll be back tonight. It could be fine.

HS:     (UI)

CW:     We paid the, we paid the waitress already.

UM:     You didn't.

CW:     Yeah, we did. (laughing) Yeah, that's what I said. I'll know more later.

        (OUTSIDE/TRAFFIC NOISES)

CW:     Alright, I'll give you a call late. But if this guy still gambles, the coach from...

HS:     (UI) basketball, now there's no pressure on em.

CW:     (Stuttering)

HS:     He's not coaching anymore, so he doesn't have anybody looking over his shoulder.

15

FILE NUMBER:                245A-MM-88632

DATE OF TAPE:               OCTOBER 22, 1999

TIME OF TAPE:               2:28 P.M.

TAPE NUMBER:                83H8

TYPE OF TAPE:               BODY RECORDER

CASE AGENT:                 SA NEIL MATHISON              :

TRANSCRIBED/TYPED BY:       DANA BRAGER

REVIEWED BY:                SA TAMI KAYWORTH


PARTICIPANTS:               CW - COOPERATING WITNESS
                            HS - HARRIS STEINHART
                            UF - UNKNOWN FEMALE
                            UM - UNKNOWN MALE


ABBREVIATIONS:              (UI) - UNINTELLIGIBLE
                            (SC) - SIMULTANEOUS CONVERSATION
                            (PH) - PHONETIC

245A-MM-88632

CW:                     This is Hard Eight, Hard Eight uh it's 2:28
                        on Friday, October, I think it's October
                        23rd, it is a Friday, that I know um enroute
                        to meeting with Hughey Steinhart. This is
                        Hard Eight meeting at Lester's Diner in
                        Coconut Creek, Hard Eight.

                        (LONG PAUSE)

CW:                     Yeh, can you hear? Okay. Alright, I'll let
                        you, you cut in front of me.

                        (TURN SIGNAL, TRAFFIC NOISES)

                        (PHONE RINGING)

CW:                     Yeah. Yeah, okay you know what, um maybe we
                        could meet som...maybe we could meet like
                        over over here right on the right here um
                        afterwards so then I could ya know go to the
                        other place. Okay. Bye.

                        (CARD DOOR OPENING AND CLOSING)

                        (BACKGROUND CONVERSATIONS)

CW:                     Hi, there's gonna be two of us. Non smoking.
                        Okay, I'll be right out. I have to go the
                        men's room, thank you.

                        (DOOR SHUT, URINATING, TOILET FLUSHING, DOOR
                        SHUT)

UF:                     Hello, hello, how are you?

CW:                     Good how you doing?

UF:                     Good, can I get you a beverage?

CW:                     Water with lemon, please.

UF:                     You waiting for somebody?

CW:                     Yeah, he should be here any minute.

UF:                     Okay.

                        (BACKGROUND CONVERSATIONS)

2

245A-MM-88632

CW:    Hello Hughey, are you nearby? From what? Where are you? No. The one on Coconut Creek Parkway, oh, okay, alright, bye.

HS:    I had a major fight with my mother.

CW:    Oh God.

HS:    She called me a crook.

CW:    She called you a crook?

HS:    She rehashes everyday, everyday, every wrong thing that I ever did in my life, how I blew all the money, which I admitted to her and then I said it was a sickness Ma, and then she starts on my wife, you wife is a golddigger, you give you wife all the money.

UF:    Hello?

CW:    Hey.

UF:    You want something to drink?

HS:    I would like a cup of coffee and a a, do you have a corn muffin?

UF:    Yeah.

HS:    Toasted with some butter and jelly.

UF:    Sure.

CW:    I'll have a a fruit salad.

UF:    Okay.

CW:    Thanks.

HS:    Rehashes every my wife, every single thing that my, your wife has all you money, you're a sucker, I says what ya like to call up and aggravate every day, yes she says, I said good.

CW:    Yeah, you have to do that yeah, it's not being disrespectful.

3

245A-MM-88632

HS:         I don't wanna talk to you anymore, good I
            said, don't talk to me. I'm goonna get a
            lawyer, get a lawyer.

CW:         Unbelievable, isn't it?

HS:         there's nothing to get, I pissed it all away.
            It's gone. When are you gonna pay me back?
            Ma, I'm not gonna pay you back, I'm never
            paying you back, what'd you do, work for that
            money, I'm never paying you back. I saved it,
            you saved it for me, and I blew it, whose
            fault is that, it's mine.

