UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   00-6309-CR-SEITZ/GARBER (S)

UNITED STATES OF AMERICA,
                    Plaintiff,

v.

JOHN MAMONE,
                    Defendant.

_____

GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT MAMONE'S MOTION FOR
AN ORDER ELIMINATING HOUSE ARREST AND
GOVERNMENT'S MOTION FOR REVOCATION OF
BOND WITH INCORPORATED MEMORANDUM OF LAW

        The United States of America, through its undersigned Assistant

United States Attorneys, files this response to the request of

defendant Mamone to eliminate house arrest as a condition of his

bond.   For the reasons set forth below as well as those argued at

the bond hearing, the government submits that defendant's motion

should be denied.   Further, the government submits that because of

the defendant's recent activities, the defendant's bond should be

revoked at this time.

**PROCEDURAL BACKGROUND**

        1.   On October 24, 2000, a federal grand jury sitting in Fort

Lauderdale returned a 70 count indictment charging the defendant and

eighteen[1] other persons with participating in an enterprise that was

_____

[1]        Since that time, codefendant Raffa committed suicide.

associated with the Trafficante Organized Crime Family. Mamone, a leader in the organization, was charged in all 70 counts with RICO Conspiracy (Count 1), Operating an Illegal Gambling Business (Count 2), Obstruction of Justice (Count 3), Conspiracy to Make and Collect Extortionate Extensions of Credit (Counts 4 and 5), Conspiracy to Launder Money (Counts 6, 7 and 17), Substantive Money Laundering (Counts 8-13, 18-45), and Engaging in Monetary Transactions (Counts 14-16, 46-70). The Indictment also contains a forfeiture count specifying over 34 million as proceeds subject to forfeiture, as well as a number of businesses including Gateway Transportation Services, Inc.

2. On October 31, 2000, a pretrial detention hearing was held before Magistrate-Judge Stephen T. Brown. Attached is a copy of the transcript of that proceeding.[2] The government had requested pretrial detention both on the basis of danger to the community and flight risk. At the conclusion of the hearing, Magistrate-Brown found that the defendant was not a flight risk, but did agree that he constituted a danger to the community (10/21/00 at 32). The defendant had argued for and agreed to have imposed a 24 hour house arrest as an alternative to pretrial detention (10/31/00 at 27). In light of the Court's ruling and the stipulation by the defendant, the Court set bond in the amount of $500,000 corporate surety and

---

[2] This transcript, consisting of 43 pages, is a more complete version than the 35 page transcript included with defendant's motion.

2

$500,000 personal surety, with a Nebbia hearing.  Among the many special conditions of bond, the Court imposed 24 hour house arrest with electronic monitoring, as had been stipulated to by the defendant.

3.   After the Nebbia had been satisfied, the defendant was released on house arrest starting on November 12, 2000.

4.   On January 30, 2001, a 93 count superseding indictment was returned.  The original charges as to Mamone remained the same except the Conspiracy to Make Extortionate Extensions of Credit (Count 4) was eliminated.[3]  In addition, the defendant was now charged with 24 more substantive counts of money laundering and the forfeiture amount was increased to approximately 35 million.

5.   On February 6, 2001, the defendant was arraigned on the superseding indictment and the same bond with its special conditions was continued by agreement of the parties.

### ARGUMENT

The defendant now contends that the condition of house arrest should be removed for four reasons;

1)   the defendant has complied with the condition of house arrest for almost four months;

---

[3]    However, the making of extortionate extensions of credit remained as a RICO Conspiracy predicate.

3

2)    the proffer made by the government at the detention hearing is unsupported by any evidence other than mere allegations by informants;

3)    the defendant needs to solicit business from customers and then arrange transportation for them; and,

4)    the length of time until the trial date.

The defendant also argues that initially pretrial services did not object to the removal of the house arrest condition, but through the intimidation of the government, pretrial services has now changed their position. This last argument is ludicrous. After the government learned of the position taken by Mr. Nuby of pretrial services through the defendant's motion, the government called Mr. Nuby and asked if he was aware of any of the facts underlying the indictment or of the defendant's previous supervision; Mr. Nuby was not. The government invited Mr. Nuby to meet and discuss those matters. After that meeting, Mr. Nuby told the government that he would discuss pretrial services position with his supervisor. Subsequently the government and defense counsel were informed by Mr. Nuby that pretrial services had changed their position and now objected to the release of the defendant from house arrest. There was absolutely no intimidation of Mr. Nuby by the government.[4]

---

[4]    This is born out by the memorandum prepared by Mr. Nuby and dated March 19, 2001, concerning this situation.

4

Rather, he was merely provided with facts from which pretrial services could make an informed decision on this matter.

The government believes that not only should the house arrest not be removed, but if anything, the defendant's bond should be revoked at this time.    Nevertheless, the government will still address those issues raised by defendant's motion in his argument for release from house arrest.

## A.    Compliance with the Conditions of Bond

The defendant's motion indicates that he has fully complied with the conditions of bond.    That statement is incorrect.

The forfeiture count of the indictment, as it relates to the defendant and this motion, provides for the forfeiture of approximately $35 million and all the defendants' interest in Gateway Transportation Services, Inc.    The forfeiture count also advises the defendant that the government will seek forfeiture of substitute assets pursuant to 18 U.S.C. 982 and 1963(m).

The defendant has committed a federal felony while on bond and under house arrest.[5]   In early December of 2000, the defendant was contacted by an executive of Keystone, a transportation company located in New Jersey, concerning the possibility of the defendant

---

[5]     The government is providing this information in the form of a proffer and is more than willing to provide additional details should the Court desire or to address this matter at any hearing the Court may schedule.    A proffer can be sufficient in and of itself for purposes of a hearing on this issue.  United States v. LaFontaine, 210 F.3d 125, 130 (2d Cir. 2000).

handling a transportation subcontract for Keystone. On approximately December 4, 2000, the executive of Keystone met with the defendant at his home. During that meeting, along with some subsequent telephone calls, the defendant agreed to accept the subcontract, but stated that because his company (Gateway) was being forfeited to the United States, he did not want the money to be paid directly to him or his company or to any company associated with codefendant David Bell because it would be subject to forfeiture to the government. The defendant explained that Gateway Transportation had closed[6] and was now operating as First Choice (another transportation company operated by codefendant Bell). The defendant arranged for Keystone to make the payments to John J. Jerue Trucking; the actual transportation was being handled by Bell-Four, Inc., a company owned by John Manning, the father-in-law of codefendant Bell. Because this contract was brought to Bell-Four by codefendant Bell, he was to receive a commission fee.

Under this contract, four loads were actually transported in December of 2000, however, no actual payments were made for the transportation because one of the loads was delivered with a $40,000 shortage and the final load worth approximately $450,000 was stolen.[7]

---

[6]    Gateway was not officially dissolved until December 15, 2000.

[7]    Many of the events described above are also corroborated by the consensual electronic surveillance which is part of the defendant's present bond.

In order for the Court to enter an order of revocation and detention, the Court must find that there is "(A) probable cause to believe that the person has committed a federal, state, or local crime while on release; or (B) clear and convincing evidence that the person has violated any other condition of his release ...." 18 U.S.C. 3148(b)(1). Further, if the Court finds that the defendant has committed a crime while on release, pursuant to Section 3148(b)(2)(A), "a rebuttable presumption arises that no condition or combination of conditions [of release] will assure that the person will pose a danger to the safety of any other person or the community." Such should be the finding here. Further, based on the defendant's history while under supervision as well as his current activities, it is abundantly clear that the defendant "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. 3148(b)(2).

In this case the government's proffer demonstrates that at minimum there is probable cause to believe that the defendant violated Title 18, United States Code, Section 1511 (Obstruction of Justice), or has otherwise violated the conditions of his release. The record is more than sufficient to establish by a preponderance of the evidence that the defendant's bail should be revoked. United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000);

7

United States v. Gotti, 794 F.2d 773, 777 (2d Cir.1986); United States v. Cook, 880 F.2d 1158, 1162 (10th Cir. 1989).

Moreover, in the alternative, the Court can find pursuant to Section 3148 (b)(2)(A), once the criminal violation has been proved, that the act of violating federal law itself can substantiate a revocation on the basis that "the person is unlikely to abide by any condition or combination of conditions of release." United States v. Aaron, 904 F.2d 221, 223 (5th Cir. 1990). Once again the applicable standard is preponderance of the evidence.

This is not the first time that the defendant has violated previous conditions of supervision. As was described during the pretrial detention hearing,[8] the defendant pled guilty on March 31, 1995, to conspiracy to destroy a vessel and a sentence of four years probation and restitution in the amount of $94,444.82 was imposed (Case Number 94-6214-Cr-Gonzalez). Upon the defendant's motion, the term of supervised release was terminated on April 4, 1997.

The defendant was also arrested on October 3, 1994, by the New Jersey State Police and charged with several acts of extortion by physical assault and obstruction of justice. The defendant was permitted to plead guilty to a bribery and on September 11, 1998,

---

[6]    There is an error in the dates describing the defendant's previous supervision terms in the transcript.

8

a term of four years probation was imposed.  This supervision was also terminated early on June 2, 2000.

The charges in the pending matter allege criminal activity by the defendant which took place from 1995 to the return of the indictment.[9]  Therefore the defendant was on either probation, supervised release, and/or bond during the entire time period that he was committing the very crimes charged in the present indictment.

The recent incident involving Keystone along with this defendant's past history of committing crimes while under supervision demonstrates quite clearly that even house arrest is insufficient to control his criminal activities and that bond should be revoked.

## B.   Unsupported Allegations by Informants

Defendant claims that the proffer set forth by the government at the pretrial detention hearing are merely unsupported allegations of informants.  This is an inaccurate assessment of the government's proof.

The fact that the Polito incident in which he was assaulted by the defendant was not recorded was fully discussed at the pretrial

---

[9]    The original indictment was returned on October 24, 2000; the superseding indictment was returned on January 30, 2001.

detention hearing.[10]  The government's explanation that Polito did not have an opportunity to call his FBI control agent (Hearing at 16) is not a ludicrous statement, but rather a factual explanation for the lack of a recording device being utilized during this unscheduled meeting.    Nor  is  Polito's  rendition  totally uncorroborated.  Polito met with the FBI agent later that same day, described the entire event, and the FBI agent was able to observe redness under Polito's left eye, a swollen bottom lip, and teeth marks  on  his  ear.    These  observations  directly  support  the statements of Polito.

As to Huey Steinhart, the fact that he was unwilling to testify out of fear for his own safety and that of his family (T-III Affidavit at 50, ¶96), does not diminish the strength of the information which he provided concerning the violent assault by the defendant and others which took place in May of 1997, but rather enhances it. As described during the pretrial detention hearing and in the T-III affidavit (Hearing at 17-18; T-III Affidavit at 19-20, ¶¶39-40), Mr. Steinhart had taken out a loanshark loan of $40,000 from Mamone at one point a week in approximately 1995.    In consideration of a reduction of the principal outstanding on the loan,  the  defendant  became  a  silent  partner  in  Steinhart's

---

[10]    The transcript incorrectly reflects the name "Belitto."  In fact, the cooperating witness described starting on page 15 of the hearing transcript is Al Polito.

legitimate business. During that association, Steinhart introduced Braverman to the defendant and Joe Russo, who then invested in Braverman's existing business, a pawn shop and title loans. In early May 1997, a dispute arose in which the defendant and Russo alleged that the gemstones that Braverman had posted as collateral for the business were fake. This dispute caused the two beatings which were described at the pretrial detention hearing (Hearing at 17-18). First Steinhart was summoned to the check cashing store on Margate Boulevard, roughed up, hit on the back of the head and pinned against the wall because he was being held responsible for having introduced Braverman to the defendant and Russo. Braverman was subsequently summoned to the check cashing store by the defendant and Russo, and after being threatened by them was hit with a baseball bat in the left arm by the defendant. Portions of both of these incidents were observed by independent witnesses.

Defendant's argument that neither Steinhart or Braverman are fine upstanding citizens is unavailing. Normal law-abiding citizens do not knowingly accept loanshark loans or investments from individuals associated with the mafia. Their backgrounds, however, does not diminish their descriptions of the violent nature of this defendant.

The "veiled threats" to bookies is discounted by defense counsel as merely this defendant's manner of speaking in colorful and vulgar language. Yet this argument totally ignores the fact

that these very conversations prove this defendant's position as head of a bookmaking organization as well as other criminal activity. For example, the attached transcript from a conversation intercepted on February 21, 2000, between the defendant and Ralph LNU (believed to be Ralph Lento), a bookmaker, very clearly demonstrates the defendant's top role in the gambling organization, telling Ralph LNU what can and cannot be done in the taking of bets.

Some examples of this defendant's colorful language can be seen in the three additional transcripts attached, from conversations on July 26, 1999, February 2 and 28, 2000. What these transcripts show are not just the defendant's constant use of foul language, but actual threats. For example, in the consensual recording made on July 26, 1999, the defendant is expressing his anger over Freddie (Scarola), a bookmaker working for the defendant and a codefendant in this case. At page 5, the following exchange takes place between the defendant and the cooperating witness, Al Polito:

> JM: Where's this little motherfucking Freddie, that's what I wanna know. Where's this little cocksucker?
>
> CW: Let me tell you what happened.
>
> JM: I'm more fucking irritated at him than you. Cause he lied to me he was gonna meet me Sunday before he left and he never met me this motherfucker.

And then later at pages 24-25:

> JM: Freddie wants to argue with me on the phone. Freddie, I told Freddie go buy a fucking plane

> ticket for Arizona motherfucker cause when I
> came back you've, you've had it.

CW:    You, you, you know what.  You.

JM:    I can't find this little cocksucker right now.

CW:    People tell, you it's like.

JM:    He'll show up when he has the money, I know.

(Coughing)

JM:    He avoids the (U/I) everything.  This small
       cocksucker.

CW:    Yeah, he does.

JM:    You can call your fucking cousin, your uncles,
       your brother.  Call anybody you fucking want.
       Buy a fucking plane ticket.  Don't be there
       when I get back.

During the conversations intercepted on February 2 and 28, 2000, the defendant is speaking with individuals who owe him money. Even reading the transcript alone (2/2/00 at p. 2; 2/28/00 at p. 2), the very threatening nature of the defendant's language can be seen. The government invites the Court to actually listen to these conversations to hear for itself the tone and manner in which these threats are conveyed.[11]

## C.    Desire to Work

The defendant also claims that he desires to work by soliciting business from customers who require transportation and then placing

---

[11]    At the Court's request, the government will provide the Court with copies of these recordings.

that business with a trucking company or broker. The defendant claims that this cannot be accomplished over the telephone.

Although the defendant's desire to work may be admirable, he has not demonstrated that this proposal is legitimate. As stated in the memorandum of pretrial services, they do not oppose the defendant being granted permission to seek, obtain and maintain gainful, verifiable employment approved by pretrial services. What the defendant has presented thus far falls short of verifiable employment and should be denied until he can fully demonstrate some legitimate employment that he proposes to be engaged in. In addition, considering his activities involving Gateway Transportation, Inc. and Keystone, there is serious question as to what employment he could involve himself with, without committing additional crimes.[12]

**D.    Time until trial**

The defendant also argues that because of the length of time until the set trial date, that he should be released from house arrest. However this is not a legitimate reason to alter the bond conditions.

At the calendar call when this trial date was set, the government answered ready for trial. It was solely at the request

_____

[12]    Nor is the defendant's argument that former codefendant Raffa had been permitted to work four hours a day persuasive. Raffa had an established business and had no prior criminal record or incidents of violence. The defendant's situation is quite different.

14

of all the defense counsel along with adjustments for the Court's schedule that put this matter into February of 2002. The fact that due to defense counsel own request that matter has been continued for such a period of time is no justification for release from house arrest.

## CONCLUSION

WHEREFORE, for the foregoing reasons and those that may be raised at any hearing on this matter, the government respectfully requests that this Honorable Court enter an order of revocation of bond or alternatively, that the defendant's request that the condition of house arrest be removed from his bond conditions be denied.

