UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          CASE NUMBER: 00-6309-CR-Seitz

       Plaintiff,

vs.

JOHN MAMONE

       Defendant.

_____/

**NIGHT BOX**
**FILED**

APR 1 1 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA.

## DEFENDANT JOHN MAMONE'S PETITION FOR REVIEW OF MAGISTRATE'S ORDER DENYING DEFENDANT JOHN MAMONE'S MOTION FOR ORDER ELIMINATING HOUSE ARREST COMPONENT OF BOND

THE DEFENDANT, JOHN MAMONE, through counsel, and pursuant to 18 U.S.C. §3145(a), petitions this Court to enter an Order reversing the denial, entered April 2, 2001, by the Honorable Stephen T. Brown of the Defendant John Mamone's Motion for Order Eliminating House Arrest Component of Bond. In order to assist the Court and not repeat facts, allegations or arguments previously made, in support hereof, the defense submits the following exhibits, without further argument:[1]

1.      Exhibit A - Defendant John Mamone's "Petition for Admission to Reasonable Bail" filed upon Mr. Mamone's arrest on the indictment.

2.      Exhibit B - Transcript of Pretrial Detention Hearing in this matter.

3.      Exhibit C - "Defendant John Mamone's Motion for Order Eliminating House Arrest

---

[1]By filing this Petition in this manner, the defense feels compelled to inform the Court that this is not a *pro forma* request. The brevity of this pleading in no way reduces the significance of the relief sought. The house arrest portion of pretrial release is devastating the financial and emotional well-being of John Mamone, his wife and their four minor children.

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

Component of Bond" with attachments.

4.      Exhibit D - Government's response to the motion, with attachments.

5.      Exhibit E - Defendant's "Notice of Change in Position of Pretrial Services in Regard to Defendant John Mamone's Motion for Order Eliminating House Arrest Component of Bond."

6.      Exhibit F - "Defendant John Mamone's Request for Hearing And Reply to Government's Response In Opposition to Defendant Mamone's Motion for Order Eliminating House Arrest."

7.      Exhibit G - Magistrate Stephen Brown's "Order Denying Pending Motions Re: Bond."

WHEREFORE, it is respectfully submitted the magistrate erred in denying the motion filed by the defense and that this Court should reverse the decision and enter an Order deleting the house arrest component of the bond.

Respectfully Submitted,

THORNTON & ROTHMAN, P.A.

By: _____
DAVID ROTHMAN
Florida Bar # 240273

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Petition for Review of the magistrate's denial of Defendant John Mamone's Motion for order eliminating House Arrest Component of Bond was forwarded via U.S. mail (and to the government, via facsimile) to the

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358 - 9000 • Telefax (305) 374 - 5747

Honorable Stephen T. Brown, Assistant U.S. Attorney Brian McCormick, 500 East Broward Blvd.,

Ft. Lauderdale, FL 33301 and David Nuby, Jr., Senior Pretrial Officer, 299 E. Broward Boulevard,

Suite 301, Ft. Lauderdale, FL 33301 on this the _____ day of April, 2001.

DAVID ROTHMAN

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          CASE NUMBER: 00-6309-CR-Seitz

      Plaintiff,

vs.

JOHN MAMONE

      Defendant.

_____/

### Petition for Admission to Reasonable Bail

THE DEFENDANT, JOHN MAMONE, moves this court, pursuant to the Eighth

Amendment to the United States Constitution and 18 U.S.C § 3142, to enter an Order admitting John

Mamone to pretrial release under reasonable conditions.  The defense submits that a reasonable bond

in this case is a personal surety bond, in the amount of $1,000,000.00, coupled with house arrest and

in addition to the standard conditions of bond.  The personal surety can be co-signed by:

1.    **Grace Mamone**, Mr. Mamone's wife,

2.    **Joseph Mamone**, John's brother, a manager at Coldwell Banker, New Jersey office, who owns property with equity in excess of $500,000 and

3.    **Larry Switzer**, (and, if the Court deems it appropriate, his wife, Carol) a close friend and neighbor, formerly CEO of two  publicly traded businesses.

Additionally, the defense will proffer the testimony of the following people who support the

release on bond of Mr. Mamone and will demonstrate that Mr. Mamone is neither a risk of flight nor

a threat to the community:

1.    **Chip and Cindy Hurd**, friends and neighbors, owners of National Pawn, the largest pawn shop in Florida, that has been family-owned for nearly 50 years.  The Hurds' children are friends with the Mamone children and often spend the night at the

Mamone home. In fact, the Hurd children have gone on trips with John Mamone and his family. Knowing the allegations and the prior criminal record of John Mamone does not change anything, according to Mr. Hurd. John Mamone, is his opinion, is not a danger to the community and the allegations in this case will in no way change their relationship. Each and every person mentioned herein concurs with this position and would so testify.

2.    **Gary and Anne Ellis**, friends and neighbors. Mr. Ellis is CFO of Consolidated Cigar, the largest cigar company in the world,

3.    **Ralph and Michele Vartanian**, friends and neighbors, both of whom work at Smith Barney,

4.    **Jim and Connie Guice**, friends and neighbors. Jim is presently self-employed. Formerly, he was a high-level employee of Ryder Trucks. Connie works for Prudential Realty/Arvida Realty. She sold the house in which the Mamones live.

5.    **Joe and Debbie Attenasio**, friends. Joe, who owns a stone and tile company, coached football with John,

6.    **Keith and Connie Carlson**, friends and neighbors,

7.    **Gary Pretner**, friend. Mr. Pretner, president of the football league in which John Mamone and his sons have been involved, owns his own communications business. In addition to joining the position of the other supporters regarding bond, Mr. Pretner is prepared to tell this court that the league and the kids in the league need John Mamone.

8.    **Jack London**, friend. Mr. London, who owns his own wholesale clothing business, is treasurer of the same football league,

9.    **Robert Cole**, friend. Mr. Cole, a business owner, is the Athletic Director of the football league and John Mamone's son's high school football coach. His children occasionally stay overnight at the Mamone house, and the Mamone children occasionally stay at the Cole house, and

10.    **Dr. Angel Cadiz**, family friend and neighbor. Dr. Cadiz lives next door to the Mamones and is the pediatrician for the Mamone children.

As grounds therefore, it is respectfully submitted that under a bond as requested:

1.    John Mamone does not constitute a risk of flight.

2

2.    John Mamone does not pose a threat to the community or to any person.

3.    the legitimate interests of the government and this court will be protected.

## A. FACTUAL BACKGROUND

John Mamone has been indicted in this case for RICO conspiracy, loan sharking, gambling, obstruction of justice and money laundering, all allegedly arising out of what the government has described as organized crime activity. John Mamone has known for a considerable amount of time that he was under investigation by the federal government and has offered, through counsel, on numerous occasions, to surrender to the authorities. It is expected that the government will not seriously contest the fact that with his extensive family and business ties to the community, John Mamone does not constitute a risk of flight. Based on pre-indictment conversations with the government regarding arrest and bond, however, the government's request for pretrial detention will be founded upon the argument that John Mamone represents a danger to the community.[1]    John Mamone adamantly denies this allegation. His denial is echoed by the substantial support of his friends and family.

## B. COMMUNITY TIES AND RESPONSIBILITIES

John Mamone has been married to Grace Mamone for nineteen (19) years. They have four children living with them, a fifteen year old son, John Anthony, an eleven year old son, Francesco, a ten year old son, Joey and a three year old daughter, Nikki. John Mamone has two grown children with his first wife; a son, David, who is twenty-two, and a daughter Danielle, who is thirty years old, both of whom are close with John and Grace. The Mamones have lived in the same home for nearly

---

[1]On Monday, October 30, 2000, Assistant United States Attorney Brian McCormick informed counsel that based entirely upon the potential sentence John Mamone faces if convicted as charged. government now is going to argue to the Court that he is a flight risk

3

eight years. Without John Mamone, the family will suffer emotionally and financially. If detention were warranted, that suffering is unavoidable.

John is intimately involved in the lives of his children. He is especially active in the basketball and football leagues in which his sons have played for several years. John has coached and continues to coach teams in the leagues. As vice president of the football league John is responsible for running the daily activities of the league. He has been a coach for seven years and an officer for the last two year. John has also been the athletic director for a basketball league for several years. Hundreds of young athletes have relied upon John Mamone for guidance over the last seven years. Today, an entire league depends on John Mamone for his leadership. Without John the league, but more importantly hundreds of kids, will suffer. Under the circumstances of this case, it is respectfully submitted that it is far better to permit John Mamone to continue his good work.

### C. FAMILY, FRIENDS AND COMMUNITY SUPPORT

The many people who have come forward on John Mamone's behalf are prepared to testify that each supports John Mamone, in spite of the serious allegations that have been lodged against him, and his prior criminal record.

### D. PRIOR RECORD

John Mamone has two prior cases, one a federal case in which he plead guilty to insurance fraud, and the other a state case in which he plead guilty, during the early stages of trial, to commercial bribery. In both cases, he plead guilty as a matter of convenience. His community control in the federal case was successfully completed. The probation in the state case is now over. Part of the government's argument in this matter of bond will be that the crimes alleged in this case occurred during the time John Mamone was on probation in the state case. The fact of the matter

4

Thornton & Rothman, P. A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

is that such an allegation should go to the amount of the bond, not the issue of pretrial detention. For, if Mr. Mamone violates a condition of a bond set by this court, the appropriate remedy is to revoke the bond and remand Mr. Mamone to custody.

### E. BASIS OF GOVERNMENT'S REQUEST

According to the Government, they have evidence that John Mamone threatened an informant and his family on the telephone and in person, and physically assaulted the informant in an attempt to collect a debt. In truth and in fact, among a litany of crimes and misdeeds, the informant actually provided Mr. Mamone a worthless check and then, before the check bounced, had the temerity to ask John Mamone for (and receive) money from him. Whatever dispute existed between Mr. Mamone and the informant was a spillover from months of frustration over being lied to and used, not, as the government would have this Court believe, an attempt to use violence in the course of collecting an unlawful debt.

Without in any way condoning threats of, or actual violence, it is respectfully urged that the Court must put this issue into proper perspective. Based on common sense, common knowledge and communications with the government, John Mamone has know for months the identity of the informants in this case. He also knows the family of the informant. Knowing these facts, and the seriousness of the allegations in this matter, at no time, and in no fashion, did John Mamone do or say anything to cause the informants to fear for their, or anyone else's safety. Simply put, this is not about intimidation, but about losing one's temper. The attempt of the government to extrapolate from the facts submitted to argue that John Mamone is a threat to the community is without merit. Any concern the Court may entertain in this regard can be addressed and eliminated through conditions of bond, including house arrest.

5

**F. OTHER FACTORS IMPACTING THE ISSUE OF PRE TRIAL RELEASE**

This case is based on a lengthy multi-agency, multi-year investigation. There are several informants, consensual and Title III recorded conversations, thousands of documents and multiple defendants. The prospect of expeditiously getting to trial, a trial that the government estimates will last five (5) weeks, is nonexistent. In other words, if the decision of the Court is a close one, it is respectfully requested that the Court add to its list of considerations that if bond is denied, the difficulty of preparing for the defense of John Mamone's case will be greatly increased.

**WHEREFORE,** for the reasons presented in this motion, as well as additional facts, circumstances and argument to be brought before the Court at the time of the hearing, it is respectfully requested that this Court enter its Order Admitting John Mamone to Reasonable Bail.

Respectfully submitted,

**THORNTON & ROTHMAN, P.A.**
200 S. Biscayne Blvd.
Suite 2690
Miami, FL 33131
(305) 358-9000

By: _David Rothman_
DAVID ROTHMAN

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was forwarded via facsimile to Assistant U.S. Attorney Brian McCormick, 299 East Broward Blvd., Ft. Lauderdale, Fl 33301 on this the 30th day of October, 2000.

_David Rothman_
DAVID ROTHMAN

6

# EXHIBIT B

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF FLORIDA*
*MIAMI DIVISION*

UNITED STATES OF AMERICA,

Case No. 00-6309-Cr-SEITZ

Plaintiff,

vs.                                    **MIAMI, *FLORIDA***
OCTOBER 31, 2000

JOHN MAMONE, et al.,

Defendants.

---

**TRANSCRIPT OF PRETRIAL DETENTION HEARING**
**BEFORE THE HONORABLE STEPHEN T. BROWN,**
**UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

FOR THE GOVERNMENT:

**BRIAN McCORMICK, A.U.S.A.**
500 East Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33301 954/356-7392

FOR THE DEFENDANT:

**THORNTON & ROTHMAN**
200 South Biscayne Blvd.
Miami, Florida
**BY: DAVID B. ROTHMAN, ESQ.**

REPORTED BY:                **JERALD M. MEYERS, RPR-CM**
Official Federal Court Reporter
301 North Miami Avenue, 9th Floor
Miami, FL  33128-7797 - 305/374-8108

**STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION**

1  (Call to order of the Court)

2        THE COURT:  The United States versus John Mamone,

3  case number 00-6309-Judge Seitz.

4        THE COURT:  Mr. McCormick, are you ready to

5  proceed?

6        MR. McCORMICK:  Yes, Your Honor.

7        THE COURT:  Go ahead.

8        MR. McCORMICK:  Your Honor, the basis, as we have

9  indicated before for the detention of Mr. Mamone, is flight

10 and danger to the community.

11        The government's proffer in this case is going to

12 demonstrate that the crimes charged against Mr. Mamone are

13 crimes of violence under the Bail Reform Act, that meaning

14 extortion, over and above the fact the defendant is charged

15 with the crimes of violence, by the operation of his loan

16 shark business.

17        The government will also show specific acts

18 committed by the defendant to demonstrate the propensity,

19 his propensity to commit crimes of violence in the

20 collection of debts from gamblers and loan sharks.

21        Your Honor, the government's indictment in this

22 case charges a whole plethora of crimes under the RICO

23 Statute, 1962(d), the conspiracy to participate in a

24 racketeering enterprise.

25        The crimes include loan sharking, an illegal

- 10/31/00 -

1  gambling business, money laundering and running and

2  collecting extortions, extensions of credit.

3       Your Honor, the guidelines in this case are

4  tremendously high.  Computing the money laundering

5  guidelines under the sentencing guidelines, conservatively

6  speaking, it is in the mid to high 30's, and Mr. Mamone,

7  because of things that I am going to bring up in this

8  pretrial detention hearing, is well into the criminal

9  history and in the sentencing guidelines where he will

10  serve from 25 to 30 years in prison if he is convicted, and

11  sentenced according to the government's position in these

12  matters.

13       Mr. Mamone has a criminal record that is very

14  important in this particular case, for beginning in August

15  of 1993, he has arrested for destruction of a vessel and

16  mail fraud.

17       What is important to note on that is Mr. Mamone

18  pled guilty in March of 1995, and he was sentenced to four

19  years probation and restitution of $94,000.00.  That's a

20  federal offense.

21       He was under supervision for part of that in Ft.

22  Lauderdale.  The probation lasted from 1995 until about

23  April of 1997.  Why I am raising that now, Your Honor, is

24  Mr. Mamone is charged in the indictment, the RICO

25  indictment in the substantive counts with committing

1    criminal acts during that very probation, and also during

2    the period that he was under bond.

3         So I cite the Court to Section or Title 18,

4    3142(g)(2)(b) which is a very, very important consideration

5    in terms of what factors the Court looks to in terms of

6    deciding whether detention is appropriate.

7         Again, Your Honor, in 1994, Mr. Mamone was

8    arrested for extortion bribery, I believe in New Jersey.

9    He was placed on bond.  Mr. Mamone, in March of 1994, pled

10   guilty to the bribery charges and was sentenced to four

11   years probation.

12        That probation ran from March of 1995 until about

13   June of 2000.  Once again, Your Honor, the facts of this

14   indictment spans from in or about 1995 until October of

15   2000, but importantly, again, the state probation spans the

16   period of time that he was committing the criminal acts

17   charged in this very indictment.

18        There is virtually no time period under which

19   Mr. Mamone is charged in the indictment that he wasn't

20   under some form of supervision, either bond as a result of

21   his prior criminal activity, or probation or supervised

22   release.  It just didn't occur in this case.

23        Again, Your Honor, that's an extremely important

24   consideration in terms of the Court determining whether

25   detention is the appropriate.

1          Mr. Mamone is charged in 70 counts, and all those

2    70 counts, some of those 70 counts, I should say, cover the

3    entire period.   Other counts cover specific charges.

4          The case against Mr. Mamone consists of evidence

5    gathered from consensual recordings from wire taps covering

6    approximately four months.

7          In determining -- one of the wire taps covered a

8    cellular phone that Mr. Mamone carried, I believe over a 60

9    day period of time.  Also, substantial records were

10   recovered proving up various parts of this RICO enterprise;

11         There were, from search warrants that were

12   executed in South Florida, as well as other states of the

13   union, numerous records were obtained and analyzed during

14   the pendency of this investigation from various financial

15   institutions that I will be summarizing for the Court.

16         There is a multiple of physical surveillance of

17   Mr. Raffa, Mr. Mamone and all the other co-conspirators in

18   this case, and there is, of course, cooperating witness

19   information and confidential source information.

20         In short, Your Honor, what this case is about is,

21   it is about the Trafficante crime family that operated in

22   South Florida at least during the time period set forth in

23   the indictment.

24         The indictment alleges, and we will prove in

25   court or in trial that Steve Raffa is a leader or a faction

1  of that family that operates in South Florida.

2          We will show that Steve Raffa supervised and

3  directed a criminal crew that engaged in these various

4  criminal acts set forth in the indictment, such as money

5  laundering, loan sharking, extortion, bank fraud, mail

6  fraud, wire fraud, gambling and receipt of stolen property,

7  among other crimes set forth.

8          Also, Your Honor, in terms of a summary, we will

9  show that John Mamone was Mr. Raffa's second in command who

10 managed the day-to-day operation of this organization that

11 operated in South Florida.

12         In terms of the gambling side of the case, Your

13 Honor, the proof will show at trial that the structure of

14 the enterprise, in part, relied heavily upon an illegal

15 gambling business and collection of debt from gamblers who

16 incurred losses in that business.

17         The proof will show that Mr. Mamone used, on a

18 frequent basis, used threats of violence in collection, in

19 collecting these particular losses from not only bettors

20 who bet with the illegal gambling business, but from

21 bookies and sub-bookies and agents who worked underneath

22 John Mamone and incurred major losses or major debt to John

23 Mamone who was supervising the entire operation.

24         These particular gambling activities were picked

25 up frequently in the Title III or wiretap interceptions

1    that I've already indicated to the Court.

2         Also, the government will rely and has been

3    relying greatly on a cooperating witness by the name of Al

4    Bellitto who worked with several organized crime groups

5    during the pendency of this investigation and met

6    frequently with John Mamone, and John Mamone engaged him in

7    frequent criminal conduct that will be outlined later in

8    this proffer.

9         The state warrants were also very useful in terms

10   of establishing the individual bookmakers who worked under

11   John Mamone during the time charged in this indictment.

12        Also, we are going to be showing in this proffer

13   the use of the check cashing stores in South Florida as a

14   means or focal point for laundering activities from the

15   organized crime activity which was supervised by John

16   Mamone.

17        In short -- I will get into it in a little

18   later -- the check cashing stores were used to launder

19   debts from bettors and bookies on behalf of John Mamone.

20        The check cashing stores were also used to

21   launder monies that were obtained from victims throughout

22   the United States, as a result of a very successful Ponzi

23   scheme that was perpetrated on investors who were located

24   throughout the United States, through the City of

25   Greenville, South Carolina.

1    You are going to find, Your Honor, based upon

2  this proffer, that anywhere from 20 to 30 million dollars

3  was laundered through the check cashing stores through the

4  direct knowledge and control of members of this enterprise,

5  and some direct participation by John Mamone who had

6  knowledge and aided and assisted the check cashing stores

7  in going about this type of money laundering activity.

8    Your Honor, I go back now to 1996 where there was

9  a cooperating witness by the name of Louis Maione,

10  M-a-i-o-n-e.  Mr. Maione was a cooperating witness in an

11  investigation involving the Gambino crime family.

12    Mr. Maione was linked very closely to the acting

13  head of that crime family, an individual by the name of

14  Nicholas Carazzo.

15    Mr. Carazzo assumed control of that family as a

16  result of John Gotti being convicted and being sentenced to

17  life, as I am sure the Court is aware.

18    During the pendency of Mr. Maione's cooperation

19  against the members of the Corrazo-Gambino crime family,

20  one of his assignments, while he was working under the

21  auspices of the FBI was to provide housing for Nick Corrazo

22  who came to South Florida to supervise his criminal crew

23  that was working in Deerfield Beach, Florida.

24    One of the places that Mr. Maione obtained for

25  Mr. Corrazo's stay was a hotel by the name of Ocean Manor,

1  which is located on A1A in Ft. Lauderdale.

2  　　　　Mr. Maione frequented that particular

3  establishment and the bar located in the establishment on

4  numerous occasions when the Gambino crew stayed there

5  visiting from New York.

6  　　　　During one of those particular meetings in 1996,

7  Mr. Maione met an individual by the name of Lou Kastanza.

8  Mr. Kastanza informed Mr. Maione that he had a gambling

9  debt that he had incurred with an individual bookie, and

10  the bookie had beaten him up, and he was in fear, and he

11  asked if Mr. Maione could possibly intercede on behalf of

12  Mr. Kastanza with the bookie and the organized crime group

13  that the bookie was involved in because Mr. Kastanza knew

14  that Mr. Maione had contacts with the Gambino crime family.

15  　　　　Well, Mr. Maione agreed to do that, and

16  Mr. Maione met an individual by the name of Joe Bellitto

17  who was the head of that particular bookmaking operation,

18  at least insofar as he knew at that time.

19  　　　　Mr. Maione, on behalf of the Gambino crime

20  family, told Mr. Bellitto that Mr. Kastanza was under the

21  protection of the Gambino crime family.  Therefore, he

22  should reduce the payments that Mr. Kastanza had to make,

23  and it would be done in that manner.

24  　　　　Well, Mr. Kastanza made some payments through

25  Mr. Maione to Mr. Bellitto, but the payments stopped.  At

```
 1   that time, Mr. Maione and Mr. Raffa called for a meeting or
 2   what they call, in organized crime parlance, a sit down
 3   that occurred on June 13th of 1996 to discuss the
 4   nonpayment by the bookie who owed the Trafficante gambling
 5   enterprise money at the insistence of the Gambino
 6   enterprise, and this is a traditional meeting that took
 7   place that Mr. Maione attended; Mr. Steve Raffa attended,
 8   Mr. John Mamone attended, and an individual named Augie
 9   Correro attended.  Mr. Correro was a made member of the
10   Gambino crime family.  During that particular meeting,
11   which was recorded --
12              THE COURT:  Just a second.  Hold on for a minute.
13   Something is troubling me.  You started this proffer by
14   telling this Court why Mr. Mamone is the second in command
15   of this organization and Mr. Raffa is the leader.
16              MR. McCORMICK:  Yes, Your Honor.
17              THE COURT:  This is an indicted case, vastly
18   different from a complaint.  I am assuming -- and you
19   correct me if I am wrong now -- that all of the allegations
20   that you have suggested so far, they are applicable to this
21   defendant and are, likewise, applicable to Mr. Raffa; the
22   same Mr. Raffa that you have agreed to a corporate surety
23   bond on.
24              MR. McCORMICK:  And for house arrest.
25              THE COURT:  Yes.  Now, my question is what makes
```

1  this defendant, and I think somewhere along the way you

2  need to focus on why something similar to that should not

3  be applicable to this defendant, and there certainly may be

4  an answer. I want you to be able to get there.

5      **MR. McCORMICK**: All right, Your Honor. Perhaps

6  one of the things I wanted to bring to the Court's

7  attention I already have, and the fact is that Mr. Mamone

8  was under supervision during the entire time that this case

9  was, rather the facts of this case led to the indictment,

10  from 1995 until October of 2000, and I have already

11  outlined to the Court that Mr. Mamone was, indeed, under

12  some form of supervision, sometimes double supervision by

13  probation, and that's a big difference in regard to Mr.

14  Raffa.

15      Another matter which is going to distinguish him

16  from Mr. Raffa are that Mr. Mamone actually participated in

17  acts of violence in furtherance of the RICO enterprise, and

18  I am going to get into that, and this is preliminary to

19  that, and his leadership role is proved up by virtue you of

20  his attending the June 13, 1996 meeting.

21      I just have a couple of excerpts to read as to

22  that, and my intention then was to provide to the Court

23  specific threats made by Mr. Mamone to specific acts of

24  violence made by Mr. Mamone that support our contention

25  that he should be detained.

1          **THE COURT:**  Okay.  I think you will need to focus

2    on that because the general rule is that when you lay out

3    the background, obviously it might lead this Court to a

4    similar conclusion.  So, as I said, you certainly did cover

5    that, and you need to distinguish this defendant from

6    Mr. Raffa.

7          **MR. McCORMICK:**  I will do that, Your Honor.  With

8    the Court's indulgence, though, I would just read a couple

9    of excerpts.  I have the transcripts.  I don't know if the

10   Court is interested in the transcripts or not.

11         **THE COURT:**  For the moment the answer is, no, but

12   go ahead and read them and then I will let you know if I

13   need them.  Go ahead.

14         **MR. McCORMICK:**  Your Honor, I am referring to the

15   June 13, 1996 transcript of the meeting between John

16   Mamone, Steve Raffa and Augie Correro, as well as the

17   cooperating witness, Mr. Maione.

18         On page 10 I refer, when Mr. Mamone is

19   discussing -- Mr. Mamone does most of the talking during

20   this particular sit down between the two organized crime

21   families.

22         Mr. Mamone is talking about the debt owed by Lou

23   Kastanza.  He says, "9,000, and let's find out where this

24   guy that owes the money.  We will help him F--- collect,

25   like anybody else, but, you know what, you brought the guy

```
 1   in.  You are responsible for the money.  He agreed, and he
 2   agreed to pay 100 a week."
 3           What he is referring to is his insistence upon
 4   Mr. Kastanza making the payment to the bookie working under
 5   him, which is Joe Bellitto.
 6           In another discussion, talking about the physical
 7   violence that was used against Mr. Kastanza, Mr. Mamone
 8   says --
 9           MR. ROTHMAN:  What page is this, Mr. McCormick?
10   I am sorry.
11           MR. McCORMICK:  Page 12.  I am sorry.
12           MR. ROTHMAN:  Thank you.
13           MR. McCORMICK:  "He misses two appointments with
14   Lou.  He don't show up to Joe's office."  Meaning Joe
15   Bellitto.
16           "We cannot find this guy.  So we finally turn the
17   track on different play-out.  We got to play house."
18   That's unintelligible -- "especially out of disrespect.  We
19   talked to Augie," meaning Augie Correro.
20           "He's beat us.  We are trying to help you find
21   the guy for the money.  He don't even have the courtesy to
22   come down here and talk to us.  He is like avoiding us.
23   That's why he got slapped.  Not for the money.  Nothing
24   else.  Just a wake up call."  That's John Mamone.
25           Again, John Mamone states, "Yeah, Joe, why --
```

```
 1   you" -- I am going to page 13, Mr. Rothman.

 2            "Yeah, Joe, why?  Why you coming?

 3            Oh, it doesn't matter.  He wins.  We're getting

 4   something.  You understand, Joe," he says, meaning

 5   Bellitto.

 6            I "Want the guy to come up with our money.  So

 7   the next time the guy came himself.  Well, like he said, it

 8   went on for maybe four weeks, but up, before the house,

 9   when he finally got through and he got smacked by Joe,

10   listen, he does the smack.  He got plenty of time.  It

11   wasn't a shake up.  It wasn't that we threatened the guy.

12   Listen, when he comes," and he goes on and speaks about

13   that.

14            And then John Mamone on page 18 states, and it is

15   a rather lengthy meeting, but he states to the group, "So

16   we're going to, shaking him down or taking an" --

17   unintelligible -- "from him.  It is our business.  We don't

18   let anyone know we have been to this guy.  What you -- are

19   you going to tell us who to shake down now?  Like, we can't

20   shake down.  Like, somebody -- listen, I don't go into your

21   backyard and tell you what to do.  Why you coming to mine

22   and telling me what to do?  I am collecting from this guy

23   eight weeks.  Whether we are entitled to payments or not, I

24   am collecting right from this guy.  It is my business what

25   I want to do with him."
```

1          What he is telling the Gambino crime family is it

2    is their territory and he controls who is going to be

3    collected from and who is going to be shaken down.  If he

4    wants to do that, he will do that.

5          Your Honor, in terms of Al Bellitto, Al Bellitto

6    was a cooperating witness with the government, as I stated,

7    that worked for, against other organized crime groups under

8    the auspices of the FBI.

9          Al Bellitto engaged in several, at John Mamone's

10   request, engaged in several criminal acts directly having

11   to do with the illegal gambling business, as well as

12   dealing in counterfeit checks, as well as dealing in checks

13   that were obtained from the South Carolina Ponzi scheme

14   that I alluded to earlier.

15         Mr. Bellitto was also indebted to Mr. Mamone to

16   the extent of $40,000.00 in January of 1999.  That

17   particular debt was incurred as a result of some people who

18   bet through Mr. Bellitto, and that was before Mr. Bellitto

19   was cooperating with the government.

20         Mr. Bellitto was slow in paying the vigorish

21   payments, which is extortion with interest, and he was slow

22   in paying the principal.

23         Mr. Mamone made several telephone calls to him in

24   a threatening manner, that he wanted to collect for those

25   particular monies.  However, more particularly, on March

1   21, 2000, Mr. Bellitto received a call from an individual

2   by the name of Buccinna who is also on the indictment.

3           Mr. Buccinna directed Mr. Bellitto to meet with

4   Mr. Mamone at a coffee shop in Coral Springs.  Mr. Bellitto

5   did not have the opportunity to call his FBI control agent.

6           However, Mr. Bellitto did drive over and meet

7   with Mr. Mamone at that particular time.

8           When he arrived at the coffee shop, Mr. Buccinna

9   was alone, but shortly Mr. Mamone arrived in a car that was

10  driven by David Bell, another codefendant in this case.

11          Both Mr. Buccinna and Mr. Bellitto got into the

12  car; Mr. Mamone's car, although it was driven by Mr. Bell.

13          Mr. Bellitto was seated in the back seat of that

14  particular car, with Mr. Mamone.  During that particular

15  drive, which ended up behind a Borders book store in Coral

16  Springs, Mr. Mamone began to question Mr. Bellitto about

17  nonpayment of this extortionate loan that Mr. Bellitto had

18  taken out in January of 1999.

19          I think that was before Mr. Bellitto had begun

20  cooperating with the FBI, and any payments were made after

21  that through the FBI who furnished money to Mr. Bellitto

22  who gave it to Mr. Mamone.

23          During this conversation, he threatened

24  Mr. Bellitto with physical abuse, and finally hit him two

25  times while he was in the back seat; at least two times,

```
 1   and at that particular time, Mr. Mamone also tried to bite

 2   his ear off.  Mr. Mamone stayed with Mr. Bellitto for a few

 3   minutes.  Then they drove him back to his car.

 4           Your Honor, that is simply an act of violence as

 5   direct as you can get in  a loan sharking collection.

 6           Now, Your Honor, we also have Mr. Mamone engaging

 7   in loan sharking activity with an individual by the name of

 8   Mr. Steinhardt.  Mr. Steinhardt borrowed approximately

 9   $40,000.00 from Mr. Mamone at one point a week.

10           Mr. Steinhardt also referred another individual

11   by the name of Mr. Defazio to Mr. Mamone for a loan shark

12   loan or loan shark advancement.

13           Apparently there was a controversy of whether

14   Mr. Defazio was going to pay Mr. Mamone.  So Mr. Mamone

15   decided that Mr. Steinhardt should pay the entire amount of

16   the loan shark loan that was made to the individual

17   referred to him by Mr. Steinhardt.

18           Now, Mr. Steinhardt was also introduced to an

19   individual by the name of Joe Russo who was involved in

20   this loan shark operation with Mr. Mamone.

21           Mr. Mamone and Mr. Russo were not being paid by

22   Mr. Steinhardt, and what ended up happening was

23   Mr. Steinhardt was called into the check cashing store,

24   which was located at 5701 Margate Boulevard.  It was called

25   Check Cashing Unlimited, which was at least owned on paper
```

1    by Mrs. Mamone.

2           When Mr. Steinhardt arrived at that particular

3    business, Mr. Russo hit Mr. Steinhardt in the back of the

4    head and pinned him against the wall.

5           Now, Mr. Mamone, Mr. Russo and Mr. Buccinna then

6    roughed Mr. Steinhardt up in the back of the store, asking

7    for payment and asking how could he not be making these

8    payments?  How could me do things like this to them?

9           Again, on May 17th of 1997, at a meeting at

10   Mr. Mamone's residence -- strike that, Your Honor.

11          Mr. Braverman, another individual who was

12   referred to the loan shark operation by Mr. Steinhardt, I

13   believe was introduced to Mr. Mamone.

14          Mr. Braverman also became indebted to these

15   individuals in approximately May of 1997.  Mr. Braverman

16   was also called into Margate where he met with John Mamone

17   and other people.

18          Mr. Mamone directed Mr. Braverman to the check

19   cashing store; the vault area of the check cashing store.

20          There, John Mamone struck Mr. Braverman in the

21   left arm approximately three times with a baseball bat, in

22   an attempt to get his point across that payment should be

23   made to Mr. Mamone and members of the organization.

24          As I said, Your Honor, during the Title III of

25   this particular case, Mr. Mamone was intercepted on

1    numerous occasions making veiled threats on telephones to

2    the bookies who incurred debt because of bounced checks, or

3    what have you, going through the check cashing stores.

4            These are direct acts of violence and indirect

5    acts of violence that weren't present for Mr. Raffa.

6            Mr. Raffa's involvement, this is as an overseer,

7    and he will probably be punished upon conviction as

8    severely as Mr. Mamone, but at this particular time, we are

9    talking about direct threats and direct violence.  There

10   are two different considerations, in the government's view.

11           I don't know if the Court wishes me to talk about

12   the money laundering activity that occurred at the stores

13   or not.  If the Court accepts the allegations in the

14   indictment --

15           **THE COURT:**  I already said I have to.

16           **MR. McCORMICK:**  Okay.  Just to point out, just a

17   very few quick facts on that, Your Honor.  During the

18   summer of 1999 through maybe December, January of 2000,

19.  there was a Ponzi scheme that was being operated out of

20   Greenville, South Carolina.

21           The Ponzi scheme had to do with victims located

22   throughout the United States being convinced to -- I might

23   add elderly victims who had their life savings typed up in

24   these types of investments.

