UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

                CASE NO. 00-6309-CR-SEITZ

    Plaintiff,

v.

JOHN MAMONE,

    Defendant.



## NOTICE OF OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND MOTION FOR DOWNWARD DEPARTURE

The Defendant, JOHN MAMONE, by and through undersigned counsel and pursuant to Rule 32, Fed.R.Crim.P., Rule 88.8, S.D.Fla. L.R. USSG § 6A1.3 (b) notices formal objections to portions of the PSR and pursuant to 18 U.S.C. § 3553(b) and USSG §5K2.0, hereby files this his motion for downward departure. As further argued here, the consequences of the Defendant's participation in the Bureau of Prisons Witness Security Program, as a result of his cooperation with the government against others, including organized crime figures, is extraordinary in nature and degree that it forms a basis for a downward departure pursuant to USSG §5K2.0. Anticipating the filing of a sentence reduction motion by the United States, the Defendant files under separate cover his Appendix in Support of Comparative Sentencing of Cooperating Organized Crime Figures. See n. 1, p. 5, infra.

# I.

# DEPARTURE ISSUE- CONDITIONS OF CONFINEMENT AND RELATED ISSUES EFFECTING A MADE MEMBER MAFIA INFORMANT

**A.   Introduction**

The Defendant and his family have suffered problems that go beyond the scope of what ordinarily occurs to cooperating government witnesses. Because of his role as a made member of an organized crime family, the Defendant, his family, and his case have been the subject of public scrutiny, including but not limited to articles published in the local media which describes his WITSEC status. See Exhibit A, *"Florida, NY Crime Figures Rounded Up; Indictments List Links of Twenty-Nine (29) People to Mob Family,"* Fort Lauderdale Sun-Sentinel, March 21, 2002; Jeff Shields ("Clay is awaiting trial on an ... indictment that accuses him of performing similar services for Trafficante soldier John Mamone ... he [Clay] maintains his innocence and promises to go to trial, even as co-defendants such as Mamone have turned government witness and entered the Federal Witness Protection Program.")

The morning the first article was published in the Fort Lauderdale Sun Sentinel, the Defendant's wife and children left their house, uncertain where to go. They traveled to counsel's office. Fortunately, they were able to visit with the Defendant as a consequence of a previously scheduled prison meeting.

While Mamone's cooperation proved valuable to the government, the result to the Defendant and the lives of his family are far more cataclysmic. What

2

may happen to a mob informer is not in general dispute. In September of 2002, the Defendant was advised by the FBI there is a murder contract on his life.

Particularly relevant to these sentencing proceedings is the following interview excerpts with former DOJ Office of Enforcement Operations Director Gerald Shur. In 1967, Gerald Shur created the federal Witness Security Program or WITSEC. Shur retired from the U.S. Department of Justice's Organized Crime and Racketeering Section in 1994. During his 30-year tenure, he oversaw WITSEC's protection of thousands of witnesses and their dependents. Shur offered protection and anonymity to every Mafia witness since from the 1960s until his retirement (like Henry Hill of "Goodfellas" fame), including members of Pablo Escobar's notorious Medellín cartel and Islamist terrorists involved in the 1993 World Trade Center bombing in exchange for their testimony. Shur also received WITSEC protection from a feared assassination attempt by a drug cartel hitman. After writing a book about his experiences, he was interviewed "on line" by Salon, an internet magazine:

> Salon: What else does it take for someone to qualify for WITSEC in the first place?
>
> Shur: They must have very, very important information that they will testify to. Are there other ways we can introduce the same evidence without using the witness? Then if we conclude it's very important, I want to know whether he's really in danger. We have people testifying in murder trials every day, and those people aren't killed. In organized crime cases and narcotics cases, you have a much higher risk. Then I would look to see whether the person would fit into the program. Can we deal with him? Will he abide by the rules of the program?
>
> Salon: Who are the toughest types of criminals to get to testify?

