## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, :

       :  CASE NO. 00-6309-CR-Seitz

    Plaintiff, :

v.        :

JOHN MAMONE,  :

    Defendant. :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## APPENDIX IN SUPPORT OF NOTICE OF OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND MOTION FOR DOWNWARD DEPARTURE

| DESCRIPTION | APPENDIX |
|---|---|
| *"Florida, NY Crime Figures Rounded Up; Indictments List Links of Twenty-Nine (29) People to Mob Family,"* Fort Lauderdale Sun-Sentinel, March 21, 2002 | A |
| Gerald Shur Interview Salon.com/books/int/2002/02/28/shur/index.html | B |
| 18 U.S.C. § 3521 | C |
| Report Issued by the United States Senate Committee on Governmental Affairs, on December 14, 1981, | D |
| "Witness Security Program", Hearings Before the Permanent Subcommittee on Investigations United States Senate, 90-6 Congress | E |
| Statement of John C. Keeney, Acting Assistant Attorney General Criminal Division, June 18, 1996 | F |

Respectfully submitted,

By: _____
DAVID ROTHMAN, Esq.
Florida Bar No. 240273
3420 SE Financial Center
Suite 2690
Miami, Florida 33131
(305) 358-9000

NEIL M. SCHUSTER
Florida Bar No. 216909
407 Lincoln Road, Ste. 11B
Miami Beach, FL 33139
(305) 673-3737

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished this _____ day of September 2002 to: AUSAs Brian McCormick and Diana Fernandez, Office of the United States Attorney, 500 East. Broward Blvd., Fort Lauderdale, FL 33394 and USPO Silas Saunders 300 NE 1st Avenue, Suite 315, Miami, FL 33132.

By: _____
Neil M. Schuster

# FLORIDA, N.Y. CRIME FIGURES ROUNDED UP ; INDICTMENTS LIST LINKS OF 29 PEOPLE TO MOB FAMILY.

*South Florida Sun - Sentinel*; Fort Lauderdale, Fla.; Mar 21, 2002; Jeff Shields Staff Writer Staff Writers Jon Burstein, Shana Gruskin, Kevin Krause and Jeremy Milarsky contributed to this report.;

**Abstract:**

*Zancocchio Graziano Clay CRIME-FAMILY ARRESTS The following were arrested Wednesday and charged in an alleged conspiracy run by the [Bonanno] crime family: Steven Julio Batista, 25, MiamiJeffrey F. Block, 59, Fort Lauderdale Ronald Joseph Burton, 44, Pompano Beach David Neal Cavallo, 28, Lake Worth Charles Patrick Clay, 52, Margate Brian Scott Darrow, 35, Fort Lauderdale [John Finkelstein], 48, Boca Raton Blair Phillips Fitzgibbon, 25, Boca Raton Anthony A. Graziano, 61, Staten Island, N.Y, Lazar Albert Kauderer, 27, Hallandale Joseph John Lafratta, 57, Lake Worth Michael Frank Mondelli, 29, Lake Worth Geno Edward Parisi, 51, Lake Worth Nicholas G. Passalacqua, 30, Boca Raton Anibal Perez, 24, Hialeah Jose Raul Perez, 49, Hialeah Juan Andres Perez, 40, Miami Carlo Piraneo, 29, Lake Worth Angela Ann Rubbo, 58, Deerfield Beach Joseph Anthony Rubbo, 38, Pompano Beach Nicholas Dino Rubbo, 32, Pompano Beach Pasquale Anthony Rubbo, 35, Parkland Jose Maria Sanchez, 22, Miami Frederick M. Scarola, 59, Fort Lauderdale Nancy Souhrada, 38, Boca Raton Roland Joseph Tallo, 32, Hollywood Anthony Nicholas Torres, 24, Delray BeachIsrael Torres, 51, Boca Raton John Charles Zancocchio, 44, Staten Island*

**Full Text:**
(Copyright 2002 by the Sun-Sentinel)

Informational box at end of text.

Federal authorities unsealed indictments in Florida on Wednesday against 29 people as part of a two-state assault on New York's murderous Bonanno crime family.

Fresh from major victories against the Gambino and Trafficante families' Florida operations, the U.S. attorneys in Florida and New York identified Anthony Graziano, 61, of Staten Island, as the third- in-command of the Bonannos.

In indictments in New York and Florida, they accuse him of everything from torture and murder conspiracy in Brooklyn to loan- sharking, money laundering and high-pressure, "boiler room" telemarketing fraud in Boca Raton, Delray Beach and Margate.

Officials said "Operation Northern Star" will cut the South Florida tentacles of the Bonanno family, which has risen recently from near extinction in the 1980s to fill the void left by prosecutions against the Colombo, Gambino, Genovese and Lucchese families. But authorities have yet to cripple the last of the five families whose reputed boss is not behind bars.

"The Bonanno crime family continues to be a formidable criminal enterprise, and we have a great interest in ascertaining that their criminal activities, particularly in South Florida, be stopped," said Robert Casey, assistant special agent in charge of organized crime in the FBI's Miami office. "If they continue to view South Florida as another back yard they can come to, they are sadly mistaken."

Undercover agent

Two years in the making, Operation North Star starred a Tampa police officer working undercover as a money launderer named Jimmy Brock, according to court documents. The officer met at least 15 times with various members of the alleged conspiracy, sometimes at the Embassy Suites in Fort Lauderdale

**EXHIBIT A**

while FBI agents next door videotaped the meetings.

Defendants either surrendered or were rounded up Wednesday, when most of them appeared in federal court in West Palm Beach. The indictment includes charges that Charles Clay, a former Margate police officer, informed Bonanno associates when the FBI was watching. Clay is awaiting trial on an October 2000 indictment that accuses him of performing similar services for Trafficante soldier John Mamone and his friend and alleged bookmaker Frederick Scarola, who was also indicted Wednesday.

"You can't get a much more serious breach ... than to have a situation where a law enforcement officer would choose a group of criminals over other law enforcement officers," Casey said.

Clay had worked for Margate police for 25 years before resigning in January 2001. He maintains his innocence and promises to go to trial, even as co-defendants such as Mamone have turned government witness and entered the federal Witness Protection Program.

"He's been waiting a year and a half," said Jon May, Clay's attorney. "And, unfortunately, he's probably going to have to wait a few more years."

Court documents filed in Brooklyn say that Graziano has access to more than 100 soldiers of the Bonanno crime family as consigliere, or counselor, to reputed Bonanno crime boss Joseph Massino. Before that, according to prosecutors, Graziano ran a cocaine operation out of Brooklyn. In the course of business, the crew tortured one victim with a blow torch, another with a cigarette lighter, and a third by dragging him around a room with a noose around his neck.