CW:         Yeah.

HS:         So who's suffering today for it. Right? Would
            I have been in good shape if I didn't blow
            the half a million dollars?

CW:         Of course.

HS:         So who's suffering, you don't go out of the
            house.

CW:         Yeah.

HS:         Then when I tell her she don't belong there
            by herself, don't tell me I'm, she don't like
            it, I says what are you, the stock dividends
            come directly and to into the account, I
            don't see em. She shits that I told her that
            I got the checks, I didn't get the check, I
            says the check goes into the account. I says,
            how do you, don't you remember me telling you
            this. She says you never told me that, I says
            well you don't even know what day it is, you
            told me the other day it was Tuesday when it
            was Sunday, how could you remember, how could
            you tell me you remember that.

CW:         Eh, you gotta let her...

HS:         I can't. You'll never get the best of an
            argument with me, ever...

CW:         Yeah.

HS:         I will never give into you, will never agree

4

245A-MM-88632

    with, I don't give a shit what you say, forever, it'll never happen and I won't. That's why nobody talks to her.

CW:    Couple of things, um I have uh, you know I'm sorting out some IRS problems I got from the U.S. Attorney, not regarding my case, but there was an old student loan that they said I was in default of which I was on a scholarship but I think at one point my parents might have gotten a student loan for my housing and stuff.  ..

HS:    That's a long time ago.

CW:    I just got it, ya know, so make a long story short, my accountant tells me I've got to show legal income legal business my attorney had told me that a long time ago, gotta do that. What I enjoy doing, I mean, I could get a job, I could go get a job at Covenant House if I wanted, I love the touting, I like the handicapping, I love the touting. I want to do it right.

HS:    Lot of money in it.

CW:    It would be a lot of money, I could do it, I could run it right as a business I could show income, ya know there's a lot ways you could work this.

HS:    Yeah, yeah (UI) do business, I know.

CW:    Ya know, but there's ya know like a few things I know how har..,it it I know how harad it is to get customers and to hold customers. But I'll be honest with you, the information that you get is tremondous...

HS:    Whay ya mean?

CW:    You could at least have a cr, you get inside information, basketball.

HS:    Oh, I don't know, that guys retired but yeah, okay.

CW:    Who's retired?

5

245A-MM-88632

HS:        He, he don't coach any, he don't coach anymore but his friend that stuff I used to get from him.

CW:        Yeah, who doesn't coach anymore? The guy for Marino?

HS:        He's gone, that's why that game was so good that year, that game that day cause he was fired.

CW:        Oh I know, he moved to Philadelphia (UI) the Texas game.

HS:        Yeah.

CW:        I understand and I...

HS:        I get some info from my friend in Arkansas, ya know, I still get it.

CW:        Yeah, but wht I'm saying is that with the guy, ya know okay getting that kind of information and we don't have to present it as strongly as that but get that information could make us, give us some strength.

HS:        Oh, yeah.

CW:        I mean, ya know, that game I, I kick myself for not doing what I was supposed to do.

HS:        Yeah, that's the one comes along very little and ya know you don't...

CW:        Well that guys retired, he's not gonna coach anywhere else? You're kidding. but he'll still have information.

HS:        But Tommy don't even talk to em because the guy took his account away from Tommy, they had a fight but ah...

CW:        Who's Tommy from Arkansas?

HS:        Yeah, I don't need them to (UI) Tommy'll get, he'lll get the information, he'll still get, he'll still get some information.

6

245A-MM-88632

CW:         What about, what about the the coach for
            Purdue, didn't you know him?

HS:         Tommy know him. Yeah he gets information, he
            still knows guys ya know, I know Pat Bork
            (PH) but I could call em myself.

CW:         Who's Pat Bork?

HS:         He was the coach.

CW:         Of ah...

HS:         Reno.

CW:         Oh, oh, Reno because we could if we're gonna
            build up a business and we could get some
            half way decent ya know, information and the
            way you look at games, I gotta make is
            successful because I've got to start to show
            a legitimate income or I'm gonna be in, who
            knows what ya know they're looking for every
            angle, all of a sudden, ya know for them to
            come, the FBI to come and then all of sudden
            I get from the U.S. Attorney, I get from the
            IRS, ya know what I'm saying?

HS:         Yeah, but...