Respectfully submitted,

GUY E. LEWIS
UNITED STATES ATTORNEY

By: _Diana W. Fernandez for_
    J. BRIAN McCORMICK
    ASSISTANT UNITED STATES ATTORNEY
    Court I.D. #A5500084
    500 East Broward Blvd., Suite 700
    Fort Lauderdale, FL 33394
    Telephone: (954) 356-7392
    Fax: (954) 356-7230

By: _Diana W. Fernandez_
    DIANA L.W. FERNANDEZ
    ASSISTANT UNITED STATES ATTORNEY

CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was mailed this _19ᵗ_ day of _March_ , 2001 to:

David Rothman, Esq.
First Union Financial Ctr.
200 S Biscayne Blvd., Ste 2690
Miami, FL 33131
(Counsel for John Mamone)

John Howes, Esq.
633 S.E. Third Ave., Suite 4F
Fort Lauderdale, FL 33302
(Counsel for Fred Morgenstern)

Ana M. Jhones, Esq.
Bayside Plaza, Suite 625
330 Biscayne Blvd
Miami, FL 33132
(Counsel for David Morgenstern)

Emmanuel Perez, Esq.
2121 Ponce de Leon Blvd.
Suite 290
Coral Gables, FL 33134-5222
(Counsel for Joseph Silvestri)

Donald R. Spadaro, Esq.
1000 S. Federal Hwy., Ste 103
Fort Lauderdale, FL 33316
(Counsel for Julius Chiusano)

Brian L. Tannebaum, Esq.
First Union Financial Center
200 South Biscayne Blvd., Ste. 2690
Miami, FL 33131
(Counsel for Michael Buccinna)

Michael Tarre, Esq.
Two South Biscayne Blvd.,#3250
Miami, FL 33131
(Counsel for Jeffrey Bass)

John F. Cotrone, Esq.
509 S.E. 9ᵗʰ St., Suite 1
Fort Lauderdale, FL 33316
(Counsel for Frederick Scarola)

Charles Wender, Esq.
190 W. Palmetto Park Road
Boca Raton, FL 33432
(Counsel for Giuseppe Bellitto)

James Benjamin, Esq.
1 Financial Plaza, Suite 1615
Fort Lauderdale, FL 33394
(Counsel for Mark Carattini)

Peter Raben, Esq.
2665 S. Bayshore Dr., Ste 1206
Coconut Grove, FL 33133
(Counsel for Paul DiFilippi)

Neil M. Mameroff, Esq.
100 S.E. 2ⁿᵈ Ave., Suite 3350
Miami, FL 33131
(Counsel for Anson Klinger)

Brian H. Bieber, Esq.
2600 Douglas Rd., Penthouse 1
Coral Gables, FL 33134
(Counsel for Joseph Spitaleri)

Jon May, Esq.
200 East Broward Blvd.
Suite 1210
Fort Lauderdale, FL 33301
(Counsel for Charles Clay)

Richard Hamar, Esq.
Maria Hamar, Esq.
2437 Briarcrest Rd.
Beverly Hills, CA 90210
(Counsel for Charles Clay)

Steve Kreisberg, Esq.
3250 Mary St., #400
Coconut Grove, FL 33133
(Counsel for Peggy Preston)

16

Philip R. Horowitz, Esq.
12651 S. Dixie Hwy., Ste. 328
Miami, FL 33156
(Counsel for Mark Weiss)

David G. Vinikoor, Esq.
420 S.E. 12th Street
Fort Lauderdale, FL 33316
(Counsel for Jacolyn Baruch)

Jeffrey M. Harris, Esq.
One East Broward Blvd., #1500
Fort Lauderdale, FL 33301
(Counsel for David Bell)


DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF FLORIDA*
*MIAMI DIVISION*

UNITED STATES OF AMERICA,

Case No. 00-6309-Cr-SEITZ

Plaintiff,

vs.                                              MIAMI, *FLORIDA*
                                                 OCTOBER 31, 2000

JOHN MAMONE, et al.,

Defendants.

---

**TRANSCRIPT OF PRETRIAL DETENTION HEARING**
**BEFORE THE HONORABLE STEPHEN T. BROWN,**
**UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

FOR THE GOVERNMENT:

**BRIAN McCORMICK, A.U.S.A.**
500 East Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33301 954/356-7392

FOR THE DEFENDANT:

**THORNTON & ROTHMAN**
200 South Biscayne Blvd.
Miami, Florida
**BY: DAVID B. ROTHMAN, ESQ.**

REPORTED BY:                  **JERALD M. MEYERS, RPR-CM**
Official Federal Court Reporter
301 North Miami Avenue, 9th Floor
Miami, FL 33128-7797 - 305/374-8108

**STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION**

1    (Call to order of the Court)

2        THE COURT:  The United States versus John Mamone,

3    case number 00-6309-Judge Seitz.

4        THE COURT:  Mr. McCormick, are you ready to

5    proceed?

6        MR. McCORMICK:  Yes, Your Honor.

7        THE COURT:  Go ahead.

8        MR. McCORMICK:  Your Honor, the basis, as we have

9    indicated before for the detention of Mr. Mamone, is flight

10   and danger to the community.

11       The government's proffer in this case is going to

12   demonstrate that the crimes charged against Mr. Mamone are

13   crimes of violence under the Bail Reform Act, that meaning

14   extortion, over and above the fact the defendant is charged

15   with the crimes of violence, by the operation of his loan

16   shark business.

17       The government will also show specific acts

18   committed by the defendant to demonstrate the propensity,

19   his propensity to commit crimes of violence in the

20   collection of debts from gamblers and loan sharks.

21       Your Honor, the government's indictment in this

22   case charges a whole plethora of crimes under the RICO

23   Statute, 1962(d), the conspiracy to participate in a

24   racketeering enterprise.

25       The crimes include loan sharking, an illegal

1   gambling business, money laundering and running and

2   collecting extortions, extensions of credit.

3           Your Honor, the guidelines in this case are

4   tremendously high.  Computing the money laundering

5   guidelines under the sentencing guidelines, conservatively

6   speaking, it is in the mid to high 30's, and Mr. Mamone,

7   because of things that I am going to bring up in this

8   pretrial detention hearing, is well into the criminal

9   history and in the sentencing guidelines where he will

10  serve from 25 to 30 years in prison if he is convicted, and

11  sentenced according to the government's position in these

12  matters.

13          Mr. Mamone has a criminal record that is very

14  important in this particular case, for beginning in August

15  of 1993, he has arrested for destruction of a vessel and

16  mail fraud.

17          What is important to note on that is Mr. Mamone

18  pled guilty in March of 1995, and he was sentenced to four

19  years probation and restitution of $94,000.00.  That's a

20  federal offense.

21          He was under supervision for part of that in Ft.

22  Lauderdale.  The probation lasted from 1995 until about

23  April of 1997.  Why I am raising that now, Your Honor, is

24  Mr. Mamone is charged in the indictment, the RICO

25  indictment in the substantive counts with committing

1   criminal acts during that very probation, and also during

2   the period that he was under bond.

3          So I cite the Court to Section or Title 18,

4   3142(g)(2)(b) which is a very, very important consideration

5   in terms of what factors the Court looks to in terms of

6   deciding whether detention is appropriate.

7          Again, Your Honor, in 1994, Mr. Mamone was

8   arrested for extortion bribery, I believe in New Jersey.

9   He was placed on bond.  Mr. Mamone, in March of 1994, pled

10  guilty to the bribery charges and was sentenced to four

11  years probation.

12         That probation ran from March of 1995 until about

13  June of 2000.  Once again, Your Honor, the facts of this

14  indictment spans from in or about 1995 until October of

15  2000, but importantly, again, the state probation spans the

16  period of time that he was committing the criminal acts

17  charged in this very indictment.

18         There is virtually no time period under which

19  Mr. Mamone is charged in the indictment that he wasn't

20  under some form of supervision, either bond as a result of

21  his prior criminal activity, or probation or supervised

22  release.  It just didn't occur in this case.

23         Again, Your Honor, that's an extremely important

24  consideration in terms of the Court determining whether

25  detention is the appropriate.

- 10/31/00

1          Mr. Mamone is charged in 70 counts, and all those

2    70 counts, some of those 70 counts, I should say, cover the

3    entire period.  Other counts cover specific charges.

4          The case against Mr. Mamone consists of evidence

5    gathered from consensual recordings from wire taps covering

6    approximately four months.

7          In determining -- one of the wire taps covered a

8    cellular phone that Mr. Mamone carried, I believe over a 60

9    day period of time.  Also, substantial records were

10   recovered proving up various parts of this RICO enterprise;

11         There were, from search warrants that were

12   executed in South Florida, as well as other states of the

13   union, numerous records were obtained and analyzed during

14   the pendency of this investigation from various financial

15   institutions that I will be summarizing for the Court.

16         There is a multiple of physical surveillance of

17   Mr. Raffa, Mr. Mamone and all the other co-conspirators in

18   this case, and there is, of course, cooperating witness

19   information and confidential source information.

20         In short, Your Honor, what this case is about is,

21   it is about the Trafficante crime family that operated in

22   South Florida at least during the time period set forth in

23   the indictment.

24         The indictment alleges, and we will prove in

25   court or in trial that Steve Raffa is a leader or a faction

1   of that family that operates in South Florida.

2          We will show that Steve Raffa supervised and

3   directed a criminal crew that engaged in these various

4   criminal acts set forth in the indictment, such as money

5   laundering, loan sharking, extortion, bank fraud, mail

6   fraud, wire fraud, gambling and receipt of stolen property,

7   among other crimes set forth.

8          Also, Your Honor, in terms of a summary, we will

9   show that John Mamone was Mr. Raffa's second in command who

10  managed the day-to-day operation of this organization that

11  operated in South Florida.

12         In terms of the gambling side of the case, Your

13  Honor, the proof will show at trial that the structure of

14  the enterprise, in part, relied heavily upon an illegal

15  gambling business and collection of debt from gamblers who

16  incurred losses in that business.

17         The proof will show that Mr. Mamone used, on a

18  frequent basis, used threats of violence in collection, in

19  collecting these particular losses from not only bettors

20  who bet with the illegal gambling business, but from

21  bookies and sub-bookies and agents who worked underneath

22  John Mamone and incurred major losses or major debt to John

23  Mamone who was supervising the entire operation.

24         These particular gambling activities were picked

25  up frequently in the Title III or wiretap interceptions

1   that I've already indicated to the Court.

2       Also, the government will rely and has been

3   relying greatly on a cooperating witness by the name of Al

4   Bellitto who worked with several organized crime groups

5   during the pendency of this investigation and met

6   frequently with John Mamone, and John Mamone engaged him in

7   frequent criminal conduct that will be outlined later in

8   this proffer.

9       The state warrants were also very useful in terms

10  of establishing the individual bookmakers who worked under

11  John Mamone during the time charged in this indictment.

12      Also, we are going to be showing in this proffer

13  the use of the check cashing stores in South Florida as a

14  means or focal point for laundering activities from the

15  organized crime activity which was supervised by John

16  Mamone.

17      In short -- I will get into it in a little

18  later -- the check cashing stores were used to launder

19  debts from bettors and bookies on behalf of John Mamone.

20      The check cashing stores were also used to

21  launder monies that were obtained from victims throughout

22  the United States, as a result of a very successful Ponzi

23  scheme that was perpetrated on investors who were located

24  throughout the United States, through the City of

25  Greenville, South Carolina.

1          You are going to find, Your Honor, based upon

2  this proffer, that anywhere from 20 to 30 million dollars

3  was laundered through the check cashing stores through the

4  direct knowledge and control of members of this enterprise,

5  and some direct participation by John Mamone who had

6  knowledge and aided and assisted the check cashing stores

7  in going about this type of money laundering activity.

8          Your Honor, I go back now to 1996 where there was

9  a cooperating witness by the name of Louis Maione,

10  M-a-i-o-n-e.  Mr. Maione was a cooperating witness in an

11  investigation involving the Gambino crime family.

12          Mr. Maione was linked very closely to the acting

13  head of that crime family, an individual by the name of

14  Nicholas Carazzo.

15          Mr. Carazzo assumed control of that family as a

16  result of John Gotti being convicted and being sentenced to

17  life, as I am sure the Court is aware.

18          During the pendency of Mr. Maione's cooperation

19  against the members of the Corrazo-Gambino crime family,

20  one of his assignments, while he was working under the

21  auspices of the FBI was to provide housing for Nick Corrazo

22  who came to South Florida to supervise his criminal crew

23  that was working in Deerfield Beach, Florida.

24          One of the places that Mr. Maione obtained for

25  Mr. Corrazo's stay was a hotel by the name of Ocean Manor,

1  which is located on A1A in Ft. Lauderdale.

2         Mr. Maione frequented that particular

3  establishment and the bar located in the establishment on

4  numerous occasions when the Gambino crew stayed there

5  visiting from New York.

6         During one of those particular meetings in 1996,

7  Mr. Maione met an individual by the name of Lou Kastanza.

8  Mr. Kastanza informed Mr. Maione that he had a gambling

9  debt that he had incurred with an individual bookie, and

10  the bookie had beaten him up, and he was in fear, and he

11  asked if Mr. Maione could possibly intercede on behalf of

12  Mr. Kastanza with the bookie and the organized crime group

13  that the bookie was involved in because Mr. Kastanza knew

14  that Mr. Maione had contacts with the Gambino crime family.

15         Well, Mr. Maione agreed to do that, and

16  Mr. Maione met an individual by the name of Joe Bellitto

17  who was the head of that particular bookmaking operation,

18  at least insofar as he knew at that time.

19         Mr. Maione, on behalf of the Gambino crime

20  family, told Mr. Bellitto that Mr. Kastanza was under the

21  protection of the Gambino crime family.  Therefore, he

22  should reduce the payments that Mr. Kastanza had to make,

23  and it would be done in that manner.

24         Well, Mr. Kastanza made some payments through

25  Mr. Maione to Mr. Bellitto, but the payments stopped.  At

1    that time, Mr. Maione and Mr. Raffa called for a meeting or

2    what they call, in organized crime parlance, a sit down

3    that occurred on June 13th of 1996 to discuss the

4    nonpayment by the bookie who owed the Trafficante gambling

5    enterprise money at the insistence of the Gambino

6    enterprise, and this is a traditional meeting that took

7    place that Mr. Maione attended; Mr. Steve Raffa attended,

8    Mr. John Mamone attended, and an individual named Augie

9    Correro attended.  Mr. Correro was a made member of the

10   Gambino crime family.  During that particular meeting,

11   which was recorded --

12          THE COURT:  Just a second.  Hold on for a minute.

13   Something is troubling me.  You started this proffer by

14   telling this Court why Mr. Mamone is the second in command

15   of this organization and Mr. Raffa is the leader.

16          MR. McCORMICK:  Yes, Your Honor.

17          THE COURT:  This is an indicted case, vastly

18   different from a complaint.  I am assuming -- and you

19   correct me if I am wrong now -- that all of the allegations

20   that you have suggested so far, they are applicable to this

21   defendant and are, likewise, applicable to Mr. Raffa; the

22   same Mr. Raffa that you have agreed to a corporate surety

23   bond on.

24          MR. McCORMICK:  And for house arrest.

25          THE COURT:  Yes.  Now, my question is what makes

```
 1   this defendant, and I think somewhere along the way you
 2   need to focus on why something similar to that should not
 3   be applicable to this defendant, and there certainly may be
 4   an answer.  I want you to be able to get there.
 5             MR. McCORMICK:  All right, Your Honor.  Perhaps
 6   one of the things I wanted to bring to the Court's
 7   attention I already have, and the fact is that Mr. Mamone
 8   was under supervision during the entire time that this case
 9   was, rather the facts of this case led to the indictment,
10   from 1995 until October of 2000, and I have already
11   outlined to the Court that Mr. Mamone was, indeed, under
12   some form of supervision, sometimes double supervision by
13   probation, and that's a big difference in regard to Mr.
14   Raffa.
15             Another matter which is going to distinguish him
16   from Mr. Raffa are that Mr. Mamone actually participated in
17   acts of violence in furtherance of the RICO enterprise, and
18   I am going to get into that, and this is preliminary to
19   that, and his leadership role is proved up by virtue you of
20   his attending the June 13, 1996 meeting.
21             I just have a couple of excerpts to read as to
22   that, and my intention then was to provide to the Court
23   specific threats made by Mr. Mamone to specific acts of
24   violence made by Mr. Mamone that support our contention
25   that he should be detained.
```

1    **THE COURT:** Okay. I think you will need to focus

2  on that because the general rule is that when you lay out

3  the background, obviously it might lead this Court to a

4  similar conclusion. So, as I said, you certainly did cover

5  that, and you need to distinguish this defendant from

6  Mr. Raffa.

7    **MR. McCORMICK:** I will do that, Your Honor. With

8  the Court's indulgence, though, I would just read a couple

9  of excerpts. I have the transcripts. I don't know if the

10  Court is interested in the transcripts or not.

11    **THE COURT:** For the moment the answer is, no, but

12  go ahead and read them and then I will let you know if I

13  need them. Go ahead.

14    **MR. McCORMICK:** Your Honor, I am referring to the

15  June 13, 1996 transcript of the meeting between John

16  Mamone, Steve Raffa and Augie Correro, as well as the

17  cooperating witness, Mr. Maione.

18    On page 10 I refer, when Mr. Mamone is

19  discussing -- Mr. Mamone does most of the talking during

20  this particular sit down between the two organized crime

21  families.

22    Mr. Mamone is talking about the debt owed by Lou

23  Kastanza. He says, "9,000, and let's find out where this

24  guy that owes the money. We will help him F--- collect,

25  like anybody else, but, you know what, you brought the guy

1    in.  You are responsible for the money.  He agreed, and he

2    agreed to pay 100 a week."

3         What he is referring to is his insistence upon

4    Mr. Kastanza making the payment to the bookie working under

5    him, which is Joe Bellitto.

6         In another discussion, talking about the physical

7    violence that was used against Mr. Kastanza, Mr. Mamone

8    says --

9         **MR. ROTHMAN:**  What page is this, Mr. McCormick?

10   I am sorry.

11        **MR. McCORMICK:**  Page 12.  I am sorry.

12        **MR. ROTHMAN:**  Thank you.

13        **MR. McCORMICK:**  "He misses two appointments with

14   Lou.  He don't show up to Joe's office."  Meaning Joe

15   Bellitto.

16        "We cannot find this guy.  So we finally turn the

17   track on different play-out.  We got to play house."

18   That's unintelligible -- "especially out of disrespect.  We

19   talked to Augie," meaning Augie Correro.

20        "He's beat us.  We are trying to help you find

21   the guy for the money.  He don't even have the courtesy to

22   come down here and talk to us.  He is like avoiding us.