25           They were convinced by people in South Carolina,

1  Virgil Womack and his organization, to invest their IRA's

2  their pensions, what have you, into a trust called Chemical

3  Trust and other types of trusts, with the promise that the

4  trust would pay anywhere from 10 to 20 percent.

5      The agents were given commissions from that.

6  There was a guarantee given to the investors that the

7  individuals who invested, a bonding company would guarantee

8  that no losses would be incurred whatsoever as a result of

9  these investments.

10     Now, this was an out and out Ponzi scheme because

11  the money, the people who demanded their money back, or

12  demanded interest from their investment, were paid from

13  monies coming in from other investors.

14     The bulk of the monies, the bulk of these monies

15  were sent down via Fred and David Morgenstern, who are also

16  in the indictment, to be deposited in check cashing stores,

17  and there is three major check cashing stores that were

18  used, all of which Mr. Mamone had great influence over;

19  Check Cashing Unlimited, Check Cashing Unlimited II.

20     Check Cashing Unlimited became Gold Coast Check

21  Cashing, as well as the callous market.

22     Now, what is so important about Mr. Mamone in

23  this matter is he assisted this extremely large and

24  significant money laundering operation.

25     The monies were deposited through these check

- *10/31/00*

1  cashing stores and through various other accounts and

2  transported over to the Bahamas and then to Europe, and

3  those monies were never used for the intended purpose, and

4  everybody involved in this case made substantial illegal

5  profits, including Mr. Mamone.

6        An example of that would be in September of 1999,

7  Mr. Mamone brought checks totaling about a million dollars

8  to a callous market through Al Bellitto, the cooperating

9  witness with the government.

10        These funds were deposited.  They were given to

11  Kaiser Akel, a person who owned this market who was the

12  money launderer, and Mr. Akel looked at these funds and

13  looked at the individual checks from the investors.

14        Now, what Mr. Akel ended up doing was he called

15  from the legend of the check some of the investors to see

16  if these checks were good or bad, and the problem was when

17  he called the one or two investors that he did, he found

18  out that people were very, very old, and he decided that,

19  he became very fearful and didn't become involved in this

20  scheme, and he handed the checks back to Mr. Mamone.

21        Mr. Mamone put at least $350,000.00 of those

22  funds through Gold Coast Check Cashing, a check cashing

23  store that he once directly controlled, but the money was

24  lost, obviously, and it went to other parts of the country.

25        Your Honor, Mr. Mamone also cashed numerous of

- *10/31/00*

1  these Chemical Trust checks through Irving Weiss and Bruce

2  Chiusano.  Mr. Chiusano is on the indictment.

3            The check cashing store that Mr. Weiss and

4  Chiusano was involved in was Check Cashing Unlimited II.

5  These checks were brought by not only Mr. Mamone, but Fred

6  Morgenstern, a coconspirator, Peggy Preston, Mark Weiss and

7  Jason Crosson.

8            These checks were brought to the check cashing

9  stores and negotiated on behalf of the enterprise.  What is

10  important, though, is a group of these checks, at least

11  $769,000.00 of these checks were deposited by John Mamone,

12  and John Mamone asked for the money to be paid directly to

13  him.

14            Rather than do that, the Check Cashing Unlimited

15  furnished the checks to, in the form of cashier's checks to

16  the Gold Coast -- excuse me -- to Check Cashing Unlimited.

17            Mr. Mamone put the bulk of these funds in an

18  account that he opened up for the express purpose of

19  laundering these funds at a Merrill Lynch account.

20            These funds were laundered through that account.

21  And, as a matter of fact, a portion of these funds were

22  even used to deposit within Gateway Services, which is an

23  enterprise that Mr. Mamone ostensibly was running, and he

24  considered, I think in his motions papers he considers to

25  be legitimate.  May I have a minute, Your Honor?

1          THE COURT:  You may.  Let me ask you one

2    question.

3          MR. McCORMICK:  Okay.

4          THE COURT:  On what basis do you contend the

5    defendant is a risk of flight?

6          MR. McCORMICK:  Your Honor, the risk of flight

7    isn't the strongest basis.  I concede that, and I conceded

8    that to Mr. Rothman.

9          The basis, if there is any risk of flight, is the

10   dilemma that Mr. Mamone is facing upon conviction.  He

11   could possibly be sentenced to 30 years in jail, and that's

12   the sole basis that I have to make the argument the length

13   or severity of the sentence.

14         THE COURT:  Okay.

15         MR. McCORMICK:  Thank you, Your Honor.  The only

16   other matter that I would bring to the Court's attention is

17   during our investigation we do have evidence that

18   Mr. Mamone has access to monies overseas, and those monies,

19   of course, were of concern.

20         We are concerned about that because of the

21   possibility of flight.  I know he has a lot of friends and

22   neighbors here, and they are claiming that Mr. Mamone is

23   not a risk of flight, and that isn't our main argument, but

24   it certainly should be considered, in conjunction where the

25   danger to the community argument.

- *10/31/00*

1          THE COURT:  Thank you.  Mr. Rothman, address only

2     the danger to the community.

3          MR. ROTHMAN:  Judge, to begin with, number 1, if

4     prior record of Mr. Mamone is for insurance fraud and

5     commercial bribery for allegedly giving somebody money to

6     get a contract.  Not a business official, but a

7     nonbusiness -- I mean, not a public official; a business

8     official.

9          Mr. Mamone received house arrest, followed by

10    probation in the federal case and probation in the state

11    case.

12         The federal case was a case in which I

13    represented him on, and I recommended that he not plead

14    guilty and should go to trial.  He took a plea.  He got the

15    probation.  He completed the probation.

16         I would disagree with the government as to what

17    occurred.  While he was out on probation in that case, he

18    was under house arrest.  In fact, the court shortened his

19    sentence.  The government never raised any issue then which

20    they claim now they knew about.

21         In the state case, he was in the middle of a

22    trial which he would have won, and they offered him a short

23    period of probation on a plea, and he took it.  That's the

24    prior history.  No violence in those prior cases at all.

25    No pleas of violence at all.

*- 10/31/00*

```
 1              On the issues here, Judge, as I stated in my
 2   papers, there are conditions that will make Mr. Mamone not
 3   a danger to anybody, assuming the truth of any of those
 4   allegations, and I would like to question a few of those,
 5   Judge, but, obviously, in the format we have in a detention
 6   hearing, it becomes quite difficult.
 7              For example, Mr. McCormick read to you from a
 8   transcript.  I was provided last night a series of
 9   transcripts.  The one biggest allegation I think they have
10   in the violence aspect is this supposed assault upon
11   Mr. Bellitto; threatened him; hit him and went to bite his
12   ear.
13              Where is the tape?  Mr. Bellitto, in other tapes
14   I have been provided, is on the body bug.  They have a
15   series of conversations in which a lot of things were said.
16   Much of what was said was not done.  Almost all of what was
17   said was not done.  A lot of puffing going on, but it was a
18   body bug that Mr. Bellitto was wearing.
19              Where is the tape?  Where is the evidence, which
20   I don't know at this stage, what is the evidence on that?
21              Some of the people that the government talked
22   about here being involved in violence have been given a
23   bond by the government; agreed to a bond in this case.
24              Some of the people who are out on bond in other
25   cases have been given a bond in this particular case.  The
```

1   government has picked and chosen and Your Honor hit

2   probably the major issue head on at the outset of this

3   hearing.

4            If John Mamone is guilty, what does that make

5   Steve Raffa?  If John Mamone is bad, what does that make

6   Steve Raffa?  They agreed to a quarter of a million dollar

7   corporate surety; not a half a million.

8            We are offering a million dollar bond, Judge, and

9   we have the people I mentioned, but in addition to those

10  people, I would like to introduce them, they did take the

11  time to come here, but I want to address that at the end.

12           In addition to the people I mentioned in the

13  meeting we had last night, when I went to the home of the

14  Switzers who were kind enough to host a gathering of all of

15  the neighbors and friends, in addition to the people

16  mentioned, Ralph and Michelle Bartanian also agreed to

17  co-sign on a bond of a million dollars.

18           They have assets in excess of $500,000.00.  Jim

19  and Connie Guise have agreed to sign on.  They have assets

20  over a million dollars.  There is strong support.  We can

21  structure a bond so there is absolutely no concern for any

22  future violence.

23           And what I submit to the Court what is occurring

24  here today, by the government negotiating on everyone's

25  bond, and not John, Mamone is legal blackmail.

```
 1              What this is all about, Judge, is not pretrial

 2   detention.  What this is all about is cooperation.  The

 3   government point blank told me if John would cooperate,

 4   things would be different with the bond.

 5              I find that to be wrong, morally, and I find it

 6   to be offensive.  It is clearly legal.  It happens every

 7   day in court.  They have been seeking his cooperation.

 8              He is now locked up in the hole, basically,

 9   because he has been described by the indictment as

10   dangerous because they have moved for pretrial detention.

11              They have excluded his family entirely.  He has

12   not talked to his children.  This is what is being done,

13   Judge, to apply pressure.

14              What I am telling the Court is there are

15   conditions of bond.  House arrest.  I will go so far,

16   Judge, and I have never done this in 23 years of practice,

17   I will agree to 24 hours a day house arrest, and when he

18   needs to meet with me, I will go to his home, which is

19   substantially far from my practice.

20              Judge, it means that much to us to prepare this

21   case.  It means that much to us to let him be with his

22   family for what could be a very long period of time.

23              What they call acts of violence came in the

24   course of this case, and although clearly anything like

25   this is substantial, they are not such that they cannot be
```

```
 1    controlled and dealt with, assuming the truth, with a

 2    substantial personal surety bond, secured by five people,

 3    with special conditions, and 24 hour house arrest.

 4            I can address other issues, Judge.  The Louis

 5    Maione incident, we are talking about 1996.  I don't know

 6    what some of that stuff means, frankly.  I don't think

 7    that's relevant to the issues before this Court.

 8            There is a lot of chatting going on in a lot of

 9    these conversations; a lot of puffing by a lot of these

10    people.

11            THE COURT:  Mr. McCormick, we are talking about a

12    lot of tapes.  Mr. McCormick, why won't a bond -- forget

13    the bond suggested by Mr. Rothman.  I am not inclined to

14    release the defendant on a personal surety bond, but why

15    won't a bond, coupled with house arrest 24 hours a day,

16    address the issue of concern expressed by the government?

17            MR. McCORMICK:  Your Honor, I think all we have

18    to do is look to Mr. Mamone's performance in the past.

19            Mr. Mamone has shown he doesn't obey any type of

20    supervision.  Any condition, he doesn't obey it.

21            Mr. Rothman minimized all of that.  Your Honor,

22    that's the substance of this matter, is that while he was

23    under these very, not to violate federal, for example,

24    federal, state local laws, he did that.

25            He did that with impunity for 5 years.  My answer
```

1  to that, Your Honor, is I don't know that it would, and I

2  don't think he has earned the right to even test before the

3  Court at this particular stage.

4            MR. ROTHMAN:  Just in brief response, Judge, in

5  1995 when Judge Gonzalez placed Mr. Mamone on house arrest,

6  for that year he was under house arrest.  He did everything

7  he was supposed to do.

8            None of the allegations, as far as I am aware,

9  are in that one year under house arrest.  It is different.

10 We all know house arrest is different.

11           He can be controlled.  His access to and from is

12 absolutely controlled.  Any violation will be determined

13 immediately.  We can even control who can come to the

14 house.

15           I will agree to special conditions, if the

16 government agrees to provide a list of people who they

17 don't want coming to the house.  Unless there is something

18 extraordinary about it, I will agree to that.  They cannot

19 come to the house.          ·              .

20           I will agree he can't talk to people by calling

21 out of the house.  And if they want to monitor that, I will

22 agree to that.  We will agree to anything, Judge, that's

23 somewhat reasonable, given their concerns.  We tried to

24 address it.

25           MR. McCORMICK:  Your Honor, the argument that

30

```
 1   Mr. Rothman makes can be made in any case where detention

 2   is requested.

 3          There is nothing that has been shown by

 4   Mr. Rothman, other than bringing in friends and neighbors

 5   to bear witness for Mr. Mamone.  The facts don't change.

 6          THE COURT:  All right.  I am forced to agree with

 7   the government's position with regard to Mr. Mamone, while

 8   admittedly there are some distinctions as compared to even

 9   Mr. Raffa who has a prior record.

10          In a gross sense, it is inconsistent to treat the

11   defendants differently in this case.  Now, Mr. Rothman

12   accidently anticipated one of the questions that I was

13   going to ask.

14          I have asked this question in the past.  I don't

15   think the Court has any legal authority to do it, candidly,

16   but I think the parties can agree to it.  Query:  If I were

17   to agree to set a bond in this case, and we haven't gotten

18   to a bond yet as far as what has occurred so far, the

19   defendant agreed voluntarily to have his phone tapped.

20   We've offered it I have attitude to.

21          MR. ROTHMAN:  We've offered it.  Without even

22   talking to Mr. Mamone, I have offered it.  Let me confirm

23   it, please.

24          THE COURT:  All right.

25          MR. ROTHMAN:  The answer is absolutely, yes.
```

*- 10/31/00*

31

```
 1          MR. McCORMICK:  Can I speak to that issue, Your

 2   Honor?

 3          THE COURT:  Sure.

 4          MR. McCORMICK:  If nothing else, I have learned

 5   through past 3 or 4 as far as having a phone tap doesn't

 6   mean anything.  Everybody and their brother has a cell

 7   phone that they could have at their -- there is no way to

 8   control this, Your Honor.

 9          Mr. Mamone could have five phones brought in by

10   five different firms, and we would never know the

11   difference.

12          THE COURT:  Here is what I am going to do:  I

13   have heard the evidence in this case.

14          First of all, I am denying the government's

15   motion based on risk of flight, given the amount of time

16   the defendant is facing, and as I read Section 3142(G),

17   that is a condition, that is a factor to be considered, but

18   it is not dispositive of the facts.

19          If it were, the government would simply say that

20   anybody facing, I don't know -- (inaudible) they haven't

21   said that.

22          So, while that is a factor, I have to look at all

23   the other factors.  Weighing in the government's favor,

24   there is an allegation of some overseas money, but simply

25   outweighing that, however, is the fact that all of this
```

32

1  defendants ties are to the United States.

2           There is no showing that this defendant has a

3  single familial tie, a single business tie that is outside

4  of this country other than arguably somebody overseas.

5           So I have no problem finding this defendant is

6  not a risk of flight, and that I will so enter.

7           On the issue of danger to the community, I agree

8  in part with the government that there is some evidence

9  that this defendant constitutes a danger.

10          However, I also agree with Mr. Rothman with what

11 has been said that will solve this problem.  Remember,

12 danger to the community must be considered by clear and

13 convincing evidence, and I do not find, by clear and

14 convincing evidence, that the defendant constitutes such a

15 danger to the community; that is he cannot be a danger,

16 such a danger to the community that nothing short of

17 pretrial detention will suffice.  So I am denying the

18 government's request for pretrial detention.

19          Now, having said all of that, the defendant is

20 facing serious charges with serious consequences.  It is an

21 indicted case with presumptions attached.

22          What I am going to do in this case is this, and

23 we will probably have another hearing.  I am going to set a

24 $500,000.00 corporate surety bond and a $500,000.00

25 personal surety bond, both of which will have Nebbia

- 10/31/00

 1   conditions attached to them.

 2            The additional conditions of bond will be the

 3   defendant is required to maintain full 24 hour house

 4   arrest.

 5            The stipulation that you have made, Mr. Rothman,

 6   the only reason for leaving the home will be for medical

 7   emergencies that has done to be documented and proven.

 8            Additional conditions of bond:  With the

 9   defendant's acquiescence, a full wiretap.  With that

10   stipulation, you do what you need to do.

11            MR. ROTHMAN:  Excuse me.  Judge, are you ordering

12   that it be a wiretap, or are you authorizing it with our

13   agreement that the government shall or has the ability to

14   wiretap?

15            In other words, I don't want to be involved in

16   violation of a court order if the government decides not to

17   do it.

18            THE COURT:  No, no.  I have heard the defense

19   stipulate to have it done.  I am telling Mr. McCormick that

20   that stipulation has been made.  And if the government

21   wants to go ahead and do it with that stipulation, that

22   won't be an issue.

23            If the government doesn't want to, then it won't

24   be a condition.

25            MR. McCORMICK:  Your Honor, as a further

34

1    condition as to Mr. Mamone, will the Court also consider

2    directing that it would be a violation of Mr. Mamone's bond

3    for him to possess or use a cell phone?

4            THE COURT:  You are anticipating.  I am not

5    through yet.  Okay.  You still haven't answered my

6    question.  Does the government want to set up a wire tap?

7            MR. McCORMICK:  I can't answer that now.  I have

8    to speak to the agents.

9            THE COURT:  You will be allowed to do so because

10   of the situation of the defendant, if you choose to.

11           MR. McCORMICK:  It is extremely expensive.

12           THE COURT:  Now, additional conditions of bond.

13   The defendant is not to be in any possession of any other

14   telephones, either a wire, cell phone, two-way radios,

15   including but not limited to long string with cans on them.

16           MR. ROTHMAN:  Judge, when you discuss possession,

17   obviously, I think of my old law school training,

18   constructive versus actual.  They have a small child.  His

19   wife is outside the home.  Is she allowed to possess a cell

20   phone?

21           THE COURT:  I will solve the problem this way,

22   and I will hear from you on it.

23   (At this point the tape ran out.  Concluding remarks to

24   follow in a later transcript.)

25

```
 1              (Continuation of the bond detention hearing)

 2              THE COURT:  I will say, yes, the wife is allowed

 3   to have a cellular phone, but not to have it in the house.

 4   Okay.

 5              MR. McCORMICK:  Your Honor --

 6              THE COURT:  Now, additional conditions --

 7              MR. McCORMICK:  Your Honor, one of the younger

 8   agents has reminded me of the computer age, and I assume

 9   that Mr. Mamone has a computer.

10              We would ask that a condition that he not be able

11   to use a computer for e-mail or anything or the Internet.

12              THE COURT:  Mr. Rothman?

13              MR. ROTHMAN:  I haven't asked him, but I am

14   willing to bet one billion dollars that John Mamone doesn't

15   have the faintest idea of how to get onto the Internet.

16              THE COURT:  Mr. Rothman, I know of the fine

17   success you have had in your 23 years of practice, but even

18   you don't have a billion dollars.

19              MR. ROTHMAN:  My wife would agree with you,

20   Judge.  I just cannot cover that.

21              THE COURT:  All right.  Your wife could spend it,

22   but that doesn't mean you have it.  All right.

23              MR. ROTHMAN:  We will agree to that condition,

24   Judge.

25              THE COURT:  Okay.
```

- *10/31/00*

1          MR. ROTHMAN:  He can use the computer, but cannot

2    go on to the Internet.  In other words, he can use a

3    computer that is not attached to the Internet, is what we

4    are talking about.  He just cannot go on to the Internet.

5          THE COURT:  No Internet, no e-mail.  I am not

6    sophisticated on the computer.

7          MR. McCORMICK:  Unfortunately, I am not either.

8          THE COURT:  But that there will be no exception.

9          MR. McCORMICK:  Your Honor, there is a whole

10   plethora of electronic communications; pagers.  There is

11   Palm Pilots.

12         THE COURT:  No pagers.  Absolutely no pagers.

13         MR. McCORMICK:  And Palm Pilots, too.  Counsel

14   brings up a point that other members of the family using

15   the phone would also be considered I assume to --

16         MR. ROTHMAN:  There is no other adult other than

17   Grace in the home.  Everyone else is under 18.  So Grace,

18   yes, I have talked to Grace about it, and she will also

19   consent.  So if we need to do a written authorization to

20   the government to appease them, we certainly will.

21         THE COURT:  All right.  Now, we are not through

22   yet.  If the Nebbia proffer is in writing, and if the

23   government agrees to it, you can send me a one line

24   stipulation and I will sign off on it.  If the government

25   have has any questions, problems, concerns, or whatever, we

```
 1   will have a Nebbia hearing.

 2            Additionally, we will take the other offer of

 3   Mr. Rothman and the government and that is, government,

 4   there is one condition that I will impose if you choose to

 5   ask me to, and that is he gives me a list of names from

 6   Mr. Rothman of persons who will not be permitted in the

 7   Mamone household.

 8            Should there be any disagreement between counsel,

 9   we will deal with it at the Nebbia hearing.

10            Any further conditions of bond that the

11   government wishes this Court to consider?

12            MR. McCORMICK:  Well, with the conditions that we

13   asked for on the other defendants would apply anyhow I

14   think with the list that you are speaking of.  We wouldn't

15   want to give Mr. Mamone any witness names, but

16   codefendants, convicted felons, we can include those in

17   the --

18            MR. ROTHMAN:  The only exception that I will ask

19   for, Judge --

20            THE COURT:  Just a moment.

21            MR. ROTHMAN:  Okay.

22            THE COURT:  Mr. McCormick, I see a two-fold

23   problem here, and that is you want me to add as additional

24   conditions that he cannot be in contact with any of the

25   witnesses, et cetera, in this case.
```

38

```
 1            Well, it is awful hard to keep him from
 2   contacting them if we don't give him the names.
 3            MR. McCORMICK:  Well, that's correct.  Let me
 4   think about that.
 5            THE COURT:  How can he have contact with
 6   somebody, but we're not going to tell you who it is that he
 7   cannot have contact with.
 8            MR. McCORMICK:  Well, let me think about that
 9   one.
10            THE COURT:  I am prepared to give you the
11   conditions, but you have to give us some names, too.
12            MR. McCORMICK:  We will take you up on that, Your
13   Honor, but I would like to confer with the agents and
14   co-counsel.
15            THE COURT:  I will certainly give you that
16   condition provided you disclose those names that the
17   defendant cannot be in contact with, and the exception to
18   that, there is an exception.  The exception is through
19   counsel. · Okay?
20            MR. McCORMICK:  Yes, Your Honor.
21            MR. ROTHMAN:  Judge, the only exception in
22   addition that I will ask for is one particular person
23   charged in this case David Bell, John Mamone and David Bell
24   are both involved in Gateway Transportation.
25            Gateway Transportation is now involved in an
```

- 10/31/00

```
 1   unsealed order which restricts anything dealing with

 2   Gateway.

 3           In order to deal with that issue, there has to be

 4   contact between David Bell and John Mamone or no one is

 5   going to now how to do it with an ongoing business.

 6           I know the government tends to forfeit assets in

 7   that, but meanwhile it is frozen, they have got to deal

 8   with it.  They will probably get a civil lawyer involved

 9   and there will have to be contact.  I don't think there is

10   a problem with that.  I think we can have an reception, at

11   least for those purposes.

12           MR. McCORMICK:  I think we can work that out

13   between ourselves, Your Honor.

14           THE COURT:  Okay.  Are there any further

15   conditions that the government wants this Court to

16   consider?

17           MR. McCORMICK:  I don't know if the Court made it

18   clear on the record that Mr. Mamone would pay for the

19   electronic surveillance,

20           THE COURT:  Electronic monitoring?

21           MR. McCORMICK:  Electronic monitoring.

22           THE COURT:  Yes.  That will be at the defendant's

23   expense.

24           MR. McCORMICK:  How about the electronic

25   surveillance with any wire tapping, the bills incurred for
```

*- 10/31/00*

1    the government.

2         THE COURT:  I thought you were going to have an

3    open wire?

4         MR. McCORMICK:  The expenses I am talking about,

5    Your Honor.

6         THE COURT:  The expense of the wiretap, yes, I

7    will go along with that; at the defendant's expense.

8         MR. ROTHMAN:  To pay for monitors for that or to

9    pay for the actual physical set up of it?

10        THE COURT:  Okay.  To pay for the set up, not for

11   the time of the agent or agents monitoring it, no.  So we

12   are clear on that.

13        MR. ROTHMAN:  They just hook up to the phone like

14   they always do.  I am just kidding, Judge.

15        MR. McCORMICK:  The other thing is, I don't think

16   the Court mentioned any passports or travel documents.

17        THE COURT:  Any travel documents should be turned

18   into Pretrial Services.  I will certainly go along with

19   that as well.

20        MR. ROTHMAN:  I've got those now, Judge.

21        THE COURT:  My understanding was that the

22   government said, yes, there can be contact with the

23   defendant Bell.

24        MR. McCORMICK:  No, Your Honor.  I will discuss

25   it with Mr. Rothman.  I am sure we will be able to work out

- *10/31/00*

```
 1   some sort of a contact with another attorney present.

 2           THE COURT:  Well, bear in mind that if I allow

 3   contact with Mr. Bell by his own telephone, you all can

 4   monitor it.

 5           MR. McCORMICK:  That's true.

 6           THE COURT:  Okay.  But I can't rule on that

 7   unless you all -- and I am not trying to put you in a box.

 8   Don't misunderstand me.  I want you all to decide whether

 9   you, in fact, want to do the wiretap.

10           I will do you what I am going to do at this

11   point.  For the moment, for the moment, I am going to

12   prohibit contact with the defendant Bell.

13           Now, having said that, and I understand what you

14   have said, Mr. Rothman, and if this drags on and you need

15   to come back before me, let me know.  If you all can work

16   it out in the interim, that's fine.

17           If the government decides they want to go ahead

18   with the wiretap and it gets installed, I am going to allow

19   the contact, but it can be monitored.

20           Anything further, Mr. McCormick?

21           MR. McCORMICK:  No, Your Honor.  The government

22   is going to consider whether to seek a stay in the matter.

23           THE COURT:  Okay.  That will be fine.

24           MR. ROTHMAN:  You didn't list the names of the

25   people you wanted to co-sign on the personal surety, and I
```

```
 1   have people here who would have to sign while they are

 2   here.

 3             THE COURT:  That's true.  Refresh my

 4   recollection.  You told me about the people who have

 5   assets.

 6             MR. ROTHMAN:  Grace Mamone is the wife.  Of

 7   course, you want her to co-sign.

 8             THE COURT:  Absolutely.

 9             MR. ROTHMAN:  Joe Mamone is the brother who has

10   got assets over a million dollars.  He is involved in real

11   estate.  Larry Switzer who used to be CEO of --

12             THE COURT:  There was a fourth.

13             MR. ROTHMAN:  The fourth can be the Heards' have

14   agreed to put their name on a personal surety; the

15   Bartanians have agreed, and the Guises' have also.

16             THE COURT:  There is another family that you said

17   have a half million dollars in assets.

18             MR. ROTHMAN:  The Bartanians have a half; the

19   Guises have over a million.

20             THE COURT:  Okay.

21             MR. ROTHMAN:  Okay.

22             THE COURT:  They will be the co-signers on the

23   personal surety bond.

24             MR. ROTHMAN:  Do you need both husband and wife,

25   or just one?
```

- *10/31/00*

1          THE COURT:  Both husband and wife.  I don't know

2    how they own property, but I want it so stated.

3          MR. ROTHMAN:  Joe Mamone's brother, he is alone.

4    Okay.  We will take care of it.

5          THE COURT:  So that we are clear, as far as

6    co-signers on a personal surety bond, in any case in which

7    there is jointly held property, I want both names signing

8    on the bond.  Okay.  Thank you, counsel.  We are adjourned.

9          MR. McCORMICK:  Thank you, Your Honor.

10          **(Whereupon the proceedings were concluded)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3   transcription of proceedings in the above-entitled matter.

4

5   __3/6/01__                    _____

        DATE                      **JERALD M. MEYERS, RPR-CM**
6                                 Official Federal Court Reporter
                                  United States District Court
7                                 301 N. Miami Avenue, 9th Floor
                                  Miami, FL  33128-7797 - 305/374-8108
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Quality Assurance by Proximity Linguibase Technologies**

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          CASE NUMBER: 00-6309-CR-Seitz

    Plaintiff,

vs.

JOHN MAMONE

    Defendant.

_____/

## DEFENDANT JOHN MAMONE'S MOTION FOR ORDER ELIMINATING HOUSE ARREST COMPONENT OF BOND

THE DEFENDANT, JOHN MAMONE, through counsel, moves this Court to enter an Order Altering Bond, by deleting the house arrest component. In support of this request, it is respectfully alleged as follows:

1.    On October 31, 2000, Magistrate Judge Stephen T. Brown set bond for John Mamone in the amount of $1,000,000.00, with numerous special conditions, including twenty-four (24) hour house arrest. In rendering his order after a pretrial detention hearing, the judge said house arrest was necessary for the protection of the community. No appeal was taken by either party and Mr. Mamone was released.[1] (In order to assist the Court and the parties, a copy of the transcript of the hearing is attached hereto as **Exhibit A**.) Attached hereto as **Exhibit B** is an "Errata Sheet" that

_____

[1] At the time of the Detention hearing, John Mamone had been held since his arrest under subhuman conditions at FDC. He had extremely limited contact with the outside world. Even when he was taken from his cell to meet with his attorney, separated by a glass partition, his handcuffs were not removed until he was securely locked in 3' by 4' room and then, only by John Mamone putting his hands, handcuffed behind him, through a hole in the door for the guard to unlock and remove the cuffs. Total desperation understates his emotional condition. With that backdrop, the defense at the time of the Detention hearing offered 24 hour house arrest. Now, however, we are in a substantially better position to defend and even attack the Government's proffer and argument.

delineates, by page and line from that transcript, aspects of the Government's proffer that the defense now can prove are incorrect, inaccurate, misleading or incredible.

2.      Since his release, John Mamone has been under the strict supervision of Pretrial Services. The only change in the bond occurred when the Court ratified the agreement between the Government and the defense to amend house arrest so that Mr. Mamone could meet with his attorney at his attorney's office. Since then, Mr. Mamone has worked regularly at the offices of Thornton & Rothman, P.A. helping to prepare this large and complex case. In all regards, he has complied with the conditions of his release and the orders of his Pretrial Officer, David Nuby, Jr.

3.      This request to delete the condition of house arrest is being made for four (4) reasons:

A.      John Mamone has fully complied with all conditions of release for almost four (4) months and has demonstrated that even if house arrest were initially appropriate, which the defense in no way concedes, he no longer warrants such a restrictive condition of release,

B.      The Government's discovery response to date has demonstrated that the allegations made by the Government at the detention hearing, in terms of the danger prong of the pretrial detention test, are unsupported by any evidence other than mere allegations by informants.

### *1. Government's Proffer as to alleged Al Polito Incident (Transcript, P. 15-17)*

In particular, by far the most damning allegation by the Government was about a confidential informant who, the Government proffered, was beaten by John Mamone when the informant, John Mamone and others went for a ride in a car. The Government claimed at the time of the detention hearing that Mr. Mamone threatened the informant, hit him at least two times and tried to "bite his ear off." At the time of the hearing, the defense argued that there was no proof of the allegation. Now that a full review of pertinent conversations (Government's term) relating to this informant has

Page -2-

been conducted by the defense, it is known that the reason no such evidence was produced at the hearing was that no such evidence exists. Why is the lack of evidence critical? Because the alleged incident occurred during the time the informant/alleged victim was recording conversations of John Mamone and others on a body bug he wore.[2] Mr. Polito recorded at least thirty (30) meetings he had with John Mamone, according to the transcripts and cassette recordings provided to the defense. Why was this supposed meeting not recorded?

And, if the meeting were not recorded, why was it not surveilled? The Government's assertion from the detention hearing, at page 16, line 5, that Al Polito (in the transcript the name is mis-spelled "Bellitto") "did not have the opportunity to call his FBI control agent" is not only without any proof, it is ludicrous. In its proffer, the Government claimed, at page 15 and 16, that Mr. Polito received a call from Mr. Buccinna (a co-defendant in this case) arranging the meeting with John Mamone that supposedly resulted in the physical assault by Mr. Mamone upon Mr. Polito and that Mr. Polito then drove to the meeting. By the time of this purported meeting, in March of 2000, the Government was nearing the conclusion of this investigation that began years before and the agents and prosecutors were well-aware of nearly all of the information that was included in the indictment as well as the proffer for the detention hearing.

If Mr. Mamone was dangerous in court in November of 2000, he was surely dangerous from March of 1999 until March of 2000, the bookend dates of the initiation of the "Polito" tapes until this critical alleged meeting. The Government's excuse that Al Polito did not have the opportunity to call his FBI control agent just cannot withstand the simple scrutiny of common sense. The Court

---

[2]The tapes and transcripts from the Al Polito consensual recordings that were provided by the Government to the defense show that the informant wore a body bug from at least March 25, 1999, until at least April 6, 2000.

Page -3-

Thornton & Rothman, P.A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

cannot and must not put any credence in this significant part of the Government's proffer.

### 2. *Government's Proffer as to alleged Huey Steinhart Incident*

Another important fact gleaned from the thousands of pages of transcripts and other papers obtained in discovery is the admission by the Government that Huey Steinhart, one of the supposed victims of Mr. Mamone's violence, the person the Government claims in its proffer, at page 17-18, was "roughed up" by Mr. Mamone, Mr. Buccinna (a co-defendant) and a Joe Russo (not a defendant), is no longer a "cooperating witness." (See affidavit in support of Title III application, attached hereto, with relevant portion highlighted, as **Exhibit C**.) It seems at least unfair that the Government would seek pretrial detention and get 24 hour house arrest for John Mamone based, in part, on hearsay from an admitted criminal[3] who apparently claimed he was a victim and then, even before John Mamone is charged and arrested, refuses to testify. It is particularly unfair when the "victim" faces no consequences for either his admitted criminal activity or any potentially false accusation. Not incidentally, whatever happened to the Government's power to compel testimony?

### 3. *Government's Proffer as to alleged Jeffrey Braverman Incident*

A third alleged act of violence on John Mamone's part supposedly had him hitting a Mr. Braverman on the arm with a baseball bat. (Proffer, at page 18) According to information uncovered by the defense, this is the same Mr. Braverman who was the subject of a television story on infamous "con men" and who has been the focus of criminal fraud investigations. Consequently, this part of the proffer boils down to an uncorroborated allegation, from an unreliable source, who, according to the proffer, had a strong bias against John Mamone based on a financial debt.

---

[3]Attached hereto as **Exhibit D** is a copy of a transcript of a conversation, from the "Polito" tapes, between Mr. Polito and Huey Steinhardt in which Mr. Steinhardt admits prior criminal conduct.