3

> Shur: ***Members of organized crime -- be it La Cosa Nostra or a Colombian narcotics organization or a motorcycle gang or a terrorist group -- none of them want to testify. Nobody walks up to us and says, "You know, I've been doing all these bad things all my life, and I've decided to change my ways." There has to be some motivation, something pushing them, that forces them to make a choice. Either you tell because of vengeance, or I tell because I'm about to be hurt or killed. But not: I tell because I've fallen in love with the American flag.*** (Bold and italics added.)

See Exhibit B, Salon.com/books/int/2002/02/28/shur/index.html.

With good reason, former OEO Director Shur labels *La Cosa Nostra* criminals as the most difficult from whom law enforcement can acquire testimony. In past, the difficulty results from what occurs to those witnesses both in prison and thereafter. In order to assist the government with their protection effort and as a demonstration of his contrition in March 2002 Mamone voluntarily entered the prison WITSEC Program prior to sentencing. Mamone will never again be able to lead a normal life inside or outside of prison. Law enforcement officers from [ filed under seal] all have traveled to the FDC or the designated WITSEC prison (PCU) to meet with the Defendant.

Because of his protected witness status, Mamone was initially assigned to the WITSEC prison program in the FDC Miami maximum security unit, the Z Unit. During that time period, the Defendant lost all prison privileges. For a substantial time period, he could no longer visit with his wife and family in the absence of counsel. His prison conditions were substantially worse than those suffered by the most violent inmates who must be jailed in solitary confinement because of their uncontrollable behavior. During that time period, Mamone suffered

4

extraordinary psychological damage. He paced his jail cell in prison issued shoes without soles, scarring and callousing the bottom of his feet while he paced his tiny cell in claustrophobic terror.

Based on his unique status in the Witness Protection Program, his increased vulnerability, and the harder time he served and will serve, the Defendant respectfully invites this Honorable Court to consider a downward departure under § 5K2.0.[1]

### B.   Overview of Jurisdiction Under USSG §5K 2.0 for Departure Premised Upon Conditions of Confinement.

A number of courts have found that a judge does have the authority under the USSG §5K 2.0 to depart based on the conditions of pretrial confinement. See *United States v. Israel Lazaro Abel*, Case No. 91-413-CR-Ferguson (Order dated 4/26/01 District Judge Ferguson grants downward departure motion premised upon conditions of confinement at FDC Miami compared to non-pre-trial detention facility for extended period).

In *United States v. Sanchez*, the Eleventh Circuit has implicitly acknowledged the right of the district court to depart on grounds of prison conditions while reciting the background facts.

> At this first sentencing hearing, the Sanchez' made an oral motion for a downward departure from the applicable guidelines range based on the prison conditions at the Atlanta Pretrial Detention Center. The court deferred ruling on the motion.

---

[1] The Defendant anticipates that the government will file a motion for downward departure pursuant to USSG §5K1.1. This Honorable Court can chose to recognize the varied facts and circumstances raised under §5K2.0 as part and parcel of the criteria under §5K1.1 and simply decline to exercise its discretion because of the departure under §5K1.1

5

...

> At the second sentencing hearing, the court denied the motion for the downward departure, finding that the conditions at the Atlanta Pretrial Detention Center were not "so atypical as to justify the highly infrequent exercise of a downward departure." ... The court then settled on the lower end of the guideline range for each defendant, taking into account the offensive conditions at the Atlanta Pretrial Detention Center, and sentenced Ignacio Sanchez to 87 months' imprisonment and Santiago Sanchez to 108 months' imprisonment.

*United States v. Sanchez,* 242 F.3d 1294, *rehearing en banc granted opinion vacated by,* 247 F.3d 1306, *on rehearing en banc,* 269 F.3d 1250 (11th Cir. 2001).

Very recently, the Second Circuit affirmed the right of the district court to downwardly depart even in the context of a fugitive, who returned to the Dominican Republic and faced horrible conditions of confinement,

> Carty also contends that his sentence should be vacated and the case remanded to the district court ***because that court incorrectly believed that it lacked authority to grant a downward departure based on the conditions of Carty's confinement in the Dominican Republic.*** The court stated at sentencing that "under no circumstance is Mr. Carty, who went voluntarily to his own country, entitled to a downward departure because the prison conditions were such that Mr. Carty was affected adversely." The court also stated: "I am not aware of any case or authority that would hold that as a matter of law, he is entitled to a downward departure where he returned voluntarily to his own country, was apprehended by his own government, incarcerated in their prisons, and now claims that their substandard penal practices give [ ] him some benefit under our law."