The Bonannos were kicked off New York City's famed "commission" of mob families in the 1980s after the disarray and interfamily killings that followed the family's infiltration by FBI agent Joe Pistone, also known as Donnie Brasco.

But the Bonannos have returned to prominence during the past decade, as prosecutions against the other families created a power vacuum.

Jerry Capeci, a mob expert who has tracked the Bonannos' doings on his Web site, www.ganglandnews.com, said Bonanno boss Massino keeps a low profile, avoiding the mistakes of his friend and neighbor, John Gotti.

"He's learned an important lesson from Gotti -- to run the family like a secret society," Capeci said.

Working under Graziano and his son-in-law, Bonanno soldier John "Porky" Zancocchio, a group of South Floridians ran their own white- collar crime, gambling and loan-sharking operation, according to the South Florida indictment.

Angela Rubbo of Deerfield Beach and her three sons, Joseph, Nicholas and Pasquale, are accused of running a phony telemarketing scheme that stole $11.7 million from investors.

John Finkelstein of Boca Raton allegedly supervised the "boiler rooms" where "fronters" would get potential investors on the phone, then give them to managers, or "loaders," to land the sales with high-pressure tactics.

Geno "Carmine" Parisi, who is now in prison for a parole violation connected to this case, would bring the money to the undercover Tampa officer to launder, according to court documents.

Near City Hall, police

Two of the boiler room operations were run briefly out of rented offices in Boca Raton -- one of them directly across the street from City Hall and around the corner from the Boca Raton Police Department.

Robert C. Pelletier, chief executive officer of CSI, a market data retrieval service, recalled leasing a first-floor office to several of the suspects two years ago in his office building at 200 W. Palmetto Park Road. The company was called New World Exchange Inc.

Angela Rubbo signed a three-year lease in April 2000 but the company disappeared when the FBI raided its office months later.

"A number of them, about 12 to 15, roamed around the parking lot all day talking on their cell phones. They were out there all the time," he said, adding that his employees began referring to the men as "The Sopranos" because of their suspicious behavior.

Their victims included people such as Norbert Gregorich, 85, of Rocky River, Ohio, who was taken for $260,000, according to Gregorich's attorney, Kevin Markow.

"They used high-pressure tactics and all kinds of promises ... and were able to coax Norbert into sending down a quarter of a million dollars," said Markow, who has filed a lawsuit against the Rubbos and their company in Palm Beach Circuit Court.

Scarola, of Fort Lauderdale, and Israel "Buddy" Torres, of Boca Raton, are accused of running gambling and loan-sharking operations. Torres' girlfriend and son are also named in the indictment.

The indictment also reveals the mob's continuing turn toward white-collar crime, including investment and Internet fraud, even health-care fraud.

"Clearly, this is the age of diversification in organized crime," said Frank Figliuzzi, who runs the FBI's white-collar crime program in Miami.

The FBI and U.S. Attorney's Office say the indictments are a significant victory, coupled with the recent conviction of Anthony "Tony Pep" Trentacosta, who ran the Gambinos' South Florida operations, and the ongoing case against the Tampa-based Trafficante crime family.

Staff Writers Jon Burstein, Shana Gruskin, Kevin Krause and Jeremy Milarsky contributed to this report.

Jeff Shields can be reached at jshields@sun-sentinel.com or 954- 356-4531.

**[Illustration]**
PHOTOS 3; Caption: Zancocchio Graziano Clay CRIME-FAMILY ARRESTS The following were arrested Wednesday and charged in an alleged conspiracy run by the Bonnano crime family: Steven Julio Batista, 25, MiamiJeffrey F. Block, 59, Fort Lauderdale Ronald Joseph Burton, 44, Pompano Beach David Neal Cavallo, 28, Lake Worth Charles Patrick Clay, 52, Margate Brian Scott Darrow, 35, Fort Lauderdale John Finkelstein, 48, Boca Raton Blair Phillips Fitzgibbon, 25, Boca Raton Anthony A. Graziano, 61, Staten Island, N.Y, Lazar Albert Kauderer, 27, Hallandale Joseph John Lafratta, 57, Lake Worth Michael Frank Mondelli, 29, Lake Worth Geno Edward Parisi, 51, Lake Worth Nicholas G. Passalacqua, 30, Boca Raton Anibal Perez, 24, Hialeah Jose Raul Perez, 49, Hialeah Juan Andres Perez, 40, Miami Carlo Piraneo, 29, Lake Worth Angela Ann Rubbo, 58, Deerfield Beach Joseph Anthony Rubbo, 38, Pompano Beach Nicholas Dino Rubbo, 32, Pompano Beach Pasquale Anthony Rubbo, 35, Parkland Jose Maria Sanchez, 22, Miami Frederick M. Scarola, 59, Fort Lauderdale Nancy Souhrada, 38, Boca Raton Roland Joseph Tallo, 32, Hollywood Anthony Nicholas Torres, 24, Delray BeachIsrael Torres, 51, Boca Raton John Charles Zancocchio, 44, Staten Island

*Sic:*922120*Sic:*9200

**Sub Title:**  [Broward Metro Edition]
**Start Page:**  1A
**Companies:** Federal Bureau of Investigation*Sic:922120Sic:9200*

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.


Go Global. Shop the trend ▸     NeimanMarcus

Search   About Salon   Table Talk   Advertise in Salon   Investor Relations

SALON PREMIUM   find out more | log

**salon.com**   powells.com   used•new•rare•out-of-print books   CLICK HERE FREE SHIPPING

ARTS | BOOKS | COMICS | LIFE | NEWS | PEOPLE | POLITICS | SEX | TECH & BUSINESS

ARTICLE FINDER | **BOOKS**

**Search**

◉ All of Salon.com
○ Only Books

[ OK ]

**Directory**

**Hot Topics**
Book Reviews
Raymond Chandler
Rick Moody
Book Bag
Jon Krakauer
J.R.R. Tolkien
Harry Potter
Denis Johnson
Mr. Blue
Stephen King

Articles by date
● All of Salon.com
● By department

SALON.COM SITES

Arts & Entertainment
▸ Books
Comics
Life
News
People
Politics
Sex
Tech & Business
- Free Software Project
Audio

Letters
Columnists
Corrections

Salon Premium



# The mobsters and terrorists next door

The founder of the federal wi protection program talks abou killers in the suburbs and why al-Qaida members can becom abiding citizens.

- - - - - - - - - - - -

**By Suzy Hansen**


[ PRINT ]   [ EMAIL ]

Feb. 28, 2002 | Since 196

Gerald Shur created the federal Witness Security Program, or WITSEC, almo witnesses and their 14,000 family members have been relocated in the United That means that some of those 21,500 people -- former Mob hit men, Colomb gangsters, international terrorists, and their families (and lovers) -- might be s getting takeout and attending PTA meetings in a quiet suburb near you. And, course, the viability of WITSEC demands that you never know about their cri past.