CW:         You know how they work...

HS:         You don't live over your head.

CW:         No, but I have to show, how do I show how do
            I pay my bills. How could I show I pay my
            bills?

HS:         You're a professional gambler, you pay you
            taxes, they (UI) I asked them how does he
            show his income, this is how he shows it. He
            pays tax on all his gambling, what he used to
            do was he used to deposit the money he made
            as a bookmaker and pay his taxes on it,
            miscellaneous income. He never ever took a
            deduction, if he showed $832,000 income,
            miscellaneous income, he paid his thirty
            percent, twenty percent tax $168,000, he paid
            the full twenty percent tax to the government
            and never took a deduction, therefore, the

7

245A-MM-88632

government don't give a shit, they got all
their taxes. Now if he showed $832,000 and
his taxes were the hundred and sixty eight
and he took $278,000 in deductions, they
would have a fine tooth comb out, they would
wanna know every single solitary thing that
he did. That's what he told me, that his guy
told him, he's one of the best guys with that
miscellaneous income. You can show it, you
pay your taxes, they'll never question you.
It's when you start taking $200, $400, $800
deduction, they wanna know what's this for.

CW:         Well ya know football's real tough,
            basketball's gonna be starting soon. Do you
            think we could get, you think we could do
            alright with basketball?

HS:         Yeah.

CW:         Otherwise I gotta try some other business,
            but I-I enjoy doing this. but I thought this
            coach was still ya know, if he's a gambler he
            would still get some live games or the coach
            for Purdue, what's the coach's name?

HS:         Keating.

CW:         Who?

HS:         Jim Keating.

CW:         Oh.

HS:         The coach of Purdue?

CW:         Yeah, we get some live games.

HS:         I don't know about that, but its a good
            business (CW's name) but you gotta have
            leads, I think the best the thing is the way
            Muller wants to go, (UI) e-mail it, we'll all
            take a piece of it and I think it'll be
            astronomical. Is your computer fixed. We do
            weekly service, you don't talk to anybody,
            everythings on line, you get paid on line,
            you get paid by credit card. I think that's I
            think that's where its at.

8

245A-MM-88632

CW:             You gotta be good.

HS:             You gotta be able to get out to the people,
                that's the whole idea. When I was doing the
                phone service when I started in I had a lot
                of customers. If I was gonna do it today, I
                wouldn't have a lot of customers, I would
                want thirty customers. The guys I had I
                cultivated over a period of years and I used
                to work on a percentage and I kept them win
                or lose. When I lost I was in the minus and
                when I won they paid me. I had a great
                clientele, guys stuck it out, these guys
                today they blow everyone out.

CW:             But, but we, ya needed a little inside
                information you need the edge. No?
                Information you had with basketball's
                tremendous last year.

HS:             Oh yeah, yeah well basketball's...

CW:             Well Huey, footballs' half over.

HS:             It's much information is much more valuable
                in basketball.

CW:             Of course it is. You, you have the inside
                about the guys being hurt (UI) I'm talking
                about that do you still have access to that
                kind of information plus (UI), do you think.

HS:             Occasionally.

CW:             Okay. Cause we're gonna just shott from the
                hip.

HS:             Listen, this guy was a good gambler, this
                coach.

CW:             Who?

HS:             Reno.

CW:             Oh the coach in Reno, yeah. So he's gotta
                still be gamblin after he retired.

HS:             Yeah, but Tommy don't talk to him. I could
                talk to him, I got his number. He would talk

                                9

245A-MM-88632

|  | to me. |
|---|---|
| CW: | And what (UI). |
| HS: | He knows all the coaches out in that conference. |
| CW: | Now we're gonna start handicapping service or if he gives us information to get some money, I mean, is that,, is that... |
| HS: | Yeah, yeah we could do that with him. You wanna get involved now that you're not coaching. You'll have a service, coaches come in, ya know we'll cut you in for a piece of the action. Get us some info. |
| CW: | What about the coach from ValPariso? (UI) |
| HS: | Coach of Val Pariso? |
| CW: | Yeah. Oh he used to just know about that game? |
| UF: | Guys, I'm taking off, Jackie's gonna look after you if there's anything you need. Okay. You don't have to pay you check now, don't rush. |
| CW: | Yeah, we'll give it to you now. |
| UF: | Sure? |
| CW: | Yeah. |
| UF: | Okay. |
| CW: | Here you go. |
| UF: | Be right back. |
| HS: | Yeah, we could do that. He may wanna get involved with doing something like that. |
| CW: | All we're looking for just get a percentage. |
| HS: | Or get em down on the game. |
| CW: | Yeah. |

10

245A-MM-88632

HS:             Get some info on these college games, we'll
                get you down a nickel or a dime.