23   That's why he got slapped.  Not for the money.  Nothing

24   else.  Just a wake up call."  That's John Mamone.

25        Again, John Mamone states, "Yeah, Joe, why --

1    you" -- I am going to page 13, Mr. Rothman.

2         "Yeah, Joe, why?  Why you coming?

3         Oh, it doesn't matter.  He wins.  We're getting

4    something.  You understand, Joe," he says, meaning

5    Bellitto.

6         I "Want the guy to come up with our money.  So

7    the next time the guy came himself.  Well, like he said, it

8    went on for maybe four weeks, but up, before the house,

9    when he finally got through and he got smacked by Joe,

10   listen, he does the smack.  He got plenty of time.  It

11   wasn't a shake up.  It wasn't that we threatened the guy.

12   Listen, when he comes," and he goes on and speaks about

13   that.

14         And then John Mamone on page 18 states, and it is

15   a rather lengthy meeting, but he states to the group, "So

16   we're going to, shaking him down or taking an" --

17   unintelligible -- "from him.  It is our business.  We don't

18   let anyone know we have been to this guy.  What you -- are

19   you going to tell us who to shake down now?  Like, we can't

20   shake down.  Like, somebody -- listen, I don't go into your

21   backyard and tell you what to do.  Why you coming to mine

22   and telling me what to do?  I am collecting from this guy

23   eight weeks.  Whether we are entitled to payments or not, I

24   am collecting right from this guy.  It is my business what

25   I want to do with him."

1              What he is telling the Gambino crime family is it

2    is their territory and he controls who is going to be

3    collected from and who is going to be shaken down.  If he

4    wants to do that, he will do that.

5              Your Honor, in terms of Al Bellitto, Al Bellitto

6    was a cooperating witness with the government, as I stated,

7    that worked for, against other organized crime groups under

8    the auspices of the FBI.

9              Al Bellitto engaged in several, at John Mamone's

10   request, engaged in several criminal acts directly having

11   to do with the illegal gambling business, as well as

12   dealing in counterfeit checks, as well as dealing in checks

13   that were obtained from the South Carolina Ponzi scheme

14   that I alluded to earlier.

15             Mr. Bellitto was also indebted to Mr. Mamone to

16   the extent of $40,000.00 in January of 1999.  That

17   particular debt was incurred as a result of some people who

18   bet through Mr. Bellitto, and that was before Mr. Bellitto

19   was cooperating with the government.

20             Mr. Bellitto was slow in paying the vigorish

21   payments, which is extortion with interest, and he was slow

22   in paying the principal.

23             Mr. Mamone made several telephone calls to him in

24   a threatening manner, that he wanted to collect for those

25   particular monies.  However, more particularly, on March

1  21, 2000, Mr. Bellitto received a call from an individual

2  by the name of Buccinna who is also on the indictment.

3          Mr. Buccinna directed Mr. Bellitto to meet with

4  Mr. Mamone at a coffee shop in Coral Springs.  Mr. Bellitto

5  did not have the opportunity to call his FBI control agent.

6          However, Mr. Bellitto did drive over and meet

7  with Mr. Mamone at that particular time.

8          When he arrived at the coffee shop, Mr. Buccinna

9  was alone, but shortly Mr. Mamone arrived in a car that was

10  driven by David Bell, another codefendant in this case.

11          Both Mr. Buccinna and Mr. Bellitto got into the

12  car; Mr. Mamone's car, although it was driven by Mr. Bell.

13          Mr. Bellitto was seated in the back seat of that

14  particular car, with Mr. Mamone.  During that particular

15  drive, which ended up behind a Borders book store in Coral

16  Springs, Mr. Mamone began to question Mr. Bellitto about

17  nonpayment of this extortionate loan that Mr. Bellitto had

18  taken out in January of 1999.

19          I think that was before Mr. Bellitto had begun

20  cooperating with the FBI, and any payments were made after

21  that through the FBI who furnished money to Mr. Bellitto

22  who gave it to Mr. Mamone.

23          During this conversation, he threatened

24  Mr. Bellitto with physical abuse, and finally hit him two

25  times while he was in the back seat; at least two times,

1    and at that particular time, Mr. Mamone also tried to bite

2    his ear off.  Mr. Mamone stayed with Mr. Bellitto for a few

3    minutes.  Then they drove him back to his car.

4            Your Honor, that is simply an act of violence as

5    direct as you can get in  a loan sharking collection.

6            Now, Your Honor, we also have Mr. Mamone engaging

7    in loan sharking activity with an individual by the name of

8    Mr. Steinhardt.  Mr. Steinhardt borrowed approximately

9    $40,000.00 from Mr. Mamone at one point a week.

10           Mr. Steinhardt also referred another individual

11   by the name of Mr. Defazio to Mr. Mamone for a loan shark

12   loan or loan shark advancement.

13           Apparently there was a controversy of whether

14   Mr. Defazio was going to pay Mr. Mamone.  So Mr. Mamone

15   decided that Mr. Steinhardt should pay the entire amount of

16   the loan shark loan that was made to the individual

17   referred to him by Mr. Steinhardt.

18           Now, Mr. Steinhardt was also introduced to an

19   individual by the name of Joe Russo who was involved in

20   this loan shark operation with Mr. Mamone.

21           Mr. Mamone and Mr. Russo were not being paid by

22   Mr. Steinhardt, and what ended up happening was

23   Mr. Steinhardt was called into the check cashing store,

24   which was located at 5701 Margate Boulevard.  It was called

25   Check Cashing Unlimited, which was at least owned on paper

1  by Mrs. Mamone.

2        When Mr. Steinhardt arrived at that particular

3  business, Mr. Russo hit Mr. Steinhardt in the back of the

4  head and pinned him against the wall.

5        Now, Mr. Mamone, Mr. Russo and Mr. Buccinna then

6  roughed Mr. Steinhardt up in the back of the store, asking

7  for payment and asking how could he not be making these

8  payments?  How could me do things like this to them?

9        Again, on May 17th of 1997, at a meeting at

10 Mr. Mamone's residence -- strike that, Your Honor.

11       Mr. Braverman, another individual who was

12 referred to the loan shark operation by Mr. Steinhardt, I

13 believe was introduced to Mr. Mamone.

14       Mr. Braverman also became indebted to these

15 individuals in approximately May of 1997.  Mr. Braverman

16 was also called into Margate where he met with John Mamone

17 and other people.

18       Mr. Mamone directed Mr. Braverman to the check

19 cashing store; the vault area of the check cashing store.

20       There, John Mamone struck Mr. Braverman in the

21 left arm approximately three times with a baseball bat, in

22 an attempt to get his point across that payment should be

23 made to Mr. Mamone and members of the organization.

24       As I said, Your Honor, during the Title III of

25 this particular case, Mr. Mamone was intercepted on

1 numerous occasions making veiled threats on telephones to

2 the bookies who incurred debt because of bounced checks, or

3 what have you, going through the check cashing stores.

4        These are direct acts of violence and indirect

5 acts of violence that weren't present for Mr. Raffa.

6        Mr. Raffa's involvement, this is as an overseer,

7 and he will probably be punished upon conviction as

8 severely as Mr. Mamone, but at this particular time, we are

9 talking about direct threats and direct violence.  There

10 are two different considerations, in the government's view.

11        I don't know if the Court wishes me to talk about

12 the money laundering activity that occurred at the stores

13 or not.  If the Court accepts the allegations in the

14 indictment --

15        **THE COURT:**  I already said I have to.

16        **MR. McCORMICK:**  Okay.  Just to point out, just a

17 very few quick facts on that, Your Honor.  During the

18 summer of 1999 through maybe December, January of 2000,

19. there was a Ponzi scheme that was being operated out of

20 Greenville, South Carolina.

21        The Ponzi scheme had to do with victims located

22 throughout the United States being convinced to -- I might

23 add elderly victims who had their life savings typed up in

24 these types of investments.

25        They were convinced by people in South Carolina,

- 10/31/00

1   Virgil Womack and his organization, to invest their IRA's

2   their pensions, what have you, into a trust called Chemical

3   Trust and other types of trusts, with the promise that the

4   trust would pay anywhere from 10 to 20 percent.

5        The agents were given commissions from that.

6   There was a guarantee given to the investors that the

7   individuals who invested, a bonding company would guarantee

8   that no losses would be incurred whatsoever as a result of

9   these investments.

10       Now, this was an out and out Ponzi scheme because

11  the money, the people who demanded their money back, or

12  demanded interest from their investment, were paid from

13  monies coming in from other investors.

14       The bulk of the monies, the bulk of these monies

15  were sent down via Fred and David Morgenstern, who are also

16  in the indictment, to be deposited in check cashing stores,

17  and there is three major check cashing stores that were

18  used, all of which Mr. Mamone had great influence over;

19  Check Cashing Unlimited, Check Cashing Unlimited II.

20       Check Cashing Unlimited became Gold Coast Check

21  Cashing, as well as the callous market.

22       Now, what is so important about Mr. Mamone in

23  this matter is he assisted this extremely large and

24  significant money laundering operation.

25       The monies were deposited through these check

1  cashing stores and through various other accounts and

2  transported over to the Bahamas and then to Europe, and

3  those monies were never used for the intended purpose, and

4  everybody involved in this case made substantial illegal

5  profits, including Mr. Mamone.

6          An example of that would be in September of 1999,

7  Mr. Mamone brought checks totaling about a million dollars

8  to a callous market through Al Bellitto, the cooperating

9  witness with the government.

10          These funds were deposited.  They were given to

11  Kaiser Akel, a person who owned this market who was the

12  money launderer, and Mr. Akel looked at these funds and

13  looked at the individual checks from the investors.

14          Now, what Mr. Akel ended up doing was he called

15  from the legend of the check some of the investors to see

16  if these checks were good or bad, and the problem was when

17  he called the one or two investors that he did, he found

18  out that people were very, very old, and he decided that,

19  he became very fearful and didn't become involved in this

20  scheme, and he handed the checks back to Mr. Mamone.

21          Mr. Mamone put at least $350,000.00 of those

22  funds through Gold Coast Check Cashing, a check cashing

23  store that he once directly controlled, but the money was

24  lost, obviously, and it went to other parts of the country.

25          Your Honor, Mr. Mamone also cashed numerous of

 1  these Chemical Trust checks through Irving Weiss and Bruce

 2  Chiusano.  Mr. Chiusano is on the indictment.

 3          The check cashing store that Mr. Weiss and

 4  Chiusano was involved in was Check Cashing Unlimited II.

 5  These checks were brought by not only Mr. Mamone, but Fred

 6  Morgenstern, a coconspirator, Peggy Preston, Mark Weiss and

 7  Jason Crosson.

 8          These checks were brought to the check cashing

 9  stores and negotiated on behalf of the enterprise.  What is

10  important, though, is a group of these checks, at least

11  $769,000.00 of these checks were deposited by John Mamone,

12  and John Mamone asked for the money to be paid directly to

13  him.

14          Rather than do that, the Check Cashing Unlimited

15  furnished the checks to, in the form of cashier's checks to

16  the Gold Coast -- excuse me -- to Check Cashing Unlimited.

17          Mr. Mamone put the bulk of these funds in an

18  account that he opened up for the express purpose of

19  laundering these funds at a Merrill Lynch account.

20          These funds were laundered through that account.

21  And, as a matter of fact, a portion of these funds were

22  even used to deposit within Gateway Services, which is an

23  enterprise that Mr. Mamone ostensibly was running, and he

24  considered, I think in his motions papers he considers to

25  be legitimate.  May I have a minute, Your Honor?

1          THE COURT:  You may.  Let me ask you one

2   question.

3          MR. McCORMICK:  Okay.

4          THE COURT:  On what basis do you contend the

5   defendant is a risk of flight?

6          MR. McCORMICK:  Your Honor, the risk of flight

7   isn't the strongest basis.  I concede that, and I conceded

8   that to Mr. Rothman.

9          The basis, if there is any risk of flight, is the

10  dilemma that Mr. Mamone is facing upon conviction.  He

11  could possibly be sentenced to 30 years in jail, and that's

12  the sole basis that I have to make the argument the length

13  or severity of the sentence.

14         THE COURT:  Okay.

15         MR. McCORMICK:  Thank you, Your Honor.  The only

16  other matter that I would bring to the Court's attention is

17  during our investigation we do have evidence that

18  Mr. Mamone has access to monies overseas, and those monies,

19  of course, were of concern.

20         We are concerned about that because of the

21  possibility of flight.  I know he has a lot of friends and

22  neighbors here, and they are claiming that Mr. Mamone is

23  not a risk of flight, and that isn't our main argument, but

24  it certainly should be considered, in conjunction where the

25  danger to the community argument.

1          **THE COURT:**  Thank you.  Mr. Rothman, address only

2    the danger to the community.

3          **MR. ROTHMAN:**  Judge, to begin with, number 1, if

4    prior record of Mr. Mamone is for insurance fraud and

5    commercial bribery for allegedly giving somebody money to

6    get a contract.  Not a business official, but a

7    nonbusiness -- I mean, not a public official; a business

8    official.

9          Mr. Mamone received house arrest, followed by

10   probation in the federal case and probation in the state

11   case.

12         The federal case was a case in which I

13   represented him on, and I recommended that he not plead

14   guilty and should go to trial.  He took a plea.  He got the

15   probation.  He completed the probation.

16         I would disagree with the government as to what

17   occurred.  While he was out on probation in that case, he

18   was under house arrest.  In fact, the court shortened his

19   sentence.  The government never raised any issue then which

20   they claim now they knew about.

21         In the state case, he was in the middle of a

22   trial which he would have won, and they offered him a short

23   period of probation on a plea, and he took it.  That's the

24   prior history.  No violence in those prior cases at all.

25   No pleas of violence at all.

1          On the issues here, Judge, as I stated in my

2   papers, there are conditions that will make Mr. Mamone not

3   a danger to anybody, assuming the truth of any of those

4   allegations, and I would like to question a few of those,

5   Judge, but, obviously, in the format we have in a detention

6   hearing, it becomes quite difficult.

7          For example, Mr. McCormick read to you from a

8   transcript.  I was provided last night a series of

9   transcripts.  The one biggest allegation I think they have

10  in the violence aspect is this supposed assault upon

11  Mr. Bellitto; threatened him; hit him and went to bite his

12  ear.

13          Where is the tape?  Mr. Bellitto, in other tapes

14  I have been provided, is on the body bug.  They have a

15  series of conversations in which a lot of things were said.

16  Much of what was said was not done.  Almost all of what was

17  said was not done.  A lot of puffing going on, but it was a

18  body bug that Mr. Bellitto was wearing.

19          Where is the tape?  Where is the evidence, which

20  I don't know at this stage, what is the evidence on that?

21          Some of the people that the government talked

22  about here being involved in violence have been given a

23  bond by the government; agreed to a bond in this case.

24          Some of the people who are out on bond in other

25  cases have been given a bond in this particular case.  The

1   government has picked and chosen and Your Honor hit

2   probably the major issue head on at the outset of this

3   hearing.

4           If John Mamone is guilty, what does that make

5   Steve Raffa?  If John Mamone is bad, what does that make

6   Steve Raffa?  They agreed to a quarter of a million dollar

7   corporate surety; not a half a million.

8           We are offering a million dollar bond, Judge, and

9   we have the people I mentioned, but in addition to those

10  people, I would like to introduce them, they did take the

11  time to come here, but I want to address that at the end.

12          In addition to the people I mentioned in the

13  meeting we had last night, when I went to the home of the

14  Switzers who were kind enough to host a gathering of all of

15  the neighbors and friends, in addition to the people

16  mentioned, Ralph and Michelle Bartanian also agreed to

17  co-sign on a bond of a million dollars.

18          They have assets in excess of $500,000.00.  Jim

19  and Connie Guise have agreed to sign on.  They have assets

20  over a million dollars.  There is strong support.  We can

21  structure a bond so there is absolutely no concern for any

22  future violence.

23          And what I submit to the Court what is occurring

24  here today, by the government negotiating on everyone's

25  bond, and not John, Mamone is legal blackmail.

1    What this is all about, Judge, is not pretrial

2  detention.  What this is all about is cooperation.  The

3  government point blank told me if John would cooperate,

4  things would be different with the bond.

5    I find that to be wrong, morally, and I find it

6  to be offensive.  It is clearly legal.  It happens every

7  day in court.  They have been seeking his cooperation.

8    He is now locked up in the hole, basically,

9  because he has been described by the indictment as

10  dangerous because they have moved for pretrial detention.

11    They have excluded his family entirely.  He has

12  not talked to his children.  This is what is being done,

13  Judge, to apply pressure.

14    What I am telling the Court is there are

15  conditions of bond.  House arrest.  I will go so far,

16  Judge, and I have never done this in 23 years of practice,

17  I will agree to 24 hours a day house arrest, and when he

18  needs to meet with me, I will go to his home, which is

19  substantially far from my practice.

20    Judge, it means that much to us to prepare this

21  case.  It means that much to us to let him be with his

22  family for what could be a very long period of time.

23    What they call acts of violence came in the

24  course of this case, and although clearly anything like

25  this is substantial, they are not such that they cannot be

1    controlled and dealt with, assuming the truth, with a

2    substantial personal surety bond, secured by five people,

3    with special conditions, and 24 hour house arrest.