Thornton *&* Rothman, P.A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

**4. *Government's Proffer as to alleged "Veiled Threats on Telephones to the Bookies "***

At page 19 of the detention hearing transcript, the Government makes reference to John Mamone and "veiled threats." Now that the defense has reviewed thousands of pages of transcripts containing hundreds of conversations involving John Mamone, it can safely be said that Mr. Mamone has, to say the least, a colorful vocabulary and unusual manner of expressing himself. Without boring the Court with the litany of sentences, phrases and words used by Mr. Mamone that may seem, if taken out of context, to contain "veiled threats," suffice it to say that the discovery from the Government shows that on hundreds of occasions, John Mamone was loud, vulgar and aggressive. Right or wrong, that is his way. With his friends, with his employees and with his customers, John Mamone expresses, and expressed, himself in a way that may seem to have been rude, even outrageous on more that one occasion, but it was not a "threat" and should not be exaggerated to the extent of supporting the Government's detention request.

C.     Since his release, John Mamone has attempted to earn a living to help support his family, including his wife, four children at home and two older children from John's first wife. As is documented in pleadings filed with the Court, the business from which both John and his wife, Grace, earned a living (Gateway Transportation) was dissolved on December 1, 2000, after it became impossible to overcome the business difficulties partially caused by the bad press of the arrests in this case as well as the attempt by the Government to initiate forfeiture proceedings on the business, including the freezing of bank accounts.

Although Grace is now working, her income is insufficient to pay the essential bills of the family. Unless John Mamone can work, the family cannot financially survive. John Mamone, who will turn 50 this year, has been in the trucking business for all of his adult life. There is no doubt

Thornton *&* Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358 - 9000 • Telefax (305) 374 - 5747

that if he can work, John can earn sufficient funds to cover the remainder of the family's bills. In order to work, John needs to be released from house arrest so that he can solicit business from customers who need transportation and, then, place the business with the trucking company or broker that will pay the highest commission. All of this sales work must be accomplished through personal contact with both ends of the transaction. It cannot be done over the telephone.

        D.     Because of the voluminous discovery in this case, including over 3,000 taped conversations arising out of several Title III wiretaps as well as consensual monitorings, the Trial Court, at the request of the defense, set this case for trial in February of 2002.[4] By the time this case goes to trial, John Mamone would have been under house arrest for over fifteen (15) months. Given the facts presented herein, it is not fair, nor is it necessary that John Mamone be kept from earning a living and participating in the lives of his family members for that length of time.

Until the day of his arrest, John Mamone was actively involved in the care of his children. He has been especially involved in the coaching of his sons in baseball, basketball and football.[5] At the time of his arrest, John was a coach of a youth league football team that had a successful season

---

[4]We pray the Court does not see the defense request as similar to that of the child who, convicted of murdering his parents, seeks mercy by arguing he is an orphan. The defense asked for February of 2002 as the trial date not to improve Mr. Mamone's position as to this motion, but for the reasons presented to the Court, that is, to permit sufficient time to prepare for trial.

[5]Significantly, John has also been involved in the leadership of the basketball and football leagues, rising to the level of Vice President of the Coral Springs Flag Football league. In his various capacities with the leagues, he has been responsible for the daily operation of dozens of teams, scheduling, oversight of coaches, referees and cheerleaders. His leadership continues to be sought out by the leagues and even now he is helping, albeit in a much more limited fashion necessitated by the house arrest condition.

Page -6-

until his arrest and, then, lost most of its remaining games.[6] John was asked to, and tried to, help coach the team in the playoffs by telephone from his home. Attached hereto as **Exhibit E** is a collection of letters from parents of players who John coached attesting to the significant role he played in the lives of their children.

4.    John Mamone is the only person charged in this case who is under house arrest.[7] Although the superceding indictment lists John as the lead defendant, perhaps the Court recalls that in the original indictment, John was # 2. Without any effort on his part, he became # 1 when Steven Raffa, the person who was alleged to be the head of the organized crime family and supposedly John Mamone's boss, committed suicide. At the time of his death, Mr. Raffa was under house arrest, however, unlike John Mamone, Mr. Raffa was permitted to work out of the house four (4) hours per day. In Mr. Raffa's case, the Government withdrew their request for pretrial detention and agreed to the provision permitting Mr. Raffa to work, as well as a bond one-quarter the amount of Mr. Mamone's. Simply stated, the disparity in treatment was and is unfair.[8]

---

[6]In fact, until the day before his arrest, which the defense well-knew was in the works, John Mamone continued to request that his arrest be delayed until after the youth football season concluded by Thanksgiving.

[7]Some of the defendants in this case had other cases pending at the time of their arrest in this case. Several defendants have prior records. Others have less than significant ties to the community. According to the government, and based on a review of the evidence provided in discovery, a few defendants have allegedly been involved in crimes of violence.

[8]In its proffer, at page 19 of the transcript, the Government argued that because Mr. Mamone, unlike his alleged boss, Steven Raffa, was involved in "direct and indirect acts of violence," the Court should detain the subordinate and release the boss. This argument proved to be less than consistent in light of its proffer, at page 14, lines 6-13, and page 18, lines 5-8, wherein the Government alleged that co-defendants of Mr. Mamone were likewise involved in acts of actual violence, but, ultimately, the Government agreed not to seek, or to withdraw their demand for, detention for these individuals.

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

5.    John Mamone's Pretrial Release supervisor, David Nuby, Jr., has been contacted regarding his position on this motion. Mr. Nuby said John Mamone has complied with all of the bond conditions, the conditions of house arrest and his (Mr. Nuby's) orders. He has no objection to the entry of an Order that removes the house arrest condition of the bond. This Court is strongly encouraged to rely upon the experience and expertise of Mr. Nuby.

6.    There was an overwhelming outpouring of family, friends and community who literally and figuratively stood up for John Mamone. That support remains steadfast, in spite of the serious charges, the threat of decades of prison in the event of a conviction and significant press coverage of this case. The people who have come forward are pillars of the community and loved ones. They know and understand what is on the line. For that reason, many put their financial lives on the line for John Mamone. Even more offered to serve as sureties, if needed.

The size and type of bond posted in this case is not only direct evidence of support for John Mamone, but represents a huge incentive for John Mamone to comply with each and every condition of the bond. One of those conditions is to obey the law. John Mamone will comply with the conditions of his bond.

7.    The government has been provided a copy of this motion. Assistant United States Attorney Brian McCormick objects to the Court granting the relief requested in this motion.

WHEREFORE, the Defendant, John Mamone, respectfully requests that this Court enter an Order deleting the requirement of house arrest.

Respectfully Submitted,

DAVID ROTHMAN
Florida Bar #240273

Page -8-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendant John Mamone's Motion For Order Eliminating House Arrest Component of Bond was forwarded via facsimile to Assistant U.S. Attorney Brian McCormick, 299 East Broward Blvd., Ft. Lauderdale, Fl 33301 on this the _____ day of March, 2001.

DAVID ROTHMAN

Page -9-

# EXHIBIT A

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          CASE NUMBER: 00-6309-CR-Seitz

     Plaintiff,

vs.

JOHN MAMONE

     Defendant.

_____/

### *ERRATA* SHEET FOR TRANSCRIPT OF PRETRIAL DETENTION HEARING

| Page | Line | Topic (Government's Proffer and Correction or Explanation) |
|------|------|------------------------------------------------------------|
| 3 | 13-20 | Mr. Mamone was arrested for "destruction of a vessel." Although that is true, the proffer fails to explain that this was an insurance fraud case in which Mr. Mamone is not alleged to have committed any act of violence. He received, and was early terminated from, probation. |
| 4 | 7-11 | The Government stated that in 1994 Mr. Mamone pled guilty to bribery charges (in a New Jersey state case) and was placed on four years probation. In fact, the charge was "commercial bribery" and did not involve any public official. The correct date of the plea was September 11, 1998, and the four years of probation was early terminated less than 2 years later, on June 2, 2000. |
| 5-6 | 20-1 | The Government claims that this case is about the Trafficante crime family. However, there is not a single credible piece of evidence that supports this claim. |
| 6 | 17-18 | The claim is that Mr. Mamone "on a frequent basis, used threats of violence in ... collecting .... from bettors... bookies and sub-bookies and agents who worked underneath John Mamone." Our review, to date of hundreds of transcripts reveals this assertion is not accurate. As can be attested to by the agents who monitored thousands of John Mamone conversations, and as can be confirmed by friends and relatives, Mr. Mamone yells when he speaks. He uses strong language for emphasis. Not every colorful word or phrase is a threat. |

Page 1 of 2

Thornton *&* Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

| Page | Line | Topic (Government's Proffer and Correction or Explanation) |
|---|---|---|
| 12 13 | 22- 24 | The Proffer goes into great detail, quoting from a conversation from 1996, in which Mr. Mamone is involved, to prove up violence on the part of Mr. Mamone.  Preliminarily, it is important to note that the recently deceased Steven Raffa, John's "boss" and the man for whom the Government agreed to a bond, was also present.   At this conversation, Mr. Mamone described a past act, committed by someone other than John Mamone, in which someone was "slapped."  At most, this elaborate and specific part of the proffer shows knowledge on the part of Mr. Mamone, nothing more.  Just as important, however, is the fact that the person who the Government claims did the slapping is a co-defendant in this case, and he is not being detained, nor is he under house arrest. |
| 15 | 23-25 | Once again, the Government proffers that "Mr. Mamone made several telephone calls to [Al Polito] in a threatening manner..."  Once again, the "Polito" transcripts and tapes do not support this claim.  To the contrary, the proof supports the fact Mr. Polito was lying to several people, scamming not only Mr. Mamone, but others.  The cheating and the lies made Mr. Mamone angry and he became loud and vulgar, neither of which are a basis for detention or house arrest. |
| 16-17 | | The alleged Al Polito assault is referenced here.  As the matter is sufficiently dealt with in the attached motion, it is not necessary to further dispute it here. |
| 17-18 | | This is the alleged Steinhardt incident, discussed in the motion. |
| 18 | | This is the Braverman allegation, likewise discussed in the motion. |
| 18- 19 | 24- 3 | What at page 6, lines 17-18, in the proffer were "threats of violence" have morphed into, a mere twelve pages later, "veiled threats."  And the proof as found in the tapes do not support the allegation that the people to whom the Government referred to here as "bookies" were even bookmakers. |

Page 2 of 2

Thornton & Rothman, P. A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 · Telephone (305) 358 · 9000 · Telefax (305) 374 · 5747

# EXHIBIT C

DLWF:df

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

NO._____

IN THE MATTER OF THE APPLICATION   )
OF THE UNITED STATES OF AMERICA    )    <u>UNDER SEAL</u>
FOR AN ORDER AUTHORIZING THE       )
INTERCEPTION OF WIRE COMMUNICATIONS)

<u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Patrick G. Brodsky, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI).   As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I have been employed as a Special Agent of the FBI for over four years.   For the past four years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN).   As a result of my participation in these investigations, conversations with other FBI agents familiar with the criminal activities of the LCN, reviews of reports concerning LCN, reviews of reports concerning LCN activities, members and associates, and reliable informant information, I know that the

criminal activities of the LCN include, but are not limited to, gambling, trafficking in narcotics, loansharking, money laundering, extortion, labor racketeering, and murder.  I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

     3.    This Affidavit is being submitted in support of an application which seeks an Order authorizing the interception of wire communications of **STEVE BRUNO RAFFA**, **JOHN MAMONE**, **FRED MORGENSTERN**, **PEGGY PRESTON**, **MARK WEISS**, **ISRAEL "BUDDY" TORRES**, **MICHAEL BUCCINNA**, **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, and others yet unknown, occurring over the following telephone numbers for a period of thirty (30) days:

     A.    Cellular telephone number (954) 614-1821, electronic serial number (ESN) EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida, and utilized by **JOHN MAMONE**; and,

     B.    Cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by **FRED MORGENSTERN**.

     C.    Authorization is also sought to intercept communications from any telephone numbers subsequently assigned to or used by the instruments bearing the same ESN as the target cellular telephones and notwithstanding any changes in the ESN of the target cellular telephones so long as its assigned telephone

2

number remains the same.

D.    Authorization is also sought so that, in the event that the target cellular telephone is transferred outside the territorial jurisdiction of the Court, interceptions may take place in any other jurisdiction within the United States.

4.    The wire interceptions sought herein will be conducted pursuant to Title 18, United States Code, Section 2518, concerning the following offenses enumerated in Title 18, United States Code, Section 2516:

A.    Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, that is, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 4(B) through 4(I) below, and through the collection of unlawful debt, in violation of Title 18, United States Code, Sections 1962(c) and (d);

B.    Making extortionate extensions of credit, financing extortionate extensions of credit, collecting extensions of credit by extortionate means and conspiracy to do so, in violation of Title 18, United States Code, Sections 892, 893 and 894;

C.    Wire fraud and mail fraud in violation of Title 18, United States Code, Sections 1341 and 1343;

D.    Interference with commerce by threats or violence,

3

in violation of Title 18, United States Code, Section 1951;

  E. Interstate Gambling Business, in violation of Title 18, United States Code, Section 1955;

  F. Money laundering, in violation of Title 18, United States Code, Section 1956 and 1957;

  G. Transportation of stolen goods, securities, moneys, in violation of Title 18, United States Code, Section 2314;

  H. Bank Fraud, in violation of Title 18, United States Code, Section 1344;

  I. Interstate and Foreign Travel in Aid of Racketeering, in violation of Title 18, United States Code, Section 1952; and,

  J. Conspiracy, in violation of Title 18, United States Code, Section 371.

  5. I have personally participated in this investigation of the offenses referred to in paragraph 4 of this affidavit. From that personal participation in this investigation, and through oral and written reports made to me by agents and analysts of the FBI and other state and local law enforcement agencies, I am familiar with the facts and circumstances of the investigations.

  6. Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7.    The facts and circumstances of this affidavit as set forth below demonstrate that:

A.    There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated herein above in paragraphs 4(A) through 4(I).

B.    There is probable cause to believe that STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK, and others as yet unknown, have used, are using, and will continue to use cellular telephone number (954) 614-1821, ESN EB6391C2, subscribed to by Gateway Transportation, 7770 West Oakland Park, Apartment 450, Fort Lauderdale, Florida, and utilized by JOHN MAMONE, and, cellular telephone number (954) 557-3651, ESN 25314057896, subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address), and utilized by FRED MORGENSTERN, for the purpose of facilitating the offenses enumerated in paragraph 4.

C.    The interception of wire communications of STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES,  MICHAEL BUCCINNA, VIRGIL WOMACK,

CHARLOTTE WOMACK, and others yet unknown, will yield relevant information and admissible evidence of those offenses, including communications concerning:

(i)    the precise nature and scope of the illegal activities;

(ii)    the identities and roles of the coconspirators and other participants in these illegal activities;

(iii)    the locations and means used in furtherance of these illegal activities;

(iv)    the location of records maintained by or in relation to these illegal activities;

(v)    the location of assets derived as a result of these criminal activities and the distribution of money received through these illegal activities, including the methods used to transport and transfer money between and among conspirators and the current location of money and other assets derived from or used to promote these illegal activities; and,

(vi)    the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth above in paragraph 4.

D.    In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

8.    Normal investigative procedures have been tried and have

6

not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.  These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

9.  AT&T Wireless records reveal that cellular telephone number (954) **614-1821**, ESN EB6391C2, is subscribed to by Gateway Transportation, 7770 West Oakland Park Boulevard, Apartment 450, Fort Lauderdale, Florida.

10.  Sprint telephone records reveal that cellular telephone number (954) **557-3651**, ESN 25314057896, is subscribed to by Kinsman Merchant & Associates, 4901 N.W. 17th Way, #407, Fort Lauderdale, Florida (mailing address).

## BACKGROUND OF THE INTERCEPTEES

11.  **STEVE BRUNO RAFFA**, a/k/a "Uncle Steve", was born on October 2, 1941, in the city of Ciancianna, in the province of Agrigento, Sicily, Italy.  RAFFA currently resides at 15641 SW 16th Street in Pembroke Pines, Florida.  According to the Italian law enforcement authorities, RAFFA's brother, Pietro Raffa (now thought to be deceased), was documented as being a member of the Sicilian Cosa Nostra (Sicilian Mafia) based in the Agrigento Province of Sicily.  **RAFFA** is now the Boss of the Trafficante LCN family in South Florida.  The Trafficante LCN family exercises considerable power and influence in South Florida.  No arrest record for **RAFFA**

7

could be located.

12.  **JOHN MAMONE** was born on June 12, 1951, in New Jersey.
**MAMONE** currently resides at 1960 Augusta Terrace in Coral Springs,
Florida.  **MAMONE** is a made member in the Trafficante LCN family and
is considered to be one of **RAFFA's** closest confidantes.  **MAMONE** has
the following criminal record: He was arrested on December 16,
1991, in New Jersey for Intimidation and the case was dismissed.
**MAMONE** was arrested on August 16, 1993, for mail fraud; he was
subsequently convicted and was sentenced on March 31, 1995, to 48
months probation and restitution in the amount of $94,444.  On
October 3, 1994, **MAMONE** was arrested by the New Jersey State Police
and charged with one count of terrorist threats, one count of theft
by extortion, one count of commercial bribery, one count of
tampering with a witness/informant, one count of racketeering and
one count of racketeering conspiracy; **MAMONE** was sentenced on
September 9, 1998, to four years probation and a fine of $7,500.
Until approximately August of 1999, **MAMONE** operated Check Cashing
Unlimited, a check cashing store, located at 5701 Margate
Boulevard, Margate, Florida (hereinafter referred to as Check
Cashing Unlimited).  In August of 1999, Check Cashing Unlimited was
purchased by **FRED MORGENSTERN** and is now called Gold Coast Check
Cashing.

13.  **FRED MORGENSTERN** was born on October 28, 1948, and
resides at 23170 Floral Wood Lane in Boca Raton, Florida.

MORGENSTERN incorporated Gold Coast Check Cashing, Inc., in April of 1998.  In approximately August of 1999, MORGENSTERN took over the operation of Cash 96, 3591 North Andrews Avenue, Oakland Park, Florida, and Check Cashing Unlimited and is presently operating both under the name of Gold Coast Check Cashing. MORGENSTERN has a criminal record which includes the following:  MORGENSTERN was arrested on June 5, 1976, for theft and was convicted and sentenced to five years probation.  MORGENSTERN was arrested on December 22, 1976, in Cincinnati, Ohio, for passing bad checks and the case was dismissed.  On January 30, 1989, MORGENSTERN began serving a three year sentence for transportation of stolen securities.  On October 18, 1994, MORGENSTERN was arrested for grand larceny and the charges were later dropped.  As described below, MORGENSTERN is also associated with VIRGIL WOMACK in a scheme to defraud investors, which the Trafficante LCN family is also involved with at least to the extent of laundering the investors' funds.

14.  PEGGY PRESTON was born on August 17, 1964, and resides at 4717 N. W. 82nd Avenue, Fort Lauderdale, Florida. Based on electronic surveillance information, PRESTON is an associate of both MORGENSTERN and CROSSEN and assists MORGENSTERN with financial transactions.  PRESTON is employed at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate, Florida, and has no criminal record.

15.  **MARK WEISS** was born on August 25, 1962, and resides at 21190 Mainsail Circle Apartment 11, Aventura, Florida.  **WEISS** is involved in the management of Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida. He was arrested for assault and battery on January 7, 1999; this case was later dismissed. **WEISS** is a collector of extortionate loans for Bellitto made through Gold Coast Check Cashing.

16.  **ISRAEL TORRES**, also known as "Buddy", was born on July 10, 1950, in Manhattan, New York, and has a registered address of 5100 Las Verde Circle, #318, Delray Beach, Florida.  Anthony Graziano is a Capo in the Bonanno LCN Family and is **TORRES'** principal contact for the criminal crew operating in South Florida. On October 6, 1994, **TORRES** was arrested by Broward County Sheriff's Office, Florida, for two counts of Grand Larceny and Tampering With/Destroying Evidence.  On December 2, 1994, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Fraud, Illegal Use of Credit Cards and Forgery of Credit Card.  On December 23, 1994, **TORRES** plead nolo contendre to the October 6, 1994 charges and plead guilty to the December 2, 1994 charges; **TORRES** was sentenced to four years probation, suspension of his driver's license, and restitution of $8,460.  On March 31, 1998, **TORRES** was arrested by Palm Beach County Sheriff's Office, Florida, for Grand Theft; those charges were subsequently dismissed.

17.  **MICHAEL BUCCINNA** was born on April 30, 1959, and resides

at 6363 N.W. 39th Street, Coral Springs, Florida. **BUCCINNA** works
at Gold Coast Check Cashing, Inc., 5701 Margate Boulevard, Margate,
Florida. **BUCCINNA** has no criminal record, but as described below,
**BUCCINNA** helps to collect extortionate loans for **MAMONE**.

18. **VIRGIL WOMACK**, also known as Lewey L. Catoe, III, George
H. Williamson, and Clifton Wilkinson, was born on July 24, 1941, in
Georgia. **WOMACK** currently resides at 11052 Watson Drive, Suite C
in Seneca, South Carolina. **WOMACK** has a criminal record which
includes the following: **WOMACK** was arrested on March 10, 1986, for
battery and the case was dismissed; **WOMACK** was arrested on April
17, 1990, for battery, criminal damage to property second degree,
aggravated assault and terrorist threats and acts. **WOMACK** received
a suspended sentence upon payment of a fine of $120.00 and
restitution.

19. **CHARLOTTE WOMACK**, the spouse of **VIRGIL WOMACK**, was born
on November 23, 1948. **CHARLOTTE WOMACK** currently resides at 11052
Watson Drive, Suite C, Seneca, South Carolina. **CHARLOTTE WOMACK**
has no criminal history.

### PREVIOUS APPLICATIONS

20. I caused a search to be made of the electronic
Surveillance Indices of the Federal Bureau of Investigation and the
Drug Enforcement Administration during the week of December 27,
1999, in order to determine whether previous applications have been

11

made to intercept wire, oral or electronic communications of **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK,** or of any of the communication facilities named in this Affidavit. These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

21. On January 16, 1991, the Honorable Robert J. Ward, United States District Judge, Southern District of New York, signed a Court Order which authorized the interception of oral communications of **JOHN MAMONE** and others for a period of thirty (30) days. Extension Orders authorizing the continued interception of oral communications of **JOHN MAMONE** and others each for periods of thirty days were issued on February 16, 1991, March 13, 1991, April 17, 1991, and May 16, 1991.

22. On September 12, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered an Order authorizing the interception of wire communications of **JOHN FRANCIS MAMONE** and others occurring over telephone number (908) 469-1657 and (908) 469-8424, for a period of thirty (30) days. On October 16 and November 15, 1991, the Honorable Nicholas H. Politan, United States District Judge, District of New Jersey, entered Orders authorizing extensions of time for the above described interception of wire communications

12

for additional thirty (30) day periods.

23. On November 19, 1998, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **JOHN MAMONE** and others occurring over telephone number (954) 295-6672, 1700 N. State Road 7, Hollywood, Florida, for a thirty (30) day period.

24. On September 23, 1999, the Honorable William P. Dimitrouleas, United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN,** and others occurring over telephone number (954) 564-5599, for a period of thirty (30) days.

25. On November 12, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917) 414-7111, for a period of thirty (30) days.

26. On December 28, 1999, the Honorable Wilkie D. Ferguson, Jr., United States District Judge, Southern District of Florida, entered an Order authorizing the continued interception of the wire communications of **ISRAEL "BUDDY" TORRES, JOHN MAMONE,** and others occurring over cellular telephone numbers (561) 350-5824 and (917)

13

414-7111, for a period of thirty (30) days, which is ongoing at this time.

## FACTS AND CIRCUMSTANCES
## ESTABLISHING PROBABLE CAUSE

27. Based on my investigative training and experience, coupled with information provided by various sources, including other agents of the FBI, I have learned the following information about the La Cosa Nostra (LCN), a nationwide secret criminal association crime group in the United States.

A.    The LCN is the most powerful and sophisticated organized crime group in the United States.

B.    The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is very rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegime, often referred to simply as "Capo," "Captain," or "Skipper." Caporegime are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino,

14

Pages 15-18 missing in copy supplied in discovery.

37. On August 16, 1999, CS-2 advised that **RAFFA** has previously admitted to CS-2 that he (**RAFFA**) is a member of the Trafficante LCN family. CS-2 advised that **RAFFA** and Vincent Loscalzo divide the territory of the Trafficante LCN family, with **RAFFA** being located in South Florida and Loscalzo being located in Tampa. **RAFFA** operates a crew of members and associates of the Trafficante LCN family in South Florida. CS-2 advised that **JOHN MAMONE** is a member of **RAFFA's** crew and engages in illegal gambling.

38. **Confidential Source Number Three (CS-3) has been** associated with **MAMONE** for approximately four years. **Although CS-3 is no longer a source for the FBI**, the information provided by CS-3 has been corroborated by independent investigation, e.g., information supplied by other sources of information, physical surveillances, pen register information, and has been determined to be reliable.

39. In the fall or winter of 1995, CS-3 approached **JOHN MAMONE** and his associate, Joseph Russo, and took out an extortionate loan for approximately $40,000. CS-3 described the loan as a wholesale type loan that would usually run about a point to a point and a half per week. This loan was later forgiven when MAMONE became CS-3's silent partner in CS-3's business.

A. Based on my training, experience, and information form other agents, it is my understanding that this refers to one to one and one-half percent interest per week on the total loan or

19

over fifty-two percent interest per year.

40. CS-3 stated that in May 1997, **MAMONE** and Joseph Russo physically assaulted CS-3 in connection with a debt owed by a third party to **MAMONE** and Russo. **MAMONE** and Russo blamed CS-3 for the failure of the third party to pay approximately $150,000 that **MAMONE** and Russo thought they were owed as a result of a business dispute. CS-3 further stated that **MAMONE** and Russo also assaulted the third party with a baseball bat.

A. Agents from the FBI interviewed the third party who confirmed that he/she had been assaulted by **MAMONE** and Russo.

41. Confidential Source Number Four (CS-4) has provided information to the FBI for approximately eight months. CS-4 has been meeting with members and associates of various LCN families in South Florida since in or about 1995. CS-4 has provided information on loansharking, gambling, extortion and stolen property activities engaged in by members and associates of LCN families operating in South Florida and elsewhere.

42. Where possible CS-4 has consensually recorded meetings with various organized crime members and associates including, among other individuals, **MAMONE**. CS-4 consensually recorded conversations whenever the circumstances permitted, depending upon safety concerns and practical considerations. The information provided by CS-4 has been proven to be truthful and reliable. This information has been corroborated by information from other cooperating witnesses, confidential sources and the consensually

20

recorded conversations made by CS-4 with targets of the investigation. Information provided by CS-4 has previously been included in two applications for electronic surveillance, both of which were granted.

43. CS-4 has been involved in illegal gambling activities with associates of the Colombo and Bonanno LCN families since approximately 1992. Prior to his cooperation, CS-4 had been regarded by the Colombo and Bonanno LCN families as an expert in operating bookmaking businesses in South Florida.

44. On November 3, 1999, CS-4 informed me that CS-4 has known Frank Ruggiero, a close associate of MAMONE for several years and during that time Frank Ruggiero told CS-4 that RAFFA and MAMONE are members of the Trafficante LCN family and that MAMONE reports to RAFFA.

45. On December 10, 1999, CS-4 informed me that CS-4 has known MAMONE since approximately 1996. During the last three years, CS-4 has collected checks for MAMONE from gamblers who have owed money to MAMONE for their gambling losses. CS-4 has also referred several individuals to MAMONE for loans, which were subsequently extended to them at extortionate interest rates. Through his conversations with MAMONE and these individuals, CS-4 is aware that MAMONE charges three points for loan amounts under $10,000 and two and one-half points for loan amounts over $10,000.

A. Based upon my experience and information from other

law enforcement officers, I am aware that points refers to the weekly interest being charged on the total amount of the loan, normally referred to as vigorish. Three points converts to 156% per annum, and, two and one-half points would convert to 130% per annum.

46. CS-4 informed me on December 10, 1999, that CS-4 is aware through conversations with MAMONE and personal observations that MAMONE is involved in a variety of criminal activities, including the laundering of checks, loansharking, gambling and collection of gambling debts, and, possession of stolen property, including stolen credit cards. As to the gambling business, CS-4 stated that MAMONE helps finance at least two separate bookmaking offices. CS-4 is aware that one of the offices, which is managed by Jackie Baruch, has been in operation for at least the last year of which CS-4 is aware and that there are at least five individuals involved in the operation of that bookmaking office.

47. CS-4 further informed me on December 10, 1999, that CS-4 is aware through conversations with MAMONE and TORRES that they have been partners in the extortionate loan business for many years. In addition, TORRES has received money from MAMONE at a low rate of interest and extended the money at extortionate rates to other individuals.

48. CS-4 also stated that MAMONE regularly makes extortionate extensions of credit in South Florida to several individuals associated with illegal gambling businesses, in particular

22

bookmaking operations. Many of these loans were originally debts owed by individuals which were then converted into extortionate loans. Specifically, CS-4 is aware that Alan Epstein currently has an extortionate loan of approximately $20,000.00 incurred through an unpaid gambling debt, and that Ralph Lento currently has an extortionate loan through MAMONE for approximately $20,000.00 on which Lento has made payments.

49. In approximately January of 1999, prior to the time CS-4 began cooperating with the government, CS-4 received an extortionate extension of credit from MAMONE in the amount of $20,000.00 at an interest rate of 2% per week, for a total interest rate of approximately 104% per year. CS-4 has been repaying the loan on a weekly basis and continues to do so. CS-4 normally makes the payments to MAMONE at Gold Coast Check Cashing, Margate. MAMONE has advised CS-4 that with respect to CS-4's extortionate loan, that it is not just him (MAMONE) that is being paid, but MAMONE's people as well.

A.    CS-4 informed me that CS-4 understands this statement by MAMONE to mean that RAFFA and the Trafficante LCN family are also receiving monies from the extortionate loan.

B.    Although CS-4 has known MAMONE for a lengthy period of time, when CS-4 has been late on the payments to MAMONE, MAMONE has been unpleasant. For example, on October 7, 1999, at approximately 11:51 a.m., MAMONE left a message on an answering

23

machine for CS-4 concerning the outstanding extortionate loan **MAMONE** had extended to CS-4. CS-4 had not been making payments on the loan. **MAMONE** stated that CS-4 was a "fat motherfucker" and further remarked "wait till I see you" (CS-4). This message was related in an angry tone of voice, and clearly carried an implied threat of violence.

50. CS-4 has made payments on his extortionate loan from **MAMONE** at Gold Coast Check Cashing, Margate, Florida. CS-4 informed me that prior to each of the dates described below, CS-4 would call **MAMONE** at his cellular telephone number (954) 614-1821 to arrange the meetings to make payments on the extortionate loan. In addition, CS-4 had received a number of telephone calls from **MAMONE** concerning repayment on the loan which **MAMONE** placed from his cellular telephone, (954) 614-1821, which CS-4 determined from the caller identification function on CS-4's telephone. The telephone records for the telephone of CS-4 has not been obtained. CS-4 has made payments to **MAMONE** on the extortionate loan on the following dates: 6/24/99 - $400; 6/30/99 - $400; 7/15/99 - $400; 8/4/99 - $400; 8/12/99 - $400; 8/19/99 - $1,000; and, 10/7/99 - $300. In addition, on 06/14/99, CS-4 made a payment of $200 to **BUCCINNA**, which was to be credited towards CS-4's loan from **MAMONE**.

A. On December 10, 1999, CS-4 informed me that **BUCCINNA** works at Gold Coast Check Cashing, Margate, and acts as a collector of extortionate loans at the behest of **MAMONE**.

24

B.    A law enforcement officer has been present with CS-4 at the time that many of the calls have been received from or made to **MAMONE's** cellular.    In particular, over the last thirty days, a law enforcement officer observed CS-4 place calls to **MAMONE's** cellular telephone number, (954) 614-1821, and/or receive calls from **MAMONE's** cellular no less than twenty separate times, the last occasion being on January 5, 2000.    The majority of these conversations over the last thirty days involved the extortionate loan and payments on it as well as arranging meetings with **MAMONE** concerning the loan.    Some of the conversations have also concerned checks which CS-4 has cashed at **MAMONE's** behest.

C.    In addition to the payments described above, on November 29, 1999, CS-4 met with **MAMONE** at Check Cashing Unlimited and provided **MAMONE** with seven items which CS-4 represented to **MAMONE** to have been stolen from Maryland.    Specifically, CS-4 provided four Rolex watches, one Baume & Mercier watch, a ladies tennis bracelet, and a ladies emerald and diamond ring.    **MAMONE** was to sell these items through **MAMONE's** unidentified fence and the amount received by **MAMONE** was to be deducted from CS-4's payments on the outstanding extortionate loan.    The following day, November 30, 1999, CS-4 reached **MAMONE** at his cellular telephone, (954) 614-1821, and during this recorded conversation, which was made while law enforcement was present, **MAMONE** informed CS-4 that he (**MAMONE**)

25

would credit $4,500 towards the principal on CS-4's loan as the value of the "stolen" jewelry that CS-4 had provided **MAMONE** the previous day.

51.   On March 25, 1999, CS-4 met with **MAMONE** and consensually recorded their conversation.  CS-4 and **MAMONE** discussed monies owed by bettors in an illegal gambling business, a bookmaking operation, as a result of losing wagers.  CS-4 and **MAMONE** further discussed the repayment of extortionate loans to **MAMONE** by various individuals.

52.   On December 10, 1999, CS-4 stated that CS-4 is aware that Scarola currently has an extortionate loan of approximately $10,000.00 through **MAMONE**.  CS-4 is specifically aware that Scarola has received at least four extortionate loans from **MAMONE** in the past in the amounts of approximately ten to fifteen thousand dollars.

A.   During electronic surveillance conducted pursuant to the court's Order dated November 22, 1999, described above, Scarola was intercepted in conversations in late November, 1999, with **TORRES** discussing a bookmaking operation in which Scarola is participating.

B.   Although Scarola is a named interceptee and has been identified through the November 22, 1999 electronic surveillance and its extension as a bookmaker, your affiant has no evidence to indicate that Scarola's relationship to **MAMONE** is anything but a

victim of an extortionate loan. Therefore it is not anticipated that the conversations with **MAMONE** will involve any federal crimes being committed by Scarola notwithstanding the fact that Scarola is a named interceptee in the other ongoing electronic surveillance.

53. On December 10, 1999, CS-4 reported that he has been present with **MAMONE** when **MAMONE** has called or received calls from Scarola on his (**MAMONE**'s) cellular telephone. CS-4 is aware that many of these conversations refer to Scarola's outstanding loan.

A. Pen register information shows two incoming telephone calls to **MAMONE**'s cellular telephone number (954) 614-1821 from Scarola's telephone number (954) 802-4510.