> We agree with the defendant that the court may have misapprehended its authority in this case. ***The court's use of the phrase "under no circumstance" suggests that the court may have believed that pre-sentence conditions of confinement-at least when such confinement occurs in a defendant's "own"***

6

> *country--can never serve as the basis for a downward departure. This is not correct. The Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case "outside the heartland of the applicable Guideline." Koon v. United States, 518 U.S. 81, 109, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).*
>
> According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." USSG § 5K2.0 (quoting 18 U.S.C. § 3553(b)). *No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. See United States v. Francis, 129 F.Supp.2d 612, 616 (S.D.N.Y.2001). Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.*
>
> \*\*\*    \*\*\*    \*\*\*
>
> Under the circumstances prudence dictates that we VACATE the sentence and REMAND so that the district court can reconsider the defendant's request for a downward departure, and do so in the light of this holding.

*United States v. Carty*, 264 F.3d 191, 195 (2nd Cir. 2001). (Emphasis added.)

*See also, United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998) (noting that the district court granted a downward departure based on conditions of confinement but declined to decide if that was an abuse of discretion), overruled on other *Apprendi* grounds by *United States v. Nordby*, 225 F.3d 053 (9th Cir.2000); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir.1996) (noting the district court granted a downward departure of three levels

7

based on defendant's twenty-two months incarceration in a state facility, which was a " 'harsher incarceration' "); *United States v. Sutton*, 973 F.Supp. 488, 492 (D.N.J.1997) (holding that, "a sentencing court is not foreclosed as a matter of law from considering the conditions of pre-trial confinement as a possible basis for departing downward," although it declined to do so); *United States v. Navarro*, Crim. No. 93-588-14(JCL) (D.N.J. Nov. 18, 1996) (cited in *Sutton* granting downward departure for pretrial conditions of confinement); *United States v. Insuasti*, Crim. No. 96-73- 3(DRD) (D.N.J.) (cited in Sutton) (same); cf. *United States v. Bakeas*, 987 F.Supp. 44, 50 (D.Mass.1997) (holding that a "downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate").

Departures based on conditions of confinement are not discouraged; in fact, conditions of confinement constitute an unmentioned factor. There appears to be no evidence to indicate that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement (or post-sentencing conditions given WITSEC issues) into account in creating the Guidelines. No evidence exists to show that the Commission contemplated that federal pre-sentence WITSEC inmates would be kept in any particularly harsh detention facilities nor in "hell holes." "Therefore, conditions of confinement provide grounds for a departure under USSG § 5K2.0. See *United States v. Sutton*, 973 F.Supp. 488, 491-95 (D.N.J.1997)." *United States v. Francis*, 129 F.Supp.2d 612,

614-616 (S.D.N.Y. 2001) (defendant made showing of intolerable conditions sufficient to warrant departure). In formulating the guidelines, the United States Sentencing Commission did not consider the ramification of the guidelines to individuals in the Witness Security Program. *Koon v. United States*, 518 U.S. 81, 95 (1996).

The Defendant's status as protected witnesses in the prison WITSEC Program takes him out of the Guidelines' heartland. No guidelines provisions are made for the tiny population of individuals who serve harder time due to no other reason than his exceptional cooperation with the federal government.

It is, however, understandable that a population of 500 individuals in a grouping of prisoners in excess of 100,000, would not be considered by the Commission in crafting the guidelines. Thus, conditions of incarceration of this Defendant is even more atypical and unique and extraordinary in nature and degree that they form a valid basis for departure under USSG §5K2.0.

### C. The Witness Security Program

The Witness Security Program was created by Congress in 1970 to provide protection either in prison or through relocation of witnesses who find themselves in life-threatening danger by reason of cooperation with the federal government. The goal of the program is to allow witnesses to provide information against major leaders of organized crime, while assuring the protection of government witnesses.