Shur retired from the U.S. Department of Justice's Organized Crime and Rack Section in 1994. During his 30-year tenure, he oversaw WITSEC's protection witnesses and their dependents. Shur offered freedom and anonymity to every witness since the 1960s (like Henry Hill of "Goodfellas" fame), members of I Escobar's notorious Medellín cartel and Islamist terrorists involved in the 199 Trade Center bombing in exchange for their testimony.

Not surprisingly, Shur came under fire for championing a program that lets seasoned



- Downloads
- Become an Affiliate
Salon Plus
Salon Gear
Personals



**PARTICIPATE**

**Table Talk**
[Spirited
Salon forums]

The book you can't put down What are you reading right now?

Do your summer plans include murder? Mystery lovers, come out of the closet.

- Posts of the week

**The Well**
[Pioneering members-only discussions]

Honky-tonk love letter Why does author Kathi Goldmark have a leopard-skin Stratocaster?

**Sound Off**

- E-mail Salon
- Send us a Letter to the Editor
- Recent Letters



**Downloads**

- Get Salon.com on your PDA

criminals loose in society, even though 82 percent of them never commit another crime. For the most part, these criticisms of WITSEC are well documented in "WITSEC: Inside the Federal Witness Protection Program," Shur and journalist Pete Earley's collaborative account -- part memoir, part investigative history -- of Shur's years commanding the program. It's an entertaining and informative book, calibrating all the thrills of the criminal underworld with the finer frustrations of coordinating a controversial program among the many bickering departments government. But for all the dirty details from WITSEC "snitches," one of the and most tragic, tales in the book is the story of Witness X, the wife of a Bro mobster, who explains how her life fell apart after she was thrust into the pro

Shur and Earley spoke to Salon from their homes about how WITSEC convir Mafia witnesses to break the code of "omertà" or silence, why international te make good WITSEC candidates and how Shur himself at one time became a WITSEC participant.

**This question is for Pete Earley: Were there certain criticisms of WITSEC that you were particularly curious about?**

Earley: By its nature it is a very controversial program because you're taking people who are -- and this is not a word that Gerry uses, but I do -- snitches, and you're rewarding them.

Shur: That's a word that I always tell people not to use in front of me. These people are finally doing the right thing. They're cooperating.

Earley: Gerry says that he doesn't like the word "reward," but you're in essence letting them off the hook a little lighter than someone else to get the bigger fish.

Shur: Actually, it's not WITSEC that lets them off lighter. That has to do with process. When we decide to put somebody in the witness program, we have n into what their sentences would be.

**How bad was the Mafia in 1961 when you started working for the Justice**



Design and send
a BOMBAY
SAPPHIRE
martini glass
-
the perfect way
to invite your
friends for drinks.

---

**WITSEC: Inside the Federal Witness Pr Program**

Pete Earley and Gera

Bantam
368 pages
Nonfiction

Buy it



---

**Department?**

Shur: They dominated the criminal activity of most major cities. They were in different industries. In many areas, they controlled the movement of goods; in York, they controlled things down to electrical permits, the garbage industry building La Guardia Airport. They dominated many unions in the United States.

There are two positions inside La Cosa Nostra that make it different than organized crime. One is the corrupter, the person who's supposed to go out and bribe people councilmen, cops, agents -- so he can keep the operation going. The other one enforcer, the one who maintains the internal integrity of the organization, kills informants and witnesses and follows the code of omertà ["law of silence"].

Earley: The other thing you should realize was that not only did the Mafia have tremendously more power than it does today, but law enforcement knew very about it. We've all seen "The Godfather," we've all seen "The Sopranos," but is, until Joe Valachi [a 30-year veteran New York criminal and member of the Genovese crime family who identified 317 mob members] came forward in the 1960s, nobody knew about any of that.

Shur: J. Edgar Hoover specifically didn't want to admit there was such a thing Mafia. So the FBI did not have a lot of resources devoted to fighting organized until Bobby Kennedy became attorney general and ordered it.

**What made Valachi different? Why was he one of the first people to break code of silence?**

Shur: He was going to be murdered. He was in the federal penitentiary in Atlanta having been convicted on a narcotics case involving a very notorious racketeer Vito Genovese. Then, one day, Valachi actually got this kiss on the cheek that hear about, indicating that he was going to be done in. He decided that he knew was going to kill him, picked up a lead pipe one day, whacked this guy over the [in the prison yard]. He killed the wrong guy. Valachi goes to the warden and "Get me the feds, I want to talk to them."

Earley: What you discover when you talk to these Mafia types is that everybody wants to look in the mirror and feel good about themselves. They all had an explanation for turning against their former pals. Their general explanation w they'd fallen out of favor and were about to get killed, or were going to do big a penitentiary. This was their way out.

Shur: That's one of the principal incentives. They would say, "They're going me," or "They took away the moneymaking part of the business," or "I went t and did time and they didn't treat my family right."

📄 **Next page | The witness who demanded a new penis**
1, 2, 3, 4, 5

**18 § 3509**    CRIMINAL PROCEDURE    Part 2

The Federal Rules of Criminal Procedure, referred to in subsec. (f), are set out in Title 18.

**Effective and Applicability Provisions**

1994 Amendments. Section 330011(e) of Pub.L. 103–322 provided in part that the amendment made by such section, amending directory language of section 225(a) of Pub.L. 101–647 (which enacted this section), was to take effect on the date section 225(a) of Pub.L. 101–647 took effect; section 225(a) of Pub.L. 101–647 took effect on the date of enactment of Pub.L. 101–647, which was approved Nov. 29, 1990.

## § 3510.  Rights of victims to attend and observe trial

(a) **Non-capital cases.**—Notwithstanding any statute, rule, or other provision of law, a United States district court shall not order any victim of an offense excluded from the trial of a defendant accused of that offense because such victim may, during the sentencing hearing, make a statement or present any information in relation to the sentence.

(b) **Capital cases.**—Notwithstanding any statute, rule, or other provision of law, a United States district court shall not order any victim of an offense excluded from the trial of a defendant accused of that offense because such victim may, during the sentencing hearing, testify as to the effect of the offense on the victim and the victim's family or as to any other factor for which notice is required under section 3593(a).

(c) **Definition.**—As used in this section, the term "victim" includes all persons defined as victims in section 503(e)(2) of the Victims' Rights and Restitution Act of 1990.

(Added Pub.L. 105–6, § 2(a), Mar. 19, 1997, 111 Stat. 12.)

### HISTORICAL AND STATUTORY NOTES

**References in Text**

Section 503(e)(2) of the Victims' Rights and Restitution Act of 1990, referred to in subsec. (c), is classified to section 10607(e)(2) of Title 42, The Public Health and Welfare.