CW:             All you need is one Northern Texas game a
                year. Oh my God, I can't believe it.

HS:             That was a once in a lifetime that game. I
                never had a game from him any of em, at
                anytime. (UI). I had opinions but that was
                the real information man, ya know. Cause he
                always had to watch his ass because he was
                coaching.

UF:             There you go. Seven, eight, nine that makes
                ten.

CW:             Keep two of that.

UF:             Thank you very much.

CW:             Okay.

UF:             Have a great day.

CW:             Cause I got a...

UF:             Want any coffee or anything?

CW:             No thanks. Lot ya know, gotta show a legal
                income. I have the store ya know with Frank
                and I have a legal income from the store.

HS:             But there's no store, right?

CW:             There's a store but we need to come up with
                the money. Especially with these other things
                happening about a month, you gotta show
                something.

HS:             Well, I, ya know, I'll do a service with ya,
                I mean, I'm gonna I-I ah thing we can make
                money, I mean even if you make a dime a week,
                you show a dime a week, what's wrong with
                that.

CW:             anything, I just gotta show legal. I just
                gotta show...

HS:             But as far as how you live, you could show

11

245A-MM-88632

|       | miscellaneous income. |
|-------|----------------------|

CW: Oh yeah, yeah. I know that. but I gotta establish something legal with taxes.

HS: I was at my accountants last week (UI) sometimes I have guys they owe money. I have a good customer in Naples, he deposits in my account, eleven hundred, thirteen hundred and I put it down as income.

CW: Yeah.

HS: I pay my taxes on it. I put as beeper income. I could say the guy owed me four thousand, I gave him winnings, you understand?

CW: Yeah.

HS: I pay my taxes.

(PHONE RINGING)

CW: Yeah. Yeah, I know. Hello. Yeah. Good, how you doing. Okay. Um I'm just with Hughey. No I'm just saying I'm meeting with Hughey, then I gotta go meet with somebody else, what's up? Okay. Yeah, okay. Okay, yeah, okay, alright, bye. Um yeah I just I get all shook up when this guy puts me on the alert like ya know.

HS: Ya gotta, ya gotta get this going. Well, ya haven't really had a set tax, taxable income for as long as I know ya. The worst business...

CW: Since I left Covenant House.

HS: Yeah, how did you live all these years.

CW: SOS, I know that's why I've got IRS problems too.

HS: Why?

CW: Cause I didn't file taxes and I used to file all the time.

12

245A-MM-88632

HS:        Ah.

CW:        So I-I finally have starated to file but now
           I gotta be consistent and do things right.

HS:        Right, right.

CW:        I gotta go catch little Frankie.

HS:        Little Frank?

CW:        Frankie.

HS:        Oh, where's he?

CW:        I'm going to meet him on off 95.

HS:        I'll do something with you, ya know ya wanna
           gear it up ah in the next couple of weeks ah
           this computer thing should be done, I'd like
           to incorporate computer picks on it.

CW:        Yeah.

HS:        As well as ya know our opinion.

CW:        Yeah.

HS:        And the weekly selections and then have a
           nightly thing for basketball computer totals,
           everything.

CW:        A lot of those, lot of those guys they have
           like you pick then they, then they have
           computer picks, they pay less but then these
           are strictly computer picks instead of
           opinions, yeah...

HS:        Yeah, absolutely, we should do all of that. I
           got that program, by the way, its funny, it
           came to me you bet.

CW:        Yeah, Youbet.com.

HS:        I have the, the disk for you there, I'm
           loading the thing.

CW:        Good. Yeah.

13

245A-MM-88632

HS:               You can watch every race track live. Set up an account, if wanna bet, ya bet, if you don't you don't.

CW:               Freddie told me you had eight beepers that he could sell for three fifty but you only want two fifty.

HS:               Yeah, I told em. He has eight?

CW:               No, he said you have eight.