4           I can address other issues, Judge.  The Louis

5    Maione incident, we are talking about 1996.  I don't know

6    what some of that stuff means, frankly.  I don't think

7    that's relevant to the issues before this Court.

8           There is a lot of chatting going on in a lot of

9    these conversations; a lot of puffing by a lot of these

10   people.

11          **THE COURT**:  Mr. McCormick, we are talking about a

12   lot of tapes.  Mr. McCormick, why won't a bond -- forget

13   the bond suggested by Mr. Rothman.  I am not inclined to

14   release the defendant on a personal surety bond, but why

15   won't a bond, coupled with house arrest 24 hours a day,

16   address the issue of concern expressed by the government?

17          **MR. McCORMICK**:  Your Honor, I think all we have

18   to do is look to Mr. Mamone's performance in the past.

19          Mr. Mamone has shown he doesn't obey any type of

20   supervision.  Any condition, he doesn't obey it.

21          Mr. Rothman minimized all of that.  Your Honor,

22   that's the substance of this matter, is that while he was

23   under these very, not to violate federal, for example,

24   federal, state local laws, he did that.

25          He did that with impunity for 5 years.  My answer

1   to that, Your Honor, is I don't know that it would, and I

2   don't think he has earned the right to even test before the

3   Court at this particular stage.

4          MR. ROTHMAN:   Just in brief response, Judge, in

5   1995 when Judge Gonzalez placed Mr. Mamone on house arrest,

6   for that year he was under house arrest.   He did everything

7   he was supposed to do.

8          None of the allegations, as far as I am aware,

9   are in that one year under house arrest.   It is different.

10  We all know house arrest is different.

11         He can be controlled.   His access to and from is

12  absolutely controlled.   Any violation will be determined

13  immediately.   We can even control who can come to the

14  house.

15         I will agree to special conditions, if the

16  government agrees to provide a list of people who they

17  don't want coming to the house.   Unless there is something

18  extraordinary about it, I will agree to that.   They cannot

19  come to the house.

20         I will agree he can't talk to people by calling

21  out of the house.   And if they want to monitor that, I will

22  agree to that.   We will agree to anything, Judge, that's

23  somewhat reasonable, given their concerns.   We tried to

24  address it.

25         MR. McCORMICK:   Your Honor, the argument that

1  Mr. Rothman makes can be made in any case where detention

2  is requested.

3           There is nothing that has been shown by

4  Mr. Rothman, other than bringing in friends and neighbors

5  to bear witness for Mr. Mamone.  The facts don't change.

6           THE COURT:  All right.  I am forced to agree with

7  the government's position with regard to Mr. Mamone, while

8  admittedly there are some distinctions as compared to even

9  Mr. Raffa who has a prior record.

10          In a gross sense, it is inconsistent to treat the

11 defendants differently in this case.  Now, Mr. Rothman

12 accidently anticipated one of the questions that I was

13 going to ask.

14          I have asked this question in the past.  I don't

15 think the Court has any legal authority to do it, candidly,

16 but I think the parties can agree to it. .Query:  If I were

17 to agree to set a bond in this case, and we haven't gotten

18 to a bond yet as far as what has occurred so far, the

19 defendant agreed voluntarily to have his phone tapped.

20 We've offered it I have attitude to.

21          MR. ROTHMAN:  We've offered it.  Without even

22 talking to Mr. Mamone, I have offered it.  Let me confirm

23 it, please.

24          THE COURT:  All right.

25          MR. ROTHMAN:  The answer is absolutely, yes.

1          **MR. McCORMICK:**  Can I speak to that issue, Your

2  Honor?

3          **THE COURT:**  Sure.

4          **MR. McCORMICK:**  If nothing else, I have learned

5  through past 3 or 4 as far as having a phone tap doesn't

6  mean anything.  Everybody and their brother has a cell

7  phone that they could have at their -- there is no way to

8  control this, Your Honor.

9          Mr. Mamone could have five phones brought in by

10  five different firms, and we would never know the

11  difference.

12          **THE COURT:**  Here is what I am going to do:  I

13  have heard the evidence in this case.

14          First of all, I am denying the government's

15  motion based on risk of flight, given the amount of time

16  the defendant is facing, and as I read Section 3142(G),

17  that is a condition, that is a factor to be considered, but

18  it is not dispositive of the facts.

19          If it were, the government would simply say that

20  anybody facing, I don't know -- (inaudible) they haven't

21  said that.

22          So, while that is a factor, I have to look at all

23  the other factors.  Weighing in the government's favor,

24  there is an allegation of some overseas money, but simply

25  outweighing that, however, is the fact that all of this

1  defendants ties are to the United States.

2          There is no showing that this defendant has a

3  single familial tie, a single business tie that is outside

4  of this country other than arguably somebody overseas.

5          So I have no problem finding this defendant is

6  not a risk of flight, and that I will so enter.

7          On the issue of danger to the community, I agree

8  in part with the government that there is some evidence

9  that this defendant constitutes a danger.

10          However, I also agree with Mr. Rothman with what

11  has been said that will solve this problem.  Remember,

12  danger to the community must be considered by clear and

13  convincing evidence, and I do not find, by clear and

14  convincing evidence, that the defendant constitutes such a

15  danger to the community; that is he cannot be a danger,

16  such a danger to the community that nothing short of

17  pretrial detention will suffice.  So I am denying the

18  government's request for pretrial detention.

19          Now, having said all of that, the defendant is

20  facing serious charges with serious consequences.  It is an

21  indicted case with presumptions attached.

22          What I am going to do in this case is this, and

23  we will probably have another hearing.  I am going to set a

24  $500,000.00 corporate surety bond and a $500,000.00

25  personal surety bond, both of which will have Nebbia

1    conditions attached to them.

2          The additional conditions of bond will be the

3    defendant is required to maintain full 24 hour house

4    arrest.

5          The stipulation that you have made, Mr. Rothman,

6    the only reason for leaving the home will be for medical

7    emergencies that has done to be documented and proven.

8          Additional conditions of bond:  With the

9    defendant's acquiescence, a full wiretap.  With that

10   stipulation, you do what you need to do.

11         MR. ROTHMAN:  Excuse me.  Judge, are you ordering

12   that it be a wiretap, or are you authorizing it with our

13   agreement that the government shall or has the ability to

14   wiretap?

15         In other words, I don't want to be involved in

16   violation of a court order if the government decides not to

17   do it.

18         THE COURT:  No, no.  I have heard the defense

19   stipulate to have it done.  I am telling Mr. McCormick that

20   that stipulation has been made.  And if the government

21   wants to go ahead and do it with that stipulation, that

22   won't be an issue.

23         If the government doesn't want to, then it won't

24   be a condition.

25         MR. McCORMICK:  Your Honor, as a further

1  condition as to Mr. Mamone, will the Court also consider

2  directing that it would be a violation of Mr. Mamone's bond

3  for him to possess or use a cell phone?

4         THE COURT:  You are anticipating.  I am not

5  through yet.  Okay.  You still haven't answered my

6  question.  Does the government want to set up a wire tap?

7         MR. McCORMICK:  I can't answer that now.  I have

8  to speak to the agents.

9         THE COURT:  You will be allowed to do so because

10 of the situation of the defendant, if you choose to.

11        MR. McCORMICK:  It is extremely expensive.

12        THE COURT:  Now, additional conditions of bond.

13 The defendant is not to be in any possession of any other

14 telephones, either a wire, cell phone, two-way radios,

15 including but not limited to long string with cans on them.

16        MR. ROTHMAN:  Judge, when you discuss possession,

17 obviously, I think of my old law school training,

18 constructive versus actual.  They have a small child.  His

19 wife is outside the home. . Is she allowed to possess a cell

20 phone?

21        THE COURT:  I will solve the problem this way,

22 and I will hear from you on it.

23 **(At this point the tape ran out.  Concluding remarks to**

24 **follow in a later transcript.)**

25

```
 1              (Continuation of the bond detention hearing)

 2              THE COURT:  I will say, yes, the wife is allowed

 3    to have a cellular phone, but not to have it in the house.

 4    Okay.

 5              MR. McCORMICK:  Your Honor --

 6              THE COURT:  Now, additional conditions --

 7              MR. McCORMICK:  Your Honor, one of the younger

 8    agents has reminded me of the computer age, and I assume

 9    that Mr. Mamone has a computer.

10              We would ask that a condition that he not be able

11    to use a computer for e-mail or anything or the Internet.

12              THE COURT:  Mr. Rothman?

13              MR. ROTHMAN:  I haven't asked him, but I am

14    willing to bet one billion dollars that John Mamone doesn't

15    have the faintest idea of how to get onto the Internet.

16              THE COURT:  Mr. Rothman, I know of the fine

17    success you have had in your 23 years of practice, but even

18    you don't have a billion dollars.

19              MR. ROTHMAN:  My wife would agree with you,

20    Judge.  I just cannot cover that.

21              THE COURT:  All right.  Your wife could spend it,

22    but that doesn't mean you have it.  All right.

23              MR. ROTHMAN:  We will agree to that condition,

24    Judge.

25              THE COURT:  Okay.
```

- *10/31/00*

1    **MR. ROTHMAN:**  He can use the computer, but cannot

2    go on to the Internet.  In other words, he can use a

3    computer that is not attached to the Internet, is what we

4    are talking about.  He just cannot go on to the Internet.

5    **THE COURT:**  No Internet, no e-mail.  I am not

6    sophisticated on the computer.

7    **MR. McCORMICK:**  Unfortunately, I am not either.

8    **THE COURT:**  But that there will be no exception.

9    **MR. McCORMICK:**  Your Honor, there is a whole

10    plethora of electronic communications; pagers.  There is

11    Palm Pilots.

12    **THE COURT:**  No pagers.  Absolutely no pagers.

13    **MR. McCORMICK:**  And Palm Pilots, too.  Counsel

14    brings up a point that other members of the family using

15    the phone would also be considered I assume to --

16    **MR. ROTHMAN:**  There is no other adult other than

17    Grace in the home.  Everyone else is under 18.  So Grace,

18    yes, I have talked to Grace about it, and she will also

19    consent.  So if we need to do a written authorization to

20    the government to appease them, we certainly will.

21    **THE COURT:**  All right.  Now, we are not through

22    yet.  If the Nebbia proffer is in writing, and if the

23    government agrees to it, you can send me a one line

24    stipulation and I will sign off on it.  If the government

25    have has any questions, problems, concerns, or whatever, we

1  will have a Nebbia hearing.

2          Additionally, we will take the other offer of

3  Mr. Rothman and the government and that is, government,

4  there is one condition that I will impose if you choose to

5  ask me to, and that is he gives me a list of names from

6  Mr. Rothman of persons who will not be permitted in the

7  Mamone household.

8          Should there be any disagreement between counsel,

9  we will deal with it at the Nebbia hearing.

10         Any further conditions of bond that the

11  government wishes this Court to consider?

12         **MR. McCORMICK:**  Well, with the conditions that we

13  asked for on the other defendants would apply anyhow I

14  think with the list that you are speaking of.  We wouldn't

15  want to give Mr. Mamone any witness names, but

16  codefendants, convicted felons, we can include those in

17  the --

18         **MR. ROTHMAN:**  The only exception that I will ask

19  for, Judge --

20         **THE COURT:**  Just a moment.

21         **MR. ROTHMAN:**  Okay.

22         **THE COURT:**  Mr. McCormick, I see a two-fold

23  problem here, and that is you want me to add as additional

24  conditions that he cannot be in contact with any of the

25  witnesses, et cetera, in this case.

1          Well, it is awful hard to keep him from

2    contacting them if we don't give him the names.

3          MR. McCORMICK:  Well, that's correct.  Let me

4    think about that.

5          THE COURT:  How can he have contact with

6    somebody, but we're not going to tell you who it is that he

7    cannot have contact with.

8          MR. McCORMICK:  Well, let me think about that

9    one.

10          THE COURT:  I am prepared to give you the

11    conditions, but you have to give us some names, too.

12          MR. McCORMICK:  We will take you up on that, Your

13    Honor, but I would like to confer with the agents and

14    co-counsel.

15          THE COURT:  I will certainly give you that

16    condition provided you disclose those names that the

17    defendant cannot be in contact with, and the exception to

18    that, there is an exception.  The exception is through

19    counsel. · Okay?

20          MR. McCORMICK:  Yes, Your Honor.

21          MR. ROTHMAN:  Judge, the only exception in

22    addition that I will ask for is one particular person

23    charged in this case David Bell, John Mamone and David Bell

24    are both involved in Gateway Transportation.

25          Gateway Transportation is now involved in an

1  unsealed order which restricts anything dealing with

2  Gateway.

3          In order to deal with that issue, there has to be

4  contact between David Bell and John Mamone or no one is

5  going to now how to do it with an ongoing business.

6          I know the government tends to forfeit assets in

7  that, but meanwhile it is frozen, they have got to deal

8  with it.  They will probably get a civil lawyer involved

9  and there will have to be contact.  I don't think there is

10  a problem with that.  I think we can have an reception, at

11  least for those purposes.

12          MR. McCORMICK:  I think we can work that out

13  between ourselves, Your Honor.

14          THE COURT:  Okay.  Are there any further

15  conditions that the government wants this Court to

16  consider?

17          MR. McCORMICK:  I don't know if the Court made it

18  clear on the record that Mr. Mamone would pay for the

19  electronic surveillance.

20          THE COURT:  Electronic monitoring?

21          MR. McCORMICK:  Electronic monitoring.

22          THE COURT:  Yes.  That will be at the defendant's

23  expense.

24          MR. McCORMICK:  How about the electronic

25  surveillance with any wire tapping, the bills incurred for

1    the government.

2            THE COURT:  I thought you were going to have an

3    open wire?

4            MR. McCORMICK:  The expenses I am talking about,

5    Your Honor.

6            THE COURT:  The expense of the wiretap, yes, I

7    will go along with that; at the defendant's expense.

8            MR. ROTHMAN:  To pay for monitors for that or to

9    pay for the actual physical set up of it?

10           THE COURT:  Okay.  To pay for the set up, not for

11   the time of the agent or agents monitoring it, no.  So we

12   are clear on that.

13           MR. ROTHMAN:  They just hook up to the phone like

14   they always do.  I am just kidding, Judge.

15           MR. McCORMICK:  The other thing is, I don't think

16   the Court mentioned any passports or travel documents.

17           THE COURT:  Any travel documents should be turned

18   into Pretrial Services.  I will certainly go along with

19   that as well.        .            .

20           MR. ROTHMAN:  I've got those now, Judge.

21           THE COURT:  My understanding was that the

22   government said, yes, there can be contact with the

23   defendant Bell.

24           MR. McCORMICK:  No, Your Honor.  I will discuss

25   it with Mr. Rothman.  I am sure we will be able to work out

1    some sort of a contact with another attorney present.

2         THE COURT:  Well, bear in mind that if I allow

3    contact with Mr. Bell by his own telephone, you all can

4    monitor it.

5         MR. McCORMICK:  That's true.

6         THE COURT:  Okay.  But I can't rule on that

7    unless you all -- and I am not trying to put you in a box.

8    Don't misunderstand me.  I want you all to decide whether

9    you, in fact, want to do the wiretap.

10        I will do you what I am going to do at this

11   point.  For the moment, for the moment, I am going to

12   prohibit contact with the defendant Bell.

13        Now, having said that, and I understand what you

14   have said, Mr. Rothman, and if this drags on and you need

15   to come back before me, let me know.  If you all can work

16   it out in the interim, that's fine.

17        If the government decides they want to go ahead

18   with the wiretap and it gets installed, I am going to allow

19   the contact, but it can be monitored.

20        Anything further, Mr. McCormick?

21        MR. McCORMICK:  No, Your Honor.  The government

22   is going to consider whether to seek a stay in the matter.

23        THE COURT:  Okay.  That will be fine.

24        MR. ROTHMAN:  You didn't list the names of the

25   people you wanted to co-sign on the personal surety, and I

1  have people here who would have to sign while they are

2  here.

3          THE COURT:  That's true.  Refresh my

4  recollection.  You told me about the people who have

5  assets.

6          MR. ROTHMAN:  Grace Mamone is the wife.  Of

7  course, you want her to co-sign.

8          THE COURT:  Absolutely.

9          MR. ROTHMAN:  Joe Mamone is the brother who has

10  got assets over a million dollars.  He is involved in real

11  estate.  Larry Switzer who used to be CEO of --

12          THE COURT:  There was a fourth.

13          MR. ROTHMAN:  The fourth can be the Heards' have

14  agreed to put their name on a personal surety; the

15  Bartanians have agreed, and the Guises' have also.

16          THE COURT:  There is another family that you said

17  have a half million dollars in assets.

18          MR. ROTHMAN:  The Bartanians have a half; the

19  Guises have over a million.

20          THE COURT:  Okay.

21          MR. ROTHMAN:  Okay.

22          THE COURT:  They will be the co-signers on the

23  personal surety bond.

24          MR. ROTHMAN:  Do you need both husband and wife,

25  or just one?

1          **THE COURT:**  Both husband and wife.  I don't know

2    how they own property, but I want it so stated.

3          **MR. ROTHMAN:**  Joe Mamone's brother, he is alone.

4    Okay.  We will take care of it.

5          **THE COURT:**  So that we are clear, as far as

6    co-signers on a personal surety bond, in any case in which

7    there is jointly held property, I want both names signing

8    on the bond.  Okay.  Thank you, counsel.  We are adjourned.