54. CS-4 informed me on December 10, 1999, that in or about July 1999, CS-4 overheard **TORRES** engaging in conversations utilizing his own cellular telephone. After such conversations, **TORRES** informed CS-4 that he (**TORRES**) had just spoken with **MAMONE**. **TORRES** advised CS-4 that he (**TORRES**) had discussed with **MAMONE** monies loaned to individuals as extortionate extensions of credit.

A. CS-4 advised that CS-4 could not overhear the substance of **TORRES** telephone conversations, but was informed by **TORRES** thereafter.

55. On May 5, 1999, CS-4 met with **MAMONE** and consensually recorded their conversation. At the direction of the FBI, CS-4 and **MAMONE** discussed the laundering of money through **MAMONE**'s check cashing store in Margate, Check Cashing Unlimited, in the form of

27

checks provided by losing bettors to CS-4. **MAMONE** informed CS-4 that CS-4 should charge two points to launder the gambling proceeds.

A. I know, based upon my training and experience and conversations with CS-4 that "two points" refers to two percent of the total amount of money laundered.

56. On or about July 29, 1999, **MAMONE** gave CS-4 a check in the amount of $150,141.12 and requested that CS-4 cash it at Akel's Market, a check cashing store located at 502 NW 6th Street in Pompano Beach, Florida. **MAMONE** told CS-4 that CS-4 should wipe his (**MAMONE's**) fingerprints off of the check. CS-4 attempted to cash this check but was informed that the bank had identified it as counterfeit. CS-4 advised **MAMONE** of the problem and CS-4 retreived the check from Kaiser and returned it to **MAMONE**.

A. Investigation by the FBI confirmed that the check was counterfeit and the transaction was not completed.

57. According to public records, Cash 96 was owned and operated by **RAFFA** from approximately 1998. According to CS-4, **MAMONE** owned and operated Check Cashing Unlimited from approximately 1995. CS-4 stated that both Cash 96 and Check Cashing Unlimited were sold to **MORGENSTERN** in approximately August of 1999.

A. Florida corporate records show that **MORGENSTERN** was listed as the customer who filed the articles of incorporation for

Gold Coast Checking on April 28, 1998. Gold Coast Checking is now the owner of the check cashing business being operated at 5701 Margate Boulevard, Margate, Florida. This is the location of the business formerly run by MAMONE and called Check Cashing Unlimited, from which CS-4 received the extortionate loan as discussed above.

58. CS-4 reported that in approximately September of 1999, MAMONE told CS-4 that MAMONE had twenty-one checks which MAMONE wanted CS-4 to have cashed at Akel's Market, 502 N.W. 6th Street, Pompano Beach, Florida. MAMONE told CS-4 that the checks had all come from MORGENSTERN, that MORGENSTERN has people to invest and that they receive 4-5% return a year. MAMONE stated·that he (MAMONE) wanted to receive back approximately $100,000 in cash, and the rest in money orders and/or cashier checks. MAMONE initially provided CS-4 with copies of the twenty-one checks, which CS-4 in turn provided to Akel Kaiser. On or about September 22, 1999, MAMONE and CS-4 took the twenty-one checks drawn on various accounts, payable to the order of Chemical Trust, Alliance Trust and various individuals, totaling approximately $1,046,000.00, to Akel's Market. MAMONE said the checks should be good and asked Kaiser to only charge him (MAMONE) one and one-half points rather than two points. MAMONE said that he (MAMONE) would have more checks to come. Kaiser was concerned because of the circumstances of the out-of-state checks. Kaiser ended up taking all twenty-one checks from MAMONE. Within a day, Kaiser called CS-4 and told CS-4

that Kaiser could not cash the twenty-one checks because it was too large an amount.  MAMONE got the checks back from Kaiser and MAMONE later told CS-4 that he (MAMONE) had gotten rid of the checks.

A.  Based upon the investigation, it appears that Kaiser is aware that the checks had come from MORGENSTERN, but is not aware of the investment fraud scheme.  The investigation was unable to determine how or where MAMONE finally cashed these twenty-one checks after Kaiser refused to handle them.

B.  The FBI in Greenville, South Carolina, has been conducting an ongoing investigation regarding mail fraud activities engaged in by various targets, including MORGENSTERN, and, VIRGIL and CHARLOTTE WOMACK.  The investigation has disclosed that the above-referenced checks were the proceeds of mail fraud activity and were sent to South Florida in order to promote the illegal activity.  A more detailed explanation of the scheme and artifice to defraud is set forth below.

59.  In September of 1998, the Securities and Exchange Commission (SEC) filed a complaint for injunctive and other relief in federal court, Southern District of Florida, Case Number 98-7044-Civ-Dimitrouleas, against MORGENSTERN, Amquest International, Ltd., and others.  That complaint alleges the following information.  During 1996, Amquest did a private placement offering in order to supposedly raise money to create a mortgage company.  Registration form N1-A was filed with the SEC, as well as form D

30

regarding the private placement memorandums issued by Amquest. The private placement memorandums were issued to approximately 100 investors. Approximately 5,000 shares of common stock were sold and approximately $3.4 million was raised. The proceeds of the private placement were laundered by MORGENSTERN through Kinsman Merchant & Associates, Inc. Checks were made payable to Kinsman, which were signed by MORGENSTERN and deposited in Kinsman's bank accounts. Kinsman then issued checks made payable to approximately fifteen different companies; these companies opened brokerage accounts in which the monies were deposited. Some of the money was as well deposited into MORGENSTERN's personal bank account and the personal account of the secretary of Amquest. MORGENSTERN was also involved in a second offering, Sleep Source, in which they raised money in an attempt to acquire Sleep-O-Rama. MORGENSTERN raised approximately $800,000 from fifteen different investors. The proceeds from this offering were again laundered through Kinsman and again through the fifteen company accounts. The complaint charges that MORGENSTERN and others engaged in a scheme to defraud investors in connection with Amquest International, LTD., described by the defendants as a financial services business. That civil case is still pending.

60.    In November of 1996, VIRGIL WOMACK, Principal for Western Continental Holdings, Inc., Tifton, Georgia, began to offer and sell unregistered securities in the form of Commercial

Promissory Notes.  By January of 1997, **VIRGIL WOMACK** and his wife, **CHARLOTTE WOMACK**, formed a corporation known as Global Financial, Inc. (GFI), which continued to sell the notes nationwide to hundreds of investors.  GFI falsely claimed that its corporate promissory note was an approved exempt security under the Securities Act of 1933.  GFI further falsely claimed that the Notes were doubly insured and backed by a financial guarantee policy issued by Keyes International Insurance Company (KIIC), Ltd of St. Kitts, West Indies.

A.    According to the Georgia Secretary of States Office, these notes are not deemed exempt securities in accordance with state statutes, and neither are the transactions deemed exempt. **VIRGIL WOMACK** was not registered by the State of Georgia or any other state to sell securities.

B.    The National Association of Insurance Commissioners advised that KIIC was an offshore insurance company located on the island of St. Kitts, West Indies, and was not licensed to conduct business in the United States.

61.  From November of 1996 until mid-1999, **VIRGIL** and **CHARLOTTE WOMACK**, through their organization, defrauded investors of approximately $8 million.  In fact, during one year the organization defrauded over one hundred investors of $6.4 million. According to public records, the State of Georgia placed GFI under receivership in 1999 and shortly thereafter, **VIRGIL WOMACK** left the State of Georgia.

62.  Information from FBI, Macon, Georgia, on July 30, 1999, indicated that VIRGIL WOMACK had relocated to South Carolina from Georgia and was perpetuating a new investment fraud scheme, soliciting investors for an offering named Alliance Trust.

63.  Confidential Source Number Five (CS-5) has been providing information to the FBI since October 29, 1999, and is being paid for this information.  CS-5 is an employee of VIRGIL WOMACK and is in a unique position to provide information.  The information provided by CS-5 has been corroborated through independent investigation, including other sources of information, physical surveillances, and pen register information, and, has been determined to be reliable.

64.  On October 29, 1999, CS-5 advised a special agent of the Federal Bureau of Investigation (FBI) that VIRGIL WOMACK, his wife, CHARLOTTE WOMACK, her sister-in-law, Crystal Wilkinson, and others, are operating a securities investment business known as Chemical Trust and/or Alliance Trust, based in two condominiums in Seneca, South Carolina, one of which is WOMACKs' residence.  CS-5 advised the FBI that VIRGIL WOMACK had recruited a cadre of salespeople (agents) throughout the United States who were actually marketing and selling these investment instruments, known as Chemical Trust and Alliance Trust, to investors nationwide.  Investors are promised a guaranteed contract which returns varying amounts of interest on their investment. Salespersons, however, are advised by VIRGIL WOMACK that they are guaranteed up to 25% commission on

33

their client's investment.

65.    CS-5 advised this operation is receiving from $250,000 to $600,000 in investor checks on a daily basis. CS-5 stated that approximately 25% of the investor funds are processed through the First National Bank of Onaga, Onaga, Kansas, and Fidelity Bank of Atlanta, Georgia, through the use of Self-Directed Individual Retirement Accounts (IRAs). CS-5 indicated these IRA funds are wire transferred directly from these banks to a Chemical Trust account at Admiralty Bank, Palm Beach Gardens, Florida.

66.    CS-5 advised that **VIRGIL WOMACK** has signatory authority on the Chemical Trust account at Admiralty Bank and he (**VIRGIL WOMACK**) recently wire transferred funds from that account to London, England.

A.    A review of subpoenaed bank records by agents of the FBI for Admiralty Bank, Palm Beach Gardens, Florida, reflect that on October 20, 1999, $3,000,000.00 was wire transferred from Chemical Trust account #300137931, Seneca, South Carolina, to Falcon Trust Company, Ltd., account #63772677, at Barclays Bank, PLC, London, England. Bank records reflect authority to make this transaction were received by fax from **VIRGIL WOMACK**.

B.    A review of subpoenaed bank records for Admiralty Bank reflect that on November 1, 1999, $1,250,000.00 was wire transferred from Chemical Trust account #300137931, to Falcon Trust Company, Ltd., account #63772677, Barclays Bank, PLC, London, England. **VIRGIL WOMACK's** signature and date, "11-1-99," appear on

the facsimile sheet authorizing the transaction.

67.   On October 29, 1999, CS-5 advised that VIRGIL WOMACK has another account at the Admiralty Bank, Palm Beach Gardens, Florida, in the name of Prestige Accounting Services, Inc., which is used to pay agents (salesmen) and clients (investors) their commissions and interest earnings when demanded by the investor.   CS-5 indicated that VIRGIL WOMACK uses the signature stamp of George H. Williamson, Sr. on this account.   CS-5 told the FBI that these checks are also prepared from the Seneca, South Carolina location.

A.   A review of subpoenaed bank records for Admiralty Bank, Palm Beach Gardens, Florida, for Prestige Accounting Services, Inc., Seneca, South Carolina 29678, account #300137842, reflects signatory authority as VIRGIL WOMACK and also shows checks signed by George H. Williamson, Sr., with a West Palm Beach address.

B.   I understand that WOMACK's organization further the investor/victims by convincing them to forego annual interest payments on their investments with the promise of an additional 5% interest return.

68.   On October 29, 1999, CS-5 told the FBI that VIRGIL WOMACK does not use his true name, but rather uses the name of Clifton Wilkinson, which is his brother-in law's name, when dealing with salespersons who market his trust instruments.   CS-5 indicated VIRGIL WOMACK signs all documents as Wilkinson and utilizes a signature stamp in Wilkinson's name.   CS-5 stated that VIRGIL

WOMACK also has a signature stamp with the names Lewey L. Catoe, III, and George H. Williamson, which he uses on documents and checks. CS-5 stated that VIRGIL WOMACK told CS-5 that he is to be referred to as Clifton Wilkinson when responding to telephonic inquiries by salespeople. VIRGIL WOMACK refers salespersons who would like to meet personally, to United Marketing Trust, which source believes is an office located at 4126 Pleasantdale Road, Suite B-207, Atlanta, Georgia 30340. CS-5 advised that all salespersons refer to VIRGIL WOMACK as Cliff (Wilkinson), and uses his cellular telephone, (770) 331-4079, extensively to conduct business operations.

A.    I am aware that area code 770 is an Atlanta, Georgia telephone exchange.

69.    On October 29, 1999, CS-5 advised that when VIRGIL WOMACK receives a new contract for an investor, the source prepares a payment surety bond, then facsimiles these bonds to U.S. Guarantee Corporation, in Scottsdale, Arizona. U.S. Guarantee Corporation sends back to VIRGIL WOMACK, via overnight mail, a new payment surety bond with an "official" logo of a blue eagle, signed by Alvin Tang, its Chief Operating Officer, and Kenneth Turner, its Vice-President. CS-5 advised that VIRGIL WOMACK stamps the name Lewey L. Cato, III on the bottom of the bond and it is sent to the investor. U.S. Guarantee Corporation represents that they are backed by $2.6 billion in assets.

A.    Your affiant has determined through a review of

investigative records that Alvin Albert Tang was convicted by the State of Arizona in 1988 for defrauding investors of $1 million in a stock scheme.

      B.   Your affiant has been advised by the SEC that the claim that U.S. Guarantee Corporation is backed by $2.6 billion in assets is false.

    70.  On October 29, 1999, CS-5 told the FBI that the actual business address for the above-described Trusts, which is reflected on all business correspondence and the destination points for incoming mail from salespersons and investors, is Applewood Center Place, 290G Applewood Center, Suite 301, Seneca, South Carolina 29678-0930, which is a Mail Boxes, Etc. location. Unendorsed investor checks are packaged daily and mailed via Federal Express to **FRED MORGENSTERN** in South Florida.

      A.   CS-5 stated that until November 29, 1999, at the direction of **VIRGIL WOMACK**, CS-5 mailed the investor checks to **MORGENSTERN** at The Merrit Advisors Group, Inc., 4901 N.W. 17th Way, Suite 407, Fort Lauderdale, Florida. Since November 29, 1999, the checks are now being mailed on a daily basis to **MORGENSTERN** at Gold Coast Checking, Margate, Florida.

      B.   Based upon the investigation being conducted in South Carolina as well as in South Florida, your affiant has been unable to find any other reason for contact between **WOMACK** and **MORGENSTERN** other than the ongoing investment fraud described in this affidavit.

71. On November 1, 1999, CS-5 advised that MORGENSTERN is the individual who assists VIRGIL WOMACK in cashing investor checks through several banks, including one in the Bahamas, and possibly two check cashing operations in Florida, one known as Gold Coast Check Cashing, Inc. On November 12, 1999, CS-5 advised that PEGGY PRESTON works with MORGENSTERN in the Fort Lauderdale, Florida office of The Merrit Advisors Group. According to CS-5, PRESTON is involved in moving money from the Admiralty Bank in Palm Beach Gardens, Florida.

A. MORGENSTERN is associated with both Kinsman Merchant & Associates as well as The Merrit Advisors Group. Both these companies have the same office space located at 4901 N. W. 17th Way, Suite 407, Fort Lauderdale, Florida.

72. CS-5 has indicated that the daily receipts which are then forwarded to MORGENSTERN average from $250,000 to $600,000 in investments, however, on several days the total has been in excess of $1 million. For example, CS-5 stated that on October 28, 1999, at VIRGIL WOMACK's direction, CS-5 forwarded by DHL Express, unendorsed investor checks made payable to Chemical Trust totaling $626,574.66 to MORGENSTERN. On October 29, 1999, CS-5 forwarded an additional $256,206.00 in unendorsed investor checks to MORGENSTERN. On November 1, 1999, CS-5 mailed, at VIRGIL WOMACK's direction, unendorsed investors checks made payable to Chemical Trust totaling $193,718.43 to MORGENSTERN. On December 17, 1999,

38

CS-5 mailed to MORGENSTERN in Florida, at VIRGIL WOMACK's direction, unendorsed investors checks totaling $1,350,557.00; on December 21, 1999, the total of unendorsed investors checks mailed to MORGENSTERN in Florida was $1,234,535.06.

73. Based upon the information being provided on a daily basis by CS-5, from October 28, 1999, through December 30, 1999, a total of over 15 million dollars in investors checks have been received at WOMACK's office and in turn forwarded to MORGENSTERN in Florida. These monies represent the proceeds from the fraudulent investment scheme, commonly referred to as a Ponzi scheme, which is being operated by WOMACK and his associates out of South Carolina. As indicated by CS-5, the majority of the investors' checks are being forwarded on a daily basis to MORGENSTERN in South Florida. MORGENSTERN is the individual who handles the cashing of these checks, at least some of which are handled by MAMONE.

74. On November 12, 1999, CS-5 stated that PRESTON facsimilied a document regarding Chemical Trust, which had a return address of 5701 Margate Boulevard, Margate, Florida 33063. CS-5 advised that PRESTON acknowledged receipt of two packages, one containing $676,747.72, the other $98,891.00. CS-5 stated PRESTON can be reached at (954) 969-8606.

A. Telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, Margate, Florida.

75. On November 1, 1999, CS-5 advised that VIRGIL WOMACK said

39

to the source that once he (**VIRGIL WOMACK**) moved to the Bahamas and, "got the money out of the United States, it could not be touched by the United States Government," and added that "people that had money in the United States could put their money in his investment opportunity."

76. Your affiant has determined through investigation that the Secretaries of State or Superior Courts of eight (8) states have issued these Cease and Desist orders directing that **VIRGIL WOMACK** or Clifton Wilkinson, d.b.a. Chemical Trust, Allliance Trust, and Global Financial Incorporated, or his salesmen, immediately cease selling unregistered securities. These states are South Dakota, Kansas, Michigan, Georgia, Kentucky, Pennsylvania, Arkansas, and Oklahoma.

77. On November 23, 1999, CS-5 advised that **VIRGIL WOMACK** told CS-5 the reason that the Chemical Trust funds are now being placed into many different bank accounts is to not draw unwanted attention from the banks by having large sums of money in one account. **VIRGIL WOMACK** told the source that this is the reason the First National Bank of Onaga, Kansas, closed the Chemical Trust account.

A. A review of subpoenaed bank records has disclosed that **VIRGIL WOMACK** has recently opened and then closed several new accounts, i.e., Continental Trust, Seneca, South Carolina - opened August 20, 1999; closed November 30, 1999; Three Rivers Trust, Seneca, South Carolina - opened June 9, 1999, closed November 30,

40

1999; and, New Millennium Management, Longwood, Florida - opened July 9, 1999, closed October 14, 1999. **VIRGIL WOMACK** had signatory authority on all these accounts.

78.  CS-5 provided copies of two different letters which were prepared on March 19, 1999, to be sent to various insurance companies with the stamped names of George H. Williamson and Lewey L. Cato, III, respectively, which were prepared by **CHARLOTTE WOMACK**. The letters represented these two individuals as trustees of Chemical Trust.

79.  CS-5 has advised the FBI that **VIRGIL WOMACK** travels to Florida routinely to consult with **MORGENSTERN** concerning the business. **VIRGIL WOMACK** also travels to the Bahamas routinely and recently returned from a trip on November 16, 1999. CS-5 indicated **VIRGIL WOMACK** plans to relocate his business to the Bahamas in the near future.

A.  Records of the United States Customs Service, Department of Treasury reflect that **VIRGIL WOMACK** entered the United States from Nassau, the Bahamas, on August 3, 1999, November 12, 1999, and November 16, 1999.

B.  Records of the United States Customs Service, Department of Treasury reflect that **FRED MORGENSTERN** entered the United States from Nassau, the Bahamas, on October 15, 23, and 26 1998, November 3, 1998, December 2, 1998, January 3, 4, and 12, 1999, February 2, 1999, April 4, 1999, May 3, 1999, October 13, 22,

and 27, 1999, November 5 and 17, 1999, December 1, 8, 14, and 17, 1999.

C. Recent pen register information from MORGENSTERN's cellular telephone, (954) 557-3651, shows that on two occasions, the day after MORGENSTERN returned from the Bahamas, he (MORGENSTERN), utilized the target cellular telephone, (954) 537-3651 and placed calls to MAMONE's cellular telephone, (954) 614-1821. Specifically on December 8, 1999, Customs' records indicate that MORGENSTERN returned from the Bahamas; on December 9, 1999, MORGENSTERN's cellular was then used to place a call to MAMONE. On December 17, 1999, MORGENSTERN again returned from the Bahamas; on December 18, 1999, MORGENSTERN's cellular was again used to call MAMONE's cellular.

D. Based upon the investigation to date, the financial records reviewed, and the source information set forth above, your affiant believe that the travels by VIRGIL WOMACK and MORGENSTERN to and from the Bahamas and the follow-up telephone calls from MORGENSTERN's cellular to MAMONE's cellular as described above are in furtherance of the fraud being committed against numerous investors throughout the United States and the unlawful deposit of those funds in the Bahamas for the purpose of concealing the illegal profits from law enforcement detection and seizure.

PEN REGISTER ANALYSIS

42

79. As described, above, in the preceding section, **MAMONE** uses his cellular telephone, target telephone number (954) 614-1821, to discuss the extortionate loans and other criminal activity undertaken by the **RAFFA** organization. The pen register analysis set forth below demonstrates that **MAMONE**'s cellular telephone, target telephone number (954) 614-1821, is in regular contact with telephone number associated with other members of the criminal conspiracy set forth herein. Based on the intercepted conversations, and the pattern of contact revealed by the pen register, your Affiant concludes that these contacts are in furtherance of the criminal activities of the conspiracy.

80. On November 2, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 614-1821 for a period of sixty (60) days.

81. Pen register records for cellular telephone number (954) 614-1821 reflect that 55 calls were placed to telephone number (954) 969-8606 between November 8, 1999 and December 27, 1999, with the last call being placed on December 22, 1999. Pen register records for telephone number (954) 969-8606 reflect that 10 calls were place to telephone number (954) 614-1821 between November 17, 1999, and December 27, 1999, the last call being place on December

43

11, 1999. Telephone company records reflect that telephone number (954) 969-8606 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

82. Pen register records for cellular telephone number (954) 614-1821 reflect that 26 calls were placed to telephone number (954) 969-9691 between November 10, 1999 and December 27, 1999, with the last call being placed on December 22, 1999. Pen register records for telephone number (954) 969-9691 reflect that 17 calls were place to telephone number (954) 614-1821 between November 15, 1999, and December 27, 1999, the last call being place on December 11, 1999. Telephone company records reflect that telephone number (954) 969-9691 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

83. Pen register records for cellular telephone number (954) 614-1821 reflect that 21 calls were placed to telephone number (954) 969-8638 between November 6, 1999 and December 27, 1999, with the last call being placed on December 23, 1999. Pen register records for telephone number (954) 969-8638 reflect that 5 calls were place to telephone number (954) 614-1821 between November 20, 1999, and December 27, 1999, the last call being place on December 11, 1999. Telephone company records reflect that telephone number (954) 969-8638 is subscribed to by Gold Coast Check Cashing, 5701 Margate Boulevard, Margate, Florida, 33063.

84. Pen register records for cellular telephone number (954)

44

614-1821 reflect that 39 calls were placed to telephone number (954) 829-4142 between November 15, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 829-4142 is subscribed to Ralph Lento, 1550 N. W. 80th Avenue, Margate, Florida.

A.    As described above in the affidavit, Lento presently has an outstanding extortionate loan which Lento received from **MAMONE**.

85.    Pen register records for cellular telephone number (954) 614-1821 reflect that 43 calls were placed to telephone number (954) 802-4510 between November 10, 1999 and December 27, 1999, with the last call being placed on December 24, 1999. Telephone company records reflect that telephone number (954) 802-4510 is subscribed to Freddy Scarola 1550 N. W. 80th Avenue, Margate, Florida.

A.    Scarola presently has an outstanding extortionate loan which Scarola had received from **MAMONE**, as described above in the affidavit.

86.    Pen register records for cellular telephone number (954) 614-1821 reflect that 34 calls were placed to telephone number (954) 270-0061 between November 10, 1999 and December 27, 1999, with the last call being placed on December 25, 1999. Telephone company records reflect that telephone number (954) 270-0061 is subscribed to **MICHAEL BUCCINNA**, 6363 N. W. 39th Street, Coral

45

Springs, Florida.

87.  Pen register records for cellular telephone number (954) 614-1821 reflect that 9 calls were placed to telephone number (954) 557-3651 between November 9, 1999 and December 27, 1999, with the last call being placed on December 21, 1999.  Telephone company records reflect that telephone number (954) 557-3651 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

88.  Pen register records for cellular telephone number (954) 614-1821 reflect that 3 calls were placed to telephone number (954) 557-3648 between November 17, 1999 and December 27, 1999, with the last call being placed on December 6, 1999.  Telephone company records reflect that telephone number (954) 557-3648 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

89.  Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954) 557-6252 on November 8, 1999.   Telephone company records reflect that telephone number (954) 557-6252 is subscribed to Kinsman Merchant and Associates, 4901 N. W. 17th Way, Fort Lauderdale, Florida, a business associated with **MORGENSTERN**.

90.  Pen register records for cellular telephone number (954) 614-1821 reflect that 1 call was placed to telephone number (954)

46

681-3545 on November 24, 1999. Telephone company records reflect that telephone number (954) 557-6252 is subscribed to T.M.C., Commercial Center Inc, 4137 N. W. 135th Court, Opa-locka, Florida, **RAFFA's** business.

91. On December 22, 1999, Chief United States Magistrate Barry S. Seltzer, United States District Court, Southern District of Florida, signed an Order authorizing the FBI to initiate a pen register device, a trap and trace device, and Basic/Enhanced Caller Identification on target telephone number (954) 557-3651 and (954) 927-7113 for a period of sixty (60) days.

A.    Since the inception of this pen register, there was limited use of target cellular telephone (954) 557-3651 reflected on the pens. Your affiant believes that this may have been due to the end of the year holidays.

B.    However there have been some recent calls of significance reflected on the pen register since the holidays have ended. Specifically, from January 3 to 4, 2000, there have been a total of 6 calls placed from **MORGENSTERN's** cellular telephone, (954) 557-3651 to the Bahamas. Thus far your affiant has only been able to identify one of the numbers called, that is, (242) 326-3981, which is the American International Bank in the Bahamas; three of the calls on January 4, 2000 were placed to this telephone number.

C.    Pen register records for cellular telephone number (954) 557-3651 reflect 1 call was placed to telephone number (954)

47

557-3648, Kinsman Merchant & Associates, on January 4, 2000.

92. Pen registers have also been utilized in the South Carolina investigation. As it relates to this investigation, the following information has been received.

A. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-9021, the Chemical Trust office, reflects that from the period November 22, 1999 through December 27, 1999, 23 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on December 21, 1999. These calls were place on the following dates: November 22, 1999 (2 calls); November 23, 1999 (3 calls); November 29, 1999 (2 calls); December 2, 1999 ( 1 call); December 3, 1999 (4 calls); December 6, 1999 (3 calls); December 14, 1999 (1 call); December 15, 1999 (1 call); December 16, 1999 (1 call); December 20, 1999 (3 calls); and, December 21, 1999 (2 calls).

B. A review of court authorized dialed number recorder information by the FBI for telephone number (864) 882-5471, another number for the Chemical Trust office, reflects that from the period November 22, 1999 through January 2, 2000, 12 calls were made to (954) 557-3651, MORGENSTERN's cellular, with the last call being placed on January 2, 2000. These calls took place on the following dates: November 21, 1999 (2 calls); November 28, 1999 (1 call); December 2, 1999 (1 call); December 2, 1999(1 call); December 9, 1999 (1 call); December 15, 1999 (1 call); December 20, 1999 (2 calls); December 22, 1999 (1 call); December 31, 1999 (1 call);

48

January 1, 2000; and, January 2, 2000.

C.  A review of court ordered records concerning telephone number (770) 331-4079, a cellular telephone subscribed to by **VIRGIL WOMACK**, revealed that from October 5, 1999, through December 16, 1999, 5 calls were made to (954) 557-3651, **MORGENSTERN's** cellular, with the last call being placed on October 22, 1999.

D.  A review of court ordered records concerning telephone number (864) 882-5471, **WOMACK's** residence, revealed that from November 22, 1999, through December 21, 1999, 8 calls were made to (954) 557-3651, with the last call being placed on December 21, 1999.

### NORMAL INVESTIGATIVE TECHNIQUES

93.  Your affiant submits this application seeking authorization for the interception of wire communications because alternative investigative techniques to further this investigation (a) have been tried with only limited success and appear reasonably unlikely to reach greater success if continued, or, (b) are too dangerous to attempt and reasonably appear unlikely to succeed if tried, as more specifically set forth below.

94.  Your affiant is aware that **JOHN MAMONE** is a member of a criminal organization in South Florida headed by **STEVEN BRUNO RAFFA**. Your affiant is also aware from prior investigations that members of LCN Crime families, such as **RAFFA**, typically use others

to insulate themselves from the commission of certain criminal acts. The relationship between members and associates of the **RAFFA** organization, and, **FRED MORGENSTERN** and **PEGGY PRESTON** is consistent with this type of insulation. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

95. The FBI in 1994 attempted to introduce two undercover agents into the **RAFFA** criminal organization. These efforts proved to be unsuccessful, and **RAFFA** later became aware of this failed operation. At present, your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

96. The use of confidential sources has been very valuable in developing information pertaining to the named interceptees and their criminal activities. However CS-1, CS-2, and CS-3 are unwilling to testify against the targets of this investigation out of fear for their own safety and that of their families. Although CS-4 and CS-5 are willing to testify, they do not know all or sufficient detail concerning their co-conspirators' criminal conduct, which is needed to ensure a successful prosecution. This is, in part, because the targets of this investigation have been unwilling to discuss with them all of the details of their criminal activity. For example, none of them are in the inner circle of the Trafficante LCN family and thus are not privy to the many

50

activities and businesses in which they are not personally involved.

A.    CS-4 has met **MORGENSTERN** and although CS-4 was asked to assist **MAMONE** in cashing twenty-one checks in September, 1999 which **MAMONE** had identified as having come from **MORGENSTERN**, CS-4 was unable to gain any more information concerning those particular checks.  In addition, CS-4 has not been asked to assist **MAMONE** in the cashing of any other checks which **MAMONE** is apparently receiving from **MORGENSTERN**.  Nor has the investigation in South Florida or South Carolina been able to determine where or how **MORGENSTERN** is cashing the enormous amount of investors' checks that he (**MORGENSTERN**) is receiving on a daily basis from **VIRGIL WOMACK**.

B.    Although CS-5 is working in **VIRGIL WOMACK's** office in South Carolina, CS-5 is not privy to a vast amount of information concerning the investment fraud.  CS-5 is not aware of the substance of the conversations between **VIRGIL WOMACK** and the various salespeople throughout the country.  Further, because of **VIRGIL WOMACK's** recent concern over law enforcement scrutiny, **VIRGIL WOMACK** relocated his business records to a storage facility on December 21, 1999.  CS-5 also has no information concerning the manner in which **MORGENSTERN** handles the laundering of the investors' checks once they reach South Florida.  Therefore,

51

although the information from CS-5 provides some direct evidence against **VIRGIL WOMACK** and his immediate associates in South Carolina, CS-5's information is insufficient to identity the entire scope of this conspiracy and all the participants.

97. Maione and CS-3 are no longer available to work in an undercover capacity for the FBI and are not known to have any current association with the listed interceptees. As noted above, CS-4 still has direct and regular contact with **MAMONE**. At the FBI's direction, CS-4 has engaged in limited criminal transactions with **MAMONE**. These transactions have included the purchase of jewelry purportedly stolen from interstate commerce and negotiations concerning the laundering of proceeds from illegal gambling. However CS-4 is still not in a position to determine the full nature and extent of the criminal activity of all the named interceptees. None of the confidential sources possess complete access to all the listed interceptees. In addition, although there is one other source not specifically mentioned in this affidavit, who has had contact with some of the named interceptees, the source does not have access to all of the named interceptees nor is the source in a position to determine the full extent of the ongoing criminal activity. Specifically, in February and March of 1999, another source of the FBI cashed checks for **PRESTON** and another associate, and, during that time period met **MORGENSTERN**, who **PRESTON** indicated she worked for. However the investigation has not shown those checks to be related to the South Carolina fraud

being spearheaded by VIRGIL WOMACK nor has the investigation as yet been able to even determine the source of those checks or if it relates to any criminal activity. Since that time, this particular source has not been approached by MORGENSTERN, PRESTON, or their associates to handle the cashing of any further checks. Therefore this source is not in a position at this time to be able to gather any information which would further the goals of this investigation. Moreover, the source is not in contact with the other named interceptees or their associates and, consequently, is not in a position to reveal the full scope and nature of the criminal activity. In summary, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein. Moreover, many sources have expressed fear of being killed or seriously injured by members of the conspiracy if they were to testify. Indeed, as noted in this affidavit, the members of RAFFA organization use violence to further their criminal acts.

98. Conducting physical surveillance of participants is a commonly used investigative technique. Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. For example, surveillance has established that on September 29, 1999, RAFFA, MAMONE and Bellitto all met at Gold Coast Check Cashing, Oakland Park, Florida. However, this technique has failed to

53

reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to observe their activities. In addition, it is not possible to conduct physical surveillance within either Gold Coast Check Cashing Store now owned by MORGENSTERN because the facilities are small and the presence of anyone but customers would arouse suspicion. The location of MORGENSTERN's other companies, The Merrit Advisors Group, Inc., and Kinsman Merchant & Associates, is upstairs in a secured building; law enforcement has been unable to gain access to the building itself.

A.    Physical surveillance on September 29, 1999, identified STEVE RAFFA, Giuseppe Bellitto and JOHN MAMONE at Gold Coast Check Cashing, 3591 North Andrews Avenue in Oakland Park, Florida. Specifically, from approximately 12:00 p.m. to 12:11 p.m. all three persons were inside Gold Coast Check Cashing. At approximately 12:12 p.m., Bellitto and MAMONE stepped outside of the store and briefly talked with each other. MAMONE then drove away in his vehicle while Bellitto reentered the store. Thereafter, at approximately 12:17 p.m., Bellitto stepped outside

54

the store, talked on cellular telephone, and then re-entered the store. At approximately 12:19 p.m., **RAFFA** and Bellitto left the store together and drove away in a vehicle.

    B.    On November 29, 1999, physical surveillance was conducted at Gold Coast Check Cashing, Margate, which was able to confirm the meeting between CS-4 and **MAMONE** described above during which CS-4 provided **MAMONE** with the "stolen" jewelry. However because this meeting took place within the store, the agents could not observe the actual exchange nor was physical surveillance able to determine where **MAMONE** took the jewelry subsequent to the meeting in order to fence or sell the "stolen" property.