The relocation and protection of the witnesses is governed by 18 U.S.C. §

3521 (relevant portions of which are appended to this memo). See Exhibit C. A participant in the WITSEC program must enter into a statutory "memorandum of understanding" with the Attorney General. 18 U.S.C. § 3521(d)(1). This memorandum sets forth the agreements and obligations of both sides. Each such memorandum of understanding reflects the fundamental agreement that the witness will offer testimony in return for protection and safety.

A potential WITSEC witness is screened by the Bureau of Prisons and Department of Justice before admission to the program. If the witness is expected to be incarcerated, the Bureau of Prisons is notified and polygraph testing and pre-commitment reviews are performed. Upon completion of these examinations, a witness finally may be considered for placement.

WITSEC inmates are housed in either general federal or state prison populations, or in one of a limited number of federal PCU's. An inmate is housed in a PCU if the Bureau of Prisons determines he needs significant protection. A PCU is a separate, self-sufficient prison section designed specifically to house WITSEC prisoners.

The value of this program is lauded by law enforcement and Congress. In a report issued by the United States Senate Committee on Governmental Affairs, with respect to the Witness Security Program (hereinafter "Senate Report"), the Committee concluded that "so essential has the (Witness) Security Program become, in fact, that it is difficult to imagine federal law enforcement without it." Senate Report at p. 53 excerpted hereto as Exhibit D.

### D. Protected Prisoners Serve Harder Time

From the inception of the program, it has been recognized that the Witness Security Program has significant problems. For example, it has been repeatedly recognized by Congress and the Federal Bureau of Prisons, that an inmate serving time in the Witness Security Program serves "harder time" than other prisoners. Specifically, the United States Senate conducted hearings in 1980 which included review of this very issue. *Id.* at 59.

During the Senate hearings, Congress heard the testimony of Gregory Baldwin, Assistant Counsel to the Permanent Subcommittee on Investigations. In his testimony, Mr. Baldwin discussed the fact that prisoner witnesses face severe problems due to the more restrictive conditions under which they are incarcerated. See also, "Witness Security Program," Hearing before the Permanent Subcommittee on Investigations United States Senate, 90-6 Congress, excerpts of which are appended as Exhibit E.

The Senate Report concludes as follows:

> The preponderance of testimony at the subcommittee's hearings indicated that inmates who cooperate with authorities then enter the Witness Security Program end up serving 'harder time' than his non-cooperating fellow convicts. Protected prisoners have less opportunity for retraining and recreational activities and, for security reasons, they are frequently placed in solitary confinement.

Senate Report, at page 59.

Robert Costello, then Assistant United States Attorney, testified that protected witnesses do harder time also due to the physical set-up of their

11

confinement and the lack of educational opportunities or facilities. Mr. Costello testified that "as a result of the necessary security measures, they (prisoner witnesses) cannot possibly be given. . . the same kind of benefits that are given to other inmates." Senate Hearings, pp. 12 1-122.

Testimony from Norman A. Carlson, then Director of the Bureau of Prisons confirmed that such prisoner witnesses do serve harder time. Carlson acknowledged the difficulty facing prisoners in the Witness Security Program and explained that physical and financial constraints prevent prisoners from enjoying the same privileges as other inmates.

> Chairman Nunn: Is it true that generally a protected witness does harder time than a non-prisoner witness because of the facility he is housed in, his protection needs, his lack of access to programs and facilities to the regular inmate?
>
> Mr. Carlson: Unfortunately, Mr. Chairman, it is....
>
> Chairman Nunn: Are there any alternatives - I don't know what facilities are not available to them. I assume there would be things that would relate to the machinery, equipment, things that would be very expensive unless you provided it for very large numbers of people. That would be what they would be usually precluded from using, wouldn't it?
>
> Mr. Carlson: That is correct. They would not have access to the broad range of programs that would be available in the general institution. Because of the small number it would simply be cost-prohibitive to install large and very expensive programs for them.
>
> Chairman Nunn: But it does seem the prisoners who cooperate should not be penalized in effect although it is not intentional for his cooperation.