**Effective and Applicability Provisions**

1997 Acts. Section 3510(d) of Pub.L. 105–6 provided that: "The amendments made by this section [enacting this section, amending section 3593(c) of this title, and enacting provisions set out as a note under section 3481 of this title] shall apply in cases pending on the date of the enactment of this Act [Mar. 19, 1997]."

## CHAPTER 224—PROTECTION OF WITNESSES

Sec.
3521. Witness relocation and protection.
3522. Probationers and parolees.
3523. Civil judgments.
3524. Child custody arrangements.
3525. Victims Compensation Fund.
3526. Cooperation of other Federal agencies and State governments; reimbursement of expenses.
3527. Additional authority of Attorney General.
3528. Definition.

## § 3521.  Witness relocation and protection

(a)(1) The Attorney General may provide for the relocation and other protection of a witness or a potential witness for the Federal Government or for a State government in an official proceeding concerning an organized criminal activity or other serious offense, if the Attorney General determines that an offense involving a crime of violence directed at the witness with respect to that proceeding, an offense set forth in chapter 73 of this title directed at the witness, or a State offense that is similar in nature to either such offense, is likely to be committed. The Attorney General may also provide for the relocation and other protection of the immediate family of, or a person otherwise closely associated with, such witness or potential witness if the family or person may also be endangered on account of the participation of the witness in the judicial proceeding.

(2) The Attorney General shall issue guidelines defining the types of cases for which the exercise of the authority of the Attorney General contained in paragraph (1) would be appropriate.

(3) The United States and its officers and employees shall not be subject to any civil liability on account of any decision to provide or not to provide protection under this chapter.

(b)(1) In connection with the protection under this chapter of a witness, a potential witness, or an immediate family member or close associate of a witness or potential witness, the Attorney General shall take such action as the Attorney General determines to be necessary to protect the person involved from bodily injury and otherwise to assure the health, safety, and welfare of that person, including the psychological well-being and social adjustment of that person, for as long as, in the judgment of the Attorney General, the danger to that person exists. The Attorney General may, by regulation—

(A) provide suitable documents to enable the person to establish a new identity or otherwise protect the person;

(B) provide housing for the person;

(C) provide for the transportation of household furniture and other personal property to a new residence of the person;

(D) provide to the person a payment to meet basic living expenses, in a sum established in accordance with regulations issued by the Attorney Gen-



eral, for such times as the Attorney General determines to be warranted;

(E) assist the person in obtaining employment;

(F) provide other services necessary to assist the person in becoming self-sustaining;

(G) disclose or refuse to disclose the identity or location of the person relocated or protected, or any other matter concerning the person or the program after weighing the danger such a disclosure would pose to the person, the detriment it would cause to the general effectiveness of the program, and the benefit it would afford to the public or to the person seeking the disclosure, except that the Attorney General shall, upon the request of State or local law enforcement officials or pursuant to a court order, without undue delay, disclose to such officials the identity, location, criminal records, and fingerprints relating to the person relocated or protected when the Attorney General knows or the request indicates that the person is under investigation for or has been arrested for or charged with an offense that is punishable by more than one year in prison or that is a crime of violence;

(H) protect the confidentiality of the identity and location of persons subject to registration requirements as convicted offenders under Federal or State law, including prescribing alternative procedures to those otherwise provided by Federal or State law for registration and tracking of such persons; and

(I) exempt procurement for services, materials, and supplies, and the renovation and construction of safe sites within existing buildings from other provisions of law as may be required to maintain the security of protective witnesses and the integrity of the Witness Security Program.

The Attorney General shall establish an accurate, efficient, and effective system of records concerning the criminal history of persons provided protection under this chapter in order to provide the information described in subparagraph (G).

(2) Deductions shall be made from any payment made to a person pursuant to paragraph (1)(D) to satisfy obligations of that person for family support payments pursuant to a State court order.

(3) Any person who, without the authorization of the Attorney General, knowingly discloses any information received from the Attorney General under paragraph (1)(G) shall be fined $5,000 or imprisoned five years, or both.

(c) Before providing protection to any person under this chapter, the Attorney General shall, to the extent practicable, obtain information relating to the suitability of the person for inclusion in the program, including the criminal history, if any, and a psychological

evaluation of, the person. The Attorney General shall also make a written assessment in each case of the seriousness of the investigation or case in which the person's information or testimony has been or will be provided and the possible risk of danger to other persons and property in the community where the person is to be relocated and shall determine whether the need for that person's testimony outweighs the risk of danger to the public. In assessing whether a person should be provided protection under this chapter, the Attorney General shall consider the person's criminal record, alternatives to providing protection under this chapter, the possibility of securing similar testimony from other sources, the need for protecting the person, the relative importance of the person's testimony, results of psychological examinations, whether providing such protection will substantially infringe upon the relationship between a child who would be relocated in connection with such protection and that child's parent who would not be so relocated, and such other factors as the Attorney General considers appropriate. The Attorney General shall not provide protection to any person under this chapter if the risk of danger to the public, including the potential harm to innocent victims, outweighs the need for that person's testimony. This subsection shall not be construed to authorize the disclosure of the written assessment made pursuant to this subsection.

(d)(1) Before providing protection to any person under this chapter, the Attorney General shall enter into a memorandum of understanding with that person. Each such memorandum of understanding shall set forth the responsibilities of that person, including—

(A) the agreement of the person, if a witness or potential witness, to testify in and provide information to all appropriate law enforcement officials concerning all appropriate proceedings;

(B) the agreement of the person not to commit any crime;

(C) the agreement of the person to take all necessary steps to avoid detection by others of the facts concerning the protection provided to that person under this chapter;

(D) the agreement of the person to comply with legal obligations and civil judgments against that person;

(E) the agreement of the person to cooperate with all reasonable requests of officers and employees of the Government who are providing protection under this chapter;

(F) the agreement of the person to designate another person to act as agent for the service of process;

**(G)** the agreement of the person to make a sworn statement of all outstanding legal obligations, including obligations concerning child custody and visitation;

**(H)** the agreement of the person to disclose any probation or parole responsibilities, and if the person is on probation or parole under State law, to consent to Federal supervision in accordance with section 3522 of this title; and

**(I)** the agreement of the person to regularly inform the appropriate program official of the activities and current address of such person.

Each such memorandum of understanding shall also set forth the protection which the Attorney General has determined will be provided to the person under this chapter, and the procedures to be followed in the case of a breach of the memorandum of understanding, as such procedures are established by the Attorney General. Such procedures shall include a procedure for filing and resolution of grievances of persons provided protection under this chapter regarding the administration of the program. This procedure shall include the opportunity for resolution of a grievance by a person who was not involved in the case.

**(2)** The Attorney General shall enter into a separate memorandum of understanding pursuant to this subsection with each person protected under this chapter who is eighteen years of age or older. The memorandum of understanding shall be signed by the Attorney General and the person protected.