HS:               I said I have beepers, I didn't give him a number, I said I have a bunch of beepers. He's gotta give me two hundred, he's gonna leave it over there, at DCI. Monday, called me today.

CW:               Oh, I was with em when he called.

HS:               Oh, I should leave it over there (UI).

CW:               Alright, so then if I know that your feelings that we can honestly make a living and show income, start something.

HS:               Yeah, we can start, I mean ya know, see I have access cause I know all these guys, the names but I don't wanna get on the phone and cold call people.

CW:               Well, if we can get this guy, the coach from Reno or the ex-coach whatever, that would, get a little, you know, get a little inside information, a little edge it could help us in a couple of ways.

HS:               Basketball, ya know, set up a corporation and the uh, I think Moe is right, computer...

CW:               That is the best, cleanest out of the way.

HS:               You don't have to talk to anybody and then ya know I was gonna have my web page if they ever do it for, ya know, high rollers, send em video, they could see the Wall Street Journal. See what I'm doing is ya know even though you know I do other things a lot under the table things, I'm still accountable. The

14

245A-MM-88632

         FBI was in my office, cause I started this
         whole industry they didn't know what the hell
         was going on. so for me to be doing it today,
         it's the same kind of thing and this is what
         I do, I mean and know I'm in the beeper
         business, I'm selling beepers to people and
         so they're gamblers, so when I go see the
         guy, it's a little bit different, ya know? So
         I'd like to uh...

CW:      Alright, cause I gotta, gotta uh, I didn't
         panic her ya know buy my they said it's kind
         of pressing ya know I gotta get something
         done by the end of the year. It's October.

HS:      So, open up a corporation and do the sports.
         Sports handicapping, ya know put it in and uh
         I don't know how you handle what you earned
         in the past, you ah...

CW:      alright, I gotta go meet Frankie...

HS:      What's happening with what's his name, he
         ain't back yet is he?

CW:      No, he's not back yet. He'll be back tonight.
         It could be fine.

HS:      (UI)

CW:      We paid the, we paid the waitress already.

UM:      You didn't.

CW:      Yeah, we did. (laughing) Yeah, that's what I
         said. I'll know more later.

         (OUTSIDE/TRAFFIC NOISES)

CW:      Alright, I'll give you a call late. But if
         this guy still gambles, the coach from...

HS:      (UI) basketball, now there's no pressure on
         em.

CW:      (Stuttering)

HS:      He's not coaching anymore, so he doesn't have
         anybody looking over his shoulder.

15

245A-MM-88632

| | |
|---|---|
| CW: | And the one from Purdue. |
| HS: | Yeah, he knows all those guys, I could get in touch with Bork (PH), I'll get in touch with him maybe next week, I'll tell em we're looking to start a service for basketball, you wanna get involved in it, then we'll take care of you. |
| CW: | No money out of pocket. |
| HS: | You know, cause you know all these coaches and these teams, ya know, I think he may go for that. |
| CW: | Well, I gotta do something I'm (UI) I'm gonna see Frankie now,..We'll do that and... |
| HS: | Are you goonna see my other guy tomorrow for me? |
| CW: | Yeah, Joey I'm supposed to see him tomorrow midday. |
| HS: | What do I do with my mother (UI) everytime I call I get annoyed. |
| CW: | Well, Hughey, you're doing the right thing, there's nothing you can do. Don't feel guilty, yeah... |
| | (CAR DOOR CLOSING) |
| CW: | Okay, this is Hard Eight, meeting concluded with Hughey Steinhart it was at Lester's Diner, you heard the voice of the waitress and then the manager at the end. This is Hard Eight, Hard Eight, Hard Eight. |
| | (END OF TAPE) |

16

# EXHIBIT E

November 6, 2000


The Honorable Patrica Seitz:


This letter is to ask for your consideration regarding recent events surrounding the situation of John Mamone. Basically, I am writing on behalf of the children involved in the Coral Springs Flag Football League. John Mamone has been one of the central individuals in the management of league for many years. He has devoted hundreds of hours of his time to make this league work.

I have been John's assistant coach this year for our team; the Rams. The boys have been working very hard for almost five months and now the end of the season is near. Under John's guidance, our team ended the regular season as Division winners, and has the best record in the league. I, quite honestly know very little about sports and my sponsorship of the team and participation as assistant coach is done for my son and the other boys and girls on the team. John's dedication to the league and the team is for the same reason; the children. We need John to get us through the last two weeks of the season. We have the best team, but without the Coach's leadership and knowledge, we most certainly will not achieve the results for which these kids have worked so hard.