9          **MR. McCORMICK:**  Thank you, Your Honor.

10          **(Whereupon the proceedings were concluded)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# C E R T I F I C A T E

2        I hereby certify that the foregoing is an accurate

3   transcription of proceedings in the above-entitled matter.

4

5   ___3/6/01___          _Jerald M. Myers_____
        DATE                JERALD M. MEYERS, RPR-CM

6                          Official Federal Court Reporter
                           United States District Court

7                          301 N. Miami Avenue, 9th Floor
                           Miami, FL  33128-7797 - 305/374-8108

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
FILE NUMBER              245A-MM-91505

CONVERSATION DATE:      02/21/2000

CONVERSATION TIME:      10:32:58

TELEPHONE NUMBER:       954/614-1821

CALL NUMBER:            2194

CASE AGENT/SQUAD        SA PATRICK G. BRODSKY/OC-2

REVISED BY:             SA CHRISTOPHER S. STARRETT

DATE TYPED:             06/14/2000

PARTICIPANTS:           JM - JOHN MAMONE
                        RL - RALPH LAST NAME UNKNOWN

ABBREVIATIONS:          UI - UNINTELLIGIBLE
                        PH - PHONETIC
                        IA - INAUDIBLE
                        SC - SIMULTANEOUS CONVERSATION
```

* * * * * * * * * * * * * * * * * * * * * * * * *

245A-MM-91505

(Sound of phone ringing)

JM:     Hello.

RL:     Hey buddy.

JM:     Hey.  (UI)...(UI)...

RL:     (SC)... (UI)...

JM:     Listen to me, I got a question.

RL:     Hello.

JM:     Can you hear me?

RL:     Now I can.

JM:     All right, listen.  You know, you guys asked me for that number cause youse are laying off, but you guys ain't laying off... I mean you guys are playing and that's not what this thing was intended to do.  I can't have this, it's not what we agreed to do.

RL;     Okay, can I run into you... I...I ... not that I'm ...

JM:     Well I'm still up here, I'm not down here, but you know there was an incident yesterday... on a college situation, he only takes 3 dimes on totals, you didn't even ask the guy if you had a bet, you just hang up the phone, you can't do stuff like that.

RL:     Okay, Ah... well see okay... look is Jeff around?

JM:     He's around, but I'll catch up to you tomorrow morning, cause I told him, I don't want you guys doing nothing this is not what I agreed to do... it's...it's ...just not what I want to do.

RL:     Okay...it's not us...that...that's what it is... it's, I don't know...

2

245A-MM-91505


JM:      How can you say that... How can you say that.

RL:      No it's not us, personally.  It's guys we're doing
         something with, a couple of his kids that Ah... when I
         see you I'll tell ya...  Couple of kids that were doing
         something with, that you're doing us a favor with...

JM:      Meet me in the morning tomorrow...

RL:      Good enough buddy.  Hey...

JM:      Meet me at 10:00 o'clock.

RL:      Over by the same place?

JM:      Yeah.

RL:      All right.  Bye.

End of Conversation.

File Number:          281A-MM-88632

Number of Tape:       60H8

Date of Tape:         July 26, 1999

Time of Tape:         5:01 p.m.

Type of Tape:         Body Recorder

Case Agent:           SA NEIL MATHISON/OC-1

Transcribed/
Typed By:             MARY LOU TAYLOR/HRA

Date Typed:           October 18, 1999

Participants:         CW:  COOPERATING WITNESS
                      JM:  JOHN MAMONE
                      MB:  MICHAEL BUCCINNA
                      MV:  MICHAEL VIDAL (PH)
                      FRAN
                      HUEY
                      UF:  UNIDENTIFIED FEMALE
                      UM:  UNIDENTIFIED MALE
                      MIKE
                      RALPH

Abbreviations:        (UI): Unintelligible
                      (IA): Inaudible
                      (PH): Phonetic
                      (SC): Simultaneous Conversation

*****************************************************************

281A-MM-88632

CW:         ..5:01 on Monday, July 26th, 5:01 p.m., en route to ah,
            check cashing store with John Mamone.  Hard Eight, Hard
            Eight.

(Pause.)

(Driving in car.)

(Getting out of car and closing door.)

(Walking.)

CW:       Why is this door always locked?

JM:       (UI)

CW:       I know.

JM:       And I'm gonna save a little piece for (UI) Joey.   (UI)

JM:       I just got back from (UI)

MIKE:     Did you?

JM:       I just got back from a fucking cruise.

MIKE:     Yeah, how was it?

JM:       It was all right.

(Laughing.)

JM:       (UI)...I couldn't take it.  I will never do a cruise
          again.  It was my first and last time.   (UI)

MIKE:     Yeah, I've never been on one.

JM:       (UI) stupid (UI).

MIKE:     That's the way I think I'd be on a boat.

JM:       When ah, when do you wanna get together and talk the
          numbers?

MIKE:     Ah, give me a couple weeks.  Yeah, I'm not, not in a
          rush.  I'm gonna let this guy that owns the, the

2

281A-MM-88632

> building that's he's in, didn't go the way he planned, then I'm gonna come back ask him a little (UI).  (UI) you know what I mean he's doing the right thing.

JM:      Who's the guy, do I know him or...

MIKE:    (UI) been there fifteen (UI)

MIKE:    He runs the business then I gotta deal with the owner. But you might know the owner.

JM:      Of the Banana Boat?

MIKE:    No, the property in the building.  His partner is Jerry Farrell (PH).  (UI)

MIKE:    Which will work in our benefit (UI)

MIKE:    ...of the relationship.

JM:      Uh-huh.

MIKE:    Go from there.

JM:      Yeah, I'm, I'm interested (UI)

MIKE:    I'm glad he told me, I forgot that.

MIKE:    I was running for (UI)

(Laughing.)

JM:      Sometimes things, sometimes things like that happen.

MIKE:    Oh yeah, but holy shit.

JM:      All right Mike.

MIKE:    All right John, thank you.  Thank you Michael.  Hello.

CW:      Hey.

(Background voices.)

JM:      I'm gonna go get a bat and (UI)

3

281A-MM-88632

CW:     It's okay, just make sure it's big.

JM:     I gotta a really big bat.  (UI) I can't lift it (UI)

CW:     Here uhm...I got this ah...

MB:     He's bothering me with fucking (UI)

CW:     No, no.

MB:     Oh.

        (UI)

MB:     Oh, yeah.

CW:     The, the guy's uhm...

MB:     That's my dream job.  Absolutely.

JM:     I got you three, four guys that'll give me money...to do it.

MB:     Okay big CW.

CW:     Okay, I, I got a guy coming that ah, what's the matter?

JM:     Either you got a broken ankle, broken foot, everything bothers this guy...

CW:     I got a chip in my ankle, you know that.  Played football for a scholarship and ah, you think (UI) this. Ah, I have a kid coming in 5:30 with a check for twenty-three hundred which I'll give to you.  And that'll ah...

JM:     (UI) almost even, or we are even, right?

CW:     We will be.

JM:     You owe me eleven and the twenty-two fifty.

CW:     No, I, I, I owe twenty, ah, twenty-two fifty.  A couple of things, just I don't want you to...

JM:     (UI) gotta charge you to cash the check?

4

281A-MM-88632

CW:      Yeah.

JM:      I got nothing to do with this check cashing business.

CW:      No, I know, no, I know.  That's just, it's twenty-three.

JM:      (SC) (UI) that will work yeah.  Why don't we do fifteen...

CW:      Yeah, should be...

MB:      (UI)

         (UI)...

JM:      (UI)

MB:      Yeah, (UI)

         (UI)

CW:      No, I just want you to know, just so you could see...that I'm not messing around.  What, what, I'm being square with you.  I'm not...there's no bullshit. I was given a check...

JM:      Where's this little motherfucking Freddie, that's what I wanna know.  Where's this little cocksucker?

CW:      Let me tell you what happened.

JM:      I'm more fucking irritated at him than you.  Cause he lied to me he was gonna meet me Sunday before he left and he never met me this mother fucker.

(Phone ringing.)

CW:      That's one thing, I'm not crying the blues.  I'm just telling you what's going on in the past ten days.  So then you'll, you'll understand it.

MB:      (On phone.)  Check cashing.  Carla (PH)

JM:       Oh, tell her to shut the hell up now.

5

281A-MM-88632

(Laughing.)

JM:        Now she wants to call on our time?

(Laughing.)

JM:        We have no time to talk to her.  Hang up.

MB:        She says she's gonna kill ya.

JM:        Yeah.  I thought, I thought, I thought you were in good
           shape (SC) (UI)...

MB:        (UI) and I couldn't do nothing right.

JM:        The odds are against ya.

(Laughing.)

JM:        You went out, you went out of your way to buy a fucking
           ticket.  She didn't even...(SC) (UI)

MB:        Nothing happened but I know you're on the phone and
           it's annoying me that you can't pickup.

JM:        (SC) (UI)...bank (UI) funds.  Please advise that you're
           not...(UI)...this is (UI) your...

CW:        Yes, what happened (UI), John I don't bullshit you.

MB:        You say hold on, (UI) call.

CW:        Remember I was given the check and...at the time he
           was...

JM:        Forty-eight fifty is what we're looking.

CW:        Yeah.  And I put, why I got in, ended up running it
           through my account.  It was no good.  All my checks
           bounced.  All my checks bounced.  So that's what
           happened.

(MB background conversation.)

CW:        The guy hasn't made good yet so.  I'm just telling you
           what's going.  I'm not, I'm not bullshitting you.  I'm

281A-MM-88632

getting squared. But I'll tell you...another thing. This is what happened. Last week, Wednesday, did he tell you about what happened to my wife?

JM:     Yeah, somebody ran up to her by the car.

CW:     Road rage. Guy stopped the car, got in... You know she, she didn't have a gun with her. Thank God in a way.

JM:     She should have shot him.

CW:     She would have. She, she reached for it. She didn't have it.

JM:     She had a right to.

CW:     She had every right, the cop said. Every right. She had the window down this much cause she smokes. He kicked the car, started reach, started shaking the car...she went into her bag, she didn't have it. She pressed the button to put the window up, the window went down. He punched her in the face. That was on Wednesday. Friday morning we have another car which we sublease to her girlfriend. Her girlfriend's driving the car, called me Friday morning the car was totaled. This is, this is just what's going on. It has nothing to do with you. I'm, I'm being square.

JM:     I know, I know.

CW:     Okay. When the guy brings the check I'll give you that. I have...end of the week we're doing this deal. I'll start bringing those things in. It starts Friday, okay.

JM:     Yeah, uh-huh.

CW:     I'll start bringing them in, whatever it is up and above four points, that point and a half, that'll go towards you, all right? And we'll, and we'll work it and you won't, you won't have anything.

        (UI)

CW:     If you wanna verify a couple of things you talk with

7

281A-MM-88632

Buddy. It puts, couple of, we got a couple of new players. I put my big guy in...now, and we're, we're gonna start earning. Buddy's gonna oversee it. Huey is gonna handle it cause I don't even wanna handle, right now I don't even wanna handle (UI) cause I'm juggling too much and we'll piece off and it won't, and it won't be any problems, trust me on that no problems at all. Uhm...

JM:    What's going on with Joe Flowers?

CW:    Uhm... I've been giving him games.

JM:    What?

CW:    You know for them to play and, and ah, Benny gave me like 200. Ah...they stopped the, the shop over there. I don't know. Yeah, he's working on a few things, he says he's, he's gonna have something for me with computers and everything. He doesn't.

JM:    What do you mean?

CW:    I don't know, some kind of a job, do some kind of a work, I have no idea.

JM:    And you're not doing nothing with ah...

CW:    Dan, I haven't go paid in nine weeks from Dan. He did pay the lawyer though. So I'm not, you know...

JM:    Is he gonna pay you the nine weeks or he's just (UI)

CW:    He, he says, he says he'll come up with the, some kind of agreement. He says, he's, as far as he knows everything is over. So he wants to go under that premise.

JM:    Is it?

CW:    Is it? I don't think it is.

JM:    I don't know, the state's gonna make a deal with those guys by the end of the month.

CW:    That's the state.

8

281A-MM-88632

JM:     I know but (UI)

CW:     But I heard we weren't state.

JM:     No, you're Federal.

CW:     Yeah.  So he, so under his I, thing, I don't mean my
        back to you Mike.

MB:     No, it's okay.

CW:     Ah, he feels that everything is over.  So, that there
        should be, he says oh I'll work up a, I says you're a
        fair man, whatever you feel lump sum and then, but I
        says, still I need to have the bail bondsman and pay
        the lawyer.  He finally paid the lawyer, the lawyer got
        a check last Saturday ah, for those services.  Uhm...

JM:     So there's no work with him or nothing.  Hey what ever
        happened with that kid in Tamarac that your son was
        playing with?

CW:     He's playing...

JM:     Remember?  You told me you were good (UI)

CW:     Freddie's got him now.  He's the de, I, I met
        Charlie...

JM:     Right.

CW:     ...and Chinky.  I met him at the race track last
        Saturday night and I spoke to him.  I told him I said
        Chinky, I said no disrespect, I said my son is bottomed
        out right now.  I says he's got two things hanging over
        his head...

JM:     Yeah.

CW:     ...he says you know, and he was like all right with it,
        you know.  The kid lost seven hundred he paid, then he
        lost twenty-one hundred, he paid like thirteen hundred.
        So he was okay with it.  Then I don't know how this
        evolves, I don't know how he gets to this point Fat
        Ralphie's sitting down with Chinky and Charlie and
        Freddie and they bring up my son's name again and I

9

281A-MM-88632

> told them I don't know what you're talking about cause I met those guys, I spoke to some people face-to-face... And then Charlie now is playing...with Freddie.

JM:     Charlie's playing?

CW:     Charlie is playing. And Freddie put him in directly with Jose.

JM:     Freddie deals with Jose too? Don't Freddie hold his own edge?

CW:     He, he should. He owes too much. He should, he should deal with Jose more.

JM:     But you guys, ain't gonna deal with Jose no more.

CW:     Well, I've been holding off...

JM:     (UI)

CW:     I was told by our friend that when you come back and when comes to this...

(Background conversation.)

CW:     ...I got some big guys good and John, I'm telling ya, I've got some big, good guys. Very good. Right now...

(Phone ringing.)

CW:     ...Buddy and I are getting out because of some of the players I put in there and then I said we got a makeup figure...

(Phone ringing.)

CW:     ...it's, it's coming like this. So it's gonna be very easy for us to...

JM:     (UI)

CW:     You know, and maybe leave, if you want maybe leave a couple, but I got some big guys. Guys from St. Andrews.

281A-MM-88632

JM:     Are they good players?

MB:     (On telephone in background.)

CW:     Actually yeah.  And they deal directly.  But as I, as I
        said, the past ten days have been absolutely upside
        down for me.  It won't happen again.

MB:     Joe.

CW:     It won't.

JM:     Getting worse than me.

CW:     I love cruise, how can you not love a cruise.  What did
        you on, what, what cruise line?

JM:     The Carnival "Destiny."

CW:     No.

JM:     Biggest ship in the world.

CW:     Yeah.  I go Norwegian.  Norwegian...

JM:     Somebody told me Norwegian got better ships.

CW:     That's what I go on, Norwegian.  Every year.  We
        haven't been able, in fact I'm dying to.  I, I tell you
        the truth I would like to if I get, if I get this money
        back or get it, see my way clear for a couple, I'd love
        to go, I gotta get away.  I'm like...I'm...

JM:     Why don't you get the money back the wife.  I don't
        understand.  That's bullshit.

CW:     I'll tell you exactly.  You wanna know the God's honest
        truth.  That is like Fran's only security.  And then
        what...

JM:     You don't understand.  It's been sitting there let's
        say...four months...

CW:     For...

JM:     ...five months, I don't know.

11

281A-MM-88632

CW:     Try...

JM:     ..six months?

CW:     ...close to six months.

JM:     Why don't you take it out, give it to me.  When you
        need it you can have it back.  Why would you pay on
        that money.  You don't understand.  I don't, I, I mean
        I'm trying to be your friend now...

CW:     No, I know.

JM:     ...I don't wanna be a fucking vulture.

CW:     No, no, you're not being a vulture.  I know what you're
        saying.

JM:     I, I mean why make it difficult.  I, can use it and put
        it out there right now, and earn somewhere with ya.
        If, if it ain't you it's somebody else.

CW:     Yeah.

JM:     You understand what I'm saying?

CW:     Yeah.

JM:     So, to me it don't matter but if you need it, I could
        always get it.  There's no fucking problem.

CW:     Okay.

JM:     Why is it any better in my pocket than his pocket?

CW:     No.  A hundred percent.

JM:     You're off the clock when you give it to me.

CW:     I, I know.  I know and I appreciate that.

JM:     Well that's what I'm trying to explain.

CW:     I...

JM:     I, I, it doesn't make no sense to me.

281A-MM-88632

CW:     Okay.  I'll explain, it's a woman's sense thing, you
        know, you know what she's saying...

JM:     She ain't even gonna know.

CW:     I, everything's in her name.

JM:     Just tell her you wanna take it and you'll get it back
        when you need it.

CW:     She, she has (UI) to do.  You know what she feels.

JM:     You just tell her you're gonna give it to another
        lawyer, that's all.

CW:     I keep telling her, I'm saying, you know I don't know
        what's gonna happen.  With this guy not paying...with
        the, you know, what's his name, they're not paying.
        She's, that's her right now.  She's scared stiff...that
        he doesn't pay where's she gonna be.  She wants some
        sense of security.  She sees that money as her, as her
        security.  Maybe I'll try to work on it.  Maybe I'll
        try to get like if there's 40 in there, maybe I'll try
        to get 15 over 20, maybe even not get that.

JM:     Well don't, don't that make sense to you?

CW:     I, I want (SC) (UI)...

JM:     (SC) I don't wanna tell you how to live.

CW:     I agree a hundred percent.

JM:     I don't wanna tell you what to do but don't you think
        that you know you're (UI) every week is more
        important....

CW:     Of course.

JM:     ...to you than me?

CW:     A hundred percent but...

JM:     Don't you need that to live?  I mean that's why (SC)
        (UI)

13

281A-MM-88632

CW:     And I would, I would like that.

JM:     ...and a fucking to pay your rent.

CW:     You see cause she doesn't know about this.  If I told
        her...if, I'll just tell her I have an obligation with
        you.  Even, she'll be the first one.  Maybe I, maybe I
        need to.  But not say you per se, I'm not saying but
        ah...you know maybe I'll just explain something to her.
        But that's, that's her sense cause I tell her, you
        know, the chance of going away, and she says well this
        guy's not gonna take care of me.  Who's gonna take care
        of her?  Who's gonna take care of her?

JM:     Well (SC) (UI)

CW:     My friend in Boca, he's, he's taking care of two
        families now, he's gonna take care of mine?  No, I
        can't put him (UI).  I mean he'll, he'll protect my
        interest with the office but I mean...this Dan scares
        me.  You know, he just ah...nine weeks.

JM:     (UI)

CW:     No, it's a girl coming.  No mine's a guy coming.

JM:     What time is he coming?

CW:     He'll be here, he says absolutely  no later than 5:30.

JM:     Where's he coming from?

CW:     Uhm...State Road 84, Griffin Road, 441.

JM:     He's been here before?  He knows how to get here?

CW:     Mike the computer kid.

JM:     Oh.  Oh the kid who was here (UI)

CW:     Yeah, yeah that's who it is, yeah.

JM:     (Clears throat.)  Shit.

CW:     You know, so...  No, I, I'd love to because ah, it'd
        make life a heck of a lot easier but she sees that as

                              14

281A-MM-88632

a, as her security.

JM:     No, no, no.