    C.    On January 5, 2000, physical surveillance was conducted at **MORGENSTERN's** business location at 4901 N.W. 17th Way, Fort Lauderdale. However no observation of **MORGENSTERN** could be made and law enforcement was unable to gain access to the buailding without arousing suspicion.

    99.    Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **STEVE BRUNO RAFFA**, **JOHN MAMONE**, **FRED MORGENSTERN**, **PEGGY PRESTON**, **MARK WEISS**, **ISRAEL "BUDDY" TORRES**, **MICHAEL BUCCINNA**, **VIRGIL WOMACK**, **CHARLOTTE WOMACK**, and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing

55

investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise. Your affiant has caused a covert video surveillance camera to be installed in the vicinity of the exterior of Gold Coast Check Cashing store in Oakland Park, Florida (formerly RAFFA's Cash 96). Initially the images from this camera were generally not sufficiently clear to identify the persons entering and leaving the location. However, this condition has improved somewhat with the addition of new equipment. Yet even with the improved clarity, the camera can merely identify the individuals at the location, but cannot provide sufficient evidence because the substance of any conversations between those individuals remains unknown. Moreover, because of the physical location of Gold Coast Check Cashing, extensive physical surveillance is difficult. Physical surveillance has proved useful in confirming the presence of persons at meetings, e.g., the meeting of RAFFA, Bellitto and MAMONE on September 29, 1999. However, as noted above, in and of itself this technique does not disclose the substance of the criminal conversations.

100. The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However,

many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

101. Consideration has been given to interviewing co-conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic

surveillance, in this case, is still necessary to accomplish successful prosecution because the recorded testimony of a cooperating witness will not reveal the full nature and extent of the criminal organization.

102. From prior investigations and reports of other Agents, your affiant knows that LCN Crime families and the Sicilian Mafia are extremely sophisticated in detecting and avoiding investigations by law enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

103. Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

104. Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace

58

techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

105. Although many bank records have been subpoenaed and reviewed in relationship to the investment fraud portion of this investigation, those records alone are insufficient to meet the goals of this investigation. The bank records have disclosed where some, but certainly not all, of the investors' funds are being funneled by WOMACK and his associates. WOMACK and his group are constantly opening and closing bank accounts, thereby making it difficult to continue to locate the accounts and acquire the bank records. Further, WOMACK and his associates have moved large amounts of the cash overseas to the Bahamas and England; those bank records are not readily available to U.S. law enforcement.

106. Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that the use of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Most such records are typically kept in a coded format, which is difficult to

decipher absent the interception of relevant communications.    On January 7, 2000, South Carolina arrested **VIRGIL WOMACK, CHARLOTTE WOMACK**, and two associates and are in the process of executing search warrants at the WOMACKs' residence and the offices of Chemical/Alliance Trust in South Carolina, U.S. Guarantee Corporation in Arizona, as well as Merrit Advisors Group, Inc, and Gold Coast Check Cashing/Prestige Accounting Services, Margate. These latter two locations are where the investors' checks have been forwarded to **MORGENSTERN** and his associates.    Even with the arrests of **VIRGIL** and **CHARLOTTE WOMACK**, these individuals would still have access to telephones and therefore remain named interceptees.  Further, even if some records and evidence is found at these locations, it is not expected that they will fully disclose the manner and means by which **MORGENSTERN** and his associates have been laundering the vast amounts of investors' checks that they have been receiving on a daily basis at least since October of 1999.    It is presently unknown where **MORGENSTERN** and his associates have been cashing these checks.    Further, since **MAMONE** has divested himself of the check cashing store, it is not reasonable to expect that any evidence will be found which would reveal the agreement that **MORGENSTERN** and **MAMONE** have concerning the cashing of at least some of these investors' checks nor the specifics of where **MAMONE** has, in fact, cashed those checks.    Nor can these search warrants be expected to uncover any evidence

concerning **RAFFA's** participation in this fraudulent investment scheme or his receipt, on behalf of the Trafficante LCN family, of his portion of the earnings of **MAMONE** for all of his (**MAMONE's**) criminal activities.

107. As set forth above, **FRED MORGENSTERN** was also the subject of a separate criminal investigation concerning suspected money laundering and fraud activities. Although initially, it appeared that this investigation was unrelated to the criminal activities of **RAFFA**, it now seems that the fraudulent activity and money laundering activity undertaken by **MORGENSTERN** is related to the **RAFFA** organization. As noted above, CS-4 stated that **MORGENSTERN** is a significant earner and **MAMONE** receives a portion of those earnings. In any event, the court authorized interceptions sought herein are necessary in order to disclose the full nature and extent of the on going criminal relationship between the **RAFFA** organization and **MORGENSTERN**.

A. Although **VIRGIL** and **CHARLOTTE WOMACK** and their associates in South Carolina, Georgia and Arizona may be arrested during the course of this electronic surveillance, it is not anticipated that **MORGENSTERN, MAMONE, RAFFA** or their associates in South Florida will be arrested. Therefore the criminal activity between **MORGENSTERN** and **MAMONE** is expected to continue in relationship to the investment fraud. Based upon the the pen register information described above, it is clear that **WOMACK** and

61

his offices are not the only locations or individuals that MORGENSTERN is in telephonic contact with concerning the investment fraud. In addition, it is reasonable to expect that the arrests will cause MORGENSTERN and MAMONE to be even more circumspect in their dealings and therefore electronic surveillance will be the only means of obtaining the evidence of their criminal activities. Further, because MAMONE, RAFFA, and their associates are involved in a number of unrelated criminal activities, the arrest of VIRGIL and CHARLOTTE WOMACK and their associates should have no effect on the continuation of those activities.

108. Finally, it should be observed that MAMONE and TORRES are also the subject of an ongoing investigation concerning his criminal activities with members and associates of the Bonanno LCN family. Indeed, the United States has recently obtained a court authorized electronic surveillance order in connection with that investigation (November 12, 1999, which was continued by Court Order on December 28, 1999). However the ongoing electronic surveillance of the cellular telephones being utilized by TORRES and Anthony Graziano do not appear to have developed any evidence concerning the criminal activity described in this affidavit. The pertinent interceptions of TORRES and MAMONE in that electronic surveillance thus far has disclosed that TORRES is currently involved in a bookmaking office, loansharking, and possibly telemarketing fraud. The interceptions thus far of MAMONE in that

62

electronic surveillance have been minimal.

109. Based on the foregoing, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK**, the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

### MINIMIZATION

110. All interceptions will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interceptions will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

111. It is anticipated that interceptions will occur involving Italian and possibly other foreign languages. In the event such

conversations occur, and an expert in that language is not reasonably available, it is requested that the Court authorize that the minimization may be conducted as soon as practicable after such interception.

### PERIOD OF INTERCEPTION

112. It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which **STEVE BRUNO RAFFA, JOHN MAMONE, FRED MORGENSTERN, PEGGY PRESTON, MARK WEISS, ISRAEL "BUDDY" TORRES, MICHAEL BUCCINNA, VIRGIL WOMACK, CHARLOTTE WOMACK,** and others as yet unknown, participate in the illegal conduct referenced herein, the identifies of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, or for a period not to exceed thirty (30)

days, such thirty-day period to begin on the day on which the investigative or law enforcement officer first begins to conduct an interception under the Order, or, ten (10) days after Order is entered, whichever is earlier.

_____
Patrick G. Brodsky, Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this ___ day of January, 2000.

_____
WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and correct copy of the document on file
Clarence Maddox. Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk

Date _____

# EXHIBIT D

```
FILE NUMBER:              245A-MM-88632

DATE OF TAPE:             OCTOBER 22, 1999

TIME OF TAPE:             2:28 P.M.

TAPE NUMBER:              83H8

TYPE OF TAPE:             BODY RECORDER

CASE AGENT:               SA NEIL MATHISON                    :

TRANSCRIBED/TYPED BY:     DANA BRAGER

REVIEWED BY:              SA TAMI KAYWORTH



PARTICIPANTS:             CW - COOPERATING WITNESS
                          HS - HARRIS STEINHART
                          UF - UNKNOWN FEMALE
                          UM - UNKNOWN MALE


ABBREVIATIONS:            (UI) - UNINTELLIGIBLE
                          (SC) - SIMULTANEOUS CONVERSATION
                          (PH) - PHONETIC
```

245A-MM-88632

CW:     This is Hard Eight, Hard Eight uh it's 2:28 on Friday, October, I think it's October 23rd, it is a Friday, that I know um enroute to meeting with Hughey Steinhart. This is Hard Eight meeting at Lester's Diner in Coconut Creek, Hard Eight.

        (LONG PAUSE)

CW:     Yeh, can you hear? Okay. Alright, I'll let you, you cut in front of me.

        (TURN SIGNAL, TRAFFIC NOISES)

        (PHONE RINGING)

CW:     Yeah. Yeah, okay you know what, um maybe we could meet som...maybe we could meet like over over here right on the right here um afterwards so then I could ya know go to the other place. Okay. Bye.

        (CARD DOOR OPENING AND CLOSING)

        (BACKGROUND CONVERSATIONS)

CW:     Hi, there's gonna be two of us. Non smoking. Okay, I'll be right out. I have to go the men's room, thank you.

        (DOOR SHUT, URINATING, TOILET FLUSHING, DOOR SHUT)

UF:     Hello, hello, how are you?

CW:     Good how you doing?

UF:     Good, can I get you a beverage?

CW:     Water with lemon, please.

UF:     You waiting for somebody?

CW:     Yeah, he should be here any minute.

UF:     Okay.

        (BACKGROUND CONVERSATIONS)

2

245A-MM-88632

CW:     Hello Hughey, are you nearby? From what?
        Where are you? No. The one on Coconut Creek
        Parkway, oh, okay, alright, bye.

HS:     I had a major fight with my mother.

CW:     Oh God.

HS:     She called me a crook.

CW:     She called you a crook?

HS:     She rehashes everyday, everyday, every wrong
        thing that I ever did in my life, how I blew
        all the money, which I admitted to her and
        then I said it was a sickness Ma, and then
        she starts on my wife, you wife is a
        golddigger, you give you wife all the money.

UF:     Hello?

CW:     Hey.

UF:     You want something to drink?

HS:     I would like a cup of coffee and a a, do you
        have a corn muffin?

UF:     Yeah.

HS:     Toasted with some butter and jelly.

UF:     Sure.

CW:     I'll have a a fruit salad.

UF:     Okay.

CW:     Thanks.

HS:     Rehashes every my wife, every single thing
        that my, your wife has all you money, you're
        a sucker, I says what ya like to call up and
        aggravate every day, yes she says, I said
        good.

CW:     Yeah, you have to do that yeah, it's not
        being disrespectful.

3

245A-MM-88632

HS:    I don't wanna talk to you anymore, good I said, don't talk to me. I'm goonna get a lawyer, get a lawyer.

CW:    Unbelievable, isn't it?

HS:    there's nothing to get, I pissed it all away. It's gone. When are you gonna pay me back? Ma, I'm not gonna pay you back, I'm never paying you back, what'd you do, work for that money, I'm never paying you back. I saved it, you saved it for me, and I blew it, whose fault is that, it's mine.

CW:    Yeah.

HS:    So who's suffering today for it. Right? Would I have been in good shape if I didn't blow the half a million dollars?

CW:    Of course.

HS:    So who's suffering, you don't go out of the house.

CW:    Yeah.

HS:    Then when I tell her she don't belong there by herself, don't tell me I'm, she don't like it, I says what are you, the stock dividends come directly and to into the account, I don't see em. She shits that I told her that I got the checks, I didn't get the check, I says the check goes into the account. I says, how do you, don't you remember me telling you this. She says you never told me that, I says well you don't even know what day it is, you told me the other day it was Tuesday when it was Sunday, how could you remember, how could you tell me you remember that.

CW:    Eh, you gotta let her...

HS:    I can't. You'll never get the best of an argument with me, ever...

CW:    Yeah.

HS:    I will never give into you, will never agree

4

245A-MM-88632

with, I don't give a shit what you say, forever, it'll never happen and I won't. That's why nobody talks to her.

CW:     Couple of things, um I have uh, you know I'm sorting out some IRS problems I got from the U.S. Attorney, not regarding my case, but there was an old student loan that they said I was in default of which I was on a scholarship but I think at one point my parents might have gotten a student loan for my housing and stuff.

HS:     That's a long time ago.

CW:     I just got it, ya know, so make a long story short, my accountant tells me I've got to show legal income legal business my attorney had told me that a long time ago, gotta do that. What I enjoy doing, I mean, I could get a job, I could go get a job at Covenant House if I wanted, I love the touting, I like the handicapping, I love the touting. I want to do it right.

HS:     Lot of money in it.

CW:     It would be a lot of money, I could do it, I could run it right as a business I could show income, ya know there's a lot ways you could work this.

HS:     Yeah, yeah (UI) do business, I know.

CW:     Ya know, but there's ya know like a few things I know how har..,it it I know how harad it is to get customers and to hold customers. But I'll be honest with you, the information that you get is tremondous...

HS:     Whay ya mean?

CW:     You could at least have a cr, you get inside information, basketball.

HS:     Oh, I don't know, that guys retired but yeah, okay.

CW:     Who's retired?

5

245A-MM-88632

HS:    He, he don't coach any, he don't coach anymore but his friend that stuff I used to get from him.

CW:    Yeah, who doesn't coach anymore? The guy for Marino?

HS:    He's gone, that's why that game was so good that year, that game that day cause he was fired.

CW:    Oh I know, he moved to Philadelphia (UI) the Texas game.

HS:    Yeah.

CW:    I understand and I...

HS:    I get some info from my friend in Arkansas, ya know, I still get it.

CW:    Yeah, but wht I'm saying is that with the guy, ya know okay getting that kind of information and we don't have to present it as strongly as that but get that information could make us, give us some strength.

HS:    Oh, yeah.

CW:    I mean, ya know, that game I, I kick myself for not doing what I was supposed to do.

HS:    Yeah, that's the one comes along very little and ya know you don't...

CW:    Well that guys retired, he's not gonna coach anywhere else? You're kidding. but he'll still have information.

HS:    But Tommy don't even talk to em because the guy took his account away from Tommy, they had a fight but ah...

CW:    Who's Tommy from Arkansas?

HS:    Yeah, I don't need them to (UI) Tommy'll get, he'lll get the information, he'll still get, he'll still get some information.

6

245A-MM-88632

CW:          What about, what about the the coach for Purdue, didn't you know him?

HS:          Tommy know him. Yeah he gets information, he still knows guys ya know, I know Pat Bork (PH) but I could call em myself.

CW:          Who's Pat Bork?

HS:          He was the coach.

CW:          Of ah...

HS:          Reno.

CW:          Oh, oh, Reno because we could if we're gonna build up a business and we could get some half way decent ya know, information and the way you look at games, I gotta make is successful because I've got to start to show a legitimate income or I'm gonna be in, who knows what ya know they're looking for every angle, all of a sudden, ya know for them to come, the FBI to come and then all of sudden I get from the U.S. Attorney, I get from the IRS, ya know what I'm saying?

HS:          Yeah, but...

CW:          You know how they work...

HS:          You don't live over your head.

CW:          No, but I have to show, how do I show how do I pay my bills. How could I show I pay my bills?

HS:          You're a professional gambler, you pay you taxes, they (UI) I asked them how does he show his income, this is how he shows it. He pays tax on all his gambling, what he used to do was he used to deposit the money he made as a bookmaker and pay his taxes on it, miscellaneous income. He never ever took a deduction, if he showed $832,000 income, miscellaneous income, he paid his thirty percent, twenty percent tax $168,000, he paid the full twenty percent tax to the government and never took a deduction, therefore, the

7

245A-MM-88632

government don't give a shit, they got all
their taxes. Now if he showed $832,000 and
his taxes were the hundred and sixty eight
and he took $278,000 in deductions, they
would have a fine tooth comb out, they would
wanna know every single solitary thing that
he did. That's what he told me, that his guy
told him, he's one of the best guys with that
miscellaneous income. You can show it, you
pay your taxes, they'll never question you.
It's when you start taking $200, $400, $800
deduction, they wanna know what's this for.

CW:     Well ya know football's real tough,
        basketball's gonna be starting soon. Do you
        think we could get, you think we could do
        alright with basketball?

HS:     Yeah.

CW:     Otherwise I gotta try some other business,
        but I-I enjoy doing this. but I thought this
        coach was still ya know, if he's a gambler he
        would still get some live games or the coach
        for Purdue, what's the coach's name?

HS:     Keating.

CW:     Who?

HS:     Jim Keating.

CW:     Oh.

HS:     The coach of Purdue?

CW:     Yeah, we get some live games.

HS:     I don't know about that, but its a good
        business (CW's name) but you gotta have
        leads, I think the best the thing is the way
        Muller wants to go, (UI) e-mail it, we'll all
        take a piece of it and I think it'll be
        astronomical. Is your computer fixed. We do
        weekly service, you don't talk to anybody,
        everythings on line, you get paid on line,
        you get paid by credit card. I think that's I
        think that's where its at.

8

245A-MM-88632

CW:            You gotta be good.

HS:            You gotta be able to get out to the people,
               that's the whole idea. When I was doing the
               phone service when I started was I had a lot
               of customers. If I was gonna do it today, I
               wouldn't have a lot of customers, I would
               want thirty customers. The guys I had I
               cultivated over a period of years and I used
               to work on a percentage and I kept them win
               or lose. When I lost I was in the minus and
               when I won they paid me. I had a great
               clientele, guys stuck it out, these guys
               today they blow everyone out.

CW:            But, but we, ya needed a little inside
               information you need the edge. No?
               Information you had with basketball's
               tremendous last year.

HS:            Oh yeah, yeah well basketball's...

CW:            Well Huey, footballs' half over.

HS:            It's much information is much more valuable
               in basketball.

CW:            Of course it is. You, you have the inside
               about the guys being hurt (UI) I'm talking
               about that do you still have access to that
               kind of information plus (UI), do you think.

HS:            Occasionally.

CW:            Okay. Cause we're gonna just shott from the
               hip.

HS:            Listen, this guy was a good gambler, this
               coach.

CW:            Who?

HS:            Reno.

CW:            Oh the coach in Reno, yeah. So he's gotta
               still be gamblin after he retired.

HS:            Yeah, but Tommy don't talk to him. I could
               talk to him, I got his number. He would talk

9

245A-MM-88632

|       |                                                    |
|-------|----------------------------------------------------|
|       | to me.                                             |
| CW:   | And what (UI).                                     |
| HS:   | He knows all the coaches out in that conference.   |
| CW:   | Now we're gonna start handicapping service or if he gives us information to get some money, I mean, is that,, is that... |
| HS:   | Yeah, yeah we could do that with him. You wanna get involved now that you're not coaching. You'll have a service, coaches come in, ya know we'll cut you in for a piece of the action. Get us some info. |
| CW:   | What about the coach from ValPariso? (UI)          |
| HS:   | Coach of Val Pariso?                                |
| CW:   | Yeah. Oh he used to just know about that game?      |
| UF:   | Guys, I'm taking off, Jackie's gonna look after you if there's anything you need. Okay. You don't have to pay you check now, don't rush. |
| CW:   | Yeah, we'll give it to you now.                     |
| UF:   | Sure?                                              |
| CW:   | Yeah.                                             |
| UF:   | Okay.                                             |
| CW:   | Here you go.                                       |
| UF:   | Be right back.                                    |
| HS:   | Yeah, we could do that. He may wanna get involved with doing something like that. |
| CW:   | All we're looking for just get a percentage.       |
| HS:   | Or get em down on the game.                         |
| CW:   | Yeah.                                             |

10

245A-MM-88632

| | |
|---|---|
| HS: | Get some info on these college games, we'll get you down a nickel or a dime. |
| CW: | All you need is one Northern Texas game a year. Oh my God, I can't believe it. |
| HS: | That was a once in a lifetime that game. I never had a game from him any of em, at anytime. (UI). I had opinions but that was the real information man, ya know. Cause he always had to watch his ass because he was coaching. |
| UF: | There you go. Seven, eight, nine that makes ten. |
| CW: | Keep two of that. |
| UF: | Thank you very much. |
| CW: | Okay. |
| UF: | Have a great day. |
| CW: | Cause I got a... |
| UF: | Want any coffee or anything? |
| CW: | No thanks. Lot ya know, gotta show a legal income. I have the store ya know with Frank and I have a legal income from the store. |
| HS: | But there's no store, right? |
| CW: | There's a store but we need to come up with the money. Especially with these other things happening about a month, you gotta show something. |
| HS: | Well, I, ya know, I'll do a service with ya, I mean, I'm gonna I-I ah thing we can make money, I mean even if you make a dime a week, you show a dime a week, what's wrong with that. |
| CW: | anything, I just gotta show legal. I just gotta show... |
| HS: | But as far as how you live, you could show |

11

245A-MM-88632

miscellaneous income.

CW:         Oh yeah, yeah. I know that. but I gotta
            establish something legal with taxes.

HS:         I was at my accountants last week (UI)
            sometimes I have guys they owe money. I have
            a good customer in Naples, he deposits in my
            account, eleven hundred, thirteen hundred and
            I put it down as income.

CW:         Yeah.

HS:         I pay my taxes on it. I put as beeper income.
            I could say the guy owed me four thousand, I
            gave him winnings, you understand?

CW:         Yeah.

HS:         I pay my taxes.

            (PHONE RINGING)

CW:         Yeah. Yeah, I know. Hello. Yeah. Good, how
            you doing. Okay. Um I'm just with Hughey. No
            I'm just saying I'm meeting with Hughey, then
            I gotta go meet with somebody else, what's
            up? Okay. Yeah, okay. Okay, yeah, okay,
            alright, bye. Um yeah I just I get all shook
            up when this guy puts me on the alert like ya
            know.

HS:         Ya gotta, ya gotta get this going. Well, ya
            haven't really had a set tax, taxable income
            for as long as I know ya. The worst
            business...

CW:         Since I left Covenant House.

HS:         Yeah, how did you live all these years.

CW:         SOS, I know that's why I've got IRS problems
            too.

HS:         Why?

CW:         Cause I didn't file taxes and I used to file
            all the time.

12

245A-MM-88632

| | |
|---|---|
| HS: | Ah. |
| CW: | So I-I finally have starated to file but now I gotta be consistent and do things right. |
| HS: | Right, right. |
| CW: | I gotta go catch little Frankie. |
| HS: | Little Frank? |
| CW: | Frankie. |
| HS: | Oh, where's he? |
| CW: | I'm going to meet him on off 95. |
| HS: | I'll do something with you, ya know ya wanna gear it up ah in the next couple of weeks ah this computer thing should be done, I'd like to incorporate computer picks on it. |
| CW: | Yeah. |
| HS: | As well as ya know our opinion. |
| CW: | Yeah. |
| HS: | And the weekly selections and then have a nightly thing for basketball computer totals, everything. |
| CW: | A lot of those, lot of those guys they have like you pick then they, then they have computer picks, they pay less but then these are strictly computer picks instead of opinions, yeah... |
| HS: | Yeah, absolutely, we should do all of that. I got that program, by the way, its funny, it came to me you bet. |
| CW: | Yeah, Youbet.com. |
| HS: | I have the, the disk for you there, I'm loading the thing. |
| CW: | Good. Yeah. |

13

245A-MM-88632

HS:          You can watch every race track live. Set up an account, if wanna bet, ya bet, if you don't you don't.

CW:          Freddie told me you had eight beepers that he could sell for three fifty but you only want two fifty.

HS:          Yeah, I told em. He has eight?

CW:          No, he said you have eight.

HS:          I said I have beepers, I didn't give him a number, I said I have a bunch of beepers. He's gotta give me two hundred, he's gonna leave it over there, at DCI. Monday, called me today.

CW:          Oh, I was with em when he called.

HS:          Oh, I should leave it over there (UI).

CW:          Alright, so then if I know that your feelings that we can honestly make a living and show income, start something.

HS:          Yeah, we can start, I mean ya know, see I have access cause I know all these guys, the names but I don't wanna get on the phone and cold call people.

CW:          Well, if we can get this guy, the coach from Reno or the ex-coach whatever, that would, get a little, you know, get a little inside information, a little edge it could help us in a couple of ways.

HS:          Basketball, ya know, set up a corporation and the uh, I think Moe is right, computer...

CW:          That is the best, cleanest out of the way.

HS:          You don't have to talk to anybody and then ya know I was gonna have my web page if they ever do it for, ya know, high rollers, send em video, they could see the Wall Street Journal. See what I'm doing is ya know even though you know I do other things a lot under the table things, I'm still accountable. The

14

245A-MM-88632

FBI was in my office, cause I started this whole industry they didn't know what the hell was going on. so for me to be doing it today, it's the same kind of thing and this is what I do, I mean and know I'm in the beeper business, I'm selling beepers to people and so they're gamblers, so when I go see the guy, it's a little bit different, ya know? So I'd like to uh...

CW:     Alright, cause I gotta, gotta uh, I didn't panic her ya know buy my they said it's kind of pressing ya know I gotta get something done by the end of the year. It's October.

HS:     So, open up a corporation and do the sports. Sports handicapping, ya know put it in and uh I don't know how you handle what you earned in the past, you ah...

CW:     alright, I gotta go meet Frankie...

HS:     What's happening with what's his name, he ain't back yet is he?

CW:     No, he's not back yet. He'll be back tonight. It could be fine.

HS:     (UI)

CW:     We paid the, we paid the waitress already.

UM:     You didn't.

CW:     Yeah, we did. (laughing) Yeah, that's what I said. I'll know more later.

        (OUTSIDE/TRAFFIC NOISES)

CW:     Alright, I'll give you a call late. But if this guy still gambles, the coach from...

HS:     (UI) basketball, now there's no pressure on em.

CW:     (Stuttering)

HS:     He's not coaching anymore, so he doesn't have anybody looking over his shoulder.

15

245A-MM-88632

CW:              And the one from Purdue.

HS:              Yeah, he knows all those guys, I could get in
                 touch with Bork (PH), I'll get in touch with
                 him maybe next week, I'll tell em we're
                 looking to start a service for basketball,
                 you wanna get involved in it, then we'll take
                 care of you.

CW:              No money out of pocket.

HS:              You know, cause you know all these coaches
                 and these teams, ya know, I think he may go
                 for that.

CW:              Well, I gotta do something I'm (UI) I'm gonna
                 see Frankie now,..We'll do that and...

HS:              Are you goonna see my other guy tomorrow for
                 me?

CW:              Yeah, Joey I'm supposed to see him tomorrow
                 midday.

HS:              What do I do with my mother (UI) everytime I
                 call I get annoyed.

CW:              Well, Hughey, you're doing the right thing,
                 there's nothing you can do. Don't feel
                 guilty, yeah...

                 (CAR DOOR CLOSING)

CW:              Okay, this is Hard Eight, meeting concluded
                 with Hughey Steinhart it was at Lester's
                 Diner, you heard the voice of the waitress
                 and then the manager at the end. This is Hard
                 Eight, Hard Eight, Hard Eight.

                 (END OF TAPE)

16

# EXHIBIT E

November 6, 2000


The Honorable Patrica Seitz:


This letter is to ask for your consideration regarding recent events surrounding the situation of John Mamone. Basically, I am writing on behalf of the children involved in the Coral Springs Flag Football League. John Mamone has been one of the central individuals in the management of league for many years. He has devoted hundreds of hours of his time to make this league work.

I have been John's assistant coach this year for our team; the Rams. The boys have been working very hard for almost five months and now the end of the season is near. Under John's guidance, our team ended the regular season as Division winners, and has the best record in the league. I, quite honestly know very little about sports and my sponsorship of the team and participation as assistant coach is done for my son and the other boys and girls on the team. John's dedication to the league and the team is for the same reason; the children. We need John to get us through the last two weeks of the season. We have the best team, but without the Coach's leadership and knowledge, we most certainly will not achieve the results for which these kids have worked so hard.

I do not wish to minimize the importance of the legal situation involved, but these children and their parents should not be punished for a scenario they could do nothing about. I can only respectfully implore your Honor to think about the innocent young boys and girls involved, their months of hard work at practice and in the games, and the unfair consequences of not having John Mamone as coach for these last few games.

John loves these kids and they love him. Coaching these children is something John does from his heart; you can see it in his face, his smile, and his full dedication to the team. You could see it last night through the tears as he brought everyone together to explain the situation and apologize for the circumstances.

Again, I respectfully ask you to consider allowing John to fulfill his coaching responsibilities. Please do it for the children, they do not deserve to suffer these consequences.

Sincerely,

Michael Noshay
Assistant Coach


cc: David Rothman, Esq.

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

_(signatures)_

## CORAL  SPRINGS  FLAG  FOOTBALL TEAM
## THE RAMS

Parents signature:

*[Numerous handwritten signatures, illegible]*

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

*[handwritten signatures]*

# CORAL SPRINGS FLAG FOOTBALL TEAM
## THE RAMS

Parents signature:

*(handwritten signatures, illegible)*

November 6, 2000

Johnny Diaz
11811 Royal Palm Boulevard
Coral Springs, FL  33065
(954) 340-2071

To Whom It May Concern:

I am writing this letter on the behalf of John Mamone.  In the three years that I have known John, I have found him to be a man of compassion and integrity.  He has held various offices in the different sporting leagues of Coral Springs, offering stability, experience and guidance to the children.  Having been involved in sports year around either as a coach or player parent I have witnessed this first hand.  I not only trust John with my family, my son being one of his players, but feel it is important for him to be at the games continuing his work with the team.

I hope you will consider my request and allow John Mamone to finish what he has started in coaching my son's football team.

Sincerely,

Johnny Diaz

11/5/00

To Whom It May Concern:

Our son has been coached by John Mamone this past season with flag football. His coaching techniques and the way he speaks and deals with the children have been wonderful. To have John participate during our "finest hour" would truly be in the best interest of the children. We ask you to please see your way clearly in this matter and let him attend and coach the boys through the Super Bowl. Thank you for your cooperation.

Respectfully,

Mike & Debbi C

11/6/00

To Whom it May Concern:

Our son is on the Coral Springs Flag Football Junior Rams Team, which has been coached this year by John Mamone. He has lead the team through a successful season, and the team is now in the end of the season playoffs. Coach Mamone's absence has been felt by not only the assistant coaches, but most especially by the young men on the team. These boys have worked and played very hard this season and deserve to end the season victoriously. Having their coach at the playoffs/"Superbowl" would certainly add to their confidence, and offer the consistency of leadership they have come to depend on. We thank you for your consideration in this matter.

The Heshmaty Family

To Whom It May Concern,

I am one of the parents of a child who is coached by John Mamone. My son Vincent is on Johns football team. I was asked to write a letter to help in any way for John to be able to coach the team for the playoff game. The team consists of 10 & 11 yr old boys who have worked hard all year long along with their dedicated coach & parents to come this far. I along with the team know John Mamone as a warm, dedicated coach who has taught these boys team work, loyalty & dedication. Please see that these boys can be reunited with their coach for the rest —

To Whom it may Concern:

Our son Bryan Antl is playing Flag Football for the first time. Bryan absolutely loves playing football better than anyother sport. Thanks to the teaching and careing of John Mamone. He is one of the only coaches that care enough to talk and teach the boys. Because of John's compassion for the boys they have the best team in the league. The boys need John's coaching skills to help the boys go to the superbowl. Please do not hold John away from his team, he worked so hard with for the last 6 months.

Thank You!

Sincerely,

Bryan & Rene Antl

November 6, 2000

To Whom It May Concern:

Please allow John Mamone the opportunity to finish coaching his Junior
Rams flag football team.  John has been an excellent coach and has treated
each child on the team with fairness and kindness.

Our team may be headed for the Super Bowl, but without John as our coach,
our team is lacking the leadership that only he can provide.  John has two of
his sons on the team and I know that they really miss their father at the
games.

As one of the team moms for our team, I have had a lot of contact with John
and he has always been a perfect gentleman.  He really cares about each
player and makes sure that we are aware of everything that concerns our
team.

He is a wonderful coach and it would mean a lot to his children and his
players to have him back as our coach.


Sincerely,

Patricia Weiss

**Scott McCoy**
10565 NW 3 place
Coral Springs, Florida 33071

November 6, 2000

To Whom It May Concern,

My son Ryan is a player on the Coral Springs Flag Football team that is coached by John Mamone. It is Ryan's first season playing football and I can't stress enough how grateful I am that Ryan was fortunate enough to get Mr. Mamone as his coach. Coach Mamones patience and dedication with not only my son but with all the kids has made this a very enjoyable experience. Even in the midst of his unfortunate troubles he has taken the time to keep in contact with the parents and the players on his team,which shows me how important the kids are to him.

I know that Ryan was very upset to hear that his coach may not be there to lead them into the playoffs and hopefully the Super Bowl. I urge you to consider letting Coach Mamone participate in finishing what has been a very rewarding and successful season for our kids, the only one who will suffer from his absence at this time is my son and the other players on the team who have worked so hard all season to make it to the Super Bowl.

Sincerely,

Scott McCoy

November 6, 2000

Your Judgeship,

I would like to introduce myself as a parent of two children, one of whom, my son, is a player on a flag football team, and the other child, my daughter, is a cheerleader for the same team. The season has been long and successful. The team ended the regular season with a record of 14 wins, 1 loss, and 1 tie, which was outstanding! The team is now heading into the playoffs with great confidence and exuberance. It is sadly missing, however, one very important component. It is currently without its Head Coach. That person, as I am sure you have already figured out, is John Mamone. It has been his guidance and leadership that has taken this team to the top of the standings. Having been on the sidelines for all of the practices and all of the games this year I can personally attest to John's dedication and desire to prepare the team for each game and lead it to the best record in the league. Now, you are obviously wondering if there is anyone else who could take his place, an assistant coach, or a parent. Unfortunately, the answer is No. As you might suspect, John took control of his team, as a head coach should, and totally and completely controlled and scripted every facet of every practice and every game. At the beginning of the season he quickly learned all of the kids names, then assigned them to positions. He ran them through drills and plays at practice, and he would call all of the defensive and offensive plays during the games. I would like to reiterate that there is no one to replace John and I am saddened by the fact that this season, which has been so emotionally satisfying, to this point, may quickly end in the playoffs. As a parent of two children on this team, I do not want to see their season end in an unhappy and disspirited way. This letter is like no other I have ever written because it involves a request to a Judge to allow a man, John Mamone, the opportunity to lead his team, a team of 10 and 11 year-old players and accompanying cheerleaders on the field. My request is that he be allowed to participate in one, one hour practice at Mullins Park in Coral Springs, and also be allowed to coach his team in the playoffs, which would probably be 3 or 4 games, each taking approximately one hour.