Senate Hearings, at pages 230-231.

Mr. Costello also noted that security concerns prevent protected witnesses from receiving privileges, such as furloughs, extended to regular inmates. Senate Hearings, at page 122. Mr. Costello noted that the above "little items," when added together, equate to protected prisoners serving harder time when compared with prisoners in the general population. Id.

One of the most difficult problems with the prisoner Witness Security Program is that the only possible response of the Bureau of Prisons to a threat against a participant inmate or a problem with the participant inmate is placement of the prisoner in solitary confinement. Moreover, participants in the Witness Security Program are prohibited from being housed in any security classification other than medium or higher.

Mr. Baldwin testified that even the identification of a prisoner as a witness might endanger the welfare of the witness. Therefore, to guaranty the witness's safety, he must be placed in solitary confinement or "the hole." Senate Hearings at page 14. "In the argot of the penitentiary, that adds up to 'harder time.'" Senate Report, at page 40.

In 1996, John C. Keeney, the Acting Attorney General, appeared before the United States Senate Committee on the Judiciary for Hearings Regarding the Witness Security Program. Mr. Keeney indicated that protected prisoners continue to serve harder time than prisoners in the general population. Mr. Keeney noted the Bureau built protective custody units which he termed as "prisons within prisons." Statement of John C. Keeney at page 8 and excerpts

13

attached hereto as Exhibit F. These units are small, even by prison standards, and do not contain the same amenities available to prisoners in the general population. These units have small, if any, kitchen facilities, recreational yards, and education rooms. "The nature of these units has resulted in protected witnesses often receiving less in the way of rehabilitation, training, recreation, and educational opportunities than do prisoners who are not cooperating with the government." Statement of John C. Keeney at page 8. The overall result is that protected witnesses continue to serve more difficult time as compared to his non-cooperative counterparts in the general population.

E.  **Contact with the Individuals Outside the Prison is Limited and Difficult**

Visitation and telephone rights are extremely limited and difficult for this Defendant. Protected witness inmates have a limited visitor list. It takes between two and three months to have a visitor approved. Even phone calls are limited to a list which requires approval in OEO headquarters for security purposes.

F.  **Witsec Defendants Must Serve a Longer Period of Incarceration and Solitary Confinement**

Of great significance is the additional fact that participants in the witness security program give up rights for early release through halfway houses, boot camps, and substance abuse programs. Thus, any participant in the Witness Security Program is virtually guaranteed a longer period of incarceration through lack of early release options. The Defendant is automatically denied any early release normally available through halfway houses and other usual programs.

When Mamone is transported to Florida or elsewhere for testimony in upcoming trials and for this proceeding he will be placed in solitary confinement.

The guidelines do not contemplate these circumstances. It is therefore respectfully submitted the Defendant should be considered for a more lenient sentence to reflect the harsher time that he will have to serve because of his WITSEC status and the other factors that make Defendant particularly vulnerable to victimization.

## II.
## PSR OBJECTIONS

The Defendant notes the following PSR objections:

1. **PSR, p. 8, ¶ 11, second sentence.**

Spitaleri was not partners with Mamone. Rather, Spitaleri paid Mamone 2.5% to cash checks. After Pacaro's death, Spitaleri was protected by Mamone.

2. **PSR, p. 9, ¶ 14, second sentence.**

Mamone normally charged 2.5%, not 3%.

3. **PSR, p. 9, ¶15.**

Chiusano operated independently from Mamone, aside from a mutual accommodation in cashing checks.

4. **PSR, p. 9, ¶16, first sentence.**

Mamone did not introduce Chiusano to Spitaleri. Rather Chiusano knew Spitaleri through John Pacaro.

5. **PSR, p. 12, ¶27.**

Mamone fully intended to make a paper trail concerning all funds received from Irving Weiss and therefore deposited the monies in his bank account, notwithstanding the fact that Irving Weiss offered cash.