**(3)** The Attorney General may delegate the responsibility initially to authorize protection under this chapter only to the Deputy Attorney General, to the Associate Attorney General, to the Assistant Attorney General in charge of the Criminal Division of the Department of Justice, to the Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice (insofar as the delegation relates to a criminal civil rights case), and to one other officer or employee of the Department of Justice.

**(e)** If the Attorney General determines that harm to a person for whom protection may be provided under section 3521 of this title is imminent or that failure to provide immediate protection would otherwise seriously jeopardize an ongoing investigation, the Attorney General may provide temporary protection to such person under this chapter before making the written assessment and determination required by subsection (c) of this section or entering into the memorandum of understanding required by subsection (d) of this section. In such a case the Attorney General shall make such assessment and determination and enter into such memorandum of understanding without undue delay after the protection is initiated.

**(f)** The Attorney General may terminate the protection provided under this chapter to any person who substantially breaches the memorandum of understanding entered into between the Attorney General and that person pursuant to subsection (d), or who provides false information concerning the memorandum of understanding or the circumstances pursuant to which the person was provided protection under this chapter, including information with respect to the nature and circumstances concerning child custody and visitation. Before terminating such protection, the Attorney General shall send notice to the person involved of the termination of the protection provided under this chapter and the reasons for the termination. The decision of the Attorney General to terminate such protection shall not be subject to judicial review.

(Added Pub.L. 98–473, Title II, § 1208, Oct. 12, 1984, 98 Stat. 2153, and amended Pub.L. 101–647, Title XXXV, § 3582, Nov. 29, 1990, 104 Stat. 4929; Pub.L. 105–119, Title I, § 115(a)(9), Nov. 26, 1997, 111 Stat. 2467.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1997 Amendments.** Amendment by section 115 of Pub.L. 105–119 to take effect on Nov. 26, 1997, except that States shall have 3 years from Nov. 26, 1997, to implement amendments made by Pub.L. 104–119 which impose new requirements under subchapter VI (section 14071 et seq.) of chapter 136 of Title 42, The Public Health and Welfare, and the Attorney General may grant an additional 2 years to a State that is making good faith efforts to implement these amendments, see section 115(c) of Pub.L. 105–119, set out as a note under section 14071 of Title 42.

**1984 Amendments.** Section 1210 of Pub.L. 98–473 provided that: "This subpart [subpart A of part F of chapter XII of Title II of Pub.L. 98–473, enacting this chapter] and the amendments made by this subpart [repealing provisions formerly set out as a note preceding section 3481 of this title] shall take effect on October 1, 1984."

**Short Title**

**1984 Acts.** Section 1207 of Pub.L. 98–473 provided that: "This subpart [subpart A of part F of chapter XII of Title II of Pub.L. 98–473, enacting this chapter, repealing provisions formerly set out as a note preceding section 3481 of this title, and enacting provisions set out as a note under section] may be cited as the 'Witness Security Reform Act of 1984'."

## § 3522. Probationers and parolees

**(a)** A probation officer may, upon the request of the Attorney General, supervise any person provided protection under this chapter who is on probation or parole under State law, if the State involved consents to such supervision. Any person so supervised shall be under Federal jurisdiction during the period of supervision and shall, during that period be subject to all laws of the United States which pertain to probationers or parolees, as the case may be.

**(b)** The failure by any person provided protection under this chapter who is supervised under subsection (a) to comply with the memorandum of understanding entered into by that person pursuant to section 3521(d) of this title shall be grounds for the revocation of probation or parole, as the case may be.

**(c)** The United States Parole Commission and the Chairman of the Commission shall have the same powers and duties with respect to a probationer or parolee transferred from State supervision pursuant to this section as they have with respect to an offender convicted in a court of the United States and paroled under chapter 311 of this title. The provisions of sections 4201 through 4204, 4205(a), (e), and (h), 4206 through 4215, and 4218 of this title shall apply following a revocation of probation or parole under this section.

**(d)** If a person provided protection under this chapter who is on probation or parole and is supervised under subsection (a) of this section has been ordered by the State court which imposed sentence on the person to pay a sum of money to the victim of the offense involved for damage caused by the offense, that penalty or award of damages may be enforced as though it were a civil judgment rendered by a United States district court. Proceedings to collect the moneys ordered to be paid may be instituted by the Attorney General in any United States district court. Moneys recovered pursuant to such proceedings shall be distributed to the victim.

(Added Pub.L. 98–473, Title II, § 1208, Oct. 12, 1984, 98 Stat. 2157, and amended Pub.L. 99–646, § 75, Nov. 10, 1986, 100 Stat. 3618; Pub.L. 100–690, Title VII, § 7072(b), Nov. 18, 1988, 102 Stat. 4405.)

### HISTORICAL AND STATUTORY NOTES

**References in Text**

Chapter 311 of this title, referred to in subsec. (c), which consisted of 18 U.S.C.A. §§ 4201 to 4218, was repealed effective Nov. 1, 1987, by Pub.L. 98–473, Title II, §§ 218(a)(5), 235(a)(1), (b)(1), Oct. 12, 1984, 98 Stat. 2027, 2031, 2032, subject to remaining effective for five years after Nov. 1, 1987, in certain circumstances.

**Effective and Applicability Provisions**

**1984 Acts.** Section effective on Oct. 1, 1984, see section 1210 of Pub.L. 98–473 set out as a note under section 3521 of this title.

## § 3523. Civil judgments

**(a)** If a person provided protection under this chapter is named as a defendant in a civil cause of action arising prior to or during the period in which the protection is provided, process in the civil proceeding may be served upon that person or an agent designated by that person for that purpose. The Attorney General shall make reasonable efforts to serve a copy of the process upon the person protected at the person's last known address. The Attorney General shall notify the plaintiff in the action whether such process has been served. If a judgment in such action is entered against that person the Attorney General shall determine whether the person has made reasonable efforts to comply with the judgment. The Attorney General shall take appropriate steps to urge the person to comply with the judgment. If the Attorney General determines that the person has not made reasonable efforts to comply with the judgment, the Attorney General may, after considering the danger to the person and upon the request of the person holding the judgment disclose the identity and location of the person to the plaintiff entitled to recovery pursuant to the judgment. Any such disclosure of the identity and location of the person shall be made upon the express condition that further disclosure by the plaintiff of such identity or location may be made only if essential to the plaintiff's efforts to recover under the judgment, and only to such additional persons as is necessary to effect the recovery. Any such disclosure or nondisclosure by the Attorney General shall not subject the United States and its officers or employees to any civil liability.