I do not wish to minimize the importance of the legal situation involved, but these children and their parents should not be punished for a scenario they could do nothing about. I can only respectfully implore your Honor to think about the innocent young boys and girls involved, their months of hard work at practice and in the games, and the unfair consequences of not having John Mamone as coach for these last few games.

John loves these kids and they love him. Coaching these children is something John does from his heart; you can see it in his face, his smile, and his full dedication to the team. You could see it last night through the tears as he brought everyone together to explain the situation and apologize for the circumstances.

Again, I respectfully ask you to consider allowing John to fulfill his coaching responsibilities. Please do it for the children, they do not deserve to suffer these consequences.

Sincerely,

Michael Noshay
Assistant Coach

cc: David Rothman, Esq.

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

*[Signatures — illegible handwriting]*

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

_(handwritten signatures)_

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

# CORAL SPRINGS FLAG FOOTBALL TEAM
# THE RAMS

Parents signature:

November 6, 2000


Johnny Diaz
11811 Royal Palm Boulevard
Coral Springs, FL  33065
(954) 340-2071

To Whom It May Concern:

I am writing this letter on the behalf of John Mamone.  In the three years that I have known John, I have found him to be a man of compassion and integrity.  He has held various offices in the different sporting leagues of Coral Springs, offering stability, experience and guidance to the children.  Having been involved in sports year around either as a coach or player parent I have witnessed this first hand.  I not only trust John with my family, my son being one of his players, but feel it is important for him to be at the games continuing his work with the team.

I hope you will consider my request and allow John Mamone to finish what he has started in coaching my son's football team.


Sincerely,



Johnny Diaz

11/5/00

To Whom It May Concern:

Our son has been coached by John Mamone this past season with Flag football. His coaching techniques and the way he speaks and deals with the children have been wonderful. To have John participate during our "finest hour" would truly be in the best interest of the children. We ask you to please see your way clearly in this matter and let him attend and coach the boys through the Super Bowl. Thank you for your cooperation.

Respectfully,

Mike & Debbi Co

11/6/00

To Whom it May Concern:

Our son is on the Coral Springs Flag Football Junior Rams Team, which has been coached this year by John Mamone. He has lead the team through a successful season, and the team is now in the end of the season playoffs. Coach Mamone's absence has been felt by not only the assistant coaches, but most especially by the young men on the team. These boys have worked and played very hard this season and deserve to end the season victoriously. Having their coach at the playoffs/"Superbowl" would certainly add to their confidence, and offer the consistency of leadership they have come to depend on. We thank you for your consideration in this matter.


The Heshmaty Family

To Whom It May Concern,

I am one of the parents of a child who is coached by John Mamone. My son Vincent is on Johns football team. I was asked to write a letter to help in any way for John to be able to coach the team for the playoff game. The team consists of 10 & 11 yr old boys who have worked hard all year long along with their dedicated coach & parents to come this far. I along with the team know John Mamone as a warm, dedicated coach who has taught these boys team work, loyalty & dedication. Please see that these boys can be reunited with their coach for the rest—

To Whom it may Concern:

Our son Bryan Antle is playing Flag Football for the first time. Bryan absolutely loves playing football better than any other sport. Thanks to the teaching and caring of John Mamone, He is one of the only coaches that care enough to talk and teach the boys. Because of John's compassion for the boys they have the best team in the league. The boys need John's coaching skills to help the boys go to the superbowl. Please do not hold John away from his team he worked so hard with for the last 6 months.

Thank You!

Sincerely,

Bryan & Rene Antle

November 6, 2000

To Whom It May Concern:

Please allow John Mamone the opportunity to finish coaching his Junior Rams flag football team.  John has been an excellent coach and has treated each child on the team with fairness and kindness.

Our team may be headed for the Super Bowl, but without John as our coach, our team is lacking the leadership that only he can provide.  John has two of his sons on the team and I know that they really miss their father at the games.

As one of the team moms for our team, I have had a lot of contact with John and he has always been a perfect gentleman.  He really cares about each player and makes sure that we are aware of everything that concerns our team.

He is a wonderful coach and it would mean a lot to his children and his players to have him back as our coach.