CW:     That's why I wish things would either happen or not.
        At least I know where I stand.  Cause if something does
        happen...

JM:     What about your refund on the fourteen grand, are they
        gonna give forfeiture?

CW:     I think we're gonna get it.

JM:     Yeah?

CW:     Looks very, very good.  Very, very good.  So, I mean,
        you know, between a few things like that and this other
        thing I'm working...

JM:     Where the fuck these kids...

CW:     But I appreciate it.  I don't mean to put, dump my crap
        on you.  But that was, what a week.

JM:     Three more weeks exhibition, or four?

MB:     That's it, three weeks.  It starts, yeah.

JM:     Three weeks.

MB:     Everybody can't wait.  I'm hoping it ain't, last year
        it wasn't a good football season.

CW:     I, the, last year was not good.  Everyone says (UI).
        Last year was, last year was a players' year.  You know
        why?  And it's gonna be, players' year more and more, .
        because there's too much information out.  The bettors
        are starting to get more informative as opposed to....

JM:     Yeah, but if you, if you have the right line out there
        it don't matter...

(CW's cell phone ringing.)

JM:     ...because it's a even game.  You understand?

281A-MM-88632

CW:       Yeah.

JM:       With the right handicap there, it's an even game.

CW:       You have to do things right.  They don't do things
          right.

JM:       Those fucking (UI)

CW:       I better, let me, I better call her.  She probably
          things I'm with a gumadi (PH) now.

JM:       Yeah.

CW:       I'm serious.  You think it's funny.

(CW dialing on cell phone.)

JM:       That's right, the 15th, August 15th.

MB:       I got my ticket, I got, I got two club seats plus eight
          seats down below.

CW:       Where?  The Dolphins?

MB:       Yeah.  Every year man.  I'm right in the end zone.

CW:       Yeah?

JM:       Club seats tonight.

MB:       I got them, you know what I got club seats this year?
          For the parking.

.(CW on phone.)

FRAN:     (UI)

CW:       Yeah, what's up?

JM:       That's cause you get right into the stadium.

CW:       I, I told you where I was gonna be.

MB:       I couldn't sit in that other section again...

281A-MM-88632

FRAN:       (UI)

CW:         Because I'm in a meeting.

(Pause.)

CW:         What?

FRAN:       Nothing.  Nothing.  It's nothing.  Nothing.  I'll call
            you back (UI)

CW:         Now she's (UI).  I worry about her.

CW:         I gotta be out of my fucking mind.

(Beep.)

JM:         You (UI)

CW:         I gotta be out of my mind.  (Coughs.)

JM:         This the kid, no?

CW:         No, you know what he looks like?

JM:         Yes and no.  No, I didn't see who was getting out of
            the car.

CW:         I just got tickets for Cher.

JM:         So did I.

MB:         So did he.

CW:         You, not like this though.

MB:         I just got another ticket, I got...

JM:         Just go to Ticketmaster.

(Pause.)

CW:         Did he bring them back?

MB:         No.

17

281A-MM-88632

JM:     Why, where are your tickets?

CW:     My tickets in the first row.

JM:     Ah, you don't want to sit on the fucking floor seats.

CW:     Not floor seats.  This is the first row.  Here's, here's, here's the...

JM:     First row.

MB:     (UI) on the side.

CW:     ...stage.  On the side with the handicap section.

JM:     Yeah.

CW:     Tremendous.  They're the best.  They're, believe me.

(CW's cell phone ringing.)

JM:     How much you pay?

CW:     One of my, one of my players.

JM:     What does he get tickets?

(CW on cell phone.)

CW:     Hello.

JM:     You, you called the wrong guy.  (UI)

CW:     Listen...Huey, Huey what's up?

JM:     Tell that little prick I wanna see him.

CW:     Oh, I'm, I'm with, I'm with somebody that you know...in Margate.

H:      Oh yeah.

CW:     I'm with somebody you know in Margate.  Let me ah, I'll call you later.

H:      (UI)

18

281A-MM-88632

CW:      Okay, okay.

JM:      Huey... What's he doing?

(CW off cell phone.)

CW:      He's on vacation in Cape Cod (laughing).  Coming back
         tonight.

JM:      In Cape Cod?

CW:      Yeah.  (Laughing.)

JM:      What the fucks he doing in Cape Cod.

CW:      You want tickets?

JM:      He just bought them.

MB:      I just bought them.  Can't get, can't get my money
         back.

MB:      You'll get them.  Anson (PH will sell them for you no
         problem.  Tell Anson (PH) you got them.  He'll push
         them and you'll make money on them.  You hear me?  The
         concert definitely is gonna be sold, when is it,
         October?

JM:      September 23rd.

MB:      It's gonna be sold out before that.

MB:      How much are they?

CW:      I'll take care of ya.

JM:      I need four though.

CW:      Four?

JM:      I need six.

CW:      No.

JM:      (Laughing.)

19

281A-MM-88632

CW:       You gonna scalp them?

JM:       Scalp, my wife wants to go.  We went to the last one.

CW:       Are you serious?

JM:       I don't think  she'll go again.  Maybe she wants to go.


MB:       I just want four.  (SC) (UI)

JM:       It's the same show, I don't think it's worth seeing it.

CW:       How much?

JM:       It's the same show.

MB:       (SC) (UI)

CW:       For four?

JM:       I want tick, I want tickets for Ricky Martin.

(CW on cell phone.)

CW:       Yeah, this is CW is Frank there?

JM:       That's what you gotta get me.  Can you get Ricky.
          Martin?

CW:       Okay, listen ah... when he comes in, ah, do, do you
          have ah...I already got some tickets to uhm...for Cher
          but I may need to get some more tickets.  And what
          about Ricky Martin?

(Pause.)

CW:       He's putting them aside for me.  Yeah, he...  Okay well
          I needed two and now I may need...

JM:       No, I don't want Cher, I just need Ricky Martin I want.

CW:       ...four more.

JM:       I gotta have Ricky Martin.

20

281A-MM-88632

CW:        Yup and I need, yeah, he knows, he...

(Dial tone.)

(Dialing.)

CW:        Well I don't know if he can still get next to me from
           what, what I got.

UM:        (UI)

CW:        Yeah.  yeah.

UM:        (UI)

CW:        Yeah.  And I need...

UM:        (UI)

CW:        ...yeah CW, right.  And, and Ricky Martin.

JM:        Backstage passes.  Okay.

CW:        How many Ricky Martin?

JM:        I'm gonna find out right now.

CW:        Find out.  It'll be four to six right now.

UM:        (UI)

CW:        I know, Frank, you know if you talk to Frank he'll...
           Yeah, yeah, Frank does something special for me so
           just...

UM:        (UI)

CW:        I know.

UM:        (UI)

JM:        (UI)

JM:        Where the fuck (UI)

CW:        Well, no.  Look I, I have, he already reserved two for

21

281A-MM-88632

|       | me.  I may need another four and uhm... |
|-------|-----------------------------------------|

UM:       (UI)

CW:       Four to...four to six tickets for Ricky Martin, yeah.

UM:       (UI)

CW:       He knows, the, I only, every time, I just want the best.  Yeah.

UM:       (UI)

CW:       Okay.  All right, bye.

UM:       Where can he reach you?

CW:       He's, he's got my numbers.

UM:       Okay.

CW:       All right, bye.

(CW end cell phone call.)

JM:       Who's that guy?

MB:       (UI) yeah, like you say, (UI).  It always gets (UI) give those to Anson to get rid of.

CW:       Elton...

MB:       Or I can give them to this guy to get rid of.

CW:       Elton John, I was in the first row.  You know they have, they have the stage...I don't know, they have the stage...

MB:       Hello, calling you.

CW:       They have the stage like this.  Then they have at ground level and you're looking, you get (UI)

(Background voice.)

MB:       (UI) getting a cell phone (UI)

22

281A-MM-88632

CW:       Then they have like this, right on the side.   That's
          right where I was, first row.

(Background voice.)

CW:       Elton John.

JM:       Well so, trade it in.   Let me know cause I got these
          four...

CW:       I called him.

JM:       If you get them, then I know I'll get Ricky Martin.
          (UI)

JM:       You want them?

          (UI)

JM:       How many you want, four or six?

          (UI)

JM:       And backstage passes?

CW:       Oh, I don't know about that.   I'm trying.

(Laughing.)

CW:       Jesus.

MB:       And dinner with Ricky after the show.   (Laughing.)

CW:       He's getting really (UI).  He gets, yeah.   You know I
          did that with Bon Jovi you know.

MB:       Yeah?

CW:       Yeah.   Bon Jovi...

JM:       (On phone.) (UI) or six?

JM:       How many now, four and six?

(Pause.)

281A-MM-88632

JM:      My son wants this.

JM:      Joey.

(Pause.)

JM:      Six.  (UI)  No, so you, me, three kids and Tanya (UI).

(Pause.)

JM:      All right, bye.  What are you doing hon?

(Pause.)

JM:      That's all right, we'll take...

MB:      He's gonna see all the girls.

JM:      I'll take, take (UI).  We'll take another kid, we'll take ah, Angelo (UI) sister.  What ah...

         (UI) John (UI)

JM:      Oh yeah, John...

         (UI)

JM:      Oh, you know you don't have (UI).  All right.

CW:      See the (UI) laptops.

JM:      What ah, what's going on, ah with dinner.  We're going (UI)

CW:      You know the Compaq 1685's, 1690's?  Go for 24, 26, 27...

(Pause.)

(Beeping.)

CW:      I'm doing things now I never thought I would (UI)

JM:      Oh, I know hon, hold on.

(Phone ringing.)

281A-MM-88632

JM:      (JM answers phone.)  Hello, check cashing.  John.

CW:      To bad he can't.

JM:      (On phone.)

JM:      Flower store, mine?  Mine?  Tell him I'll pickup (UI)

         Yeah.  Right.  A hold on.  Yeah.  Yeah, what ah, what
         were they doing, they going to gym?  (Coughs.)

         (UI)

JM:      All right.  I'm at the store.  I'll be here about
         another ten minutes and then I'll be leaving.  So
         what's ah..

         Well I don't know.  (UI) right now (UI)...taking off
         today or what.

JM:      Oh, all right.  So I'll meet you home.

FRAN:    Want me to go (UI)

JM:      Yeah, I'll get changed, I wanna get changed.  Bye.

         Bye now.

(JM ends call.)

JM:      (UI)

CW:      Yeah, (UI).  I just don't want you...

JM:      Who gives golf lessons?  You don't do golf lessons, do
         you?  Do you play golf?

CW:      I'm starting, I'm starting (UI) playing golf.  You...

MB:      (UI) fucking business.

CW:      You gonna play golf?

JM:      I'm gonna, I want the lessons.

CW:      With who?

25

281A-MM-88632

JM:    I'm going to North Caroline to some fucking school.

CW:    When you going to North Carolina, that's where she wants to go on vacation.

JM:    (Laughing.)  Not to play golf, does she?

CW:    No, but I, I play golf.  I gotta show you. I showed you my clubs.  I brought one of them in.  I just feel bad when you get upset.  I don't like to get you upset.

JM:    I couldn't get off the fucking boat.  It bothered me, I wanted to strangle everybody.

CW:    I know.  (Laughing.)

JM:    (UI) with ah John Mamone.

MB:    Two guys overboard.

JM:    (UI) on the ah, (UI)

CW:    And he's on the phone.

JM:    Into the ah...

CW:    You know and...

JM:    (UI)

CW:    And, and he's on the phone and I know he's upset.  And he's, I know cause he's almost spitting and I'm just, yeah.  I, I like (SC) (UI)

MB:    (SC) (UI)

JM:    Yeah, CW handles it the best.  You know his (UI)...

CW:    Ah, cause, cause you're right.

JM:    Freddie wants to argue with me on the phone.  Freddie, I told Freddie go buy a fucking plane ticket for Arizona motherfucker cause when I came back you've, you've had it.

CW:    You, you, you know what.  You...

26

281A-MM-88632

JM:     I can't find this little cocksucker right now.

CW:     People tell, you know it's like...

JM:     He'll show up when he has the money, I know.

(Coughing.)

JM:      He avoids the (UI) everything.  This small cocksucker.

CW:     Yeah, he does.

JM:     You can call your fucking cousin, your uncle, your
        brother.  Call anybody you fucking want.  Buy a fucking
        plane ticket.  Don't be there when I get back.

CW:     He, he told me that.

MB:     His cousin that was with you.

        He's slap him.

JM:     His cousin already told me.  Do whatever you want.

CW:     Ah, he's, he's, he's a (UI).  He's up to much.

JM:     He lies so much to me, this little cocksucker.  Him,
        Joey DeFazio, all are the same, same...

(CW's cell phone ringing.)

CW:     I (UI)

JM:     (UI) constantly fucking telling me stories.

CW:     Here's Mike.

(Phone ringing.)

CW:     Mike, where are ya?

MIKE:   I should be there in about eight minutes.

CW:     Okay.

MIKE:   All right, I'll (UI)

27

281A-MM-88632

CW:        Okay, sounds good, 441, okay great, all right.

MIKE:      Bye.

CW:        Bye.

(CW ends phone call.)

JM:        (UI)

CW:        Yeah.

JM:        (UI)

CW:        Yeah. Uhm... No, I mean I ah...again I, I don't like
           to...you know. I get crazy when I don't, don't do
           something right. But so, so I'll get those tickets for
           you. I'll get those for you.

JM:        Ricky Martin? I really want backseat passes.

CW:        I don't know if I can swing that.

JM:        Back, backstage passes. My daughter's in love with
           Ricky Martin. She thinks he's (SC) (UI)

CW:        If it was Bon Jovi I could do it.

JM:        He's from New Jersey, Bon Jovi. My daughter don't know
           Bon Jovi. My daughter knows...

MB:        (SC) (UI)

JM:        (UI)... My daughter's two years old, sings it. Had
           him on stage in a fucking boat singing it.

CW:        Yeah? The cruises are good...

JM:        Singing Rock-a-Bye-Baby...

CW:        You didn't like a cruise? I think it's a great
           vacation.

JM:        Ah...maybe when you don't have kids.

CW:        Oh yeah.

28

281A-MM-88632

JM:       Maybe if I was there just me and my wife.

CW:       You could dance, you could gamble...you could do
          anything you want.

JM:       What can I do?  My daughter wouldn't even go to the
          kids clubs.  I had no babysitter...

CW:       Oh...

JM:       ...it isn't like Vegas so I took a babysitter with me.

CW:       So then you're trapped.

JM:       So I'm trapped.

(CW's cell phone ringing.)

JM:       I gotta get up when she gets up.  Sleep when she
          sleeps, eat when she eats...and I want sun.  I put her
          in the room once, once they were, they were fucking
          calling me on the paging system, come pickup your kid.
          I swear to God.  You don't know.

CW:       (On cell phone.)  Hello.

JM:       They were calling me to pick up my kid.

RALPH:    (UI)

CW:       Hey.

RALPH:    (UI)

CW:       (UI)

RALPH:    Where's the (UI)

CW:       Yeah.

RALPH:    (UI) and cash.

CW:       Cash?

RALPH:    (UI)... when you get the cash tonight but it's gotta be
          paid next day.

29

281A-MM-88632

JM:      Sounds like Fat Ralphie.  You can hear his fucking
         voice right from here.

RALPH:   (UI)

CW:      Uhm, I, I can't get involved in any of that cause I
         hadda take a couple of steps back.  You know.

RALPH:   Who do you like (UI)

CW:      Okay.

RALPH:   (UI)

JM:      Who do you like tonight.   (UI)

CW:      Ah, Cubs.

JM:      (UI)

CW:      Cubs.

RALPH:   (UI)

CW:      Ah, they should be about 150 - 160.

RALPH:   Favorite?

CW:      Yeah.

RALPH:   And they're playing...

CW:      Ah, Cubs are playing Montreal.

RALPH:   (UI)

CW:      Yeah, no in Montreal.  And then Detroit's a strong, oh,
         not Detroit, uhm, Cubs, Toronto.

RALPH:   (UI)

JM:      Tell Ralphie I said...  Let me talk to him.

CW:      Here.  I'm with somebody that wants to say hello to ya.

JM:      Hey, we, we get, we get 50 percent of the wins I'm

281A-MM-88632

    telling you.

(Laughing.)

JM:   Who's this.  Come on, who do you think it is?  What do
      you mean you don't know.  Why cause I have a cold you
      don't recognize me?

RALPHIE: Is it (UI)

JM:   No.

CW:   He (UI)

JM:   You, you were close though.

(Laughing.)

JM:   Come on Ralphie.

RALPH:  I don't know.

JM:   You don't know who this is?  (UI)

RALPH:  Give me the first name.

JM:   J.

(Laughing.)

JM:   Look at him, I can't believe you don't know who this
      is.  How come I can hear your voice 50 miles away and I
      know who it is and you have no idea who this is.

RALPH:  I'm international.

JM:   You're international, you're all right.

(Laughing.)

JM:   I just told ya.

RALPH:  With a J?

JM:   How many, how many guys you know with a J beside your
      friend?

31

281A-MM-88632

CW:        That owns a store.

(Pause.)

JM:        Come on, I'm at, I'm at the check cashing store in
           Margate.  Who do you think you're talking to?

RALPH:     (UI)

(Laughing.)

JM:        Jesus Christ!

RALPH:     How was your vacation?

JM:        It was good.  Good.

RALPH:     (UI) if you wanna say hello.

JM:        Who?  Your, your friend?

RALPH:     (UI) friend.

JM:        Your friend.

(Laughing.)

JM:        All right.

MB:        Hello.  Hey.  How are you?  Not much.  How, what's
           going on with you?  Yeah, you here for, for, for a
           while or what?

RALPH:     (UI)

MB:        .Yeah.

RALPH:     (UI)

MB:        Oh. All right.  Maybe we'll hookup or something.

RALPH:     All right.

MB:        All right, pal.  I'll see you later.

CW:        Let me talk to him.

32

281A-MM-88632

MB:     Hold on.

JM:     Put ah (UI) get nervous when I get on the phone...

CW:     Do they?

JM:     ...(UI)

CW:     They did get nervous.    (Laughing.)   I didn't give him
        the games.   (UI) the games.

JM:     Well he got nervous.

(Pause.)

(Laughing.)

CW:     I don't know if you'll be sit, sitting with me but
        he'll check it, but otherwise he'll get good seats.

JM:     So what do you do, you're, you're giving handicapping
        games to everybody?

CW:     Certain, he asked me.   Actually, John, ah, Johnny...

JM:     Johnny Boy?

CW:     ...asked me.

JM:     To, to handicap him?

CW:     For Ralphie.

JM:     And...are they giving you anything or no?

CW:     Well we'll see.   It's just starting...

JM:     Oh, okay. I told him 50 percent.   You heard what I told
        him.   I'm gonna tell him they gotta give you something.

CW:     All right.   Well they gotta and if he gives me I'll...
        everybody and anybody...that's fine, I'll take care of.

JM:     Are you, are you playing yourself or no.

33

281A-MM-88632

CW:    No, I don't play.  I don't play John.

JM:    So why you handicapping him?

CW:    (UI)

JM:    How about Huey?  Huey doing the handicapping service or no?

CW:    Yeah.

JM:    He's got that tape, he's worthless, isn't he?  I don't understand this fucking guy.

CW:    He doesn't, doesn't, hey he just doesn't do things right.  I gotta guy that's willing to back me and do...

MB:    He's on vacation in Cape Cod?

JM:    Did he drive up or he flew?

CW:    Flew.  Coming back tonight.

JM:    Cape Cod, where'd he go to visit ah, John, JFK?

CW:    JFK.  Yeah.

JM:    He wanted to see the memorial.  Did he go up with fucking flowers in his hair?  What the fuck did he go to the Cape for?

CW:    First, first they just...

JM:    It must be a zoo up there right now because of that.

CW:    (UI).  People don't wanna leave.

JM:    Who the fuck goes to Cape Cod?

MB:    The rich.

JM:    Do they?

CW:    He's got some relatives up there.

JM:    He's doing all right.

34

281A-MM-88632

MB:    You ought to see up by Joe.  I could be in a room on the beach.

JM:    Ah.

JM:    It's season.  If it's season then see summertime for them is season up there.

CW:    Where'd you go?

MB:    Fort Walton Beach.

JM:    Remember when we asked what season.  They said in the summer.

MB:    Oh, man was it nice.  You oughta see the flea bag (UI)

JM:    Summertime.  You didn't book the room in advance?

MB:    No, cause I never had trouble.  I didn't, you know I was never, I was never there in Aug, in ah, July.  The I had trouble getting a room there.

CW:    Laptops, I got the new best laptops out.

JM:    (UI) one.

CW:    Well I mean if you know of people.  How much it cost me.

JM:    (UI)

CW:    Yeah, I wish.  A thousand.  And they're twenty-six, twenty-eight hundred machines.  Compaq.

JM:    I gotta truckload (UI) you gotta guy wants them?

CW:    Yeah, I could...I could (UI).  This, between this kid and the other guy...

JM:    (UI)

CW:    Like nothing.

JM:    You gotta find out who sends (UI) to us.  We took, we took the from a company that owed us money.  I got a

35

281A-MM-88632