Your consideration of this request would be greatly appreciated, not only by myself, but also by the 14 players, 8 cheerleaders, and all of the other parents of this team. Thank you.

Sincerely,

*Charles G. Gulette*

Charles G. Gulette
Parent of Adam and Alissa
2151 N.W. 99 Way
Coral Springs, FL 33071

November 6, 2000

To Whom It May Concern:
I am writing this letter to ask for your help. Coach Mammon has been a true inspiration and incredible role model to the team and to each of the kids. He is the reason that our team has gone this far with such strong support. Without his supervision, it may be impossible for this team to make to the Superbowl. Please understand, as a parent, how important it is to have your child succeed with the proper guidance. Coach Mammon is the guidance with his strong passion for the children's development, as well as his great personality. He has earned every child's respect for others, as well commitment to teamwork. It is so important to have Coach Mammon back again.

Thank you for your understanding.

Sincerely,

Isaac Florens
6601 Lyons Road
Coconut Creek FL 33073

Joseph Attenasio
10419 N.W 48 Manor
Coral Springs, Fl. 33076
(954) 753-6513

October 30, 2000

To whom it may concern,

Due to the recent operation on my throat, I unfortunately cannot attend. I have known Mr.John Mamone for the past six years. We have gone to many social occasions together including affairs with our children. I have even coached flag football with John several years ago. John is so devoted to kids, he even became president of the Coral Springs Flag Football League. In my opinion, John Mamone is the proverbial real "family man".

I do not think that John Mamone is a flight risk, I truly believe John will fight against the allegations made against him. Should there be any questions regarding this letter please do not hesitate to contact me.

Sincerely,

Joseph Attenasio

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6309-CR-SEITZ/GARBER (S)

UNITED STATES OF AMERICA,
                    Plaintiff,

v.

JOHN MAMONE,
                    Defendant.

RECEIVED

MAR 2 1 2001

THORNTON & ROTHMAN, P.A.

_____

GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT MAMONE'S MOTION FOR
AN ORDER ELIMINATING HOUSE ARREST AND
GOVERNMENT'S MOTION FOR REVOCATION OF
BOND WITH INCORPORATED MEMORANDUM OF LAW

The United States of America, through its undersigned Assistant United States Attorneys, files this response to the request of defendant Mamone to eliminate house arrest as a condition of his bond.  For the reasons set forth below as well as those argued at the bond hearing, the government submits that defendant's motion should be denied.  Further, the government submits that because of the defendant's recent activities, the defendant's bond should be revoked at this time.

### PROCEDURAL BACKGROUND

1.   On October 24, 2000, a federal grand jury sitting in Fort Lauderdale returned a 70 count indictment charging the defendant and eighteen[1] other persons with participating in an enterprise that was

_____

[1]     Since that time, codefendant Raffa committed suicide.

associated with the Trafficante Organized Crime Family. Mamone, a leader in the organization, was charged in all 70 counts with RICO Conspiracy (Count 1), Operating an Illegal Gambling Business (Count 2), Obstruction of Justice (Count 3), Conspiracy to Make and Collect Extortionate Extensions of Credit (Counts 4 and 5), Conspiracy to Launder Money (Counts 6, 7 and 17), Substantive Money Laundering (Counts 8-13, 18-45), and Engaging in Monetary Transactions (Counts 14-16, 46-70). The Indictment also contains a forfeiture count specifying over 34 million as proceeds subject to forfeiture, as well as a number of businesses including Gateway Transportation Services, Inc.

2.   On October 31, 2000, a pretrial detention hearing was held before Magistrate-Judge Stephen T. Brown. Attached is a copy of the transcript of that proceeding.[2] The government had requested pretrial detention both on the basis of danger to the community and flight risk. At the conclusion of the hearing, Magistrate-Brown found that the defendant was not a flight risk, but did agree that he constituted a danger to the community (10/21/00 at 32). The defendant had argued for and agreed to have imposed a 24 hour house arrest as an alternative to pretrial detention (10/31/00 at 27). In light of the Court's ruling and the stipulation by the defendant, the Court set bond in the amount of $500,000 corporate surety and

---

[2]   This transcript, consisting of 43 pages, is a more complete version than the 35 page transcript included with defendant's motion.

$500,000 personal surety, with a Nebbia hearing. Among the many special conditions of bond, the Court imposed 24 hour house arrest with electronic monitoring, as had been stipulated to by the defendant.

3. After the Nebbia had been satisfied, the defendant was released on house arrest starting on November 12, 2000.

4. On January 30, 2001, a 93 count superseding indictment was returned. The original charges as to Mamone remained the same except the Conspiracy to Make Extortionate Extensions of Credit (Count 4) was eliminated.[3] In addition, the defendant was now charged with 24 more substantive counts of money laundering and the forfeiture amount was increased to approximately 35 million.

5. On February 6, 2001, the defendant was arraigned on the superseding indictment and the same bond with its special conditions was continued by agreement of the parties.

**ARGUMENT**

The defendant now contends that the condition of house arrest should be removed for four reasons;

1) the defendant has complied with the condition of house arrest for almost four months;

---

[3] However, the making of extortionate extensions of credit remained as a RICO Conspiracy predicate.

3

2)    the proffer made by the government at the detention hearing is unsupported by any evidence other than mere allegations by informants;

3)    the defendant needs to solicit business from customers and then arrange transportation for them; and,

4)    the length of time until the trial date.

The defendant also argues that initially pretrial services did not object to the removal of the house arrest condition, but through the intimidation of the government, pretrial services has now changed their position. This last argument is ludicrous. After the government learned of the position taken by Mr. Nuby of pretrial services through the defendant's motion, the government called Mr. Nuby and asked if he was aware of any of the facts underlying the indictment or of the defendant's previous supervision; Mr. Nuby was not. The government invited Mr. Nuby to meet and discuss those matters. After that meeting, Mr. Nuby told the government that he would discuss pretrial services position with his supervisor. Subsequently the government and defense counsel were informed by Mr. Nuby that pretrial services had changed their position and now objected to the release of the defendant from house arrest. There was absolutely no intimidation of Mr. Nuby by the government.[4]

---

[4]    This is born out by the memorandum prepared by Mr. Nuby and dated March 19, 2001, concerning this situation.

4

Rather, he was merely provided with facts from which pretrial services could make an informed decision on this matter.

The government believes that not only should the house arrest not be removed, but if anything, the defendant's bond should be revoked at this time.    Nevertheless, the government will still address those issues raised by defendant's motion in his argument for release from house arrest.

**A.    Compliance with the Conditions of Bond**

The defendant's motion indicates that he has fully complied with the conditions of bond.    That statement is incorrect.

The forfeiture count of the indictment, as it relates to the defendant and this motion, provides for the forfeiture of approximately $35 million and all the defendants' interest in Gateway Transportation Services, Inc.    The forfeiture count also advises the defendant that the government will seek forfeiture of substitute assets pursuant to 18 U.S.C. 982 and 1963(m).

The defendant has committed a federal felony while on bond and under house arrest.[5]    In early December of 2000, the defendant was contacted by an executive of Keystone, a transportation company located in New Jersey, concerning the possibility of the defendant

---

[5]    The government is providing this information in the form of a proffer and is more than willing to provide additional details should the Court desire or to address this matter at any hearing the Court may schedule.    A proffer can be sufficient in and of itself for purposes of a hearing on this issue.    United States v. LaFontaine, 210 F.3d 125, 130 (2d Cir. 2000).

handling a transportation subcontract for Keystone. On approximately December 4, 2000, the executive of Keystone met with the defendant at his home. During that meeting, along with some subsequent telephone calls, the defendant agreed to accept the subcontract, but stated that because his company (Gateway) was being forfeited to the United States, he did not want the money to be paid directly to him or his company or to any company associated with codefendant David Bell because it would be subject to forfeiture to the government. The defendant explained that Gateway Transportation had closed[6] and was now operating as First Choice (another transportation company operated by codefendant Bell). The defendant arranged for Keystone to make the payments to John J. Jerue Trucking; the actual transportation was being handled by Bell-Four, Inc., a company owned by John Manning, the father-in-law of codefendant Bell. Because this contract was brought to Bell-Four by codefendant Bell, he was to receive a commission fee.

Under this contract, four loads were actually transported in December of 2000, however, no actual payments were made for the transportation because one of the loads was delivered with a $40,000 shortage and the final load worth approximately $450,000 was stolen.[7]

---

[6]    Gateway was not officially dissolved until December 15, 2000.

[7]    Many of the events described above are also corroborated by the consensual electronic surveillance which is part of the defendant's present bond.

6

In order for the Court to enter an order of revocation and detention, the Court must find that there is "(A) probable cause to believe that the person has committed a federal, state, or local crime while on release; or (B) clear and convincing evidence that the person has violated any other condition of his release ...." 18 U.S.C. 3148(b)(1).    Further, if the Court finds that the defendant has committed a crime while on release, pursuant to Section 3148(b)(2)(A), "a rebuttable presumption arises that no condition or combination of conditions [of release] will assure that the person will pose a danger to the safety of any other person or the community."    Such should be the finding here. Further, based on the defendant's history while under supervision as well as his current activities, it is abundantly clear that the defendant "is unlikely to abide by any condition or combination of conditions of release."    18 U.S.C. 3148(b)(2).

In this case the government's proffer demonstrates that at minimum there is probable cause to believe that the defendant violated Title 18, United States Code, Section 1511 (Obstruction of Justice), or has otherwise violated the conditions of his release. The record is more than sufficient to establish by a preponderance of the evidence that the defendant's bail should be revoked. <u>United States v. LaFontaine</u>, 210 F.3d 125, 134 (2d Cir. 2000);

7

United States v. Gotti, 794 F.2d 773, 777 (2d Cir.1986); United States v. Cook, 880 F.2d 1158, 1162 (10th Cir. 1989).

Moreover, in the alternative, the Court can find pursuant to Section 3148 (b)(2)(A), once the criminal violation has been proved, that the act of violating federal law itself can substantiate a revocation on the basis that "the person is unlikely to abide by any condition or combination of conditions of release." United States v. Aaron, 904 F.2d 221, 223 (5th Cir. 1990). Once again the applicable standard is preponderance of the evidence.

This is not the first time that the defendant has violated previous conditions of supervision. As was described during the pretrial detention hearing,[8] the defendant pled guilty on March 31, 1995, to conspiracy to destroy a vessel and a sentence of four years probation and restitution in the amount of $94,444.82 was imposed (Case Number 94-6214-Cr-Gonzalez). Upon the defendant's motion, the term of supervised release was terminated on April 4, 1997.

The defendant was also arrested on October 3, 1994, by the New Jersey State Police and charged with several acts of extortion by physical assault and obstruction of justice. The defendant was permitted to plead guilty to a bribery and on September 11, 1998,

---

[8] There is an error in the dates describing the defendant's previous supervision terms in the transcript.

8

a term of four years probation was imposed. This supervision was also terminated early on June 2, 2000.

The charges in the pending matter allege criminal activity by the defendant which took place from 1995 to the return of the indictment.[9] Therefore the defendant was on either probation, supervised release, and/or bond during the entire time period that he was committing the very crimes charged in the present indictment.

The recent incident involving Keystone along with this defendant's past history of committing crimes while under supervision demonstrates quite clearly that even house arrest is insufficient to control his criminal activities and that bond should be revoked.

B.    **Unsupported Allegations by Informants**

Defendant claims that the proffer set forth by the government at the pretrial detention hearing are merely unsupported allegations of informants. This is an inaccurate assessment of the government's proof.

The fact that the Polito incident in which he was assaulted by the defendant was not recorded was fully discussed at the pretrial

---

[9]    The original indictment was returned on October 24, 2000; the superseding indictment was returned on January 30, 2001.

9

detention hearing.[10] The government's explanation that Polito did not have an opportunity to call his FBI control agent (Hearing at 16) is not a ludicrous statement, but rather a factual explanation for the lack of a recording device being utilized during this unscheduled meeting. Nor is Polito's rendition totally uncorroborated. Polito met with the FBI agent later that same day, described the entire event, and the FBI agent was able to observe redness under Polito's left eye, a swollen bottom lip, and teeth marks on his ear. These observations directly support the statements of Polito.

As to Huey Steinhart, the fact that he was unwilling to testify out of fear for his own safety and that of his family (T-III Affidavit at 50, ¶96), does not diminish the strength of the information which he provided concerning the violent assault by the defendant and others which took place in May of 1997, but rather enhances it. As described during the pretrial detention hearing and in the T-III affidavit (Hearing at 17-18; T-III Affidavit at 19-20, ¶¶39-40), Mr. Steinhart had taken out a loanshark loan of $40,000 from Mamone at one point a week in approximately 1995. In consideration of a reduction of the principal outstanding on the loan, the defendant became a silent partner in Steinhart's

---

[10]    The transcript incorrectly reflects the name "Belitto." In fact, the cooperating witness described starting on page 15 of the hearing transcript is Al Polito.

10

legitimate business. During that association, Steinhart introduced Braverman to the defendant and Joe Russo, who then invested in Braverman's existing business, a pawn shop and title loans. In early May 1997, a dispute arose in which the defendant and Russo alleged that the gemstones that Braverman had posted as collateral for the business were fake. This dispute caused the two beatings which were described at the pretrial detention hearing (Hearing at 17-18). First Steinhart was summoned to the check cashing store on Margate Boulevard, roughed up, hit on the back of the head and pinned against the wall because he was being held responsible for having introduced Braverman to the defendant and Russo. Braverman was subsequently summoned to the check cashing store by the defendant and Russo, and after being threatened by them was hit with a baseball bat in the left arm by the defendant. Portions of both of these incidents were observed by independent witnesses.

Defendant's argument that neither Steinhart or Braverman are fine upstanding citizens is unavailing. Normal law-abiding citizens do not knowingly accept loanshark loans or investments from individuals associated with the mafia. Their backgrounds, however, does not diminish their descriptions of the violent nature of this defendant.

The "veiled threats" to bookies is discounted by defense counsel as merely this defendant's manner of speaking in colorful and vulgar language. Yet this argument totally ignores the fact

11

that these very conversations prove this defendant's position as head of a bookmaking organization as well as other criminal activity. For example, the attached transcript from a conversation intercepted on February 21, 2000, between the defendant and Ralph LNU (believed to be Ralph Lento), a bookmaker, very clearly demonstrates the defendant's top role in the gambling organization, telling Ralph LNU what can and cannot be done in the taking of bets.

Some examples of this defendant's colorful language can be seen in the three additional transcripts attached, from conversations on July 26, 1999, February 2 and 28, 2000. What these transcripts show are not just the defendant's constant use of foul language, but actual threats. For example, in the consensual recording made on July 26, 1999, the defendant is expressing his anger over Freddie (Scarola), a bookmaker working for the defendant and a codefendant in this case. At page 5, the following exchange takes place between the defendant and the cooperating witness, Al Polito:

> JM: Where's this little motherfucking Freddie, that's what I wanna know. Where's this little cocksucker?
>
> CW: Let me tell you what happened.
>
> JM: I'm more fucking irritated at him than you. Cause he lied to me he was gonna meet me Sunday before he left and he never met me this motherfucker.

And then later at pages 24-25:

> JM: Freddie wants to argue with me on the phone. Freddie, I told Freddie go buy a fucking plane

12

ticket for Arizona motherfucker cause when I
came back you've, you've had it.

CW:    You, you, you know what.  You.

JM:    I can't find this little cocksucker right now.

CW:    People tell, you it's like.

JM:    He'll show up when he has the money, I know.

(Coughing)

JM:    He avoids the (U/I) everything.    This small
cocksucker.

CW:    Yeah, he does.

JM:    You can call your fucking cousin, your uncles,
your brother.  Call anybody you fucking want.
Buy a fucking plane ticket.  Don't be there
when I get back.

During the conversations intercepted on February 2 and 28,
2000, the defendant is speaking with individuals who owe him money.
Even reading the transcript alone (2/2/00 at p. 2; 2/28/00 at p. 2),
the very threatening nature of the defendant's language can be seen.
The government invites the Court to actually listen to these
conversations to hear for itself the tone and manner in which these
threats are conveyed.[11]

C.    **Desire to Work**

The defendant also claims that he desires to work by soliciting
business from customers who require transportation and then placing

_____

[11]    At the Court's request, the government will provide the
Court with copies of these recordings.

that business with a trucking company or broker.    The defendant claims that this cannot be accomplished over the telephone.

Although the defendant's desire to work may be admirable, he has not demonstrated that this proposal is legitimate. As stated in the memorandum of pretrial services, they do not oppose the defendant being granted permission to seek, obtain and maintain gainful, verifiable employment approved by pretrial services. What the defendant has presented thus far falls short of verifiable employment and should be denied until he can fully demonstrate some legitimate employment that he proposes to be engaged in.    In addition,    considering    his    activities    involving    Gateway Transportation, Inc. and Keystone, there is serious question as to what employment he could involve himself with, without committing additional crimes.[12]

## D.    Time until trial

The defendant also argues that because of the length of time until the set trial date, that he should be released from house arrest.  However this is not a legitimate reason to alter the bond conditions.

At the calendar call when this trial date was set, the government answered ready for trial.  It was solely at the request

---

[12]    Nor is the defendant's argument that former codefendant Raffa had been permitted to work four hours a day persuasive.  Raffa had an established business and had no prior criminal record or incidents of violence.  The defendant's situation is quite different.

of all the defense counsel along with adjustments for the Court's schedule that put this matter into February of 2002. The fact that due to defense counsel own request that matter has been continued for such a period of time is no justification for release from house arrest.

## CONCLUSION

WHEREFORE, for the foregoing reasons and those that may be raised at any hearing on this matter, the government respectfully requests that this Honorable Court enter an order of revocation of bond or alternatively, that the defendant's request that the condition of house arrest be removed from his bond conditions be denied.

Respectfully submitted,

GUY E. LEWIS
UNITED STATES ATTORNEY

By: _Diana W. Fernandez for_
J. BRIAN McCORMICK
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500084
500 East Broward Blvd., Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax: (954) 356-7230

By: _Diana W. Fernandez_
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

15

<u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that a true and correct copy of the foregoing was mailed this _19<sup>t</sup>_ day of _March_____, 2001 to:

David Rothman, Esq.
First Union Financial Ctr.
200 S Biscayne Blvd., Ste 2690
Miami, FL 33131
(Counsel for John Mamone)

John Howes, Esq.
633 S.E. Third Ave., Suite 4F
Fort Lauderdale, FL 33302
(Counsel for Fred Morgenstern)

Ana M. Jhones, Esq.
Bayside Plaza, Suite 625
330 Biscayne Blvd
Miami, FL 33132
(Counsel for David Morgenstern)

Emmanuel Perez, Esq.
2121 Ponce de Leon Blvd.
Suite 290
Coral Gables, FL 33134-5222
(Counsel for Joseph Silvestri)

Donald R. Spadaro, Esq.
1000 S. Federal Hwy., Ste 103
Fort Lauderdale, FL 33316
(Counsel for Julius Chiusano)

Brian L. Tannebaum, Esq.
First Union Financial Center
200 South Biscayne Blvd., Ste.
2690
Miami, FL 33131
(Counsel for Michael Buccinna)

Michael Tarre, Esq.
Two South Biscayne Blvd.,#3250
Miami, FL 33131
(Counsel for Jeffrey Bass)

John F. Cotrone, Esq.
509 S.E. 9th St., Suite 1
Fort Lauderdale, FL 33316
(Counsel for Frederick Scarola)

Charles Wender, Esq.
190 W. Palmetto Park Road
Boca Raton, FL 33432
(Counsel for Giuseppe Bellitto)

James Benjamin, Esq.
1 Financial Plaza, Suite 1615
Fort Lauderdale, FL 33394
(Counsel for Mark Carattini)

Peter Raben, Esq.
2665 S. Bayshore Dr., Ste 1206
Coconut Grove, FL 33133
(Counsel for Paul DiFilippi)

Neil M. Mameroff, Esq.
100 S.E. 2nd Ave., Suite 3350
Miami, FL 33131
(Counsel for Anson Klinger)

Brian H. Bieber, Esq.
2600 Douglas Rd., Penthouse 1
Coral Gables, FL 33134
(Counsel for Joseph Spitaleri)

Jon May, Esq.
200 East Broward Blvd.
Suite 1210
Fort Lauderdale, FL 33301
(Counsel for Charles Clay)

Richard Hamar, Esq.
Maria Hamar, Esq.
2437 Briarcrest Rd.
Beverly Hills, CA 90210
(Counsel for Charles Clay)

Steve Kreisberg, Esq.
3250 Mary St., #400
Coconut Grove, FL 33133
(Counsel for Peggy Preston)

16

Philip R. Horowitz, Esq.
12651 S. Dixie Hwy., Ste. 328
Miami, FL 33156
(Counsel for Mark Weiss)

David G. Vinikoor, Esq.
420 S.E. 12th Street
Fort Lauderdale, FL 33316
(Counsel for Jacolyn Baruch)

Jeffrey M. Harris, Esq.
One East Broward Blvd., #1500
Fort Lauderdale, FL 33301
(Counsel for David Bell)

_Diana W. Fernandez_
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

```
FILE NUMBER                   245A-MM-91505

CONVERSATION DATE:            02/21/2000

CONVERSATION TIME:            10:32:58

TELEPHONE NUMBER:             954/614-1821

CALL NUMBER:                  2194

CASE AGENT/SQUAD              SA PATRICK G. BRODSKY/OC-2

REVISED BY:                   SA CHRISTOPHER S. STARRETT

DATE TYPED:                   06/14/2000

PARTICIPANTS:                 JM - JOHN MAMONE
                              RL - RALPH LAST NAME UNKNOWN

ABBREVIATIONS:                UI - UNINTELLIGIBLE
                              PH - PHONETIC
                              IA - INAUDIBLE
                              SC - SIMULTANEOUS CONVERSATION
```

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

245A-MM-91505

(Sound of phone ringing)

JM:     Hello.

RL:     Hey buddy.

JM:     Hey.  (UI)...(UI)...

RL:     (SC)... (UI)...

JM:     Listen to me, I got a question.

RL:     Hello.

JM:     Can you hear me?

RL:     Now I can.

JM:     All right, listen.  You know, you guys asked me for
        that number cause youse are laying off, but you guys
        ain't laying off... I mean you guys are playing and
        that's not what this thing was intended to do.  I can't
        have this, it's not what we agreed to do.

RL;     Okay, can I run into you... I...I ... not that I'm ...

JM:     Well I'm still up here, I'm not down here, but you know
        there was an incident yesterday... on a college
        situation, he only takes 3 dimes on totals, you didn't
        even ask the guy if you had a bet, you just hang up the
        phone, you can't do stuff like that.

RL:     Okay, Ah... well see okay... look is Jeff around?

JM:     He's around, but I'll catch up to you tomorrow morning,
        cause I told him, I don't want you guys doing nothing
        this is not what I agreed to do... it's...it's ...just
        not what I want to do.

RL:     Okay...it's not us...that...that's what it is... it's,
        I don't know...

2

245A-MM-91505

JM:     How can you say that... How can you say that.

RL:     No it's not us, personally.  It's guys we're doing
        something with, a couple of his kids that Ah... when I
        see you I'll tell ya...  Couple of kids that were doing
        something with, that you're doing us a favor with...

JM:     Meet me in the morning tomorrow...

RL:     Good enough buddy.  Hey...

JM:     Meet me at 10:00 o'clock.

RL:     Over by the same place?

JM:     Yeah.

RL:     All right.  Bye.

End of Conversation.

```
File Number:            281A-MM-88632

Number of Tape:         60H8

Date of Tape:           July 26, 1999

Time of Tape:           5:01 p.m.

Type of Tape:           Body Recorder

Case Agent:             SA NEIL MATHISON/OC-1

Transcribed/
Typed By:               MARY LOU TAYLOR/HRA

Date Typed:             October 18, 1999

Participants:           CW:  COOPERATING WITNESS
                        JM:  JOHN MAMONE
                        MB:  MICHAEL BUCCINNA
                        MV:  MICHAEL VIDAL (PH)
                        FRAN
                        HUEY
                        UF:  UNIDENTIFIED FEMALE
                        UM:  UNIDENTIFIED MALE
                        MIKE
                        RALPH

Abbreviations:          (UI): Unintelligible
                        (IA): Inaudible
                        (PH): Phonetic
                        (SC): Simultaneous Conversation
```

**************************************************************

281A-MM-88632

CW:         ..5:01 on Monday, July 26th, 5:01 p.m., en route to ah,
            check cashing store with John Mamone.  Hard Eight, Hard
            Eight.

(Pause.)

(Driving in car.)

(Getting out of car and closing door.)

(Walking.)

CW:         Why is this door always locked?

JM:         (UI)

CW:         I know.

JM:         And I'm gonna save a little piece for (UI) Joey.  (UI)

JM:         I just got back from (UI)

MIKE:       Did you?

JM:         I just got back from a fucking cruise.

MIKE:       Yeah, how was it?

JM:         It was all right.

(Laughing.)

JM:         (UI)...I couldn't take it.  I will never do a cruise
            again.  It was my first and last time.  (UI)

MIKE:       Yeah, I've never been on one.

JM:         (UI) stupid (UI).

MIKE:       That's the way I think I'd be on a boat.

JM:         When ah, when do you wanna get together and talk the
            numbers?

MIKE:       Ah, give me a couple weeks.  Yeah, I'm not, not in a
            rush.  I'm gonna let this guy that owns the, the

2

281A-MM-88632

building that's he's in, didn't go the way he planned, then I'm gonna come back ask him a little (UI).   (UI) you know what I mean he's doing the right thing.

JM:      Who's the guy, do I know him or...

MIKE:    (UI) been there fifteen (UI)

MIKE:    He runs the business then I gotta deal with the owner. But you might know the owner.

JM:      Of the Banana Boat?

MIKE:    No, the property in the building.  His partner is Jerry Farrell (PH).  (UI)

MIKE:    Which will work in our benefit (UI)

MIKE:    ...of the relationship.

JM:      Uh-huh.

MIKE:    Go from there.

JM:      Yeah, I'm, I'm interested (UI)

MIKE:    I'm glad he told me, I forgot that.

MIKE:    I was running for (UI)

(Laughing.)

JM:      Sometimes things, sometimes things like that happen.

MIKE:    Oh yeah, but holy shit.

JM:      All right Mike.

MIKE:    All right John, thank you.  Thank you Michael.  Hello.

CW:      Hey.

(Background voices.)

JM:      I'm gonna go get a bat and (UI)

3

281A-MM-88632

CW:    It's okay, just make sure it's big.

JM:    I gotta a really big bat.  (UI) I can't lift it (UI)

CW:    Here uhm...I got this ah...

MB:    He's bothering me with fucking (UI)

CW:    No, no.

MB:    Oh.

       (UI)

MB:    Oh, yeah.

CW:    The, the guy's uhm...

MB:    That's my dream job.  Absolutely.

JM:    I got you three, four guys that'll give me money...to do it.

MB:    Okay big CW.

CW:    Okay, I, I got a guy coming that ah, what's the matter?

JM:    Either you got a broken ankle, broken foot, everything bothers this guy...

CW:    I got a chip in my ankle, you know that.  Played football for a scholarship and ah, you think (UI) this. Ah, I have a kid coming in 5:30 with a check for twenty-three hundred which I'll give to you.  And that'll ah...

JM:    (UI) almost even, or we are even, right?

CW:    We will be.

JM:    You owe me eleven and the twenty-two fifty.

CW:    No, I, I, I owe twenty, ah, twenty-two fifty.  A couple of things, just I don't want you to...

JM:    (UI) gotta charge you to cash the check?

4

281A-MM-88632

CW:     Yeah.

JM:     I got nothing to do with this check cashing business.

CW:     No, I know, no, I know.  That's just, it's twenty-three.

JM:     (SC) (UI) that will work yeah.  Why don't we do fifteen...

CW:     Yeah, should be...

MB:     (UI)

        (UI)...

JM:     (UI)

MB:     Yeah, (UI)

        (UI)

CW:     No, I just want you to know, just so you could see...that I'm not messing around.  What, what, I'm being square with you.  I'm not...there's no bullshit.  I was given a check...

JM:     Where's this little motherfucking Freddie, that's what I wanna know.  Where's this little cocksucker?

CW:     Let me tell you what happened.

JM:     I'm more fucking irritated at him than you.  Cause he lied to me he was gonna meet me Sunday before he left and he never met me this mother fucker.

(Phone ringing.)

CW:     That's one thing, I'm not crying the blues.  I'm just telling you what's going on in the past ten days.  So then you'll, you'll understand it.

MB:     (On phone.)  Check cashing.  Carla (PH)

JM:     Oh, tell her to shut the hell up now.

5

281A-MM-88632

(Laughing.)

JM:        Now she wants to call on our time?

(Laughing.)

JM:        We have no time to talk to her.  Hang up.

MB:        She says she's gonna kill ya.

JM:        Yeah.  I thought, I thought, I thought you were in good
           shape (SC) (UI)...

MB:        (UI) and I couldn't do nothing right.

JM:        The odds are against ya.

(Laughing.)

JM:        You went out, you went out of your way to buy a fucking
           ticket.  She didn't even...(SC) (UI)

MB:        Nothing happened but I know you're on the phone and
           it's annoying me that you can't pickup.

JM:        (SC) (UI)...bank (UI) funds.  Please advise that you're
           not...(UI)...this is (UI) your...

CW:        Yes, what happened (UI), John I don't bullshit you.

MB:        You say hold on, (UI) call.

CW:        Remember I was given the check and...at the time he
           was...

JM:        Forty-eight fifty is what we're looking.

CW:        Yeah.  And I put, why I got in, ended up running it
           through my account.  It was no good.  All my checks
           bounced.  All my checks bounced.  So that's what
           happened.

(MB background conversation.)

CW:        The guy hasn't made good yet so.  I'm just telling you
           what's going.  I'm not, I'm not bullshitting you.  I'm

6

281A-MM-88632

getting squared. But I'll tell you...another thing.
This is what happened. Last week, Wednesday, did he
tell you about what happened to my wife?

JM:     Yeah, somebody ran up to her by the car.

CW:     Road rage. Guy stopped the car, got in... You know
she, she didn't have a gun with her. Thank God in a
way.

JM:     She should have shot him.

CW:     She would have. She, she reached for it. She didn't
have it.

JM:     She had a right to.

CW:     She had every right, the cop said. Every right. She
had the window down this much cause she smokes. He
kicked the car, started reach, started shaking the
car...she went into her bag, she didn't have it. She
pressed the button to put the window up, the window
went down. He punched her in the face. That was on
Wednesday. Friday morning we have another car which we
sublease to her girlfriend. Her girlfriend's driving
the car, called me Friday morning the car was totaled.
This is, this is just what's going on. It has nothing
to do with you. I'm, I'm being square.

JM:     I know, I know.

CW:     Okay. When the guy brings the check I'll give you
that. I have...end of the week we're doing this deal.
I'll start bringing those things in. It starts Friday,
okay.

JM:     Yeah, uh-huh.

CW:     I'll start bringing them in, whatever it is up and
above four points, that point and a half, that'll go
towards you, all right? And we'll, and we'll work it
and you won't, you won't have anything.

        (UI)

CW:     If you wanna verify a couple of things you talk with

7

281A-MM-88632

> Buddy. It puts, couple of, we got a couple of new players. I put my big guy in...now, and we're, we're gonna start earning. Buddy's gonna oversee it. Huey is gonna handle it cause I don't even wanna handle, right now I don't even wanna handle (UI) cause I'm juggling too much and we'll piece off and it won't, and it won't be any problems, trust me on that no problems at all. Uhm...

JM:     What's going on with Joe Flowers?

CW:     Uhm... I've been giving him games.

JM:     What?

CW:     You know for them to play and, and ah, Benny gave me like 200. Ah...they stopped the, the shop over there. I don't know. Yeah, he's working on a few things, he says he's, he's gonna have something for me with computers and everything. He doesn't.

JM:     What do you mean?

CW:     I don't know, some kind of a job, do some kind of a work, I have no idea.

JM:     And you're not doing nothing with ah...

CW:     Dan, I haven't go paid in nine weeks from Dan. He did pay the lawyer though. So I'm not, you know...

JM:     Is he gonna pay you the nine weeks or he's just (UI)

CW:     He, he says, he says he'll come up with the, some kind of agreement. He says, he's, as far as he knows everything is over. So he wants to go under that premise.

JM:     Is it?

CW:     Is it? I don't think it is.

JM:     I don't know, the state's gonna make a deal with those guys by the end of the month.

CW:     That's the state.

8

281A-MM-88632

JM:     I know but (UI)

CW:     But I heard we weren't state.

JM:     No, you're Federal.

CW:     Yeah.  So he, so under his I, thing, I don't mean my back to you Mike.

MB:     No, it's okay.

CW:     Ah, he feels that everything is over.  So, that there should be, he says oh I'll work up a, I says you're a fair man, whatever you feel lump sum and then, but I says, still I need to have the bail bondsman and pay the lawyer.  He finally paid the lawyer, the lawyer got a check last Saturday ah, for those services.  Uhm...

JM:     So there's no work with him or nothing.  Hey what ever happened with that kid in Tamarac that your son was playing with?

CW:     He's playing...

JM:     Remember?  You told me you were good (UI)

CW:     Freddie's got him now.  He's the de, I, I met Charlie...

JM:     Right.

CW:     ...and Chinky.  I met him at the race track last Saturday night and I spoke to him.  I told him I said Chinky, I said no disrespect, I said my son is bottomed out right now.  I says he's got two things hanging over his head...

JM:     Yeah.

CW:     ...he says you know, and he was like all right with it, you know.  The kid lost seven hundred he paid, then he lost twenty-one hundred, he paid like thirteen hundred.  So he was okay with it.  Then I don't know how this evolves, I don't know how he gets to this point Fat Ralphie's sitting down with Chinky and Charlie and Freddie and they bring up my son's name again and I

9

281A-MM-88632

> told them I don't know what you're talking about cause
> I met those guys, I spoke to some people face-to-
> face... And then Charlie now is playing...with
> Freddie.

JM:    Charlie's playing?

CW:    Charlie is playing. And Freddie put him in directly
with Jose.

JM:    Freddie deals with Jose too? Don't Freddie hold his
own edge?

CW:    He, he should. He owes too much. He should, he should
deal with Jose more.

JM:    But you guys, ain't gonna deal with Jose no more.

CW:    Well, I've been holding off...

JM:    (UI)

CW:    I was told by our friend that when you come back and
when comes to this...

(Background conversation.)

CW:    ...I got some big guys good and John, I'm telling ya,
I've got some big, good guys. Very good. Right now...