6. **PSR, p. 13, ¶32, third sentence.**

Mamone never received stolen items for resale. Rather, Mamone did receive proceeds of stolen goods.

Moreover, Mamone profited approximately $15,000 from the Rubbo boiler rooms. Co-defendant Bell, Mamone's partner suffered a restitution order of $300,000. Mamone should be the same.

7. **PSR, p. 14, ¶36 second sentence.**

Mamone solely set betting limits on his own clients, three individuals.

Ralph Lento was a bettor not a bookmaker.

Al Polita was a shylock customer not a bettor.

Bass owned Mamone approximately $310,000 not $400,000.

8. **PSR, p. 15, ¶40, third sentence.**

Mamone did not direct Baruch's bookmaking business. Rather, he simply protected her.

9. **PSR, p. 15, ¶41.**

Campagnano (first name should be Ed throughout the PSR) owed money to Mamone on an auto title loan. Campagnano was slapped in the mouth. He was not physically injured.

The assault on Al Polito was the result of a bad check in the amount of $4200.

10. **PSR, p. 16, ¶43, second to last sentence.**

Weiss worked for Fred Morgenstern, not John Mamone.

11. **PSR, p. 16, ¶44.**

Jeff Braverman, not Michael Braverman, defrauded Mamone and Russo out of $400,000, not $40,000.

12. **PSR, p. 16, ¶45, second to the last sentence.**

Mamone provided Spitaleri an extortionate loan in the amount of $25,000 and charged him 2.5% per week.

13. **PSR, p. 16, ¶46.**

16

O'Sullivan's threats were and are his alone and he was not instructed to do so by John Mamone.

14.    **PSR, p. 17, ¶48.**

The Defendant may dispute the amount of restitution.

15.    **PSR, p. 19, ¶62.**

Mamone never received any stolen property from Gateway. Rather, he received proceeds.

## OFFENSE LEVEL COMPUTATION

16.    **PSR, p.21, ¶77, ¶84.**

The Defendant disputes that both victims sustained bodily injury. The base offense level for an offense of extortionate collection of an extension of credit is increased by two levels "[i]f any victim sustained bodily injury." United States Sentencing Commission, *Guidelines Manual,* § 2E2.1(b)(2) (Nov. 1989). " 'Bodily injury' means any significant injury; *e.g.,* an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." USSG § 1B1.1, comment. (n. 1(b)). The blow struck by the Defendant to Campagnano was a slap and certainly not "medically" significant to the victim, particularly given the respective status of the parties.

17.    **PSR, p. 23, ¶109.**

This offense involves the same Campagnano matter described earlier.

18.    **PSR, p. 25, ¶127**

The total offense level should be 32

19.    **PSR, p. 26, ¶134.**

The Defendant is John Mamone.

20.  **PSR, p. 27, ¶143.**

The Defendant does not deny a history of illegal drugs substance abuse. This expert was taken from a PSR in a different case.

21.  **PSR, p. 28, ¶147.**

Gateway Transportation Services is independent and different from Gateway Freight Systems South.

22.  **PSR, p. 29, ¶151.**

The Defendant disputes that he has any access to his wife's business interest in the amount of $400,000.

23.  **PSR, p. 31, ¶152.**

The Defendant disputes that it is "fair to say that the Defendant has access to income received by his wife." In no manner whatsoever has the Defendant, "indicated that he has access to his wife's buy out monies."

Respectfully submitted,

By: _____
DAVID ROTHMAN, Esq.
Florida Bar No. 240273
3420 SE Financial Center
Suite 2690
Miami, Florida 33131
(305) 358-9000

NEIL M. SCHUSTER
Florida Bar No. 216909
407 Lincoln Road, Ste. 11B
Miami Beach, FL 33139
(305) 673-3737

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished this _____ day of September 2002 to: AUSAs Brian McCormick and Diana Fernandez, Office of the United States Attorney, 500 East. Broward Blvd., Fort Lauderdale, FL 33394 and USPO Silas Saunders 300 NE 1st Avenue, Suite 315, Miami, FL 33132.

By:_____
Neil M. Schuster