**(b)(1)** Any person who holds a judgment entered by a Federal or State court in his or her favor against a person provided protection under this chapter may, upon a decision by the Attorney General to deny disclosure of the current identity and location of such protected person, bring an action against the protected person in the United States district court in the district where the person holding the judgment (hereinafter in this subsection referred to as the "petitioner") resides. Such action shall be brought within one hundred and twenty days after the petitioner requested the Attorney General to disclose the identity and location of the protected person. The complaint in such action shall contain statements that the petitioner holds a valid judgment of a Federal or State court against a person provided protection under this chapter and that the petitioner sought to enforce the judgment by requesting the Attorney General to disclose the identity and location of the protected person.

**(2)** The petitioner in an action described in paragraph (1) shall notify the Attorney General of the action at the same time the action is brought. The Attorney General shall appear in the action and shall affirm or deny the statements in the complaint that the person against whom the judgment is allegedly held is provided protection under this chapter and that the petitioner requested the Attorney General to disclose the identity and location of the protected person for the purpose of enforcing the judgment.

**(3)** Upon a determination (A) that the petitioner holds a judgment entered by a Federal or State court and (B) that the Attorney General has declined to disclose to the petitioner the current identity and

# WITNESS SECURITY PROGRAM

---

DECEMBER 14 (legislative day, NOVEMBER 30), 1981.—Ordered to be printed

---

Mr. ROTH, from the Committee on Governmental Affairs,
submitted the following

## REPORT

### I. INTRODUCTION

The Senate Permanent Subcommittee on Investigations held hearings on the Witness Security Program on December 15, 16, and 17, 1980. The hearings were conducted under the authority granted the Senate Governmental Affairs Committee and its Permanent Subcommittee on Investigations by rule XXV of the Standing Rules of the Senate and by Senate Resolution 361, agreed to on March 5, 1980.

The Witness Security Program was created by the Organized Crime Act of 1970. Administered by the Marshals Service with the assistance of the Bureau of Prisons in the Department of Justice, the mission of the Witness Security Program is to protect Government witnesses and their families when there is reason to believe that because of their testimony their lives are in danger. Most of the prosecutions that require that witnesses be protected involve organized crime.

The Witness Security Program, known as WITSEC, provides Government witnesses and their families with a variety of services, including temporary protection, relocation, establishing a new identity, providing documentation to support the new identity and limited financial and employment assistance.

At the time of the hearings, about 3,500 witnesses and about 8,000 of their dependents were participating in the security program.

Senator Sam Nunn of Georgia, who was chairman of the subcommittee at the time of the hearings, commented on the value of the Witnesses Security Program. He said:

> In general, the contributions of these [Government witnesses] to the war on organized crime cannot be overestimated. We can all appreciate this fact when we consider the courage it takes for a victim or a member of organized crime to come forward and testify against the mob. Their lives, and often the lives of their families, instantly become potential targets for reprisals.

## VII. Findings, Conclusions and Recommendations for Corrective Action

### SUMMARY

The subcommittee believes in the value and necessity of the Federal Witness Security Program. In its first 10 years as an established Government program, the witness security effort has proven to be one of law enforcement's most effective tools in the attempt to control and immobilize organized crime groups.

The Witness Security Program has given agents and prosecutors the opportunity to offer a prospective witness against organized crime protection against harm and a reasonable chance to live out the rest of his life secure in the knowledge that his family and he will not suffer retaliation from mobsters.

So essential has the security program become, in fact, that it is difficult to imagine Federal law enforcement without it. That is a high and well deserved compliment to pay a program that is only 10 years old—and a program that is replete with the potential for many problems of great magnitude.

Before passage of the Organized Crime Control Act of 1970 which led to creation of the Witness Security Program, Federal prosecutors were usually frustrated in their ability to win the cooperation of witnesses who believed their testimony would endanger their lives.

Prior to 1970—before there was a witness security program—there was no way to counter an organized gang's ability to intimidate potential witnesses and discourage cooperation. The Government's impotence in this regard was well known in the criminal underworld.

Prosecutors were often left without a response when a prospective witness against organized crime would tell them he might consider testifying except for the fact that if he did he would certainly be killed.

In its relatively short life, the Witness Security Program demonstrated that people, for a variety of reasons, some selfish, some altruistic, will testify against organized crime if they have a reasonable and realistic assurance that they will survive the experience.

The witness program also demonstrated that the Government, if it is imaginative, principled and operating within established, lawful procedures, can persuade organized criminals to testify against each other. As most prosecutors will agree, there is no better witness against organized criminals than the man who is one himself.

Many of the relocated witnesses were either organized crime figures themselves or were in some way associated with organized crime. In relocating these witnesses and their families, the marshals are often dealing with men and women who have never done an honest day's work in their lives.

Many of them were skilled criminals—burglars, embezzlers, arsonists, physical enforcers—accustomed to lucrative financial rewards and

# WITNESS SECURITY PROGRAM

4

# HEARINGS

BEFORE THE

# PERMANENT

# SUBCOMMITTEE ON INVESTIGATIONS

OF THE

# COMMITTEE ON

# GOVERNMENTAL AFFAIRS

# UNITED STATES SENATE

## NINETY-SIXTH CONGRESS

SECOND SESSION

DECEMBER 15, 16, AND 17, 1980

Printed for the use of the Committee on Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE,
WASHINGTON : 1980

74-237 O



121

The establishment of a separate facility or a separate wing of a previously existing facility to be staffed only by correctional officers assigned to that wing I think would solve a great many of the problems.

Chairman NUNN. How about the other problems you mentioned? You mentioned food problems, mail problems—I think we have already gone through the general population problems. I think you also mentioned in your statement education and training, medical access, telephone calls, and visiting problems. Let us start with food problems. Have you got any particular suggestion on that?

Mr. COSTELLO. Senator, with respect to the current food problems, I think that they could easily be solved by simply convincing the inmates through one means or another that in fact the current system is being followed. The current system will work if it is followed and all we have to do is convince those witnesses on the third floor that it is in fact the rule and it is practiced without exception every day.

There is something else I would like to mention and that, I think, is a serious deficiency with respect to incarcerated individuals under the program that currently exists. At least in the metropolitan New York area, there is absolutely no Federal facility for housing women in the witness protection program. As a result, what the marshals and the Bureau of Prison personnel are required to do with respect to a woman who enters the witness protection program, who is incarcerated, is to house those people in State or local facilities and quite frankly, that is a courtesy that has been rendered to us by the State and local jails and something that I do not think we can count on in the future. I think certainly some steps must be taken to provide adequate protected facilities for housing women inmates.

Chairman NUNN. What about the telephone calls? Is there any way to address the problem of lack of security there?

Mr. COSTELLO. Yes, Senator. The main problem that is involved with respect to telephone calls as the system currently operates is that if a protected witness wishes to make a long distance call, he must get in touch with the MCC operator who then puts him in touch with the long distance operator. The MCC operator then, as I understand it, remains on the line until the receiving party accepts the phone call, which necessarily means both the MCC operator and the long distance operator become aware of whom that prisoner witness is calling and what telephone number is being called.