Sincerely,

Patricia Weiss

Patricia Weiss

**Scott McCoy**
10565 NW 3 place
Coral Springs, Florida 33071

November 6, 2000

To Whom It May Concern,

       My son Ryan is a player on the Coral Springs Flag Football team that is coached by John Mamone. It is Ryan's first season playing football and I can't stress enough how grateful I am that Ryan was fortunate enough to get Mr. Mamone as his coach. Coach Mamones patience and dedication with not only my son but with all the kids has made this a very enjoyable experience. Even in the midst of his unfortunate troubles he has taken the time to keep in contact with the parents and the players on his team, which shows me how important the kids are to him.

       I know that Ryan was very upset to hear that his coach may not be there to lead them into the playoffs and hopefully the Super Bowl. I urge you to consider letting Coach Mamone participate in finishing what has been a very rewarding and successful season for our kids, the only one who will suffer from his absence at this time is my son and the other players on the team who have worked so hard all season to make it to the Super Bowl.

Sincerely,

Scott McCoy

November 6, 2000

Your Judgeship,

I would like to introduce myself as a parent of two children, one of whom, my son, is a player on a flag football team, and the other child, my daughter, is a cheerleader for the same team. The season has been long and successful. The team ended the regular season with a record of 14 wins, 1 loss, and 1 tie, which was outstanding! The team is now heading into the playoffs with great confidence and exuberance. It is sadly missing, however, one very important component. It is currently without its Head Coach. That person, as I am sure you have already figured out, is John Mamone. It has been his guidance and leadership that has taken this team to the top of the standings. Having been on the sidelines for all of the practices and all of the games this year I can personally attest to John's dedication and desire to prepare the team for each game and lead it to the best record in the league. Now, you are obviously wondering if there is anyone else who could take his place, an assistant coach, or a parent. Unfortunately, the answer is No. As you might suspect, John took control of his team, as a head coach should, and totally and completely controlled and scripted every facet of every practice and every game. At the beginning of the season he quickly learned all of the kids names, then assigned them to positions. He ran them through drills and plays at practice, and he would call all of the defensive and offensive plays during the games. I would like to reiterate that there is no one to replace John and I am saddened by the fact that this season, which has been so emotionally satisfying, to this point, may quickly end in the playoffs. As a parent of two children on this team, I do not want to see their season end in an unhappy and disspirited way. This letter is like no other I have ever written because it involves a request to a Judge to allow a man, John Mamone, the opportunity to lead his team, a team of 10 and 11 year-old players and accompanying cheerleaders on the field. My request is that he be allowed to participate in one, one hour practice at Mullins Park in Coral Springs, and also be allowed to coach his team in the playoffs, which would probably be 3 or 4 games, each taking approximately one hour.

Your consideration of this request would be greatly appreciated, not only by myself, but also by the 14 players, 8 cheerleaders, and all of the other parents of this team. Thank you.

Sincerely,

Charles G. Gulette
Parent of Adam and Alissa
2151 N.W. 99 Way
Coral Springs, FL  33071

November 6, 2000

To Whom It May Concern:

I am writing this letter to ask for your help. Coach Mammon has been a true inspiration and incredible role model to the team and to each of the kids. He is the reason that our team has gone this far with such strong support. Without his supervision, it may be impossible for this team to make to the Superbowl. Please understand, as a parent, how important it is to have your child succeed with the proper guidance. Coach Mammon is the guidance with his strong passion for the children's development, as well as his great personality. He has earned every child's respect for others, as well commitment to teamwork. It is so important to have Coach Mammon back again.

Thank you for your understanding.

Sincerely,

Isaac Flakens
6601 Lyons Road
Coconut Creek FL 33073

Joseph Attenasio
10419 N.W 48 Manor
Coral Springs, Fl. 33076
(954) 753-6513

October 30, 2000

To whom It may concern,

Due to the recent operation on my throat, I unfortunately cannot attend. I have known Mr.John Mamone for the past six years. We have gone to many social occasions together including affairs with our children. I have even coached flag football with John several years ago. John is so devoted to kids, he even became president of the Coral Springs Flag Football League. In my opinion, John Mamone is the proverbial real "family man".

I do not think that John Mamone is a flight risk, I truly believe John will fight against the allegations made against him. Should there be any questions regarding this letter please do not hesitate to contact me.

Sincerely,

Joseph Attenasio