```
            whole (UI)...no, no hassle, no nothing.

CW:         Yeah.

JM:         Uh-huh.  (UI) this guy, he wants to get...

MB:         Coast, Coast Diving.  Another customer (UI)

JM:         Tell him what the fuck (UI)...

MB:         I don't even want to talk to him.

JM:         See if he's throwing rocks through the fucking window.
            Just tell him we're on delivery and they don't deliver,
            (UI)money (UI).

MB:         This is such bullshit, I don't know.

            Is it?

CW:         (Sighs.)

(Pause.)

CW:         Yeah, any kind of...he got us tickets for any, an kind
            of event, I could help you with that.  In fact I got my
            banker.  See what my...my banker blew it.  He, he had,
            the one check came back.  And normally he doesn't let
            any checks go back I got him tickets for Tampa
            Bay/Denver, on the 35 yard line of Tampa Bay.

JM:         In Tampa Bay?  I have a Sky Box there.

JM:         Yeah?

JM:         Through Banker.  (SC) (UI)

CW:         Banker is office supplies.

JM:         My friend's the CEO of the company.

CW:         Oh...

JM:         They have a box.  They told me I can go to the hockey
            games in Tampa.  I can go to football games in Tampa.
            I can go to baseball games in Tampa.  They got Sky
```

36

281A-MM-88632

|  | Boxes for every fucking thing up there. So what, I'm never in Tampa. |
|---|---|
| CW: | Where is this kid. He was in South Gate and 441. |
| JM: | Oh yeah, there's traffic right now. Crossing that fucking Atlantic Boulevard at this time take you a half an hour. |
| MB: | Call Fred Morgen stern. |
| JM: | Fred Morgenstern, he don't answer his phone. |
| CW: | Oh. |
| JM: | Oh ah, what's his name? |
| CW: | Yeah, couple of things. I met Little, Little, Little Frankie. One, again, understand it's the father that's talking. The father says how bad this kid is. He went for another twelve. He's still, the kid is real bad. And what, what address do you have? |
| JM: | I don't have an address. I only got a phone number. He used to live in West Palm Beach in somebody's apartment. But I don't even have a fucking address. |
| CW: | You don't? |
| JM: | He was living with his girlfriend. He's not living with her no more. She threw him out. |
| CW: | Girlfriend. He was with his girlfriend, in West Palm Beach? |
| JM: | Ah, I don't know where the girlfriend lives. The phone number I have is his girlfriend's phone number. That's her recording. Frankie's (UI) too, he owes him money, right? |
| CW: | Yeah, yeah, but he's more, he's...he's trying follow for, for you. |
| JM: | Yeah. I, the only phone number I have was at... |
| CW: | Here's, Frankie's handwriting. Cause I told him I was |

281A-MM-88632

gonna see you Monday.  Address...possibly...

JM:    He lives, he lived in this kids house in West Palm
       Beach...on the Intracoastal.  He lived in a condo.  He,
       he didn't pay the guy.  He owes the guy 60,000 for
       fucking rent.  He never paid him rent for two fucking
       year, so the guy threw him out.  From there he moved in
       with (UI)...

CW:    For two years.

JM:    From, from there, from there he moved to ah, is it, 30,
       maybe he owes him 30,000.

CW:    Oh, well that's, that's...

JM:    But it's an Intracoastal house.  The guy was getting
       like 25 hundred a month for fucking rent.  He went in,
       he didn't pay him rent for two fucking years.

CW:    That's 30,000 one year.  25 hundred.

JM:    Right, so that's what I'm saying it's close to 60,000
       he owes him.  That's what I believe he owes him 60,000.
       So it was a penthouse apartment.  A penthouse.  A
       penthouse.  This guy Joe Rasick (PH).  Another friend
       of, of Jack and Alice.

CW:    So he went to try to get, you know, see what address he
       might have had because he can't...

JM:    I don't have an address.  I'm so fucking aggravated.
       Let me call him first.

(Dial tone.)

CW:    You ready to leave?

JM:    Yeah, I'm just waiting for this guy.

CW:    Oh, okay.

JM:    (UI)

CW:    I thought maybe you were waiting for a delivery.

38

281A-MM-88632

JM:     Yeah.

CW:     You know I, I, one thing I don't, I don't play, John. I don't play sports at all. Horses I'll play. I don't play sports.

JM:     How you doing with the horses?

CW:     Good. Well I haven't been able, I haven't been able to go.

JM:     Then go (UI)

MB:     Still give promotions on the Internet?

CW:     Huh?

MB:     You still can get the races on the Internet?

CW:     Yeah. (UI)

CW:     You have the real player?

CW:     Yeah.

MB:     Make a bet...on the Internet?

CW:     If you wanted to. I, I didn't set up and account. But if you wanted to you could.

JM:     Better call your wife so she knows.

CW:     I called her one time.

JM:     Okay.

CW:     I think she heard, might have heard your voice in the background. (UI)

JM:     (UI) Like this fucking guy with this fucking thing.

MB:     Bond, I just called him again.

JM:     And?

MB:     I got his recording. Says he's in the office but he's,

39

281A-MM-88632

           he's busy, he'll call back.

JM:        He's in the office but he's busy.  Freddie's fucking
           (UI)

(Dial tone.)

(Dialing.)

CW:        Do you have a laptop?

Operator:  You have reached the (UI) voice mail box of...Fred
           Morgen stern.  To reach...

(Dial tone.)

(Dialing.)

JM:        Where's Pam?

MB:        Away, away till Wednesday.

JM:        Where is she?

(Phone ringing.)

MB:        She's in LA somewhere.

CW:        Is (UI) still work in here?

           (UI)

CW:        Is that girl still working here?

JM:        (UI)

(Phone ringing.)

CW:        No, she's gone.

JM:        She'll be back.

(Laughing.)

CW:        Some guy was answering the phone.  I don't know who.
           (UI)

                              40

281A-MM-88632

JM:      (UI)

(Phone ringing.)

CW:      God he said eight minutes, that was twelve minutes ago.

PEGGY:   Hi, this is Peggy.  I can't get to the phone right now.
         If you leave a message I'll give you a call back.

(Dial tone.)

(Dialing.)

CW:      Yeah, cause what's his name said he going to move some
         guys by you, move some for foot, football, good guys.

CW:      Owner of Service Merchandise.

JM:      (UI)

(Busy signal.)

CW:      He lives right next door to my, my big player.

(Dial tone.)

JM:      He's coming in here Mike.

(Dialing.)

CW:      Where is this kid.  This kid drives me crazy.

(Dialing.)

CW:      Did you ever get that connection for your laptop?

(Phone ringing.)

JM:      Write it up CW.  He's on the (UI)

(Phone ringing.)

JM:      I wanna work out at the fucking gym.

CW:      Everybody works out on Mondays.

41

281A-MM-88632

(Banging.)

(Phone ringing.)

JM:     (UI)

CW:     (UI) you ever see a tricep like that.  Like a rock.
        Feel it, Mike, feel it.

JM:     (UI) it's like a fucking rock.

CW:     Yeah, but imagine yeah Louisville with this.

(Recorded phone message.)

CW:     You know what I do?  Get two ten, ten pound dumbbells.
        You watching television tonight, you just sit
        there...and you just, and I'm telling ya.  Do three
        sets during the whole night.  Just watching television,
        nice and easy.  Ten pounds.

JM:     I started doing (UI) fucking exercise for me.  I ain't
        eating.

MB:     (UI)(laughing).

CW:     Get those pills, those pills I, I can't...

JM:     I take them.  I got them pills.  Frankie Russo gave
        them to me.  Same thing, they don't fucking work.

CW:     (UI).  I, I have no appetite with these.

JM:     I got an appetite.

CW:     John, I...

JM:     CW, it looks like you got an appetite as well as mine.
        (Laughing.)

CW:     John, I know but (UI)

JM:     (SC) (UI) you than me.

CW:     With, no but I've lost eleven, that's how big I was.  I
        was up to 270.

42

281A-MM-88632

JM:     Yeah, I'm about 260 now.  I gotta lose a little weight.
        I gotta lose, I wanna (UI)

MB:     (UI)

CW:     You know what's it's bad when you sit down and you feel
        this come up to here.

MB:     I wanna get to 230.

JM:     235 is my perfect weight.

CW:     Do you remember when celebrities was (UI) I was down to
        228.

JM:     Yeah, I was down, when Joe was home I was down to
        230...235.

CW:     He's coming back soon.

JM:     Yeah.  (UI)   I gotta go play golf.  I gotta fucking
        (UI).

CW:     It's great.

JM:     Yeah.  My son's been breaking my balls.  I'm taking all
        my kids to the (UI)

CW:     John.  John.  Take a few minutes.  I'll go to the range
        with you everyday.

JM:     Fuck the range, I need to get a professional (UI)

CW:     My friend will teach you.  My friend shoots in the
        70's.  The hockey player.  He'll, he'll teach you.
        He'll give you...

JM:     You know if you need.  I need to go to a camp first,
        for five days.  It's a, it's just a, a camp for golf.

CW:     I got one (UI)

JM:     That's all you fucking do.  You hands will be, your
        hands come home, they, they look like you worked.
        That's how many golf balls you fucking hit.  And you'll
        hit it right.

43

281A-MM-88632

CW:     You know the pros after they play, you know what they
        do?  After they play a round of golf like a tournament,
        when they're done playing they go right to the range.

MB:     Huey said he's good.

CW:     Huey?  I give him credit.  Huey's a very good golfer.

JM:     Yeah, he said he was.

CW:     But this, this, this friend of mine, the hockey
        player...

JM:     Huey was a good basketball player too.

CW:     Let me, he's an athlete.  He really is.

JM:     He told me he was in a (UI) (laughing).

CW:     I mean look at this.

        (SC)   (UI)

MB:     I know he could run.

CW:     He could run, he could, he could run.  He could...

(Laughing.)

MB:     He (UI)...

(Laughing.)

MB:     Bobbing and weaving.

(Laughing.)

CW:     He could, he ran circles around...

(Laughing.)

JM:     (UI)

MB:     He's a pinball.

JM:     Right here (UI)

44

281A-MM-88632

(Laughing.)

JM:     He knows he's a little cocksucker.

        (UI)

CW:     Where is this guy?

CW:     Mike.

CW:     Southgate and 441.  Is like twelve days.

JM:     No, he's, he'll be here.

CW:     Well all of a sudden you got patient.  (Laughing.)
        Listen, he was spitting blood a couple of minutes ago.
        Now he's a patient guy.

JM:     (UI) I'm on medication right now.  You don't know.  I'm
        not even (UI).  Probably thinks we're fucking close.

CW:     No, no, he knows (UI)

MB:     Huey told me go to the range, and just take one club.
        Take a different club...

CW:     You're supposed...

JM:     You mean everyday?

CW:     Okay.

MB:     Every, every time you plan to go just...take one club,
        a different club.  Just play that club.

JM:     Why?

MB:     He said that's how you, that's how you get good.  You
        learn, you learn the range of your clubs, how good you
        can hit it and you'll, and he said that's how you
        master it.

JM:     Well that's the key is to know what you can hit, the
        distance, what distance you can hit with the club.
        Cause that's all it is.

45

281A-MM-88632

CW:      It's you're swing.

MB:      But you know what it is when I watch these guys...

JM:      Positioning is, it's like playing pool, you gotta
         position your ball for the next shot.

MB:      But when I watch these guys they always make a fucking
         divid (PH) and it's always in front of the ball, after
         they hit it.  That's the fucking key.

CW:      Here he is right here.  Let me run outside and get him.

JM:      Let me open the door.

(Pause.)

JM:      Make sure he (UI)

CW:      Yeah.

(Pause.)

(Opens door.)

(Beeping.)

(Walking outside.)

CW:      Yeah, Mike, let me take it.

MV:      Yeah.

CW:      Cause they're really closed right now.

MV:      Okay.  Let me open it up here, that's that one...  Hey
         can I cash that, do they have enough to cash that check
         that I got from the (UI)

CW:      How much is that?

MV:      Is from the PRS guy, not this one but another one.
         It's like twenty-five hundred.  Do they have enough to
         cash it?

CW:      I don't, actually they're, they're waiting for

281A-MM-88632

delivery, they're closed.  Okay.

(Zipping.)

CW:     Here, you know what you gotta, just, just sign the back
        of this.

MV:     Sign what?

CW:     Just sign the back of this thing.  Don't worry about
        it.

MV:     I don't even wanna touch this fucking check.

(Laughing.)

CW:     Just sign the back of it.

MV:     Sign, but it's Anabel, it's a girl.  How the hell do I
        sign this...

CW:     Just sign Anabel, whatever.  Just, just make sure you
        got the right, just scribble anything on it.  I mean it
        doesn't matter to them.

MV:     There you go it's the proper spelling, just sign it
        here...is Anabel at 21.  Anabel...oh yeah.   (UI)

CW:     Are you kidding me?

MV:     Hell no, I ain't kidding you.  I don't wanna touch this
        fucking shit.  Cause they could always report it saying
        Tom, Dick and Harry, you know.   (UI)

CW:     When are you meeting what's his name?

MV:     I'm meeting him...right after I leave here.

CW:     He's gonna be short fifty dollars.  You know?  So he
        asked me if I can lay it out.  I, I, I do, but I just
        can't lay it so I have to give you fifty dollars.

MV:     Okay.  Ain't no problem.  Don't worry about it.

CW:     What's the matter?

281A-MM-88632

MV:     (UI)  All right (UI)

        I wouldn't (UI)

CW:     Stop that.

MV:     (UI)

(Walking.)

(Inside store.)

JM:     Hurry up before this guy comes in.

CW:     Who?

JM:     This ah, this guy, I don't know who the fuck he is.

(Pause.)

JM:     (UI)

        (UI)

MB:     And why did you say you didn't buy nothing?

JM:     Cause she didn't buy the right stuff.  She didn't buy
        mushrooms.

MB:     You didn't buy nothing.  I, I just put stuff on the
        list that I knew we need.  You didn't put, you didn't
        buy anything extra?

(Pause.)

CW:     I'll still owe (UI)...

MB:     (UI) yourself (UI)

CW:     The twenty-one thirty-four.  I'm gonna still, I'm gonna
        still owe you a couple dollars.

MB:     All right.

MB:     Is this the ah...

48

281A-MM-88632

JM:      Did you lock the door?

MB:      Yeah.

JM:      All right let me get out of here.

         Who's this guy.

         Who's that guy.

MB:      I never saw him before.

(Shuffling papers.)

CW:      I said what kind of (UI) August 21st on there.   '98.

JM:      Yeah, it's got August 21st.

CW:      Why does it have August 21st, from an escrow company.

JM:      It can't be August.  We can't cash it.

CW:      Maybe you should call.  I don't understand that.

JM:      Can't cash it if it says August.

CW:      No, it says '98.

JM:      August 21, 1998.

CW:      You know what is, he had somebody died, maybe they...
         well...

MB:      Find out from him first.

JM:      Go out the side door.

CW:      Huh?

JM:      Go out the side door.  The fucking (UI)...

CW:      Hey what is...  How can that be?

MB:      I know, ask him.

CW:      I got it on here.  Yeah.

49

281A-MM-88632

(Walking outside.)

CW:        How...

(Pause.)

CW:        What if this...boy it's almost a year old though.

MV:        Uh-huh.  And I told you remember.

CW:        Yeah.  Well, well no, I, thought you said a couple of months.

MV:        Oh (UI)

CW:        Maybe, did this person die or anything?

MV:        No.  That's, that's (UI)

CW:        Uhm...  Did you have something else you wanted me to leave?  To get cashed?  Or no.  You wanted...

MV:        Well no, cause I need to cash tonight cause I gotta pay somebody but if I can't get the cash now I'll get it first thing in the morning.

CW:        Okay.  Okay, well I'll get it from him.  I'll take, you know...

MV:        Okay.

CW:        They're just waiting for a delivery.

MV:        Okay.

(Walking.)

CW:        You wanna go and I'll call you later.

MV:        Okay.

CW:        I'll take care of it, don't worry, you'll...

MV:        No, no problem at all.

CW:        You're (UI)

281A-MM-88632

MV:    All right if you, if we could get, if you could take
       care of that then I'll go ahead and take of you on your
       ah system (UI)

CW:    All right, yeah, we'll take care of it.

MV:    We're squared away, all right?

CW:    Yeah.

(Walking.)

CW:    He (UI) was his aunt.  He says that was his ah, his
       aunt, (UI) time, and she just never did anything with
       it.

JM:    Oh, she never cashed it?

CW:    No.

JM:    Why?

CW:    Well, she, she's like a little...

JM:    Yeah, but will they allow her to cash it now?

CW:    Oh.

JM:    Did she sign or did him?

CW:    Oh, well it was his (UI)

MB:    His signature.  I mean it, you know sign it's signed
       down (UI) whatever.  It has no expiration like can't
       cash after a year or anything like that.  Send it in.

CW:    Oh can you, can ah...well I don't wanna tell you, I, I,
       I'm not (UI), I'm not doing anything crazy here.

       (UI)

CW:    I looked at it, it says August, I'm, I, I was like,
       this is postdated.

JM:    That's what I thought you was saying, that's why I kept
       saying (SC) you can't cash it (UI)

51

281A-MM-88632

CW:     Yeah, you can't cash it, no.

JM:     Let me see what that says.

(Pause.)

CW:     It's a payoff overage.  She might have forgotten about
        the (UI), she sold her house.  That's what it was.

(Phone ringing.)

JM:     Why the fuck would she just keep the check this long?

CW:     I'm, John I just ah...

JM:     (UI)

CW:     I have no idea.

(Pause.)

CW:     I, I, I do appreciate.  I don't, I don't like to get, I
        don't want...because of my (UI) with you, I always want
        to do everything right with you, you know what I'm
        saying?  I don't want...  For me to be late, it,
        believe me it's something that's not right.

(Pause.)

JM:     Yeah.  When this week?  When this week is he supposed
        to be back?

CW:     Oh, I thought he called in sick.  That's all I'm
        listening, I don't (UI)...

JM:     Yeah.

(Pause.)

CW:     Let me know about that...those computers supplies.

JM:     Yeah.

MB:     All right, let me know.

CW:     Cause what they do...John, there's a big market

52

281A-MM-88632

overseas in Brazil and whatnot.

JM:      Well that's it, if he gets them now I think they got to be shipped out right away.

CW:      They get, that's what they do...and they make a lot of money. And if the stuff isn't good they, people don't come back from Brazil.

JM:      (Clears throat.)

CW:      Mike.

MB:      Yeah.

CW:      All right so just ah, it's a payoff overage from when they, she sold the house.

MB:      But she never (UI)

CW:      Yeah.

MB:      It's no big deal.

CW:      Okay, if, if, you know I don't want you to think I'm doing anything (UI)

MB:      No, no, I don't think that, I was just wondering...

CW:      Okay.

MB:      ...where he got it.

CW:      Cause when I looked I saw August. I'm saying, I thought it was postdated. Let me just take a quick leak.

         (UI)

CW:      I thought it was postdated.

(Pause.)

(Using restroom.)

(Walking.)

53

281A-MM-88632

CW:     All right.  Can I dump this somewhere?

JM:     Yeah, right in the (UI)

CW:     You look like you're anxious to leave.  (Laughs.)

JM:     Yeah (UI)...

CW:     Sorry you hadda wait for me.

MB:     No, no, that's all right.

JM:     All right, I'm out of here.  I would know what to do (UI)

CW:     I'm out of here.

MB:     With what?

JM:     There's another guy that's coming in.

CW:     I owe you 200.

JM:     (UI)

(Beeping.)

(Walking outside.)

CW:     I owe you 200.  All right?

JM:     I'll see you ah...

CW:     Tomorrow or Wednesday definitely.

JM:     (UI)

CW:     Let me know about that stuff.

JM:     (UI)

CW:     John?

JM:     Yeah, you already asked me (UI)

        You can reach me (UI)

54

281A-MM-88632

CW:      Okay.  Let me uhm, and I'll get those, just let me know
         if it's four or six tickets, six.  All right.  Thanks
         for your understanding.

(Getting into car and closing door.)

(Starting car.)

(Beeping.)

(Pause.)

CW:      This is Hard Eight.  The meeting concluded uhm...heard
         conversations from John Mamone, Mike Buccinna, alias
         Mike Boots, Hard Eight...telephone calls and ah, Mike
         Vidal who is a computer person, (UI), not related to
         the situation, and...phone calls from ah, Fran, my
         wife.  Okay, Hard Eight.  Hard Eight.

End of tape.

55