(Phone ringing.)

CW:    ...Buddy and I are getting out because of some of the
players I put in there and then I said we got a makeup
figure...

(Phone ringing.)

CW:    ...it's, it's coming like this. So it's gonna be very
easy for us to...

JM:    (UI)

CW:    You know, and maybe leave, if you want maybe leave a
couple, but I got some big guys. Guys from St.
Andrews.

10

281A-MM-88632

JM:     Are they good players?

MB:     (On telephone in background.)

CW:     Actually yeah.  And they deal directly.  But as I, as I
        said, the past ten days have been absolutely upside
        down for me.  It won't happen again.

MB:     Joe.

CW:     It won't.

JM:     Getting worse than me.

CW:     I love cruise, how can you not love a cruise.  What did
        you on, what, what cruise line?

JM:     The Carnival "Destiny."

CW:     No.

JM:     Biggest ship in the world.

CW:     Yeah.  I go Norwegian.  Norwegian...

JM:     Somebody told me Norwegian got better ships.

CW:     That's what I go on, Norwegian.  Every year.  We
        haven't been able, in fact I'm dying to.  I, I tell you
        the truth I would like to if I get, if I get this money
        back or get it, see my way clear for a couple, I'd love
        to go, I gotta get away.  I'm like...I'm...

JM:     Why don't you get the money back the wife.  I don't
        understand.  That's bullshit.

CW:     I'll tell you exactly.  You wanna know the God's honest
        truth.  That is like Fran's only security.  And then
        what...

JM:     You don't understand.  It's been sitting there let's
        say...four months...

CW:     For...

JM:     ...five months, I don't know.

11

281A-MM-88632

CW:       Try...

JM:       ..six months?

CW:       ...close to six months.

JM:       Why don't you take it out, give it to me.  When you
          need it you can have it back.  Why would you pay on
          that money.  You don't understand.  I don't, I, I mean
          I'm trying to be your friend now...

CW:       No, I know.

JM:       ...I don't wanna be a fucking vulture.

CW:       No, no, you're not being a vulture.  I know what you're
          saying.

JM:       I, I mean why make it difficult.  I, can use it and put
          it out there right now, and earn somewhere with ya.
          If, if it ain't you it's somebody else.

CW:       Yeah.

JM:       You understand what I'm saying?

CW:       Yeah.

JM:       So, to me it don't matter but if you need it, I could
          always get it.  There's no fucking problem.

CW:       Okay.

JM:       Why is it any better in my pocket than his pocket?

CW:       No.  A hundred percent.

JM:       You're off the clock when you give it to me.

CW:       I, I know.  I know and I appreciate that.

JM:       Well that's what I'm trying to explain.

CW:       I...

JM:       I, I, it doesn't make no sense to me.

12

281A-MM-88632

CW:     Okay.  I'll explain, it's a woman's sense thing, you
        know, you know what she's saying...

JM:     She ain't even gonna know.

CW:     I, everything's in her name.

JM:     Just tell her you wanna take it and you'll get it back
        when you need it.

CW:     She, she has (UI) to do.  You know what she feels.

JM:     You just tell her you're gonna give it to another
        lawyer, that's all.

CW:     I keep telling her, I'm saying, you know I don't know
        what's gonna happen.  With this guy not paying...with
        the, you know, what's his name, they're not paying.
        She's, that's her right now.  She's scared stiff...that
        he doesn't pay where's she gonna be.  She wants some
        sense of security.  She sees that money as her, as her
        security.  Maybe I'll try to work on it.  Maybe I'll
        try to get like if there's 40 in there, maybe I'll try
        to get 15 over 20, maybe even not get that.

JM:     Well don't, don't that make sense to you?

CW:     I, I want (SC) (UI)...

JM:     (SC) I don't wanna tell you how to live.

CW:     I agree a hundred percent.

JM:     I don't wanna tell you what to do but don't you think
        that you know you're (UI) every week is more
        important...

CW:     Of course.

JM:     ...to you than me?

CW:     A hundred percent but...

JM:     Don't you need that to live?  I mean that's why (SC)
        (UI)

13

281A-MM-88632

CW:     And I would, I would like that.

JM:     ...and a fucking to pay your rent.

CW:     You see cause she doesn't know about this. If I told
        her...if, I'll just tell her I have an obligation with
        you. Even, she'll be the first one. Maybe I, maybe I
        need to. But not say you per se, I'm not saying but
        ah...you know maybe I'll just explain something to her.
        But that's, that's her sense cause I tell her, you
        know, the chance of going away, and she says well this
        guy's not gonna take care of me. Who's gonna take care
        of her? Who's gonna take care of her?

JM:     Well (SC) (UI)

CW:     My friend in Boca, he's, he's taking care of two
        families now, he's gonna take care of mine? No, I
        can't put him (UI). I mean he'll, he'll protect my
        interest with the office but I mean...this Dan scares
        me. You know, he just ah...nine weeks.

JM:     (UI)

CW:     No, it's a girl coming. No mine's a guy coming.

JM:     What time is he coming?

CW:     He'll be here, he says absolutely  no later than 5:30.

JM:     Where's he coming from?

CW:     Uhm...State Road 84, Griffin Road, 441.

JM:     He's been here before? He knows how to get here?

CW:     Mike the computer kid.

JM:     Oh.  Oh the kid who was here (UI)

CW:     Yeah, yeah that's who it is, yeah.

JM:     (Clears throat.)  Shit.

CW:     You know, so... No, I, I'd love to because ah, it'd
        make life a heck of a lot easier but she sees that as

14

281A-MM-88632

a, as her security.

JM:     No, no, no.

CW:     That's why I wish things would either happen or not.
        At least I know where I stand.  Cause if something does
        happen...

JM:     What about your refund on the fourteen grand, are they
        gonna give forfeiture?

CW:     I think we're gonna get it.

JM:     Yeah?

CW:     Looks very, very good.  Very, very good.  So, I mean,
        you know, between a few things like that and this other
        thing I'm working...

JM:     Where the fuck these kids...

CW:     But I appreciate it.  I don't mean to put, dump my crap
        on you.  But that was, what a week.

JM:     Three more weeks exhibition, or four?

MB:     That's it, three weeks.  It starts, yeah.

JM:     Three weeks.

MB:     Everybody can't wait.  I'm hoping it ain't, last year
        it wasn't a good football season.

CW:     I, the, last year was not good.  Everyone says (UI).
        Last year was, last year was a players' year.  You know
        why?  And it's gonna be, players' year more and more,
        because there's too much information out.  The bettors
        are starting to get more informative as opposed to....

JM:     Yeah, but if you, if you have the right line out there
        it don't matter...

(CW's cell phone ringing.)

JM:     ...because it's a even game.  You understand?

15

281A-MM-88632

CW:      Yeah.

JM:      With the right handicap there, it's an even game.

CW:      You have to do things right.  They don't do things right.

JM:      Those fucking (UI)

CW:      I better, let me, I better call her.  She probably things I'm with a gumadi (PH) now.

JM:      Yeah.

CW:      I'm serious.  You think it's funny.

(CW dialing on cell phone.)

JM:      That's right, the 15th, August 15th.

MB:      I got my ticket, I got, I got two club seats plus eight seats down below.

CW:      Where?  The Dolphins?

MB:      Yeah.  Every year man.  I'm right in the end zone.

CW:      Yeah?

JM:      Club seats tonight.

MB:      I got them, you know what I got club seats this year? For the parking.

(CW on phone.)

FRAN:    (UI)

CW:      Yeah, what's up?

JM:      That's cause you get right into the stadium.

CW:      I, I told you where I was gonna be.

MB:      I couldn't sit in that other section again...

16

281A-MM-88632

FRAN:       (UI)

CW:         Because I'm in a meeting.

(Pause.)

CW:         What?

FRAN:       Nothing.  Nothing.  It's nothing.  Nothing.  I'll call
            you back (UI)

CW:         Now she's (UI).  I worry about her.

CW:         I gotta be out of my fucking mind.

(Beep.)

JM:         You (UI)

CW:         I gotta be out of my mind.  (Coughs.)

JM:         This the kid, no?

CW:         No, you know what he looks like?

JM:         Yes and no.  No, I didn't see who was getting out of
            the car.

CW:         I just got tickets for Cher.

JM:         So did I.

MB:         So did he.

CW:         You, not like this though.

MB:         I just got another ticket, I got...

JM:         Just go to Ticketmaster.

(Pause.)

CW:         Did he bring them back?

MB:         No.

17

281A-MM-88632

JM:     Why, where are your tickets?

CW:     My tickets in the first row.

JM:     Ah, you don't want to sit on the fucking floor seats.

CW:     Not floor seats.  This is the first row.  Here's, here's, here's the...

JM:     First row.

MB:     (UI) on the side.

CW:     ...stage.  On the side with the handicap section.

JM:     Yeah.

CW:     Tremendous.  They're the best.  They're, believe me.

(CW's cell phone ringing.)

JM:     How much you pay?

CW:     One of my, one of my players.

JM:     What does he get tickets?

(CW on cell phone.)

CW:     Hello.

JM:     You, you called the wrong guy.  (UI)

CW:     Listen...Huey, Huey what's up?

JM:     Tell that little prick I wanna see him.

CW:     Oh, I'm, I'm with, I'm with somebody that you know...in Margate.

H:      Oh yeah.

CW:     I'm with somebody you know in Margate.  Let me ah, I'll call you later.

H:      (UI)

281A-MM-88632

CW:        Okay, okay.

JM:        Huey... What's he doing?

(CW off cell phone.)

CW:        He's on vacation in Cape Cod (laughing).  Coming back
           tonight.

JM:        In Cape Cod?

CW:        Yeah.  (Laughing.)

JM:        What the fucks he doing in Cape Cod.

CW:        You want tickets?

JM:        He just bought them.

MB:        I just bought them.  Can't get, can't get my money
           back.

MB:        You'll get them.  Anson (PH will sell them for you no
           problem.  Tell Anson (PH) you got them.  He'll push
           them and you'll make money on them.  You hear me?  The
           concert definitely is gonna be sold, when is it,
           October?

JM:        September 23rd.

MB:        It's gonna be sold out before that.

MB:        How much are they?

CW:        I'll take care of ya.

JM:        I need four though.

CW:        Four?

JM:        I need six.

CW:        No.

JM:        (Laughing.)

19

281A-MM-88632

CW:        You gonna scalp them?

JM:        Scalp, my wife wants to go.  We went to the last one.

CW:        Are you serious?

JM:        I don't think she'll go again.  Maybe she wants to go.


MB:        I just want four.  (SC) (UI)

JM:        It's the same show, I don't think it's worth seeing it.

CW:        How much?

JM:        It's the same show.

MB:        (SC) (UI)

CW:        For four?

JM:        I want tick, I want tickets for Ricky Martin.

(CW on cell phone.)

CW:        Yeah, this is CW is Frank there?

JM:        That's what you gotta get me.  Can you get Ricky
           Martin?

CW:        Okay, listen ah... when he comes in, ah, do, do you
           have ah...I already got some tickets to uhm...for Cher
           but I may need to get some more tickets.  And what
           about Ricky Martin?

(Pause.)

CW:        He's putting them aside for me.  Yeah, he... Okay well
           I needed two and now I may need...

JM:        No, I don't want Cher, I just need Ricky Martin I want.

CW:        ...four more.

JM:        I gotta have Ricky Martin.

20

281A-MM-88632

CW:       Yup and I need, yeah, he knows, he...

(Dial tone.)

(Dialing.)

CW:       Well I don't know if he can still get next to me from
          what, what I got.

UM:       (UI)

CW:       Yeah.  yeah.

UM:       (UI)

CW:       Yeah.  And I need...

UM:       (UI)

CW:       ...yeah CW, right.  And, and Ricky Martin.

JM:       Backstage passes.  Okay.

CW:       How many Ricky Martin?

JM:       I'm gonna find out right now.

CW:       Find out.  It'll be four to six right now.

UM:       (UI)

CW:       I know, Frank, you know if you talk to Frank he'll...
          Yeah, yeah, Frank does something special for me so
          just...

UM:       (UI)

CW:       I know.

UM:       (UI)

JM:       (UI)

JM:       Where the fuck (UI)

CW:       Well, no.  Look I, I have, he already reserved two for

21

281A-MM-88632

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
|       | me.  I may need another four and uhm...                                                   |
| UM:   | (UI)                                                                                      |
| CW:   | Four to...four to six tickets for Ricky Martin, yeah.                                     |
| UM:   | (UI)                                                                                      |
| CW:   | He knows, the, I only, every time, I just want the best.  Yeah.                           |
| UM:   | (UI)                                                                                      |
| CW:   | Okay.  All right, bye.                                                                    |
| UM:   | Where can he reach you?                                                                   |
| CW:   | He's, he's got my numbers.                                                                |
| UM:   | Okay.                                                                                     |
| CW:   | All right, bye.                                                                           |

(CW end cell phone call.)

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
| JM:   | Who's that guy?                                                                           |
| MB:   | (UI) yeah, like you say, (UI).  It always gets (UI) give those to Anson to get rid of.    |
| CW:   | Elton...                                                                                  |
| MB:   | Or I can give them to this guy to get rid of.                                             |
| CW:   | Elton John, I was in the first row.  You know they have, they have the stage...I don't know, they have the stage... |
| MB:   | Hello, calling you.                                                                       |
| CW:   | They have the stage like this.  Then they have at ground level and you're looking, you get (UI) |

(Background voice.)

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
| MB:   | (UI) getting a cell phone (UI)                                                            |

22

281A-MM-88632

CW:     Then they have like this, right on the side.  That's
        right where I was, first row.

(Background voice.)

CW:     Elton John.

JM:     Well so, trade it in.  Let me know cause I got these
        four...

CW:     I called him.

JM:     If you get them, then I know I'll get Ricky Martin.
        (UI)

JM:     You want them?

        (UI)

JM:     How many you want, four or six?

        (UI)

JM:     And backstage passes?

CW:     Oh, I don't know about that.  I'm trying.

(Laughing.)

CW:     Jesus.

MB:     And dinner with Ricky after the show.  (Laughing.)

CW:     He's getting really (UI).  He gets, yeah.  You know I
        did that with Bon Jovi you know.

MB:     Yeah?

CW:     Yeah.  Bon Jovi...

JM:     (On phone.) (UI) or six?

JM:     How many now, four and six?

(Pause.)

281A-MM-88632

JM:       My son wants this.

JM:       Joey.

(Pause.)

JM:       Six.  (UI)  No, so you, me, three kids and Tanya (UI).

(Pause.)

JM:       All right, bye.  What are you doing hon?

(Pause.)

JM:       That's all right, we'll take...

MB:       He's gonna see all the girls.

JM:       I'll take, take (UI).  We'll take another kid, we'll
          take ah, Angelo (UI) sister.  What ah...

          (UI) John (UI)

JM:       Oh yeah, John...

          (UI)

JM:       Oh, you know you don't have (UI).  All right.

CW:       See the (UI) laptops.

JM:       What ah, what's going on, ah with dinner.  We're going
          (UI)

CW:       You know the Compaq 1685's, 1690's?  Go for 24, 26,
          27...

(Pause.)

(Beeping.)

CW:       I'm doing things now I never thought I would (UI)

JM:       Oh, I know hon, hold on.

(Phone ringing.)

24

281A-MM-88632

JM:      (JM answers phone.)  Hello, check cashing.  John.

CW:      To bad he can't.

JM:      (On phone.)

JM:      Flower store, mine?  Mine?  Tell him I'll pickup (UI)

         Yeah.  Right.  A hold on.  Yeah.  Yeah, what ah, what
         were they doing, they going to gym?  (Coughs.)

         (UI)

JM:      All right.  I'm at the store.  I'll be here about
         another ten minutes and then I'll be leaving.  So
         what's ah..

         Well I don't know.  (UI) right now (UI)...taking off
         today or what.

JM:      Oh, all right.  So I'll meet you home.

FRAN:    Want me to go (UI)

JM:      Yeah, I'll get changed, I wanna get changed.  Bye.

         Bye now.

(JM ends call.)

JM:      (UI)

CW:      Yeah, (UI).  I just don't want you...

JM:      Who gives golf lessons?  You don't do golf lessons, do
         you?  Do you play golf?

CW:      I'm starting, I'm starting (UI) playing golf.  You...

MB:      (UI) fucking business.

CW:      You gonna play golf?

JM:      I'm gonna, I want the lessons.

CW:      With who?

281A-MM-88632

JM:     I'm going to North Caroline to some fucking school.

CW:     When you going to North Carolina, that's where she
        wants to go on vacation.

JM:     (Laughing.)  Not to play golf, does she?

CW:     No, but I, I play golf.  I gotta show you. I showed you
        my clubs.  I brought one of them in.  I just feel bad
        when you get upset.  I don't like to get you upset.

JM:     I couldn't get off the fucking boat.  It bothered me, I
        wanted to strangle everybody.

CW:     I know.  (Laughing.)

JM:     (UI) with ah John Mamone.

MB:     Two guys overboard.

JM:     (UI) on the ah, (UI)

CW:     And he's on the phone.

JM:     Into the ah...

CW:     You know and...

JM:     (UI)

CW:     And, and he's on the phone and I know he's upset.  And
        he's, I know cause he's almost spitting and I'm just,
        yeah.  I, I like (SC) (UI)

MB:     (SC) (UI)

JM:     Yeah, CW handles it the best.  You know his (UI)...

CW:     Ah, cause, cause you're right.

JM:     Freddie wants to argue with me on the phone.  Freddie,
        I told Freddie go buy a fucking plane ticket for
        Arizona motherfucker cause when I came back you've,
        you've had it.

CW:     You, you, you know what.  You...

26

281A-MM-88632

JM:        I can't find this little cocksucker right now.

CW:        People tell, you know it's like...

JM:        He'll show up when he has the money, I know.

(Coughing.)

JM:         He avoids the (UI) everything.  This small cocksucker.

CW:        Yeah, he does.

JM:        You can call your fucking cousin, your uncle, your
           brother.  Call anybody you fucking want.  Buy a fucking
           plane ticket.  Don't be there when I get back.

CW:        He, he told me that.

MB:        His cousin that was with you.

           He's slap him.

JM:        His cousin already told me.  Do whatever you want.

CW:        Ah, he's, he's, he's a (UI).  He's up to much.

JM:        He lies so much to me, this little cocksucker.  Him,
           Joey DeFazio, all are the same, same...

(CW's cell phone ringing.)

CW:        I (UI)

JM:        (UI) constantly fucking telling me stories.

CW:        Here's Mike.

(Phone ringing.)

CW:        Mike, where are ya?

MIKE:      I should be there in about eight minutes.

CW:        Okay.

MIKE:      All right, I'll (UI)

27

281A-MM-88632

CW:      Okay, sounds good, 441, okay great, all right.

MIKE:    Bye.

CW:      Bye.

(CW ends phone call.)

JM:      (UI)

CW:      Yeah.

JM:      (UI)

CW:      Yeah.  Uhm...  No, I mean I ah...again I, I don't like
         to...you know.  I get crazy when I don't, don't do
         something right.  But so, so I'll get those tickets for
         you.  I'll get those for you.

JM:      Ricky Martin?  I really want backseat passes.

CW:      I don't know if I can swing that.

JM:      Back, backstage passes.  My daughter's in love with
         Ricky Martin.  She thinks he's (SC) (UI)

CW:      If it was Bon Jovi I could do it.

JM:      He's from New Jersey, Bon Jovi.  My daughter don't know
         Bon Jovi.  My daughter knows...

MB:      (SC) (UI)

JM:      (UI)... My daughter's two years old, sings it.  Had
         him on stage in a fucking boat singing it.

CW:      Yeah?  The cruises are good...

JM:      Singing Rock-a-Bye-Baby...

CW:      You didn't like a cruise?  I think it's a great
         vacation.

JM:      Ah...maybe when you don't have kids.

CW:      Oh yeah.

28

281A-MM-88632

JM:       Maybe if I was there just me and my wife.

CW:       You could dance, you could gamble...you could do
          anything you want.

JM:       What can I do?  My daughter wouldn't even go to the
          kids clubs.  I had no babysitter...

CW:       Oh...

JM:       ...it isn't like Vegas so I took a babysitter with me.

CW:       So then you're trapped.

JM:       So I'm trapped.

(CW's cell phone ringing.)

JM:       I gotta get up when she gets up.  Sleep when she
          sleeps, eat when she eats...and I want sun.  I put her
          in the room once, once they were, they were fucking
          calling me on the paging system, come pickup your kid.
          I swear to God.  You don't know.

CW:       (On cell phone.)  Hello.

JM:       They were calling me to pick up my kid.

RALPH:    (UI)

CW:       Hey.

RALPH:    (UI)

CW:       (UI)

RALPH:    Where's the (UI)

CW:       Yeah.

RALPH:    (UI) and cash.

CW:       Cash?

RALPH:    (UI)... when you get the cash tonight but it's gotta be
          paid next day.

281A-MM-88632

JM:      Sounds like Fat Ralphie.  You can hear his fucking
         voice right from here.

RALPH:   (UI)

CW:      Uhm, I, I can't get involved in any of that cause I
         hadda take a couple of steps back.  You know.

RALPH:   Who do you like (UI)

CW:      Okay.

RALPH:   (UI)

JM:      Who do you like tonight.  (UI)

CW:      Ah, Cubs.

JM:      (UI)

CW:      Cubs.

RALPH:   (UI)

CW:      Ah, they should be about 150 - 160.

RALPH:   Favorite?

CW:      Yeah.

RALPH:   And they're playing...

CW:      Ah, Cubs are playing Montreal.

RALPH:   (UI)

CW:      Yeah, no in Montreal.  And then Detroit's a strong, oh,
         not Detroit, uhm, Cubs, Toronto.

RALPH:   (UI)

JM:      Tell Ralphie I said...  Let me talk to him.

CW:      Here.  I'm with somebody that wants to say hello to ya.

JM:      Hey, we, we get, we get 50 percent of the wins I'm

30

281A-MM-88632

      telling you.

(Laughing.)

JM:      Who's this.  Come on, who do you think it is?  What do you mean you don't know.  Why cause I have a cold you don't recognize me?

RALPHIE:  Is it (UI)

JM:      No.

CW:      He (UI)

JM:      You, you were close though.

(Laughing.)

JM:      Come on Ralphie.

RALPH:   I don't know.

JM:      You don't know who this is?  (UI)

RALPH:   Give me the first name.

JM:      J.

(Laughing.)

JM:      Look at him, I can't believe you don't know who this is.  How come I can hear your voice 50 miles away and I know who it is and you have no idea who this is.

RALPH:   I'm international.

JM:      You're international, you're all right.

(Laughing.)

JM:      I just told ya.

RALPH:   With a J?

JM:      How many, how many guys you know with a J beside your friend?

31

281A-MM-88632

CW:       That owns a store.

(Pause.)

JM:       Come on, I'm at, I'm at the check cashing store in
          Margate. Who do you think you're talking to?

RALPH:    (UI)

(Laughing.)

JM:       Jesus Christ!

RALPH:    How was your vacation?

JM:       It was good.  Good.

RALPH:    (UI) if you wanna say hello.

JM:       Who?  Your, your friend?

RALPH:    (UI) friend.

JM:       Your friend.

(Laughing.)

JM:       All right.

MB:       Hello.  Hey.  How are you?  Not much.  How, what's
          going on with you?  Yeah, you here for, for, for a
          while or what?

RALPH:    (UI)

MB:       Yeah.

RALPH:    (UI)

MB:       Oh. All right.  Maybe we'll hookup or something.

RALPH:    All right.

MB:       All right, pal.  I'll see you later.

CW:       Let me talk to him.

32

281A-MM-88632

MB:      Hold on.

JM:      Put ah (UI) get nervous when I get on the phone...

CW:      Do they?

JM:      ...(UI)

CW:      They did get nervous.    (Laughing.)   I didn't give him
         the games.   (UI) the games.

JM:      Well he got nervous.

(Pause.)

(Laughing.)

CW:      I don't know if you'll be sit, sitting with me but
         he'll check it, but otherwise he'll get good seats.

JM:      So what do you do, you're, you're giving handicapping
         games to everybody?

CW:      Certain, he asked me.  Actually, John, ah, Johnny...

JM:      Johnny Boy?

CW:      ...asked me.

JM:      To, to handicap him?

CW:      For Ralphie.

JM:      And...are they giving you anything or no?

CW:      Well we'll see.   It's just starting...

JM:      Oh, okay. I told him 50 percent.  You heard what I told
         him.   I'm gonna tell him they gotta give you something.

CW:      All right.  Well they gotta and if he gives me I'll...
         everybody and anybody...that's fine, I'll take care of.

JM:      Are you, are you playing yourself or no.

33

281A-MM-88632

CW:     No, I don't play.  I don't play John.

JM:     So why you handicapping him?

CW:     (UI)

JM:     How about Huey?  Huey doing the handicapping service or
        no?

CW:     Yeah.

JM:     He's got that tape, he's worthless, isn't he?  I don't
        understand this fucking guy.

CW:     He doesn't, doesn't, hey he just doesn't do things
        right.  I gotta guy that's willing to back me and do...

MB:     He's on vacation in Cape Cod?

JM:     Did he drive up or he flew?

CW:     Flew.  Coming back tonight.

JM:     Cape Cod, where'd he go to visit ah, John, JFK?

CW:     JFK.  Yeah.

JM:     He wanted to see the memorial.  Did he go up with
        fucking flowers in his hair?  What the fuck did he go
        to the Cape for?

CW:     First, first they just...

JM:     It must be a zoo up there right now because of that.

CW:     (UI).  People don't wanna leave.

JM:     Who the fuck goes to Cape Cod?

MB:     The rich.

JM:     Do they?

CW:     He's got some relatives up there.

JM:     He's doing all right.

34

281A-MM-88632

MB:     You ought to see up by Joe.  I could be in a room on
        the beach.

JM:     Ah.

JM:     It's season.  If it's season then see summertime for
        them is season up there.

CW:     Where'd you go?

MB:     Fort Walton Beach.

JM:     Remember when we asked what season.  They said in the
        summer.

MB:     Oh, man was it nice.  You oughta see the flea bag (UI)

JM:     Summertime.  You didn't book the room in advance?

MB:     No, cause I never had trouble.  I didn't, you know I
        was never, I was never there in Aug, in ah, July.  The
        I had trouble getting a room there.

CW:     Laptops, I got the new best laptops out.

JM:     (UI) one.

CW:     Well I mean if you know of people.  How much it cost
        me.

JM:     (UI)

CW:     Yeah, I wish.  A thousand.  And they're twenty-six,
        twenty-eight hundred machines.  Compaq.

JM:     I gotta truckload (UI) you gotta guy wants them?

CW:     Yeah, I could...I could (UI).  This, between this kid
        and the other guy...

JM:     (UI)

CW:     Like nothing.

JM:     You gotta find out who sends (UI) to us.  We took, we
        took the from a company that owed us money.  I got a

35

281A-MM-88632

            whole (UI)...no, no hassle, no nothing.

CW:      Yeah.

JM:      Uh-huh.  (UI) this guy, he wants to get...

MB:      Coast, Coast Diving.  Another customer (UI)

JM:      Tell him what the fuck (UI)...

MB:      I don't even want to talk to him.

JM:      See if he's throwing rocks through the fucking window.
            Just tell him we're on delivery and they don't deliver,
            (UI)money (UI).

MB:      This is such bullshit, I don't know.

            Is it?

CW:      (Sighs.)

(Pause.)

CW:      Yeah, any kind of...he got us tickets for any, an kind
            of event, I could help you with that.  In fact I got my
            banker.  See what my...my banker blew it.  He, he had,
            the one check came back.  And normally he doesn't let
            any checks go back I got him tickets for Tampa
            Bay/Denver, on the 35 yard line of Tampa Bay.

JM:      In Tampa Bay?  I have a Sky Box there.

JM:      Yeah?

JM:      Through Banker.  (SC) (UI)  .

CW:      Banker is office supplies.

JM:      My friend's the CEO of the company.

CW:      Oh...

JM:      They have a box.  They told me I can go to the hockey
            games in Tampa.  I can go to football games in Tampa.
            I can go to baseball games in Tampa.  They got Sky

281A-MM-88632

Boxes for every fucking thing up there. So what, I'm never in Tampa.

CW: Where is this kid. He was in South Gate and 441.

JM: Oh yeah, there's traffic right now. Crossing that fucking Atlantic Boulevard at this time take you a half an hour.

MB: Call Fred Morgen stern.

JM: Fred Morgenstern, he don't answer his phone.

CW: Oh.

JM: Oh ah, what's his name?

CW: Yeah, couple of things. I met Little, Little, Little Frankie. One, again, understand it's the father that's talking. The father says how bad this kid is. He went for another twelve. He's still, the kid is real bad. And what, what address do you have?

JM: I don't have an address. I only got a phone number. He used to live in West Palm Beach in somebody's apartment. But I don't even have a fucking address.

CW: You don't?

JM: He was living with his girlfriend. He's not living with her no more. She threw him out.

CW: Girlfriend. He was with his girlfriend, in West Palm Beach?

JM: Ah, I don't know where the girlfriend lives. The phone number I have is his girlfriend's phone number. That's her recording. Frankie's (UI) too, he owes him money, right?

CW: Yeah, yeah, but he's more, he's...he's trying follow for, for you.

JM: Yeah. I, the only phone number I have was at...

CW: Here's, Frankie's handwriting. Cause I told him I was

37

281A-MM-88632

      gonna see you Monday.  Address...possibly...

JM:     He lives, he lived in this kids house in West Palm
      Beach...on the Intracoastal.  He lived in a condo.  He,
      he didn't pay the guy.  He owes the guy 60,000 for
      fucking rent.  He never paid him rent for two fucking
      year, so the guy threw him out.  From there he moved in
      with (UI)...

CW:     For two years.

JM:     From, from there, from there he moved to ah, is it, 30,
      maybe he owes him 30,000.

CW:     Oh, well that's, that's...

JM:     But it's an Intracoastal house.  The guy was getting
      like 25 hundred a month for fucking rent.  He went in,
      he didn't pay him rent for two fucking years.

CW:     That's 30,000 one year.  25 hundred.

JM:     Right, so that's what I'm saying it's close to 60,000
      he owes him.  That's what I believe he owes him 60,000.
      So it was a penthouse apartment.  A penthouse.  A
      penthouse.  This guy Joe Rasick (PH).  Another friend
      of, of Jack and Alice.

CW:     So he went to try to get, you know, see what address he
      might have had because he can't...

JM:     I don't have an address.  I'm so fucking aggravated.
      Let me call him first.

(Dial tone.)

CW:     You ready to leave?

JM:     Yeah, I'm just waiting for this guy.

CW:     Oh, okay.

JM:     (UI)

CW:     I thought maybe you were waiting for a delivery.

281A-MM-88632

JM:     Yeah.

CW:     You know I, I, one thing I don't, I don't play, John.
        I don't play sports at all. Horses I'll play. I don't
        play sports.

JM:     How you doing with the horses?

CW:     Good. Well I haven't been able, I haven't been able to
        go.

JM:     Then go (UI)

MB:     Still give promotions on the Internet?

CW:     Huh?

MB:     You still can get the races on the Internet?

CW:     Yeah. (UI)

CW:     You have the real player?

CW:     Yeah.

MB:     Make a bet...on the Internet?

CW:     If you wanted to. I, I didn't set up and account. But
        if you wanted to you could.

JM:     Better call your wife so she knows.

CW:     I called her one time.

JM:     Okay.

CW:     I think she heard, might have heard your voice in the
        background. (UI)

JM:     (UI) Like this fucking guy with this fucking thing.

MB:     Bond, I just called him again.

JM:     And?

MB:     I got his recording. Says he's in the office but he's,

39

281A-MM-88632

                he's busy, he'll call back.

JM:     He's in the office but he's busy.  Freddie's fucking
        (UI)

(Dial tone.)

(Dialing.)

CW:     Do you have a laptop?

Operator: You have reached the (UI) voice mail box of...Fred
          Morgen stern.  To reach...

(Dial tone.)

(Dialing.)

JM:     Where's Pam?

MB:     Away, away till Wednesday.

JM:     Where is she?

(Phone ringing.)

MB:     She's in LA somewhere.

CW:     Is (UI) still work in here?

        (UI)

CW:     Is that girl still working here?

JM:     (UI)

(Phone ringing.)

CW:     No, she's gone.

JM:     She'll be back.

(Laughing.)

CW:     Some guy was answering the phone.  I don't know who.
        (UI)

40

281A-MM-88632

JM:        (UI)

(Phone ringing.)

CW:        God he said eight minutes, that was twelve minutes ago.

PEGGY:     Hi, this is Peggy.  I can't get to the phone right now.
           If you leave a message I'll give you a call back.

(Dial tone.)

(Dialing.)

CW:        Yeah, cause what's his name said he going to move some
           guys by you, move some for foot, football, good guys.

CW:        Owner of Service Merchandise.

JM:        (UI)

(Busy signal.)

CW:        He lives right next door to my, my big player.

(Dial tone.)

JM:        He's coming in here Mike.

(Dialing.)

CW:        Where is this kid.  This kid drives me crazy.

(Dialing.)

CW:        Did you ever get that connection for your laptop?

(Phone ringing.)

JM:        Write it up CW.  He's on the (UI)

(Phone ringing.)

JM:        I wanna work out at the fucking gym.

CW:        Everybody works out on Mondays.

41

281A-MM-88632

(Banging.)

(Phone ringing.)

JM:      (UI)

CW:      (UI) you ever see a tricep like that.  Like a rock.
         Feel it, Mike, feel it.

JM:      (UI) it's like a fucking rock.

CW:      Yeah, but imagine yeah Louisville with this.

(Recorded phone message.)

CW:      You know what I do?  Get two ten, ten pound dumbbells.
         You watching television tonight, you just sit
         there...and you just, and I'm telling ya.  Do three
         sets during the whole night.  Just watching television,
         nice and easy.  Ten pounds.

JM:      I started doing (UI) fucking exercise for me.  I ain't
         eating.

MB:      (UI)(laughing).

CW:      Get those pills, those pills I, I can't...

JM:      I take them.  I got them pills.  Frankie Russo gave
         them to me.  Same thing, they don't fucking work.

CW:      (UI).  I, I have no appetite with these.

JM:      I got an appetite.

CW:      John, I...

JM:      CW, it looks like you got an appetite as well as mine.
         (Laughing.)

CW:      John, I know but (UI)

JM:      (SC) (UI) you than me.

CW:      With, no but I've lost eleven, that's how big I was.  I
         was up to 270.