I believe that problem could be rectified rather easily by either one of two methods, either establishing an FTS line with limited access by protected inmates, or by screening and dispatching all telephone calls to long distance areas through the local marshals office. In New York at least, it is particularly convenient since the inspectors with the U.S. Marshals Service are located in the building right next door to the MCC. I do not believe it would be a substantial problem for them to handle such calls.

Chairman NUNN. Do they have any kind of educational training facilities at the MCC?

Mr. COSTELLO. They do but those facilities are limited to the general inmate populace. A constant complaint made of all protected inmate witnesses is that frankly they do what they call harder time. They do harder time in their belief because they are not entitled to the same

122

educational facilities and quite frankly, it is not the fault of the MCC or the Bureau of Prisons with respect to the physical setup that now exists. Simply as a result of the necessary security measures, they cannot possibly be given the benefits, the same kinds of benefits, that are given to other inmates.

I think that is the type of problem that would certainly be solved by a separate facility. In addition to that, there are certain privileges that other inmates would receive, such as furloughs, that necessarily, because of security measures, are out of the question with respect to a protected witness. All of these little items add up to the belief expressed and otherwise by protected inmates that they do harder time in the MCC in New York than do people in general population.

Chairman NUNN. What about the two reasons that I have heard most against a separate facility? No. 1 is cost. Have you done any kind of thinking or analysis on the cost feature?

Mr. COSTELLO. Senator, with respect to the actual cost in terms of dollars, I am certainly not qualified to render an expert opinion with respect to that. But it seems to me that really the important question here is not really a question of dollars. It is the cost of making this program work or not. As it currently exists, at least with respect to the beliefs expressed by the people on the third floor at the MCC, they feel it does not work because they feel they have to do harder time than other inmates do. If we had a separate facility, many, if not all, of the complaints that have constantly come up I think would be solved. The cost in terms of dollars I cannot measure. I simply do not know the answer to that.

But I think that equally important to the actual dollar cost is the cost of effectively and efficiently making this program work and making the inmates and the general population believe and understand that we are making a commitment to make this program work.

Chairman NUNN. Is there any danger of getting all the protected witnesses together in one facility and having someone to go after the whole facility with explosives or anything like that? Is that a reasonable concern?

Mr. COSTELLO. My personal view is that it is not.

Chairman NUNN. Do you feel that prisoner witnesses get adequate credit and parole considerations for their cooperation?

Mr. COSTELLO. Senator, with respect to parole, an interesting and in fact a unique situation faces the protected witness who is an inmate of the Bureau of Prisons. The fact is their cooperation is indeed brought to the attention of the Parole Commission at the time the inmate comes up for his parole hearing, but what is in fact I think curious is that with respect to the parole guidelines the Parole Commission has, what they call a salient factor score. That salient factor score when combined with the severity of the offense committed gives the Parole Commission prospective guidelines during which an inmate should be paroled. It is curious to me that the salient factor score does not include any category for cooperating witnesses who are indeed enrolled in the witness security program. It is strange that with respect to the salient factor score, the higher your score, the better it is for the inmate, in terms of getting out of jail early.

My understanding is, my recollection is, that you receive one point for having committed a crime that did not involve the use of an

230

in a catch-22 situation in a sense—trying to keep them separate from other visitors, yet not wanting them to come at a totally different time which would easily identify them.

Chairman NUNN. Is this problem a correctable problem? Can you do anything about it? Did you furnish alternate visiting rooms, things of that nature?

Mr. CARLSON. At the facility described where we will have the 70-inmate unit, we will have a separate visiting room. I will have to say in all candor that access to the front of the institution is public space. Anyone who wants to take the time can observe who comes into that institution.

Chairman NUNN. There is no way to correct this?

Mr. CARLSON. Not to my knowledge, Mr. Chairman. It would be very difficult.

Chairman NUNN. If you had three separate facilities would this help?

Mr. CARLSON. I believe it would. It would certainly give us greater flexibility; enable us to move the inmates around at various times, and to keep them more mobile than they are at the present time.

Chairman NUNN. How about the Metropolitan Correctional Center?

Is there any way to remodel visiting rooms there to correct this problem?

Mr. CARLSON. To my knowledge, Mr. Chairman, we are locked in architecturally in those facilities. It would be difficult to try to renovate those facilities to make them more adequate.

Chairman NUNN. Prisoner witnesses whom the subcommittee staff interviewed unanimously assert that they have been moved quickly into the general population without any advanced counseling. What is the policy of the Bureau of Prisons about advanced counseling before the move is made to general population?

Mr. CARLSON. It is our policy to provide advanced notice. However, I will admit that we have had some breakdowns in that area. We have looked into it. I assure you that in the future we will do a much better job giving them an opportunity to find out ahead of time where they will be going, and why they will be going to that particular institution.

Chairman NUNN. That kind of psychological, that kind of advanced notice would be psychologically almost essential with someone who has legitimate reasons to fear for their life, would it not?

Mr. CARLSON. It certainly would. I take the responsibility. We have not done a very adequate job in that particular regard.

Chairman NUNN. Have you changed that policy recently or are you in the process of changing it now?

Mr. CARLSON. We are in the process of reinforcing the policy, insuring it is done in all cases.

Chairman NUNN. It is not a matter of lack of policy?

Mr. CARLSON. It has not been followed through in all cases.

Chairman NUNN. Is it true that generally a protected witness does harder time than a nonprisoner witness because of the facility he is housed in, his protection needs, his lack of access to programs and facilities to the regular inmate?

Mr. CARLSON. Unfortunately, Mr. Chairman, it is.

Chairman NUNN. If you got three new facilities that would be comparable to what you are planning in the one case would that ease this problem?

Mr. CARLSON. It would certainly ameliorate the problem. It would not, however, totally eliminate the problem. I think anytime you have a protected witness he or she is obviously very fearful for their own personal safety. I think the units we are discussing and will be developing will certainly ameliorate the problem.

Chairman NUNN. Are there any alternatives—I don't know what facilities are not available to them. I assume there would be things that would relate to the machinery, equipment, things that would be very expensive unless you provided it for very large numbers of people.

That would be what they would be usually precluded from using, wouldn't it?



Mr. CARLSON. That is correct. They would not have access to the broad range of programs that would be available in the general institution. Because of the small number it would simply be cost-prohibitive to install large and very expensive programs for them.

Chairman NUNN. Could you undertake, maybe you already have, a study as to whether there are ways you can compensate for this with other types of facilities that would not be available to the general population? I don't know what that would involve, perhaps instructional films, perhaps other types of learning devices that might be too expensive to furnish to the general population but might be within reason for smaller groups. Could you look at that and undertake a policy in, it seems to me, we need a policy that would basically say if you are a witness, you cooperate with the Government, thereby jeopardizing your life that your treatment in the future is going to be at least comparable and not worse because it looks like we have created an incentive for people not to cooperate.