```
FILE NUMBER:                    245A-MM-91505

CONVERSATION DATE:              02/02/2000

CONVERSATION TIME:              09:40:48

TELEPHONE NUMBER:               954/614-1821 (Cdr 0140)

CALL NUMBER:                    1395

CASE AGENT/SQUAD:               SA PATRICK G. BRODSKY/OC-2

REVISED BY:                     SA CHRISTOPHER S. STARRETT

DATE TYPED:                     03/29/2000


PARTICIPANTS:                   JM  -  JOHN MAMONE
                                PA  -  PHILIP ANDREOLA


ABBREVIATIONS:                  (UI) - UNINTELLIGIBLE
                                (PH) - PHONETIC
                                (IA) - INAUDIBLE
                                (SC) - SIMULTANEOUS
                                       CONVERSATIONS
```

245A-MM-91505

                (Phone ringing)

PA:        Hello.

JM:        Phil.

PA:        Hello!

JM:        Phil!

PA:        Yeah, John.  I'll see you around eleven.

JM:        Yeah.  Listen to me.  You can't.  You told me to
           tell the guy to put the fuckin' two checks in the,
           the checks back in, he puts them back in, they
           come back again.  You gave me your word you would
           cover these fuckin' things.  You're making me look
           like a real fuckin' jerk off.  You can't fuckin'
           do this.  Bring me the fuckin' cash today.  Don't
           bring me no more fuckin' paper, don't ask me for
           no more favors.  You're burning your fuckin'
           bridges my friend.  You are fuckin' burning them
           rapidly.  I can't have this fuckin' shit.  These
           people are my fuckin' friends.  Don't fuckin' tell
           me to redeposit something and then don't fuckin'
           cover.  You gave me your fuckin' word.  There's
           fuckin' ten grand in checks this guy's got.  He's
           got ten.  Mike's got six.  They're all over my
           shit.

PA:        No he don't have ten.

JM:        He's got ten.  He's got two 3's and two 2's
           they're coming back he told me.

PA:        Two 2's?

JM:        He said, that's what he told me.

PA:        No, he's got the, the thirteen is, is ah.  What's
           taken care of.  The thirteen hundred was taken
           care of.

JM:        Yeah, you give me money for it, that's why it
           was taken care of.

                              2

245A-MM-91505

PA:     Right.

JM:     But what about the fuckin' 3's and the 2 the other
        day?

PA:     (UI).

JM:     Yeah, and there's not another two.  He told
        me there's two 2's.

PA:     No, no, no, there's no two 2's.  (UI) two 2's.

JM:     Where's the eight? I got, you, I gotta have this
        money for this fuckin' guy.  I gotta got to him
        with money today.  Why didn't you cover them?

PA:     Cause I just got a few dollars now.

JM:     Yeah, but you told me the lady was covering the
        checks.

PA:     I said if she didn't cover 'em, I would cover
        'em.

JM:     Right.  So but why did, why did you tell me that
        if you're not gonna do it.

PA:     (UI) the fuck.

JM:     All we're doing is getting in fuckin' thing worse
        and worse and worse and worse.  I can't do it.  I
        go from one fuckin' store to another and I leave
        them all with a debt.  I can't do this.  You gotta
        fuckin' get outta the situation.

PA:     I'm in a bind now.

JM:     I mean every week you tell you just need one
        more week and then you've been telling me
        that for six fuckin' months.

PA:     I know that's the truth (UI).

JM:     But for six months you told me you need one
        week...

3

245A-MM-91505

PA:     I know.

JM:     ...and for six months it's the same story.

PA:     I know.

JM:     I mean you gotta hear yourself talk to me.

PA:     I know.

JM:     You can't do this to me Phil.  You can't.
        You gotta fuckin' take care of this shit.

PA:     All right, just gimme a little time, I'll take care of
        it.

JM:     Well what's a little time.  I need to get this
        fuckin' done.  I gotta go see him.

PA:     Ah.

JM:     You told me give you a little time with Mike
        and it's fuckin' a month went by, you still
        didn't pay him.

PA:     Yeah.

JM:     I mean you know, you're taking away the livelihood
        of these people.  That's they make their
        fuckin' money by pushing fuckin' money out.  And
        you're fuckin' holding them up.  Mike's store's
        fuckin' tight.

PA:     Yeah.

JM:     Bruce is working day by day.  Come on.  Nobody
        goes up to your business and holds you up from
        making a living.

PA:     No, no, I, I understand John, I'm wrong.  I
        understand.  I understand.  (Sighs)

JM:     You know ten G's is two hundred dollars a day
        to these guys, 250 a day.  I mean you gotta
        come up with a better solution then, then
        just carrying checks week by week...

4

245A-MM-91505

PA:    Yeah.

JM:    ...and having them fuckin' bounce.  And, and
       floating your fuckin' money for two weeks.

PA:    Now I'm, I'm, I'm trying to get that damn
       fuckin' ah, pre-permits.  I'm supposed to get
       the (UI).

JM:    Yeah, but you been telling me your startin'
       seven houses, you done this, you (UI).

PA:    I know.  I know.  (UI).

JM:    Come on this thing is goin' on a month.  I'm
       hearing the same thing for a month, I mean...

PA:    I know.

JM:    ...the same with Joe Bellitto.  I can't go on like
       this.

PA:    I know.

JM:    I mean I built fuckin' houses.  I, I, I never
       had these kind of fuckin' problems.  You
       build when your supposed to fuckin' build.
       You get your permits and you go.

PA:    I hear ya.

JM:    I mean I don't know what the fuckin' problems
       are.

PA:    I can't get the, you know, I gotta get the money
       for the permits and I, I'm right up to there right
       now.  I got three permits sitting down there.  And
       I gotta give 'em three thousand dollars right now.

JM:    I mean go to Joe and get mon-, money out of
       him.  Work a fuckin' deal.  Get the fuckin'
       out, get outta the other situation.  Your
       better off paying him at the end then paying
       every week.

PA:    Yeah.

5

245A-MM-91505

JM:     What more do you fuckin' need.

PA:     All right, I'll call you back in one hour,
        John.

JM:     All right, one hour because I gotta go down
        there.  I gotta see him.

PA:     Right.

JM:     I gotta, I gotta pick up from last week yet.  It's
        fuckin' Friday, it's two days away.  I gotta straighten
        out all this bullshit.

PA:     All right, I'll call you back in one hour.

        (Phone hung up)  (END OF CALL)

6

FILE NUMBER:               245A-MM-91505

CONVERSATION DATE:         02/28/2000

CONVERSATION TIME:         09:34:42

TELEPHONE NUMBER:          954/614-1821 (Cdr 0233)

CALL NUMBER:               2568

CASE AGENT/SQUAD:          SA PATRICK G. BRODSKY/OC-2

TRANSCRIBED/TYPED BY:      BARBARA L. CHAFIN (HRA)

DATE TYPED:                06/15/2000


PARTICIPANTS:              JM - JOHN MAMONE
                           PL - PHILIP ANDREOLA


ABBREVIATIONS:             UI - UNINTELLIGIBLE
                           PH - PHONETIC
                           IA - INAUDIBLE
                           SC - SIMULTANEOUS CONVERSATION


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

245A-MM-91505

(telephone dialing)

(telephone ringing)

PL:     Hello.

JM:     Phil.

PL:     Yeah John.

JM:     Listen, I don't know what the fuck you're doing, but that three and two came back, the fucking guy's screaming at me, how... no checks you gave me are good, I, I don't understand what the fuck you think that, that, that they wouldn't come back or that I'm a, I'm a jerkoff but... how the fuck can you just keep telling me they're good and they're not good.

PL:     I put it in the bank.

JM:     Phil, the fucking mother-fuckers came back twice, the guy's making me pick `em up today, he wants his money. The three and the two.

PL:     (SC/IA)

JM:     That's two fucking weeks old, those checks.  I want the fucking money today Phil, I'm done with you believe me, don't call me your fucking friend, don't call me nobody.  I want the money today.  Give me the 5,000 for those two, you've got to give me 6,300 for the other guy, you got to give me 6,000 for Mike, I want the fucking money today Phil.  Don't make me come look for you.  I want the fucking money today.

(END OF CALL)

2