42

281A-MM-88632

JM:     Yeah, I'm about 260 now.  I gotta lose a little weight.
        I gotta lose, I wanna (UI)

MB:     (UI)

CW:     You know what's it's bad when you sit down and you feel
        this come up to here.

MB:     I wanna get to 230.

JM:     235 is my perfect weight.

CW:     Do you remember when celebrities was (UI) I was down to
        228.

JM:     Yeah, I was down, when Joe was home I was down to
        230...235.

CW:     He's coming back soon.

JM:     Yeah.  (UI)    I gotta go play golf.  I gotta fucking
        (UI).

CW:     It's great.

JM:     Yeah.  My son's been breaking my balls.  I'm taking all
        my kids to the (UI)

CW:     John.  John.  Take a few minutes.  I'll go to the range
        with you everyday.

JM:     Fuck the range, I need to get a professional (UI)

CW:     My friend will teach you.  My friend shoots in the
        70's.  The hockey player.  He'll, he'll teach you.
        ·He'll give you...

JM:     You know if you need.  I need to go to a camp first,
        for five days.  It's a, it's just a, a camp for golf.

CW:     I got one (UI)

JM:     That's all you fucking do.  You hands will be, your
        hands come home, they, they look like you worked.
        That's how many golf balls you fucking hit.  And you'll
        hit it right.

43

281A-MM-88632

CW:     You know the pros after they play, you know what they
        do?  After they play a round of golf like a tournament,
        when they're done playing they go right to the range.

MB:     Huey said he's good.

CW:     Huey?  I give him credit.  Huey's a very good golfer.

JM:     Yeah, he said he was.

CW:     But this, this, this friend of mine, the hockey
        player...

JM:     Huey was a good basketball player too.

CW:     Let me, he's an athlete.  He really is.

JM:     He told me he was in a (UI) (laughing).

CW:     I mean look at this.

        (SC)   (UI)

MB:     I know he could run.

CW:     He could run, he could, he could run.  He could...

(Laughing.)

MB:     He (UI)...

(Laughing.)

MB:     Bobbing and weaving.

(Laughing.)

CW:     He could, he ran circles around...

(Laughing.)

JM:     (UI)

MB:     He's a pinball.

JM:     Right here (UI)

281A-MM-88632

(Laughing.)

JM:        He knows he's a little cocksucker.

           (UI)

CW:        Where is this guy?

CW:        Mike.

CW:        Southgate and 441.  Is like twelve days.

JM:        No, he's, he'll be here.

CW:        Well all of a sudden you got patient.  (Laughing.)
           Listen, he was spitting blood a couple of minutes ago.
           Now he's a patient guy.

JM:        (UI) I'm on medication right now.  You don't know.  I'm
           not even (UI).  Probably thinks we're fucking close.

CW:        No, no, he knows (UI)

MB:        Huey told me go to the range, and just take one club.
           Take a different club...

CW:        You're supposed...

JM:        You mean everyday?

CW:        Okay.

MB:        Every, every time you plan to go just...take one club,
           a different club.  Just play that club.

JM:   .    Why?

MB:        He said that's how you, that's how you get good.  You
           learn, you learn the range of your clubs, how good you
           can hit it and you'll, and he said that's how you
           master it.

JM:        Well that's the key is to know what you can hit, the
           distance, what distance you can hit with the club.
           Cause that's all it is.

45

281A-MM-88632

CW:      It's you're swing.

MB:      But you know what it is when I watch these guys...

JM:      Positioning is, it's like playing pool, you gotta
         position your ball for the next shot.

MB:      But when I watch these guys they always make a fucking
         divid (PH) and it's always in front of the ball, after
         they hit it.    That's the fucking key.

CW:      Here he is right here.  Let me run outside and get him.

JM:      Let me open the door.

(Pause.)

JM:      Make sure he (UI)

CW:      Yeah.

(Pause.)

(Opens door.)

(Beeping.)

(Walking outside.)

CW:      Yeah, Mike, let me take it.

MV:      Yeah.

CW:      Cause they're really closed right now.

MV:      Okay.  Let me open it up here, that's that one...  Hey
         can I cash that, do they have enough to cash that check
         that I got from the (UI)

CW:      How much is that?

MV:      Is from the PRS guy, not this one but another one.
         It's like twenty-five hundred.  Do they have enough to
         cash it?

CW:      I don't, actually they're, they're waiting for

281A-MM-88632

delivery, they're closed.  Okay.

(Zipping.)

CW:       Here, you know what you gotta, just, just sign the back
          of this.

MV:       Sign what?

CW:       Just sign the back of this thing.  Don't worry about
          it.

MV:       I don't even wanna touch this fucking check.

(Laughing.)

CW:       Just sign the back of it.

MV:       Sign, but it's Anabel, it's a girl.  How the hell do I
          sign this...

CW:       Just sign Anabel, whatever.  Just, just make sure you
          got the right, just scribble anything on it.  I mean it
          doesn't matter to them.

MV:       There you go it's the proper spelling, just sign it
          here...is Anabel at 21.  Anabel...oh yeah.  (UI)

CW:       Are you kidding me?

MV:       Hell no, I ain't kidding you.  I don't wanna touch this
          fucking shit.  Cause they could always report it saying
          Tom, Dick and Harry, you know.  (UI)

CW:       When are you meeting what's his name?

MV:       I'm meeting him...right after I leave here.

CW:       He's gonna be short fifty dollars.  You know?  So he
          asked me if I can lay it out.  I, I, I do, but I just
          can't lay it so I have to give you fifty dollars.

MV:       Okay.  Ain't no problem.  Don't worry about it.

CW:       What's the matter?

47

281A-MM-88632

MV:      (UI)  All right  (UI)

         I wouldn't (UI)

CW:      Stop that.

MV:      (UI)

(Walking.)

(Inside store.)

JM:      Hurry up before this guy comes in.

CW:      Who?

JM:      This ah, this guy, I don't know who the fuck he is.

(Pause.)

JM:      (UI)

         (UI)

MB:      And why did you say you didn't buy nothing?

JM:      Cause she didn't buy the right stuff.  She didn't buy
         mushrooms.

MB:      You didn't buy nothing.  I, I just put stuff on the
         list that I knew I need.  You didn't put, you didn't
         buy anything extra?

(Pause.)

CW:      I'll still owe (UI)...

MB:      (UI) yourself (UI)

CW:      The twenty-one thirty-four.  I'm gonna still, I'm gonna
         still owe you a couple dollars.

MB:      All right.

MB:      Is this the ah...

281A-MM-88632

JM:     Did you lock the door?

MB:     Yeah.

JM:     All right let me get out of here.

        Who's this guy.

        Who's that guy.

MB:     I never saw him before.

(Shuffling papers.)

CW:     I said what kind of (UI) August 21st on there.  '98.

JM:     Yeah, it's got August 21st.

CW:     Why does it have August 21st, from an escrow company.

JM:     It can't be August.  We can't cash it.

CW:     Maybe you should call.  I don't understand that.

JM:     Can't cash it if it says August.

CW:     No, it says '98.

JM:     August 21, 1998.

CW:     You know what is, he had somebody died, maybe they...
        well...

MB:     Find out from him first.

JM:     Go out the side door.

CW:     Huh?

JM:     Go out the side door.  The fucking (UI)...

CW:     Hey what is...  How can that be?

MB:     I know, ask him.

CW:     I got it on here.   Yeah.

281A-MM-88632

(Walking outside.)

CW:      How...

(Pause.)

CW:      What if this...boy it's almost a year old though.

MV:      Uh-huh.  And I told you remember.

CW:      Yeah.  Well, well no, I, thought you said a couple of
         months.

MV:      Oh (UI)

CW:      Maybe, did this person die or anything?

MV:      No.  That's, that's (UI)

CW:      Uhm...  Did you have something else you wanted me to
         leave?  To get cashed?  Or no.  You wanted...

MV:      Well no, cause I need to cash tonight cause I gotta pay
         somebody but if I can't get the cash now I'll get it
         first thing in the morning.

CW:      Okay.  Okay, well I'll get it from him.  I'll take, you
         know...

MV:      Okay.

CW:      They're just waiting for a delivery.

MV:      Okay.

(Walking.)

CW:      You wanna go and I'll call you later.

MV:      Okay.

CW:      I'll take care of it, don't worry, you'll...

MV:      No, no problem at all.

CW:      You're (UI)

50

281A-MM-88632

MV:     All right if you, if we could get, if you could take
        care of that then I'll go ahead and take of you on your
        ah system (UI)

CW:     All right, yeah, we'll take care of it.

MV:     We're squared away, all right?

CW:     Yeah.

(Walking.)

CW:     He (UI) was his aunt.  He says that was his ah, his
        aunt, (UI) time, and she just never did anything with
        it.

JM:     Oh, she never cashed it?

CW:     No.

JM:     Why?

CW:     Well, she, she's like a little...

JM:     Yeah, but will they allow her to cash it now?

CW:     Oh.

JM:     Did she sign or did him?

CW:     Oh, well it was his (UI)

MB:     His signature.  I mean it, you know sign it's signed
        down (UI) whatever.  It has no expiration like can't
        cash after a year or anything like that.  Send it in.

CW:     Oh can you, can ah...well I don't wanna tell you, I, I,
        I'm not (UI), I'm not doing anything crazy here.

        (UI)

CW:     I looked at it, it says August, I'm, I, I was like,
        this is postdated.

JM:     That's what I thought you was saying, that's why I kept
        saying (SC) you can't cash it (UI)

51

281A-MM-88632

CW:     Yeah, you can't cash it, no.

JM:     Let me see what that says.

(Pause.)

CW:     It's a payoff overage.  She might have forgotten about
        the (UI), she sold her house.  That's what it was.

(Phone ringing.)

JM:     Why the fuck would she just keep the check this long?

CW:     I'm, John I just ah...

JM:     (UI)

CW:     I have no idea.

(Pause.)

CW:     I, I, I do appreciate.  I don't, I don't like to get, I
        don't want...because of my (UI) with you, I always want
        to do everything right with you, you know what I'm
        saying?  I don't want...  For me to be late, it,
        believe me it's something that's not right.

(Pause.)

JM:     Yeah.  When this week?  When this week is he supposed
        to be back?

CW:     Oh, I thought he called in sick.  That's all I'm
        listening, I don't (UI)...

JM:     Yeah.

(Pause.)

CW:     Let me know about that...those computers supplies.

JM:     Yeah.

MB:     All right, let me know.

CW:     Cause what they do...John, there's a big market

52

281A-MM-88632

                overseas in Brazil and whatnot.

JM:      Well that's it, if he gets them now I think they got to be shipped out right away.

CW:      They get, that's what they do...and they make a lot of money. And if the stuff isn't good they, people don't come back from Brazil.

JM:      (Clears throat.)

CW:      Mike.

MB:      Yeah.

CW:      All right so just ah, it's a payoff overage from when they, she sold the house.

MB:      But she never (UI)

CW:      Yeah.

MB:      It's no big deal.

CW:      Okay, if, if, you know I don't want you to think I'm doing anything (UI)

MB:      No, no, I don't think that, I was just wondering...

CW:      Okay.

MB:      ...where he got it.

CW:      Cause when I looked I saw August. I'm saying, I thought it was postdated. Let me just take a quick leak.

                (UI)

CW:      I thought it was postdated.

(Pause.)

(Using restroom.)

(Walking.)

281A-MM-88632

CW:     All right.  Can I dump this somewhere?

JM:     Yeah, right in the (UI)

CW:     You look like you're anxious to leave. (Laughs.)

JM:     Yeah (UI)....

CW:     Sorry you hadda wait for me.

MB:     No, no, that's all right.

JM:     All right, I'm out of here.  I would know what to do
        (UI)

CW:     I'm out of here.

MB:     With what?

JM:     There's another guy that's coming in.

CW:     I owe you 200.

JM:     (UI)

(Beeping.)

(Walking outside.)

CW:     I owe you 200.  All right?

JM:     I'll see you ah...

CW:     Tomorrow or Wednesday definitely.

JM:     (UI)

CW:     Let me know about that stuff.

JM:     (UI)

CW:     John?

JM:     Yeah, you already asked me (UI)

        You can reach me (UI)

54

281A-MM-88632

CW:      Okay.  Let me uhm, and I'll get those, just let me know
if it's four or six tickets, six.  All right.  Thanks
for your understanding.

(Getting into car and closing door.)

(Starting car.)

(Beeping.)

(Pause.)

CW:      This is Hard Eight.  The meeting concluded uhm...heard
conversations from John Mamone, Mike Buccinna, alias
Mike Boots, Hard Eight...telephone calls and ah, Mike
Vidal who is a computer person, (UI), not related to
the situation, and...phone calls from ah, Fran, my
wife.  Okay, Hard Eight.  Hard Eight.

End of tape.

```
FILE NUMBER:                  245A-MM-91505

CONVERSATION DATE:            02/02/2000

CONVERSATION TIME:            09:40:48

TELEPHONE NUMBER:             954/614-1821 (Cdr 0140)

CALL NUMBER:                  1395

CASE AGENT/SQUAD:             SA PATRICK G. BRODSKY/OC-2

REVISED BY:                   SA CHRISTOPHER S. STARRETT

DATE TYPED:                   03/29/2000


PARTICIPANTS:                 JM  -  JOHN MAMONE
                              PA  -  PHILIP ANDREOLA


ABBREVIATIONS:                (UI) - UNINTELLIGIBLE
                              (PH) - PHONETIC
                              (IA) - INAUDIBLE
                              (SC) - SIMULTANEOUS
                                     CONVERSATIONS
```

245A-MM-91505

        (Phone ringing)

PA:      Hello.

JM:      Phil.

PA:      Hello!

JM:      Phil!

PA:      Yeah, John.  I'll see you around eleven.

JM:      Yeah.  Listen to me.  You can't.  You told me to tell the guy to put the fuckin' two checks in the, the checks back in, he puts them back in, they come back again.  You gave me your word you would cover these fuckin' things.  You're making me look like a real fuckin' jerk off.  You can't fuckin' do this.  Bring me the fuckin' cash today.  Don't bring me no more fuckin' paper, don't ask me for no more favors.  You're burning your fuckin' bridges my friend.  You are fuckin' burning them rapidly.  I can't have this fuckin' shit.  These people are my fuckin' friends.  Don't fuckin' tell me to redeposit something and then don't fuckin' cover.  You gave me your fuckin' word.  There's fuckin' ten grand in checks this guy's got.  He's got ten.  Mike's got six.  They're all over my shit.

PA:      No he don't have ten.

JM:      He's got ten.  He's got two 3's and two 2's they're coming back he told me.

PA:      Two 2's?

JM:      He said, that's what he told me.

PA:      No, he's got the, the thirteen is, is ah.  What's taken care of.  The thirteen hundred was taken care of.

JM:      Yeah, you give me money for it, that's why it was taken care of.

245A-MM-91505

PA:     Right.

JM:     But what about the fuckin' 3's and the 2 the other
        day?

PA:     (UI).

JM:     Yeah, and there's not another two.  He told
        me there's two 2's.

PA:     No, no, no, there's no two 2's.  (UI) two 2's.

JM:     Where's the eight?  I got, you, I gotta have this
        money for this fuckin' guy.  I gotta got to him
        with money today.  Why didn't you cover them?

PA:     Cause I just got a few dollars now.

JM:     Yeah, but you told me the lady was covering the
        checks.

PA:     I said if she didn't cover 'em, I would cover
        'em.

JM:     Right.  So but why did, why did you tell me that
        if you're not gonna do it.

PA:     (UI) the fuck.

JM:     All we're doing is getting in fuckin' thing worse
        and worse and worse and worse.  I can't do it.  I
        go from one fuckin' store to another and I leave
        them all with a debt.  I can't do this.  You gotta
        fuckin' get outta the situation.

PA:     I'm in a bind now.

JM:     I mean every week you tell you just need one
        more week and then you've been telling me
        that for six fuckin' months.

PA:     I know that's the truth (UI).

JM:     But for six months you told me you need one
        week...

3

245A-MM-91505

PA:        I know.

JM:        ...and for six months it's the same story.

PA:        I know.

JM:        I mean you gotta hear yourself talk to me.

PA:        I know.

JM:        You can't do this to me Phil. You can't.
           You gotta fuckin' take care of this shit.

PA:        All right, just gimme a little time, I'll take care of
           it.

JM:        Well what's a little time. I need to get this
           fuckin' done. I gotta go see him.

PA:        Ah.

JM:        You told me give you a little time with Mike
           and it's fuckin' a month went by, you still
           didn't pay him.

PA:        Yeah.

JM:        I mean you know, you're taking away the livelihood
           of these people. That's how they make their
           fuckin' money by pushing fuckin' money out. And
           you're fuckin' holding them up. Mike's store's
           fuckin' tight.

PA:        Yeah.

JM:        Bruce is working day by day. Come on. Nobody
           goes up to your business and holds you up from
           making a living.

PA:        No, no, I, I understand John, I'm wrong. I
           understand. I understand. (Sighs)

JM:        You know ten G's is two hundred dollars a day
           to these guys, 250 a day. I mean you gotta
           come up with a better solution then, then
           just carrying checks week by week...

                                4

245A-MM-91505

PA:     Yeah.

JM:     ...and having them fuckin' bounce.  And, and
        floating your fuckin' money for two weeks.

PA:     Now I'm, I'm, I'm trying to get that damn
        fuckin' ah, pre-permits.  I'm supposed to get
        the (UI).

JM:     Yeah, but you been telling me your startin'
        seven houses, you done this, you (UI).

PA:     I know.  I know.  (UI).

JM:     Come on this thing is goin' on a month.  I'm
        hearing the same thing for a month, I mean...

PA:     I know.

JM:     ...the same with Joe Bellitto.  I can't go on like
        this.

PA:     I know.

JM:     I mean I built fuckin' houses.  I, I, I never
        had these kind of fuckin' problems.  You
        build when your supposed to fuckin' build.
        You get your permits and you go.

PA:     I hear ya.

JM:     I mean I don't know what the fuckin' problems
        are.

PA:     I can't get the, you know, I gotta get the money
        for the permits and I, I'm right up to there right
        now.  I got three permits sitting down there.  And
        I gotta give 'em three thousand dollars right now.

JM:     I mean go to Joe and get mon-, money out of
        him.  Work a fuckin' deal.  Get the fuckin'
        out, get outta the other situation.  Your
        better off paying him at the end then paying
        every week.

PA:     Yeah.

5

245A-MM-91505

JM:        What more do you fuckin' need.

PA:        All right, I'll call you back in one hour,
           John.

JM:        All right, one hour because I gotta go down
           there.  I gotta see him.

PA:        Right.

JM:        I gotta, I gotta pick up from last week yet.  It's
           fuckin' Friday, it's two days away.  I gotta straighten
           out all this bullshit.

PA:        All right, I'll call you back in one hour.

           (Phone hung up) (END OF CALL)

6

FILE NUMBER:                    245A-MM-91505

CONVERSATION DATE:             02/28/2000

CONVERSATION TIME:             09:34:42

TELEPHONE NUMBER:              954/614-1821 (Cdr 0233)

CALL NUMBER:                   2568

CASE AGENT/SQUAD:              SA PATRICK G. BRODSKY/OC-2

TRANSCRIBED/TYPED BY:          BARBARA L. CHAFIN (HRA)

DATE TYPED:                    06/15/2000


PARTICIPANTS:                  JM - JOHN MAMONE
                               PL - PHILIP ANDREOLA


ABBREVIATIONS:                 UI - UNINTELLIGIBLE
                               PH - PHONETIC
                               IA - INAUDIBLE
                               SC - SIMULTANEOUS CONVERSATION


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

245A-MM-91505

(telephone dialing)

(telephone ringing)

PL:     Hello.

JM:     Phil.

PL:     Yeah John.

JM:     Listen, I don't know what the fuck you're doing, but
        that three and two came back, the fucking guy's
        screaming at me, how... no checks you gave me are good,
        I, I don't understand what the fuck you think that,
        that, that they wouldn't come back or that I'm a, I'm a
        jerkoff but... how the fuck can you just keep telling
        me they're good and they're not good.

PL:     I put it in the bank.

JM:     Phil, the fucking mother-fuckers came back twice, the
        guy's making me pick `em up today, he wants his money.
        The three and the two.

PL:     (SC/IA)

JM:     That's two fucking weeks old, those checks.  I want the
        fucking money today Phil, I'm done with you believe me,
        don't call me your fucking friend, don't call me
        nobody.  I want the money today.  Give me the 5,000 for
        those two, you've got to give me 6,300 for the other
        guy, you got to give me 6,000 for Mike, I want the
        fucking money today Phil.  Don't make me come look for
        you.  I want the fucking money today.

(END OF CALL)

2

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          CASE NUMBER: 00-6309-CR-Seitz

      Plaintiff,

vs.

JOHN MAMONE

      Defendant.

_____/

## NOTICE OF CHANGE IN POSITION OF PRETRIAL SERVICES IN REGARD TO DEFENDANT JOHN MAMONE'S MOTION FOR ORDER ELIMINATING HOUSE ARREST COMPONENT OF BOND

THE DEFENDANT, JOHN MAMONE, through counsel, notifies this Court that the position of Pretrial Services in regard to this motion has changed, and the statement of no objection made in the motion is no longer correct. The position of Pretrial Services is that they would not object to a modification of house arrest so that PTS is given the authority, on a request by request basis, to permit Mr. Mamone to leave his residence.

By way of background, it is important to point out that the genesis of the original motion was the suggestion by David Nuby, Jr., the Pretrial Services officer, for the defense to move to eliminate house arrest, due to the passage of time. Prior to preparing the motion, defense counsel spoke directly with Mr. Nuby to ask for his position. Mr. Nuby told counsel he was not permitted to say he agreed to the motion, however, he stated he did not object, and that counsel could put that in the motion.

Upon completion of the motion, but prior to seeking the Government's position, a copy of the motion was sent, via facsimile, to Mr. Nuby. Mr. Nuby was then called and asked, again, his

position on the request and whether it was properly stated in the motion. Mr. Nuby said the language that was in the motion was correct as to his position. A copy was then faxed to the Government. The prosecutor told counsel the Government objected to the motion. On Thursday, March 1, the motion was filed with the Court.

On Tuesday, March 6th at about 2:45 p.m. the prosecutor called counsel's office (counsel was out of town) and left a message including the information that Pretrial Services' position had changed. At about 2:59 p.m. Mr. Nuby called counsel's office and left a message that there was a "modification" to Pretrial Services' position. Upon returning to Miami on Wednesday morning, counsel called Mr. Nuby and the Government.

Mr. Nuby told counsel that he was requested to meet with the Government regarding this matter. He further told counsel that he met with "prosecutors" and "agents" and that based on that meeting, he wanted to "modify" his (Pretrial Services') position on the motion. Mr. Nuby said that the "modification" was based on the information the Government gave him on alleged violations of the law by Mr. Mamone while he was on supervised release and alleged acts of violence by Mr. Mamone. Mr. Nuby went on to say that in a few months he would be willing to reconsider his position.

In the conversation with the Government after speaking with Mr. Nuby, counsel learned that the meeting was with two prosecutors and two F.B.I. agents. Counsel objected to the manner in which the Government turned Mr. Nuby. Whether or not it was the intent of the Government, and counsel accepts as true Mr. McCormick's denial it was his intent, a meeting with two federal prosecutors and two F.B.I. agents to which another government employee is summoned smacks of intimidation. The level of intimidation greatly increases when one considers that the obvious reason

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

for the meeting was that the federal government strenuously opposed Mr. Nuby's position, feared that his position may have some effect on this Court's decision, and wanted to do all it could to get Mr. Nuby to change his position. What alternative did Mr. Nuby have? After all, he had to think that if the Government wanted to alert him to "evidence" that supported its position, a simple telephone call from the prosecutor would have sufficed. The fact the Government convened a meeting and included two high-ranking prosecutors and two agents of the F.B.I. said more than any protestations to the contrary. The Government was successful in its efforts.

The "modification" in the position of Pretrial Services does nothing to the request of the defense to delete the requirement of 24 hour house arrest. The Government cannot bootstrap their argument by using the uncorroborated allegations twice, once to request detention, and a second time to convince a Pretrial Services officer to alter his position. The fact remains that there are still other defendants in this case who supposedly committed offenses while under some form of supervision, other defendants in this case who have a prior record, other defendants in this case who allegedly committed acts of violence and even one defendant, now deceased who was supposedly John Mamone's boss, who all are on bond, without 24 hour house arrest.

WHEREFORE, the Defendant, John Mamone, continues to urge this Court to enter an Order deleting the requirement of house arrest.

Respectfully Submitted,

DAVID ROTHMAN
Florida Bar #240273

Page -3-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendant John Mamone's Motion For Order Eliminating House Arrest Component of Bond was forwarded via facsimile to Assistant U.S. Attorney Brian McCormick, 500 East Broward Blvd., Ft. Lauderdale, Fl 33301 on this the ___ day of March, 2001.

DAVID ROTHMAN

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358 - 9000 • Telefax (305) 374 - 5747

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA            CASE NUMBER: 00-6309-CR-Seitz

     Plaintiff,

vs.

JOHN MAMONE

     Defendant.

_____/

## DEFENDANT JOHN MAMONE'S REQUEST FOR HEARING
## AND REPLY TO GOVERNMENT'S RESPONSE
## IN OPPOSITION TO DEFENDANT MAMONE'S MOTION FOR ORDER
## ELIMINATING HOUSE ARREST

THE DEFENDANT, JOHN MAMONE, through counsel, replies to the Government's

Response and, further, moves this Court to schedule a hearing on the Motion and Response. In brief

support thereof, the defense proffers the following facts and argument:

1.     The Government's allegation that Mr. Mamone violated the law by attempting to

work with Keystone, a transportation company, is legally and factually wrong. Nothing John

Mamone did or said in regard to Keystone in any way approached a violation of the protective order

in effect as to Gateway Transportation, its owners and certain employees, including Defendants John

Mamone and David Bell, or, as alleged in the Government's response, constituted the crime of

obstruction of justice.

Keystone, which was never a customer of Gateway, came to John Mamone to discuss a

legitimate business arrangement. Gateway had been forced to close down, in part, by the

Government's freezing, and refusal to unfreeze, accounts that were needed to pay drivers and fuel

expenses. Grace Mamone, John's wife and a part owner of Gateway, and John Mamone, an employee of Gateway, were forced to the brink of bankruptcy by the Government's actions and were trying to save their home and pay necessary expenses. Whatever business opportunity could have been developed with Keystone, which the Government's heavy-handed tactics have now precluded, were entirely lawful.

2.      The remainder of the Government's Response is a louder version of their proffer at the pretrial detention hearing.[1] Cursing and yelling by Mr. Mamone constitute rude and vulgar behavior, but probably do not rise to the level of a criminal offense or a violation of a condition of bond. The defense is confident the Government's use of conversations that are admittedly vulgar will not inappropriately sway this Court.[2]

3.      As to Mr. Polito, if the Government was so concerned with Mr. Mamone's incredibly dangerous and violent personality, how did they permit an informant, or why would an informant on his own agree, to meet with Mr. Mamone without the protection of surveillance, either in person or via a body bug? If this violent encounter actually occurred, where is (are) the tape recording(s) of the conversation(s) following the encounter that corroborate the violence?

4.      In light of the memorandum, dated March 19, 2001, from David Nuby, John Mamone's PTS supervisor, a copy of which was received by the defense on March 20, the defense finds itself in an untenable position. On the one hand, the defense would like to take at face value the response by Mr. Nuby that he did not feel intimidated by the Government. On the other hand,

_____

[1]As in its original proffer, the Government, in its Response, has made factually incorrect or incomplete statements that, if the Court grants the defense request for a hearing, will be addressed.

[2]The quoted conversations used by the Government in its Response are identical to the conversations previously utilized at the pretrial detention hearing.

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

if he were not at least affected by the "discussion" with the two prosecutors and the two agents, why then did he not afford the defense an opportunity to respond to the Government's presentation? After all, had he done so, he would have learned the so-called threat to an off duty police officer allegedly occurred a decade ago. And he would have also learned that the case was dismissed.

Additionally, Mr. Nuby supervised Mr. Mamone in the past, before the present indictment was returned. It was his idea to file the motion to delete house arrest. If the Court goes back to the recommendation of Pretrial Services at the time of Mr. Mamone's arrest, it will find that the bond recommended was a $250,000 corporate surety bond and a $150,000 personal surety bond. At the time Mr. Mamone was arrested, as indicated in the same report, Pretrial Services was aware of the charges in this case, including the extortion charges which were part of the original indictment, but not of the superceding indictment. Finally, except for the noncrime relating to Gateway Transportation (see ¶ 1 *infra.*), everything the Government alleges as part of its Response was raised at the PTD hearing.

Therefore, although defense counsel has personally met with and spoken with Mr. Nuby and finds him to be a consummate professional, it would not be the first time an individual with the best of intentions was forced into a corner by the Government. Again, the Defense wants the Court to know that the prosecutor has specifically denied any bad or improper motivation and the defense absolutely believes him. In any event, the position of Pretrial Services now is that the Court should alter the conditions of release so PTS has the discretion to grant or deny Mr. Mamone's request(s) for permission to leave his home.[3]

---

[3]Counsel distinctly remembers the conversation between counsel and Mr. Nuby that is reflected in both the motion and Mr. Nuby's memorandum. Counsel specifically recalls asking Mr.
(continued...)

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 · Telephone (305) 358 - 9000 · Telefax (305) 374 - 5747

5.      In its Response as to Mr. Mamone's "Desire to Work," the Government claims the way Mr. Mamone plans to earn a living "falls short of verifiable employment." How can John Mamone have the opportunity to provide verification of employment if he is under twenty-four (24) hour house arrest? Respectfully, if this Court enters an Order permitting John Mamone to work, he will prove he is working.

6.      Not that this ever happens in litigation, but a somewhat cynical evaluation of the Government's request to revoke bond, filed only after receiving the defense motion to terminate house arrest, might lead one to the conclusion that the Government's exaggerated response is a thinly veiled attempt at persuading the Court to employ the "wisdom of Solomon" and deny both motions. Like Solomon certainly would, this Court should see through that ploy.

WHEREFORE, the Defendant, John Mamone, respectfully submits this Reply and, further, requests that this Court set a hearing on the Motion and the Response.

Respectfully Submitted,

THORNTON & ROTHMAN, P.A.
200 South Biscayne Boulevard
Suite 2690
Miami, Florida 33131
(305) 358-9000

BY: 
    For DAVID ROTHMAN
       Florida Bar #240273

---

(...continued)
Nuby as a follow-up to his statement that he had no objection to the deletion of the house arrest condition of the bond, something to the effect of "Can I include in the motion that you agree with the request?" Mr. Nuby responded, something to the effect of "I cannot say that," not "that is not my position." In any event, before filing the motion, a copy was provided to Mr. Nuby and he told counsel's staff that the motion accurately stated his position.

Page -4-

Thornton & Rothman, P.A. Attorneys at Law

Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Reply to Government's Response to Defendant John Mamone's Motion For Order Eliminating House Arrest Component of Bond was forwarded via facsimile to Assistant U.S. Attorneys Brian McCormick and Diana Fernandez, 500 East Broward Blvd., Suite 700, Ft. Lauderdale, FL 33301 on this the 22nd day of March, 2001.

FOR DAVID ROTHMAN

Thornton & Rothman, P.A. Attorneys at Law
Suite 2690, First Union Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 • Telephone (305) 358-9000 • Telefax (305) 374-5747

# EXHIBIT G

00-6309.ob

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6309 CR SEITZ

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JOHN MAMONE,

      Defendant.

_____/

## ORDER DENYING PENDING MOTIONS RE: BOND

**This matter** is before this Court on Defendant John Mamone's Motion for Order Eliminating House Arrest Component of Bond, filed March 1, 2001, and the government's Motion for Revocation of Bond coincidently contained in the government's response to defendant's motion, filed March 19, 2001. The Court has considered the motions, the Pretrial Services Report, and all pertinent materials in the file.

Defendant's motion seeks to eliminate house arrest without compelling support. Defendant urges that, but for the dastardly conditions of his "subhuman" confinement at FDC at the time his original hearing was held, he would not have agreed to house arrest, in the first place.[1] He had "extremely limited contact with the outside world"; "Even when he was taken from his cell to meet his attorney ...his handcuffs were not removed until he was securely locked in a 3' by 4' room ...".

---

[1]Defendant infers, without actually stating, that he would have appealed this Court's order setting bond, but for those conditions.

1

The Court is unmoved by that argument. Defendant was subjected to normal conditions of confinement.

Defendant suggests that, because he has complied with conditions for four months he should be released from the condition of house arrest, apparently as some type of "reward". Again, the Court is unmoved by that argument. Then the defendant essentially attempts to reargue matters already considered by the Court. No new evidence is presented, just more argument.

For example, as it regards the allegations as to the Al Polito incident, (pages 2-3 of the motion), we now know that the information presented by the government does not appear on the tapes submitted, and the meeting in question was not surveiled. This does not mean that the government's proffer is incorrect. In fact the government offered, and continues to offer, a reasonable explanation for what transpired and offers a type of corroboration. Short of an actual trial, which this Court cannot conduct, the explanation is acceptable. The remainder of the arguments are of similar ilk. It is, in reality, mostly re-argument.

It is unfortunate that defendant's family is allegedly suffering financial woes as a result of the bond conditions imposed. Every defendant subject to detention, house arrest, curfew, travel restrictions, and/or reporting conditions, may suffer adversely from the imposition of same. If adverse consequences of bond condition mandated not imposing them we need not have bond hearings. Finally, the delay in trial argument is similarly rejected, particularly because the delay was to accommodate defendant.

Turning now to the government's request for revocation, this Court finds it to be a classic example of "the best defense is a good offense". The alleged crime committed by defendant occurred in December of 2000. This Court has not been shown that any arrest occurred, any charges

have been made against the defendant, or any other law enforcement action of any type was instituted....until some three months later - in response to a request by defendant to eliminate house arrest. The Court finds the timing of this criminal revelation suspicious, at best. The suspicions are, at least inferentially, confirmed by the government's request that bond be revoked "or alternatively, that the defendant's request that the condition of house arrest be removed from his bond conditions de denied" (page 15 of the response).

For the reasons stated, and the Court being otherwise fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that defendant's motion to eliminate house arrest and the government's motion to revoke bond be and the same are hereby **DENIED**.

**DONE AND ORDERED** this 2d day of April, 2001, at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

cc:     Honorable Patricia A. Seitz
        David Rothman, Esq.
        Brian McCormick, Esq. - AUSA
        PT Services
        U.S. Marshal's Service

3