Mr. CARLSON. I agree fully. I assure you we will look into that possibility.

Chairman NUNN. I don't know what the other options are. We don't want to turn a penitentiary into a luxury living quarters and that kind of thing for people.

I don't think the general public or anyone else would support that. But it does seem the prisoners who cooperate should not be penalized in effect although it is not intentional for their cooperation.

Can you utilize the prison systems of the various States to place the prisoner witness in different locations?

Mr. CARLSON. Yes. We do insofar as we possibly can. As you will note in my statement, I believe we have some 28 protected witnesses now that are scattered throughout the 50 States and various State facilities. This, however, presents a problem to us because, as you well know, most State prisons are tremendously overcrowded today and many of the State systems are simply unable to accommodate additional inmates. We try to work out reciprocal arrangements with the various States whenever we possibly can. We place defendants in a State facility so he is removed from any possible Federal witness he may have testified against.

Chairman NUNN. Prisoner witnesses claim they are subjected to psychological and physical harassment by other prisoners, especially

**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

# STATEMENT OF

## JOHN C. KEENEY
### ACTING ASSISTANT ATTORNEY GENERAL
### CRIMINAL DIVISION

## PATRICK H. NEMOYER
### UNITED STATES ATTORNEY
### FOR THE WESTERN DISTRICT OF NEW YORK

## PETER M. CARLSON
### ASSISTANT DIRECTOR, FEDERAL BUREAU OF PRISONS

## EUGENE L. COON, JR.
### ACTING ASSISTANT DIRECTOR,
### UNITED STATES MARSHALS SERVICE


### U.S. DEPARTMENT OF JUSTICE


### BEFORE THE

### COMMITTEE ON THE JUDICIARY
### OF THE
### UNITED STATES SENATE


### REGARDING THE

### WITNESS SECURITY PROGRAM



### JUNE 18, 1996

based on a court-approved name change which each Program participant must agree to undergo. In most cases, each participant is provided with a basic portfolio of identity papers that might typically include a Social Security card, a driver's license or state identification card, and, if the witness is a United States citizen, proof of citizenship.

One goal of the Program is to assist relocated witnesses in becoming self-sustaining citizens in their new community. The Marshals Service provides witnesses a minimal monthly subsistence, based on cost-of-living indices, for a period of approximately six months. After that, witnesses are expected to obtain full-time employment. In that regard, the Marshals Service will assist the witness in finding employment. The Marshals Service works very closely with a team of vocational psychologists and employment specialists who help determine suitable fields of employment for witnesses. Each witness is given a battery of tests designed to specify and characterize vocational interests. These preferences, together with the witness's actual experience, can help the witness locate suitable employment. Psychologists also provide the Marshals Service with insight about handling specific witness personalities and how to best approach difficult problems.

The Federal Bureau of Prisons is responsible for prisoner witnesses, and has become increasingly more involved in the Witness Security Program as the majority of individuals accepted into the Program in recent years have been witnesses serving sentences. Designation of the institution where the witness will be incarcerated, medical treatment, and most other decisions related to a protected prisoner's incarceration are handled by the Bureau of Prisons. To protect prisoner witnesses from retaliation from within the general prison population – where many of the people against whom they testified or associates of those people may be housed – the Federal Bureau of Prisons has built several Protective Custody Units, which are basically prisons within prisons, so that incarcerated witnesses can be housed with other witnesses. These Units are not big by prison standards and, in fact, because of their small size and limited number of inmates, they are not conducive to many of the same amenities available to the general population in the main prison. Because of security concerns and space limitations, most of the Units have undersized kitchen facilities, recreation yards, and education rooms. In fact, in one Unit, a prisoner's cell had to be converted into a kitchen, while another cell was converted into a dishwashing room. The nature of these Units has resulted in protected witnesses often receiving less in the way of rehabilitation training, recreation, and educational opportunities than do prisoners who are not cooperating with the government. While it is true that the Bureau does its best to accommodate the different needs of these prisoner witnesses, the reality is that their time in custody is more difficult than that for prisoners serving their sentences in the general prison population. Strict rules govern the conduct of prisoners in these Units, and prisoner witnesses are aware that any security breaches, fighting, drug usage, or other serious negative conduct while incarcerated in the Units may result in the prisoner witness being removed from the Unit and/or being dropped from the Program or denied post-release Program services. The necessity for security, as well as the lack of resources, makes it virtually impossible for

protected witnesses' family members to visit prisoners in these Units.

The fact that an individual has been protected while incarcerated is no guarantee that additional Program services will be provided upon release. Should the prisoner witness request protection after his or her sentence has been completed, the witness's original sponsoring prosecutor must submit to the Office of Enforcement Operations an application for additional Program services and the same strict admission criteria are applied as if the witness were applying to the Program for the first time. In addition, the prosecutor must provide the Office of Enforcement Operations with clear evidence that a threat continues to exist to the witness after his or her period of incarceration and that the witness does not pose an unreasonable risk to the new community. The Office of Enforcement Operations also reviews a copy of the prisoner's record of infractions while incarcerated to determine the witness's compliance with Program rules and his or her suitability for any post-release services.

As mentioned earlier, the very nature of the criminal organizations the Department is prosecuting dictates that most of the participants in the Program have been involved in the organization's criminal activities, and approximately 97 percent of those witnesses have a criminal background. It is because these organizations are tight-knit and difficult to infiltrate that law enforcement must rely on insiders to provide the evidence needed for successful prosecution. It is very unusual for an honest, law-abiding citizen to know enough about the crimes committed by these groups to provide the type of detailed testimony necessary to convict members of these criminal organizations.

The fact that most relocated witnesses have criminal backgrounds has always been a cause for concern in the Department. Although we continue to attempt to prevent criminals from capitalizing on the secrecy provided by the Program, we also recognize that inherent in protecting criminal witnesses from retaliation is the chance that a protected witness will commit further crimes. We have thus taken steps to minimize the problem. After the passage of the 1984 Act, we voluntarily began the process of notifying local law enforcement authorities of the presence in their communities of individuals in the Program with a criminal record indicating a history of violence or sexual crimes. We also mandate random drug testing of those witnesses with a history of drug usage. If a relocated witness is on federal probation or parole, and the sentencing judge has ordered that he or she be supervised, arrangements are made for the Federal Correction and Supervision Division of the Administrative Office of the United States Courts to supervise the witness in the new location. All of the rules and regulations used in the supervision of other probationers or parolees apply to the relocated witness, and, if the witness violates probation or parole, the same revocation procedures apply. The only special consideration given to Program participants on probation or parole is the protection of their new identities and their status as relocated witnesses. A protected or former protected witness who commits a new crime after relocation will face the full consequences of his or her action, as would any other

- 9 -